UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 08 CR 10121 GAO |
| v. | VIOLATIONS: |
| ERIC L. LEVINE,<br>J. DANIEL LINDLEY,<br>ERNST APPOLON,<br>ANDRE JUNIOR LAMERIQUE,<br>WIDNER LAMARRE,<br>RALPH APPOLON,<br>DANIEL APPOLON,<br>JERMAINE BLAKE,<br>JEAN NORISCAT,<br>SAMUEL JEAN-LOUIS,<br>and<br>LATOYA HALTIWANGER,<br><br>Defendants. | 18 U.S.C. § 371 (Conspiracy)<br>18 U.S.C. § 1343 (Wire Fraud)<br>18 U.S.C. § 1957 (Money Laundering)<br>18 U.S.C. § 1028A (Aggravated Identity Theft)<br>18 U.S.C. § 2 (Aiding and Abetting)<br>18 U.S.C. § 981 (Civil Forfeiture)<br>18 U.S.C. § 982 (Criminal Forfeiture)<br>28 U.S.C. § 2461 (Forfeiture – Recovery) |

INDICTMENT

The Grand Jury charges that:

THE REAL ESTATE MORTGAGE LENDERS

At all times relevant to this Indictment:

1. Long Beach Mortgage Company (hereinafter "Long Beach Mortgage") was a real estate mortgage lender with a principal place of business at 1400 South Douglas Road, Suite 1000, Anaheim, California.

2. Credit Suisse First Boston (hereinafter "Credit Suisse") was a real estate mortgage lender with a principal place of business at 302 Carnegie Center, Suite 200, Princeton, New Jersey.

3. WMC Mortgage Corp. was a real estate mortgage lender with a principal place of business at 3100 Thornton Avenue, Burbank, California.

4. New Century Mortgage Corporation (hereinafter "New Century Mortgage") was a real estate mortgage lender with a principal place of business at 18400 Von Karman, Suite 1000, Irvine, California.

5. Accredited Home Lenders, Inc. (hereinafter "Accredited Home Lenders") was a real estate mortgage company with a principal place of business at 15253 Avenue of Science, San Diego, California.

6. Aames Home Loan (hereinafter "Aames Home Loan") was a real estate mortgage lender with a principal place of business at 350 S. Grand Avenue, Los Angeles, California. In 2006, Aames Home Loan merged with Accredited Home Lenders.

7. Argent Mortgage Company, LLC (hereinafter "Argent Mortgage") was a real estate mortgage lender with a principal place of business at 1100 Town and Country Road, Suite 1100, Orange, California.

8. Custom Mortgage Solutions, Inc. (hereinafter "Custom Mortgage") was a real estate mortgage lender with a principal place of business at 1000 Vorhees Drive, Vorhees, New Jersey.

9. Mortgage Lenders Network USA, Inc. (hereinafter "Mortgage Lenders Network") was a real estate mortgage lender with a principal place of business at 213 Central Street, Middletown, Connecticut.

10. BNC Mortgage, LLC (hereinafter "BNC Mortgage") was a real estate mortgage lender with a principal place of business at 1901 Main Street, Irvine, California.

THE MORTGAGE BROKERS

At all times relevant to this Indictment:

11. New England Merchants Corp. (hereinafter "New England Merchants") was a real estate mortgage broker with a principal place of business at 1173 Massachusetts Avenue, Arlington Heights, Massachusetts. New England Merchants maintained an office at 48 Wood Avenue, Mattapan, Massachusetts.

12. Premium Capital Funding, LLC doing business as Topdot Mortgage (hereinafter Topdot Mortgage") was a real estate mortgage broker with a principal place of business at 125 Jericho Turnpike, Jericho, New Jersey. Topdot Mortgage also maintained an office at 55 Cambridge Street, Burlington, Massachusetts.

BUSINESS ENTITIES ASSOCIATED WITH THE DEFENDANTS

At all times relevant to this Indictment:

13. Boston Exchange Group, LLC (hereinafter "BEG"), was a Massachusetts domestic limited liability company with offices at 8 Winter Street, Boston, Massachusetts.

14 Closing Tek, LLC (hereinafter "Closing Tek"), was a Massachusetts domestic limited liability company with offices at 8 Winter Street, Boston, Massachusetts.

15. New City Real Estate, LLC (hereinafter "New City"), was a Massachusetts domestic limited liability company with offices at 8 Winter Street, Boston, Massachusetts.

16. Epoch Realty, LLC (hereinafter "Epoch Realty"), was a Massachusetts domestic limited liability company with offices at 48 Wood Avenue, Mattapan, Massachusetts.

17. BESU, LLP (hereinafter "BESU"), was a Massachusetts domestic limited liability partnership with offices at 48 Wood Avenue, Mattapan, Massachusetts.

18. Oligarchy Funding, LLC (hereinafter "Oligarchy Funding"), was a Massachusetts domestic limited liability company with offices at 72 Wood Avenue, Mattapan, Massachusetts.

19. RLP International Organization, LLC (hereinafter "RLP"), was a Massachusetts domestic limited liability company with offices at 72 Wood Avenue, Mattapan, Massachusetts.

20. Alexy Real Estate Trust, (hereinafter "Alexy Realty") was a trust entity with a principal place of business at 8 Winter Street, Boston, Massachusetts.

## THE DEFENDANTS

At all times relevant to this Indictment:

21. Defendant ERIC L. LEVINE (hereinafter "LEVINE") was an attorney whose license to practice law had been suspended by the Massachusetts Supreme Judicial Court on July 17, 2003, and on April 15, 2004. Defendant LEVINE maintained an office at 8 Winter Street, Boston, Massachusetts. Defendant LEVINE was the Registered Agent for BEG, Closing Tek, New City, BESU, Oligarchy, and RLP. Defendant LEVINE operated and controlled bank accounts in the names of BEG, Closing Tek, New City, and Alexy Realty Trust. From time-to-time, defendant LEVINE maintained two accounts in the name of BEG, including an account at Citizens Bank and an account at Bank of America.

22. Defendant J. DANIEL LINDLEY (hereinafter "LINDLEY") was licensed to practice law by the Commonwealth of Massachusetts. Defendant LINDLEY maintained an office at 8 Winter Street, Boston, Massachusetts. Defendant LINDLEY operated and controlled a bank account in the name of J. Daniel Lindley, Attorney at Law, IOLTA Account.

23. Defendant ERNST APPOLON was the principal and manager of Epoch Realty and Oligarchy. Defendant ERNST APPOLON was a loan originator with New England Merchants at the company's office at 48 Wood Avenue, Mattapan, Massachusetts. Defendant ERNST APPOLON operated and controlled checking accounts in the names of Epoch Realty and Oligarchy, and was a co-signor on a checking account in the name of BESU.

24. Defendant ANDRE JUNIOR LAMERIQUE (hereinafter "LAMERIQUE") was a loan originator with New England Merchants at the company's office at 48 Wood Avenue, Mattapan, Massachusetts.

25. Defendant WIDNER LAMARRE, also known as RAHEEM ASH-SHAKUR, (hereinafter "LAMARRE"), was a loan originator with New England Merchants at the company's office at 48 Wood Avenue, Mattapan, Massachusetts. Defendant LAMARRE was a co-signer on the checking account in the name of BESU.

26. Defendant RALPH APPOLON was the principal and manager of RLP. Defendant RALPH APPOLON was a loan originator with New England Merchants at the company's office at 48 Wood Avenue, Mattapan, Massachusetts.

27. Defendant DANIEL APPOLON was an employee with New England Merchants at the company's office at 48 Wood Avenue, Mattapan, Massachusetts.

28. Defendant JERMAINE BLAKE (hereinafter "BLAKE") was a loan originator with New England Merchants at the company's office at 48 Wood Avenue, Mattapan, Massachusetts.

29. Defendant JEAN NORISCAT (hereinafter "NORISCAT") was an individual who lived at Quincy, Massachusetts.

30. Defendant SAMUEL JEAN-LOUIS (hereinafter "JEAN-LOUIS") was a loan originator with New England Merchants at the company's office at 48 Wood Avenue, Mattapan, Massachusetts.

31. Defendant LATOYA HALTIWANGER (hereinafter "HALTIWANGER") was a loan originator with Topdot Mortgage.

OTHER INDIVIDUALS

At all times relevant to this Indictment:

32. Unindicted co-conspirator Elizabeth Son (hereinafter "Son") was an individual who lived in North Andover, Massachusetts.

33. The individuals identified herein as V.C., B.O., R.R., P.R., K.R., C.O., Z.N., T.C., N.G., J.O., I.O., A.A., M.S., R.Ro., B.L., R.I., N.McC., E.G., A.C., S.P., F.P., and H.G. were persons known to the Grand Jury.

**COUNT ONE**
**(Conspiracy – 18 U.S.C. § 371)**

34. The Grand Jury realleges and incorporates by reference paragraphs 1 through 33 of this Indictment, and further charges that:

35. From in or about May 2005, to in or about December 2006, at Dorchester, Jamaica Plain, Hyde Park, Mattapan, Cohasset, Quincy, Brockton, South Boston and Boston in the District of Massachusetts and elsewhere,

**ERIC L. LEVINE,**
**J. DANIEL LINDLEY,**
**ERNST APPOLON,**
**ANDRE JUNIOR LAMERIQUE,**
**WIDNER LAMARRE,**
**RALPH APPOLON,**
**DANIEL APPOLON,**
**JERMAINE BLAKE,**
**JEAN NORISCAT,**
**SAMUEL JEAN-LOUIS,**
**and**
**LATOYA HALTIWANGER,**

defendants herein, together with unindicted co-conspirator Son and others known and unknown to the Grand Jury, conspired with each other to commit offenses against the United States, to wit:

> Having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of 18 U.S.C. § 1343 (Wire Fraud);

**THE PURPOSE OF THE CONSPIRACY**

36. The purpose of the conspiracy was that the defendants would and did unlawfully enrich themselves by:

A. Fraudulently acquiring and obtaining control over the ownership and title to real estate properties;

B. Fraudulently financing the sale of real estate properties held in the names of defendants;

C. Fraudulently obtaining mortgage loans in the names of others;

D. Fraudulently obtaining mortgage loans in excess of the sales prices of properties;

E. Fraudulently obtaining income, including mortgage broker fees, attorney fees, real estate commissions and other income associated with the sale, purchase and financing of properties;

F. Fraudulently obtaining other monetary benefits, including insurance proceeds, from control over the ownership of properties.

**THE MANNER AND MEANS OF THE CONSPIRACY**

37. To carry out the conspiracy, the conspirators, defendants herein, together with unindicted co-conspirator Son and others known and unknown to the Grand Jury, would and did employ a variety of means to fraudulently obtain money and property from real estate mortgage lenders involving the fraudulent financing of real estate properties owned and controlled by defendants, and the fraudulent financing of real estate properties acquired from third party sellers.

38. It was part of the manner and means of the conspiracy that the conspirators, defendants herein, together with others known and unknown to the Grand Jury, would and did:

A. Identify real estate properties for sale by defendants; and

B. Identify real estate properties for sale from third parties; and

C. Negotiate with third party sellers for the purchase of properties; and

D. Recruit and induce other persons to act as nominal or "straw" borrowers for the purchase of properties; and

E. Purchase and finance real estate in the names of others; and

F. Create fraudulent documents which inflated purchase prices of properties in order to obtain real estate loans; and

G. Cause real estate mortgage loan applications to be submitted which materially misrepresented the purchase prices of properties; and

H. Cause real estate mortgage loan applications to be submitted which materially misrepresented the identity, employment, and income of purported borrowers; and

I. Use false and fraudulent representations to obtain real estate mortgage loans in excess of actual purchase prices of properties; and

J. Obtain fees and commissions in connection with fraudulent real estate transactions; and

K. Obtain funds by use of checks purportedly payable to sellers, "straw" borrowers, and others, but which in fact were deposited into accounts controlled by the defendants; and

L. Share in the proceeds from fraudulent real estate mortgage loans.

39. It was further a part of the manner and means of the conspiracy that the conspirators, defendants herein, together with unindicted co-conspirator Son and others known and unknown to the Grand Jury, would and did make and cause material false and fraudulent representations and promises to be made to real estate mortgage lenders regarding:

A. True purchase prices of properties securing mortgage loans; and

B. True identities of purchasers obtaining mortgage loans; and

C. Purported borrowers' employment, creditworthiness, and ability to repay mortgage loans; and

D. Purported borrowers' intent to occupy properties securing mortgage loans and intent to personally repay mortgage loans; and

E. Disposition of proceeds from mortgage loans.

40. It was further a part of the manner and means of the conspiracy that the conspirators, defendants herein, together with unindicted co-conspirator Son and others known and unknown to the Grand Jury, would and did fraudulently obtain mortgage loan proceeds aggregating $10,617,276.34, more or less, from Long Beach Mortgage, Credit Suisse First Boston, WMC Mortgage, New Century Mortgage, Accredited Home Lenders, Aames Home Loan, Argent Mortgage, Custom Mortgage, Mortgage Lenders Network and BNC Mortgage (hereinafter collectively, "the mortgage lenders").

## OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

41. In furtherance of the conspiracy, in the District of Massachusetts, and elsewhere, the conspirators, defendants herein, committed numerous overt acts in connection with at least 21 real estate property transactions:

## 586 EAST 3rd STREET, SOUTH BOSTON

42 From in or about May 2005, to on or about June 28, 2005, defendants LEVINE, LINDLEY, and RALPH APPOLON committed overt acts in connection with real property at 586 East 3rd Street, South Boston, Massachusetts (the "East 3rd Street Property"), including:

A. In or about May 2005, defendant RALPH APPOLON recruited V.C., his mother-in-law, to act as a nominal or "straw" borrower to purchase the East 3rd Street Property for $420,000.

B. In or about May 2005, defendant RALPH APPOLON caused a Purchase and Sale Agreement to be produced and transmitted by telefax to Long Beach Mortgage representing that V.C. intended to purchase the East 3rd Street Property for $500,000.

C. In or about May 2005, defendant RALPH APPOLON caused two mortgage loan applications to be submitted by telefax to Long Beach Mortgage in the name of V.C. The loan applications contained material false representations, including: that V.C. was purchasing the East 3rd Street Property for $500,000; that V.C. was employed by National Lending Corp.; and that V.C. intended to occupy the East 3rd Street Property as her primary residence. The loan applications also contained material false representations regarding V.C.'s income.

D. On or about June 21, 2005, defendant RALPH APPOLON caused Long Beach Mortgage to approve first and second mortgages in the amounts of $400,000 and $100,000, respectively, for a total loan amount of $500,000.

E. On or about June 21, 2005, defendants LEVINE, LINDLEY, and RALPH APPOLON caused Long Beach Mortgage to transfer by wire the amounts of $403,307.00 and $99,397.40, totaling $502,704.40, to the bank account of defendant LINDLEY.

F. On or about June 21, 2005, defendants LEVINE and LINDLEY caused two different HUD-1 settlement statements to be prepared for the East 3rd Street Property, one listing a purchase price of $420,000 and the other listing a purchase price of $500,000.

G. On or about June 21, 2005, defendant LINDLEY caused loan closing documents to be submitted to Long Beach Mortgage, including the HUD-1 settlement statement representing that the purchase price was $500,000.

H. From on or about June 22, 2005, to on or about June 28, 2005, various funds, including proceeds from the purchase and sale of the East 3rd Street Property, were disbursed by check and by wire among conspirators and others, including defendants LEVINE, LINDLEY, and RALPH APPOLON.

**5 COLEMAN STREET, DORCHESTER**

43. From in or about July 2005, to on or about June 16, 2006, defendants LEVINE, LINDLEY, ERNST APPOLON, and LAMERIQUE committed overt acts in connection with real property at 5 Coleman Street, Dorchester, Massachusetts (the "Coleman Street Property"), including:

A. In or about July 2005, defendant ERNST APPOLON identified the Coleman Street Property and participated in a negotiation with the seller for a purchase price of $450,000.

B. In or about July 2005, defendant LAMERIQUE recruited R.R. to act as a nominal or "straw" borrower to purchase the Coleman Street Property.

C. In or about July 2005, defendants ERNST APPOLON and LAMERIQUE caused a Purchase and Sale Agreement to be executed in the name of the seller representing that R.R. intended to purchase the Coleman Street Property for $450,000.

D. In or about July 2005, defendants ERNST APPOLON and LAMERIQUE caused two mortgage loan applications to be submitted by telefax to Credit Suisse which listed R.R. as the buyer of the Coleman Street Property. The loan applications contained material false representations, including: that R.R. was purchasing the Coleman Street Property for $540,000; that R.R. intended to occupy the Coleman Street Property as her primary residence; that R.R. was employed by RLP; and that R.R. was currently a resident of Mattapan, MA when in fact she was a resident of Florida. The loan applications also contained material false representations regarding R.R.'s income.

E. On or about August 22, 2005, defendants ERNST APPOLON and LAMERIQUE caused Credit Suisse to approve first and second mortgages in the amounts of $432,000 and $108,000, respectively, for a total loan amount of $540,000.

F. On or about August 22, 2005, defendants LEVINE, LINDLEY, ERNST APPOLON, and LAMERIQUE caused Credit Suisse to transfer by wire the amounts of $439,152.50 and $102,385.25, totaling $541,537.75, to the bank account of defendant LINDLEY.

G. On or about August 22, 2005, defendants LEVINE and LINDLEY caused two different HUD-1 settlement statements to be prepared for the Coleman Street Property, one listing a purchase price of $450,000, and the other listing a purchase price of $540,000.

H. On or about August 22, 2005, defendant LINDLEY caused loan closing documents to be submitted to Credit Suisse, including the HUD-1 settlement statement representing that the purchase price was $540,000.

I. From on or about August 22, 2005, to on or about August 23, 2005, various funds, including proceeds from the purchase and sale of the Coleman Street Property, were disbursed by check and by wire among conspirators and others, including defendants LEVINE, LINDLEY, ERNST APPOLON, and LAMERIQUE.

J. On or about October 1, 2005, the property fraudulently obtained and financed by defendants LEVINE, LINDLEY, ERNST APPOLON, and LAMERIQUE in the name of R.R. was damaged by fire.

K. On or about March 31, 2006, the mortgage fraudulently obtained by defendants LEVINE, LINDLEY, ERNST APPOLON, and LAMERIQUE in the name of R.R. was held by American Servicing Company located at 405 Southwest 5th Street, Des Moines, IA, 50309.

L. On or about May 17, 2006, defendants LEVINE and LAMERIQUE caused a bank account at Bank of America to be created under the name American Servicing Financial, with an address of 21 Mascot Street, Dorchester, MA.

M. On or about June 7, 2006, defendants LEVINE and LAMERIQUE obtained a fire insurance payment check in the amount of $266,826.85 payable to American Servicing Company, which check they deposited into the account they created under the name American Serving Financial.

N. From on or about June 14, 2006, to on or about June 16, 2006, various funds, including proceeds from the fire insurance check payable to American Servicing Company, were disbursed by check and by wire among conspirators and others, including defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, and LAMARRE.

## 3231 WASHINGTON STREET, JAMAICA PLAIN

44. From in or about August 2005, to on or about September 21, 2005, defendants LEVINE, LINDLEY, ERNST APPOLON, and RALPH APPOLON committed overt acts in connection with real property at 3231 Washington Street, Jamaica Plain, Massachusetts, (the "Washington Street Property") including:

A. In or about August 2005, defendants ERNST APPOLON and RALPH APPOLON recruited P.R. to act as a nominal or "straw" borrower to purchase the Washington Street Property.

B. In or about August 2005, defendant ERNST APPOLON participated with P.R. in identifying the Washington Street Property and negotiating a purchase price of $450,000 with the seller.

C. On or about August 7, 2005, defendant ERNST APPOLON caused a Purchase and Sale Agreement to be prepared and executed by P.R. representing that P.R. intended to purchase the Washington Street Property for $520,000.

D. On or about September 16, 2005, defendant RALPH APPOLON caused two mortgage loan applications to be submitted by telefax to WMC Mortgage. The loan applications contained material false representations, including: that P.R. was purchasing the Washington Street Property for $520,000. The loan applications also contained material false representations regarding P.R.'s income.

E. On or about September 16, 2005, defendant RALPH APPOLON caused WMC Mortgage to approve first and second mortgages in the amounts of $416,000 and $104,000 respectively, for a total loan amount of $520,000.

F. On or about September 16, 2005, defendants LEVINE, LINDLEY, ERNST APPOLON, and RALPH APPOLON caused WMC Mortgage to transfer by wire the amounts of $422,346.71 and $103,037.55, totaling $525,384.26 to the bank account of defendant LINDLEY.

G. On or about September 16, 2005, defendants LEVINE and LINDLEY caused two different HUD-1 settlement statements to be prepared for the Washington Street Property, one listing a purchase price of $450,000 and the other listing the purchase price of $520,000.

H. On or about September 16, 2005, defendant LINDLEY caused loan closing documents to be submitted to WMC Mortgage, including the HUD-1 settlement statement representing that the purchase price was $520,000.

I. From on or about September16, 2005, to on or about September 21, 2005, various funds, including proceeds from the purchase and sale of the Washington Street Property, were disbursed by check and by wire among conspirators and others, including defendants LEVINE, LINDLEY, ERNST APPOLON and LAMARRE.

**602 SOUTH STREET, QUINCY**

45. From in or about October 2005, to on or about November 21, 2005, defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, and LAMARRE committed overt acts in connection with real property at 602 South Street, Quincy, Massachusetts (the "602 South Street Property"), including:

A. In or about October 2005, defendant ERNST APPOLON identified the 602 South Street Property and participated in negotiating with the seller for a sale of the property.

B. In or about October 2005, defendant LAMERIQUE recruited K.R. to act as a nominal or "straw" borrower to purchase the 602 South Street Property.

C. On or about November 16, 2005, defendant ERNST APPOLON caused a Purchase and Sale Agreement to be prepared and executed representing that K.R. intended to purchase the 602 South Street Property for $450,000.

D. On or about November 21, 2006, defendant LAMARRE caused two mortgage loan applications to be submitted by telefax to New Century Mortgage in the name of K.R. The loan applications contained material false representations, including: that K.R. was purchasing the 602 South Street Property for $450,000; that K.R. was employed by Oligarchy Funding and Professional Image; and that K.R. intended to occupy the 602 South Street Property as her primary residence. The loan applications also contained material false representations regarding K.R.'s income.

E. On or about November 21, 2005, defendant LAMARRE caused New Century Mortgage to approve first and second mortgages in the amounts of $360,000 and $90,000 respectively, for a total loan amount of $450,000.

F. On or about November 21, 2005, defendants LEVINE, LINDLEY, ERNEST APPOLON, LAMERIQUE, and LAMARRE caused New Century Mortgage to transfer by wire the amounts of $358,334.50 and $89,417.60, totaling $447,752.10, to the bank account of defendant LINDLEY.

G. On or about November 21, 2005, defendants LEVINE and LINDLEY caused two different HUD-1 settlement statements to be prepared for the 602 South Street Property, one listing a purchase price of $400,000 and the other listing a purchase price of $450,000.

H. On or about November 21, 2005, defendant LINDLEY caused loan closing documents to be submitted to New Century Mortgage, including the HUD-1 settlement statement representing that the purchase price was $450,000.

I. On or about November 21, 2005, various funds, including proceeds from the purchase and sale of the 602 South Street Property, were disbursed by check and by wire among conspirators and others, including defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, and LAMARRE.

**21 MASCOT STREET, DORCHESTER – SON PURCHASE**

46. From in or about November 2005, to on or about December 15, 2005, defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, LAMARRE, NORISCAT, and unindicted co-conspirator Son committed overt acts in connection with real property at 21 Mascot Street, Dorchester, Massachusetts (the "Mascot Street Property"), including:

A. In or about September 2005, defendants LAMERIQUE and NORISCAT recruited unindicted co-conspirator Son to act as a nominal or "straw" borrower to purchase property.

B. In or about November 2005, defendant ERNST APPOLON identified the Mascot Street Property and participated in a negotiation with the seller for a purchase price of $430,000.

C. On or about November 25, 2005, defendant ERNST APPOLON and unindicted co-conspirator Son caused a Purchase and Sale Agreement to be prepared and executed by unindicted co-conspirator Son and the seller representing that unindicted co-conspirator Son intended to purchase the Mascot Street Property for $430,000.

D. In or about November 2005, defendant LAMARRE and unindicted co-conspirator Son caused two mortgage loan applications to be submitted by telefax to Aames Home Loan in the name of unindicted co-conspirator Son. The loan applications contained material false representations, including: that unindicted co-conspirator Son was purchasing the Mascot Street Property for $520,000; that unindicted co-conspirator Son was employed by Oligarchy Funding and Professional

Image; and that unindicted co-conspirator Son intended to occupy the Mascot Street Property as her primary residence. The loan applications also contained material false representations regarding unindicted co-conspirator Son's income.

E. On or about December 6, 2005, defendant LAMARRE and unindicted co-conspirator Son caused Aames Home Loan to approve first and second mortgages in the amounts of $416,000 and $104,000, respectively, for a total loan amount of $520,000.

F. On or about December 6, 2005, defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, LAMARRE, NORISCAT, and unindicted co-conspirator Son caused Aames Home Loan to transfer by wire the amounts of $419,862.07 and $104,053.18, totaling $523,915.25, to the bank account of defendant LINDLEY.

G. On or about December 6, 2005, defendants LEVINE, LINDLEY, and unindicted co-conspirator Son caused two different HUD-1 settlement statements to be prepared for the Mascot Street Property, one listing a purchase price of $430,000 and the other listing a purchase price of $520,000.

H. On or about December 6, 2005, defendant LINDLEY caused loan closing documents to be submitted to Aames Home Loan including the HUD-1 Settlement Statement representing that the purchase price was $520,000.

I. From on or about December 6, 2005, to on or about December 15, 2005, various funds, including proceeds from the purchase and sale of the Mascot Street Property, were disbursed by check and by wire among conspirators and others, including defendants LEVINE, LINDLEY, ERNST APPOLON, LAMARRE, BLAKE, NORISCAT, and unindicted co-conspirator Son.

**67 MILTON AVENUE, DORCHESTER**

47. From in or about October 2005, to on or about December 12, 2005, defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, LAMARRE, NORISCAT, and unindicted co-conspirator Son committed overt acts in connection with real property at 67 Milton Avenue, Dorchester, Massachusetts (the "Milton Avenue Property"), including:

A. In or about September 2005, defendants LAMERIQUE and NORISCAT recruited unindicted co-conspirator Son to act as a nominal or "straw" borrower to purchase properties.

B. In or about October 2005, defendant ERNST APPOLON identified the Milton Avenue Property and participated in a negotiation with the seller for a purchase price of $419,000.

C. On or about October 21, 2005, defendant ERNST APPOLON and unindicted co-conspirator Son caused a Purchase and Sale Agreement to be prepared and executed by unindicted co-conspirator Son and the sellers representing that unindicted co-conspirator Son intended to purchase the Milton Avenue Property for $419,000.

D. On or about December 9, 2005 defendants LAMERIQUE, LAMARRE, and unindicted co-conspirator Son caused two mortgage loan applications to be submitted by telefax to Custom Mortgage Solutions in the name of unindicted co-conspirator Son. The loan applications contained material false representations, including: that unindicted co-conspirator Son was purchasing the Milton Avenue Property for $520,000; that unindicted co-conspirator Son was employed by Oligarchy Funding and Professional Image; and that unindicted co-conspirator Son intended to occupy the Milton Avenue Property as her primary residence. The loan application also contained material false representations regarding unindicted co-conspirator Son's income.

E. On or about December 12, 2005, defendants LAMERIQUE, LAMARRE, and unindicted co-conspirator Son caused Custom Mortgage Solutions to approve first and second mortgages in the amounts of $416,000 and $104,000, respectively, for a total loan amount of $520,000.

F. On or about December 12, 2005, defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, LAMARRE, NORISCAT, and unindicted co-conspirator Son caused Custom Mortgage Solutions to transfer by wire the amounts of $407,680 and $101,920, totaling $509,600 to the bank account of defendant LINDLEY.

G. On or about December 12, 2005, defendants LEVINE, LINDLEY, and unindicted co-conspirator Son caused two different HUD-1 settlement statements to be prepared for the Milton Avenue Property, both of which listed a purchase price of $520,000, but one of which listed cash paid to the seller as $185,363.58, while the other listed cash paid to the seller of $84,824.14 and a "gift in equity" of $100,539.44.

H. On or about December 12, 2005, defendant LINDLEY caused loan closing documents to be submitted to Custom Mortgage Solutions, including the HUD-1 settlement statement representing that the purchase price was $520,000, cash paid to the seller was $185,363.58, and no "gift in equity."

I. From on or about December 12, 2005, to on or about December 15, 2005, various funds, including proceeds from the purchase and sale of the Milton Avenue Property, were disbursed by check and by wire among conspirators and others, including defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, LAMARRE, BLAKE, and unindicted co-conspirator Son.

**19-21 VERA STREET, DORCHESTER**

48. From in or about November 2005, to on or about December 21, 2005, defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, LAMARRE, and JEAN-LOUIS committed overt acts in connection with real property at 19-21 Vera Street, Dorchester, Massachusetts (the "Vera Street Property"), including:

A. On or about November 23, 2005, defendants ERNST APPOLON and LAMERIQUE caused a Purchase and Sale Agreement to be executed by one of the sellers representing that N. G. intended to purchase the Vera Street Property for $470,000.

B. In or about December 12, 2005, defendants LAMARRE and JEAN-LOUIS caused two mortgage loan applications to be submitted by telefax to Aames Home Loan in the name of N.G. The loan applications contained material false representations, including: that N.G. was purchasing the Vera Street Property for $510,000; and that N.G. was employed by Boston Home Health Care Service. The loan applications also contained material false representations regarding N.G.'s income.

C. On or about December 15, 2005, defendants LAMARRE and JEAN-LOUIS caused Aames Home Loan to approve first and second mortgages in the amounts of $408,000 and $102,000 respectively, for a total loan amount of $510,000.

D. On or about December 16, 2005, defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, LAMARRE, and JEAN-LOUIS caused Aames Home Loan to transfer by wire the amounts of $406,009.77 and $101,415.93, totaling $507,425.70, to the bank account of defendant LINDLEY.

E. On or about December 16, 2005, defendants LEVINE and LINDLEY caused two different HUD-1 settlement statements to be prepared for the Vera Street Property, one listing a purchase price of $470,000 and the other listing a purchase price of $510,000.

F. On or about December 16, 2005, defendant LINDLEY caused loan closing documents to be submitted to Aames Home Loan, including the HUD-1 settlement statement representing that the purchase price was $510,000.

G. From on or about December 19, 2005, to on or about December 21, 2005, various funds, including proceeds from the purchase and sale of the Vera Street Property, were disbursed by check and by wire among conspirators and others, including defendants LEVINE, LINDLEY, ERNST APPOLON, and LAMARRE.

**<u>48 WOOD AVENUE, MATTAPAN</u>**

49. From in or about November 2005, to on or about January 4, 2006, defendants LEVINE, LINDLEY, LAMARRE, and DANIEL APPOLON committed overt acts in connection with real property at 48 Wood Avenue, Mattapan, Massachusetts (the "48 Wood Avenue Property"), including:

A. In or about November 2005, defendant DANIEL APPOLON recruited A.A. to act as a nominal or "straw" borrower to purchase the 48 Wood Avenue Property.

B. On or about November 29, 2005, defendant LAMARRE caused two mortgage loan applications to be submitted by telefax to WMC Mortgage in the name of A.A. The loan applications contained material false representations, including: that A.A. was purchasing the 48 Wood Avenue Property; that A.A. was employed by Boston Home Health Care and Professional

Image; and that A.A. intended to use the 48 Wood Avenue Property as her primary residence. The loan applications also contained material false representations regarding A.A.'s income.

C. On or about December 30, 2005, defendant LAMARRE caused WMC Mortgage to approve first and second mortgages in the amounts of $280,000 and $70,000 respectively, for a total loan amount of $350,000.

D. In or about December 30, 2005, defendants LEVINE, LINDLEY, LAMARRE, and DANIEL APPOLON caused WMC Mortgage to transfer by wire the amounts of $279,273.58 and $69,508.77, totaling $348,782.35, to the bank account of defendant LINDLEY.

E. On or about December 30, 2005, defendants LEVINE and LINDLEY caused a HUD-1 settlement statement to be prepared for the 48 Wood Avenue Property, which listed a purchase price of $350,000.

F. On or about December 30, 2005, defendant LINDLEY caused loan closing documents to be submitted to WMC Mortgage, including the HUD-1 settlement statement representing that the purchase price was $350,000.

G. From on or about January 3, 2006, to on or about January 4, 2006, various funds, including proceeds from the purchase and sale of the 48 Wood Avenue Property, were disbursed by check and by wire among conspirators and others, including defendants LEVINE, LINDLEY, LAMARRE, and DANIEL APPOLON.

**60 THETFORD AVENUE, DORCHESTER**

50. From in or about October 2005, to on or about January 20, 2006, defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, LAMARRE, and DANIEL APPOLON

committed overt acts in connection with real property at 60 Thetford Avenue, Dorchester, Massachusetts (the "60 Thetford Avenue Property"), including:

A. In or about October 2005, defendant ERNST APPOLON identified the 60 Thetford Avenue Property and participated in a negotiation with the seller for a purchase price of $389,000.

B. In or about November 2005, defendant DANIEL APPOLON recruited A.A. to act as the nominal or "straw" purchaser of the 60 Thetford Avenue Property.

C. On or about January 18, 2006, defendants LAMERIQUE and LAMARRE submitted to New Century Mortgage two mortgage loan applications in the name of A.A. The loan applications contained material false representations, including: that A.A. was purchasing the 60 Thetford Avenue Property for $490,000; that A.A. was employed by RLP and Boston Home Health Care Services Incorporated; and that A.A. intended to occupy the residence as her primary residence. The loan application also contained material false representations regarding A.A.'s income.

D. On or about January 19, 2006, defendants LAMERIQUE and LAMARRE caused New Century Mortgage to approve first and second mortgages in the amounts of $392,000 and $98,000 respectively, for a total of $490,000.

E. On or about January 19, 2006, defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, LAMARRE, and DANIEL APPOLON caused New Century Mortgage to transfer by wire $389,423.63 and $97,261.70, totaling $486,685.33, to the bank account of defendant LINDLEY.

F. On or about January 19, 2006, defendants LEVINE and LINDLEY caused two different HUD-1 settlement statements to be prepared for the 60 Thetford Avenue Property, one listing a purchase price of $389,000 and the other listing a purchase price of $490,000.

G. On or about January 19, 2006, defendant LINDLEY caused loan closing documents to be submitted to New Century Mortgage, including the HUD-1 settlement statement representing that the purchase price was $490,000.

H. From on or about January 18, 2006, to on or about January 20, 2006, various funds, including proceeds from the purchase and sale of the 60 Thetford Avenue Property, were disbursed by check and by wire among conspirators and others, including defendants LEVINE, LINDLEY, ERNST APPOLON, and LAMARRE.

**22 ESTRELLA STREET NO. 1, JAMAICA PLAIN**

51. From on or about March 22, 2005, to on or about February 3, 2006, defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, LAMARRE, BLAKE and unindicted co-conspirator Son committed overt acts in connection with real property at 22 Estrella Street No. 1, Jamaica Plain, Massachusetts ("Estrella Unit 1"), including:

A. In or about December 2005, defendant LEVINE identified Estrella Unit 1, which was one of two condominium units that had been designated within a two-family residence owned by defendant LEVINE.

B. In or about January 2006, unindicted co-conspirator Son induced R.Ro. to act as a nominal or "straw" borrower to purchase Estrella Unit 1.

C. On or about January 23, 2006, defendants LEVINE and ERNST APPOLON caused a Purchase and Sale Agreement regarding Estrella Unit 1 to be executed in the name of R.Ro. for a purchase price of $450,000.

D. On or about January 31, 2006, defendants LAMERIQUE, LAMARRE, and BLAKE caused two mortgage loan applications to be submitted by telefax to New Century Mortgage in the

name of R.Ro. The loan applications contained material false representations, including: that R.Ro. was purchasing Estrella Unit 1 for $450,000; that R.Ro. was employed by RPL International and Boston Home Health Care; and that R.Ro. intended to occupy Estrella Unit 1 as her primary residence. The loan application also contained material false representations regarding R.Ro.'s income.

E. On or about January 31, 2006, defendants LAMERIQUE, LAMARRE, and BLAKE caused New Century Mortgage to approve first and second mortgages in the amounts of $360,000 and $90,000, respectively, for a loan total amount of $450,000.

F. On or about January 31, 2006, defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, LAMARRE, BLAKE and unindicted co-conspirator Son caused New Century Mortgage to transfer by wire the amounts of $355,336.60 and $89,674.92, totaling $445,011.52, to the bank account of defendant LINDLEY.

G. On or about January 31, 2006, defendants LEVINE and LINDLEY caused a HUD-1 settlement statement to be prepared for Estrella Unit 1, which listed the purchase price as $450,000.

H. On or about January 31, 2006, defendant LINDLEY caused loan closing documents to be submitted to New Century Mortgage, including the HUD-1 settlement statement representing that the purchase price was $450,000.

I. From on or about January 31, 2006, to on or about February 2, 2006, various funds, including proceeds from the purchase and sale of Estrella Unit 1, were disbursed by check and by wire among conspirators and others, including defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, LAMARRE, and BLAKE.

**22 ESTRELLA STREET NO. 2, JAMAICA PLAIN**

52. From on or about March 22, 2005, to on or about February 7, 2006, defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, BLAKE, NORISCAT, JEAN-LOUIS, and unindicted co-conspirator Son committed overt acts in connection with real property at 22 Estrella Street No. 2, Jamaica Plain, Massachusetts ("Estrella Unit 2"), including:

A. In or about December 2005, defendant LEVINE identified Estrella Unit 2, which was one of two condominium units that had been designated within a two-family residence owned by defendant LEVINE.

B. In or about January 2006, unindicted co-conspirator Son induced R.Ro. to act as a nominal or "straw" borrower to purchase Estrella Unit 2.

C. In or about January 2006, defendants ERNST APPOLON, LAMERIQUE, and NORISCAT recruited B.L. to act as a nominal or "straw" buyer to purchase Estrella Unit 2.

D. On or about February 1, 2006, defendants LEVINE and ERNST APPOLON caused a Purchase and Sale Agreement regarding Estrella Unit 2 to be prepared and executed representing that R.Ro. and B.L. intended to purchase the property for $530,000.

E. On or about February 24, 2006, defendants BLAKE and JEAN-LOUIS caused two mortgage loan applications which listed R.Ro. as the co-buyer of the property to be submitted by telefax to Custom Mortgage. The loan applications contained material false representations, including: that R.Ro. was purchasing Estrella Unit 2 for $530,000; that R.Ro. was employed by RLP International and Boston Home Health Care Services; and that R.Ro. intended to occupy Estrella Unit 2 as her primary residence. The loan application also contained false representations regarding R.Ro.'s income.

F. On or about February 24, 2006, defendants BLAKE and JEAN-LOUIS caused two mortgage loan applications which listed B.L. as the co-buyer of Estrella Unit 2 to be submitted by telefax to Custom Mortgage. The loan applications contained material false representations, including: that B.L. was purchasing Estrella Unit 2 for $530,000; that B.L. was employed by RLP International and Premium Care; and that B.L. intended to occupy Estrella Unit 2 as her primary residence. The loan application also contained false representations regarding B.L.'s income.

G. On or about February 24, 2006, defendants BLAKE and JEAN-LOUIS caused Custom Mortgage to approve first and second mortgages in the amounts of $424,000 and $106,000, respectively, for a total loan amount of $530,000.

H. On or about February 27, 2006, defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, BLAKE, NORISCAT, and JEAN-LOUIS caused Custom Mortgage to transfer by wire the amounts of $415,520.00, $103,880.00, and $8,497.35, totaling $527,897.35, to the bank account of defendant LINDLEY.

I. On or about February 24, 2006, defendants LEVINE and LINDLEY caused a HUD-1 settlement statement to be prepared for Estrella Unit 2, which listed the purchase price as $530,000.

J. On or about February 24, 2006, defendant LINDLEY caused loan closing documents to be submitted to Custom Mortgage, including the HUD-1 settlement statement representing that the purchase price was $530,000.

K. From on or about February 27, 2006, to on or about March 6, 2006, various funds, including proceeds from the purchase and sale of Estrella Unit 2, were disbursed by check and by wire among conspirators and others, including defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, LAMARRE, BLAKE, and JEAN-LOUIS.

## 179 HULL STREET, COHASSET

53. From on or about February 1, 2006, to on or about March 14, 2006, defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, LAMARRE, BLAKE, and JEAN-LOUIS committed overt acts in connection with real property at 179 Hull Street, Cohasset, Massachusetts (the "Hull Street Property"), including:

A. In or about January 2006, defendant ERNST APPOLON identified the Hull Street Property and participated in a negotiation with the seller for a purchase price of $385,000.

B. On or about January 25, 2006, defendants LAMERIQUE and JEAN-LOUIS recruited R.I. to act as a nominal or "straw" borrower to purchase the Hull Street Property.

C. On or about January 25, 2006, defendant ERNST APPOLON caused a Purchase and Sale Agreement to be executed by the seller for the purchase price of $385,000. The Purchase and Sale Agreement represented that the buyer was R.I.

D. On or about March 10, 2006, defendant LEVINE caused a HUD-1 settlement statement to be prepared and executed by the seller which listed the buyer as R.I., Trustee, the purchase price as $385,000, and cash to the seller as $353,346.84.

E. On or about March 10, 2006, defendant LEVINE caused the seller to prepare and notarize a deed representing the seller had sold the Hull Street Property to R.I., Trustee of The 179 Hull St Trust for $385,000.

F. On or about March 10, 2006, defendants LEVINE and ERNST APPOLON caused a Declaration of Trust to be prepared and executed establishing The 179 Hull Street Trust and naming N.McC. as sole trustee. Defendant LEVINE further notarized said Trust and recorded the same at the Norfolk County Registry of Deeds.

G. On or about March 10, 2006, defendant LEVINE altered the deed, which had been prepared and notarized by the seller, to represent that the buyer was not R.I. but rather N.McC., Trustee of The 179 Hull St Trust, and caused the same to be recorded at the Norfolk County Registry of Deeds.

H. On about March 10, 2006, defendants LEVINE and ERNST APPOLON caused a Purchase and Sale Agreement to be prepared and executed in the name of R.I. representing that R.I. intended to purchase the Hull Street Property for $640,000.

I. On or about March 10, 2006, defendants LAMERIQUE, LAMARRE, and BLAKE caused two mortgage loan applications to be submitted to New Century Mortgage by telefax listing R.I. as the buyer of the Hull Street Property. The loan applications contained material false representations, including that R.I. was purchasing the Hull Street Property for $640,000. The loan applications also contained material false representations regarding R.I.'s income.

J. On or about March 10, 2006, defendants LAMERIQUE, LAMARRE, and BLAKE, caused New Century Mortgage to approve first and second mortgages in the amounts of $512,000 and $128,000, for a total loan amount of $640,000.

K. On or about March 10, 2006, defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, LAMARRE, BLAKE, and JEAN-LOUIS caused New Century Mortgage to transfer by wire the amounts of $508,957.02 and $126,833.14, totaling $635,790.16, to the bank account of defendant LINDLEY.

L. On or about March 10, 2006, defendants LEVINE and LINDLEY caused a HUD-1 Settlement Statement to be prepared, which represented that the seller was The 179 HULL STREET TRUST and the buyer was R.I. This HUD-1 Settlement Statement listed the purchase price as

$640,000; cash to the estate of the original seller's deceased aunt as $353,346.84; cash to the seller (Trust/N.McC.) as $255,029.60; and cash from the borrower $28,058.28.

M. On or about March 10, 2006, defendants LEVINE and LINDLEY caused the HUD-1 Settlement Statement reflecting the purchase price of $640,000 to be executed by N.McC. (as seller) and R.I. (as buyer).

N. On or about March 10, 2006, defendant LINDLEY caused loan closing documents to be submitted to New Century Mortgage, including the deed representing that the purchase price was $640,000, together with the HUD-1 Settlement Statement representing that the purchase price was $640,000, cash paid to the estate of the original seller's deceased aunt was $353,346.84, cash paid to the seller (Trust/N.McC.) was $255,029.60, and cash accepted from the borrower was $28,058.28.

O. On or about March 10, 2006, defendant ERNST APPOLON provided a personal check to defendant LINDLEY in the amount of $28,058.28, which was made payable to defendant LINDLEY. This check was never cashed.

P. From on or about March 10, 2006, to on or about March 14, 2006, various funds, including proceeds from the purchase and sale of the Hull Street Property, were disbursed by check and by wire among conspirators and others, including defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, LAMARRE, DANIEL APPOLON, BLAKE, and JEAN-LOUIS.

**<u>5 HOLIDAY STREET, DORCHESTER</u>**

54. From in or about January 2006, to on or about March 29, 2006, defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, LAMARRE, BLAKE, and NORISCAT committed overt acts in connection with real property at 5 Holiday Street, Dorchester, Massachusetts (the "Holiday Street Property"), including:

A. In or about March 2006, defendant ERNST APPOLON identified the Holiday Street Property and participated in a negotiation with the seller for a purchase price of $425,000.

B. In or about March 2006, defendant NORISCAT recruited a person unknown to the Grand Jury to use the stolen identity of E.G. to serve as a nominal or "straw" buyer for the Holiday Street Property, without the knowledge or authorization of the true E.G.

C. On or about March 16, 2006, defendants ERNST APPOLON and LAMERIQUE caused a Purchase and Sale Agreement to be prepared in the name of E.G. representing that E.G. intended to purchase the Holiday Street Property for $530,000.

D. On or about March 24, 2006, defendants LAMERIQUE, LAMARRE, and BLAKE caused two mortgage loan applications to be submitted by telefax to WMC Mortgage in the name of E.G. The loan applications contained material false representations, including: that E.G. was involved in the transaction when in fact he was not; that E.G. was purchasing the Holiday Street Property for $530,000; that E.G. was employed by Oligarchy Funding and Premium Health Care; and that E.G. intended to occupy the Holiday Street Property as his primary residence. The loan applications also contained material false representations regarding E.G.'s income.

E. On or about March 27, 2006, defendants LAMERIQUE, LAMARRE, and BLAKE caused WMC Mortgage to approve first and second mortgages in the amounts of $424,000 and $106,000, respectively, for a total loan amount of $530,000.

F. On or about March 28, 2006, defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, LAMARRE, BLAKE, and NORISCAT caused WMC Mortgage to transfer by wire amounts of $423,075.94, and $105,419.32, totaling $528,495.26, to the bank account of defendant LINDLEY.

G. On or about March 27, 2006, defendants LEVINE and LINDLEY caused two different HUD-1 settlement statements to be prepared for the Holiday Street Property, one listing a purchase price of $425,000 and the other listing a purchase price of $530,000.

H. From on or about March 27, 2006, through on or about March 28, 2006, defendant LINDLEY caused loan closing documents to be submitted to WMC Mortgage, including the HUD-1 settlement statement representing that the purchase price was $530,000.

I. From on or about March 28, 2006, to on or about March 30, 2006, various funds, including proceeds from the purchase and sale of the Holiday Street Property, were disbursed by check and by wire among conspirators and others, including defendants LEVINE, LINDLEY, ERNST APPOLON, LAMARRE, and BLAKE.

**21 MASCOT STREET, DORCHESTER - A.C. PURCHASE**

55. From in or about March 2006, to on or about April 25, 2006, defendants LEVINE, LINDLEY, LAMERIQUE, NORISCAT, HALTIWANGER, and unindicted co-conspirator Son committed overt acts in connection with real property at 21 Mascot Street, Dorchester, Massachusetts (the "Mascot Street Property"), which had previously been purchased in unindicted co-conspirator Son's name, including:

A. In or about April 2006, defendant NORISCAT recruited a person unknown to the Grand Jury to use the stolen identity of A.C. to serve as a nominal or "straw" buyer for the Mascot Street Property, without the knowledge or authorization of the true A.C.

B. In or about April 17, 2005, unindicted co-conspirator Son caused a Purchase and Sale Agreement to be prepared and executed for the purchase price of $560,000.

C. On or about April 20, 2006, defendants LAMERIQUE and HALTIWANGER caused a mortgage loan application to be submitted to New Century Mortgage in the name of A.C. The loan application contained material false representations, including: that the true A.C. was involved in the transaction when in fact he was not; that A.C. was purchasing the Mascot Street Property for $560,000; that A.C. was employed by Premium Health Care of Brockton and Oligarchy Funding; and that A.C. intended to occupy the Mascot Street Property as his primary residence. The loan application also contained material false representations regarding A.C.'s income.

D. On or about April 20, 2006, defendants LAMERIQUE and HALTIWANGER caused New Century Mortgage to approve a mortgage in the amount of $560,000.

E. On or about April 20, 2006, defendants LEVINE, LINDLEY, and unindicted co-conspirator Son caused a HUD-1 settlement statement to be prepared for the Mascot Street Property, which listed a purchase price of $560,000.

F. On or about April 20, 2006, defendant LINDLEY caused loan closing documents to be submitted to New Century Mortgage, including the HUD-1 settlement statement representing that the purchase price was $560,000.

G. On or about April 24, 2006, defendants LEVINE, LINDLEY, LAMERIQUE, NORISCAT, HALTIWANGER, and unindicted co-conspirator Son caused New Century Mortgage to transfer by wire the amount of $562,922.37 to the bank account of defendant LINDLEY.

H. From on or about April 24, 2006, to on or about April 25, 2006, various funds, including proceeds from the purchase and sale of the Mascot Street Property, were disbursed by check and by wire among conspirators and others, including defendants LEVINE, LINDLEY, HALTIWANGER, and unindicted co-conspirator Son.

**96 THETFORD AVENUE, DORCHESTER**

56. From on or about March 20, 2006, to on or about May 3, 2006, defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, DANIEL APPOLON, and BLAKE committed overt acts in connection with real property at 96 Thetford Avenue, Dorchester, Massachusetts (the "96 Thetford Avenue Property"), including:

A. In or about March 2006, defendant DANIEL APPOLON recruited S.P. to act as a nominal or "straw" borrower to purchase the 96 Thetford Avenue Property.

B. In or about March 2006, defendant ERNST APPOLON identified the 96 Thetford Avenue Property and participated in a negotiation with the seller for a purchase price of $365,000.

C. On or about March 20, 2006, defendants ERNST APPOLON and LAMERIQUE caused a Purchase and Sale Agreement to be executed by S.P. reflecting a purchase price of $450,000.

D. On or about April 24, 2006, to on or about April 28, 2006, defendants LAMERIQUE and BLAKE caused two mortgage loan applications to be submitted by telefax to WMC Mortgage in the name of S.P. The loan applications contained material false representations, including: that S.P. was purchasing the 96 Thetford Avenue Property for $450,000; and that S.P. was employed by Premium Care. The loan applications also contained material false representations regarding S.P.'s income.

E. On or about April 28, 2006, defendants LAMERIQUE and BLAKE caused WMC Mortgage to approve first and second mortgages in the amounts of $360,000 and $90,000, respectively, for a total loan amount of $450,000.

F. On or about May 1, 2006, defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, DANIEL APPOLON, and BLAKE caused WMC Mortgage to transfer by wire the

amounts of $359,371.00 and $89,550.00, totaling $448,921.00, to the bank account of defendant LINDLEY.

G. On or about April 28, 2006, defendants LEVINE and LINDLEY caused two different HUD-1 settlement statements to be prepared for the 96 Thetford Avenue Property, one listing a purchase price of $365,000 and the other listing a purchase price of $450,000.

H. On or about April 28, 2006, defendant LINDLEY caused loan closing documents to be submitted to WMC Mortgage, including the HUD-1 settlement statement representing that the purchase price was $450,000.

I. From on or about May 1, 2006, to on or about May 3, 2006, various funds, including proceeds from the purchase and sale of the 96 Thetford Avenue Property, were disbursed by check and by wire among conspirators and others, including defendants LEVINE, LINDLEY, ERNST APPOLON, LAMARRE, DANIEL APPOLON, and BLAKE.

**64 EMMET STREET, BROCKTON**

57. From in or about February 2006, to on or about May 8, 2006, defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, NORISCAT, and HALTIWANGER committed overt acts in connection with real property at 64 Emmet Street, Brockton, Massachusetts (the "Emmet Street Property"), including:

A. In or about February 2006, defendant ERNST APPOLON identified the Emmet Street Property and participated in a negotiation with the seller for a purchase price of $400,000.

B. In or about February 2006, defendant NORISCAT recruited a person unknown to the Grand Jury to use the stolen identity of E.G. to serve as a nominal or "straw" buyer for the Emmet Street Property, without the knowledge or authorization of the true E.G.

C. On or about March 18, 2006, defendant ERNST APPOLON caused a Purchase and Sale Agreement to be executed in the name of E.G. with a purchase price of $400,000, no construction holdback, and Epoch Realty listed as an agent in the transaction.

D. On or about May 5, 2006, defendants LAMERIQUE and HALTIWANGER caused two mortgage loan applications to be submitted by telefax to New Century Mortgage in the name of E.G. The loan applications contained material false representations, including: that E.G. was involved in the transaction when in fact he was not; that E.G. was purchasing the Emmet Street Property for $400,000; and that E.G. was employed by Oligarchy Funding and Premium Care. The loan applications also contained material false representations regarding E.G.'s income.

E. On or about May 5, 2006, defendants LAMERIQUE and HALTIWANGER caused New Century Mortgage to approve first and second mortgages in the amounts of $320,000 and $80,000, respectively, for a total loan amount of $400,000.

F. On or about May 5, 2006, defendants LEVINE, LINDLEY, ERNST APPOLON, LAMERIQUE, NORISCAT, and HALTIWANGER caused New Century Mortgage to transfer by wire the amounts of $322,932.37 and $78,997.87, totaling $401,930.24, to the bank account of defendant LINDLEY.

G. On or about May 5, 2006, defendants LEVINE and LINDLEY caused a HUD-1 settlement statement to be prepared for the Emmet Street Property, which listed a purchase price of $400,000.

H. On or about May 5, 2006, defendant LINDLEY caused loan closing documents to be submitted to New Century Mortgage, including the HUD-1 settlement statement representing that the purchase price was $400,000, and $20,000 was paid regarding "Construction Holdback/Boston Exchange[.]"

I. From on or about May 5, 2006, to on or about May 8, 2006, various funds, including proceeds from the purchase and sale of the Emmet Street Property, were disbursed by check and by wire among conspirators and others, including defendants LEVINE, LINDLEY, ERNST APPOLON, BLAKE, and HALTIWANGER.

**7 CLARIDGE TERRACE, DORCHESTER**

58. From in or about April 2006, to on or about May 11, 2006, defendants LEVINE, LINDLEY, ERNST APPOLON, and JEAN-LOUIS committed overt acts in connection with real property at 7 Claridge Terrace, Dorchester, Massachusetts (the "Claridge Terrace Property"), including:

A. In or about April 2006, defendant ERNST APPOLON identified the Claridge Terrace Property and participated in a negotiation with the seller for a purchase price of $400,000.

B. On or about April 14, 2006, defendant ERNST APPOLON caused a Purchase and Sale Agreement to be prepared and executed in the name of the buyers for $400,000.

C. On or about April 14, 2006, defendants ERNST APPOLON and JEAN-LOUIS caused a Purchase and Sale Agreement to be prepared and executed in the name of F.P. reflecting that the purchase price of the Claridge Terrace Property was $480,000.

D. On or about May 8, 2006, defendant JEAN-LOUIS caused two mortgage loan applications to be submitted by telefax to Mortgage Lenders Network in the name of F.P. The loan applications

contained material false representations, including: that F.P. was purchasing the Claridge Terrace Property for $480,000; that F.P. was employed by Premium Health Care of Brockton and by Boston Home Health Care Services; and that F.P. intended to occupy the Claridge Terrace Property as his primary residence. The loan applications also contained material false representations regarding F.P.'s income.

E. On or about May 8, 2006, defendant JEAN-LOUIS caused Mortgage Lenders Network to approve first and second mortgages in the amounts of $384,000 and $96,000, respectively, for a total loan amount of $480,000.

F. On or about May 8, 2006, defendants LEVINE, LINDLEY, ERNST APPOLON, and JEAN-LOUIS caused Mortgage Lenders Network to transfer by wire the amounts of $384,880.47 and $94,970.93, totaling $479,851.40, to the bank account of defendant LINDLEY.

G. On or about May 8, 2006, defendants LEVINE and LINDLEY caused two different HUD-1 settlement statements to be prepared for the Claridge Terrace Property, one listing a purchase price of $400,000 and the other listing a purchase price of $480,000.

H. On or about May 8, 2005, defendant LINDLEY caused loan closing documents to be submitted to Mortgage Lenders Network, including the HUD-1 settlement statement representing that the purchase price was $480,000.

I. From on or about May 10, 2006, to on or about May 11, 2006, various funds, including proceeds from the purchase and sale of the Claridge Terrace Property, were disbursed by check and by wire among the conspirators and others, including defendants LEVINE, LINDLEY, BLAKE, and JEAN-LOUIS.