UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

Plaintiff,

v.

ERIC L. LEVINE, J. DANIEL LINDLEY, ERNST APPOLON, DANIEL APPOLON and LATOYA HALTIWANGER,

Defendants.

Criminal Action No. 08-10121-GAO

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**JURY TRIAL**

**DAY ONE**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts 02210
Monday, April 5, 2010
10 a.m.

Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts 02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

APPEARANCES:

OFFICE OF THE UNITED STATES ATTORNEY
By: Ryan M. DiSantis, Mary B. Murrane and Victor A. Wild,
Assistant U.S. Attorneys
John Joseph Moakley Federal Courthouse
Suite 9200
Boston, Massachusetts 02210
On Behalf of the Government

DENNER PELLEGRINO, LLP
By: Isaac Borenstein, Esq.
Bruce D. Levin, Esq.
Four Longfellow Place, 35th Floor
Boston, Massachusetts 02114
On Behalf of Defendant Eric L. Levine

LAW OFFICES OF ROBERT L. SHEKETOFF
By: Robert L. Sheketoff, Esq.
One McKinley Square
Boston, Massachusetts 02109
On Behalf of Defendant J. Daniel Lindley

SWOMLEY & ASSOCIATES
By: John G. Swomley, Esq.
227 Lewis Wharf
Boston, Massachusetts 02110-3927
- and -
LAW OFFICES OF JAMES E. HAYNES
By: James E. Haynes, Esq.
10 Essex Avenue
Swampscott, Massachusetts 01907
On Behalf of Defendant Ernst Appolon

LAW OFFICES OF EDWARD J. LEE
By: Edward J. Lee, Esq.
65 Franklin Street, Suite 500
Boston, Massachusetts 02110
On Behalf of Defendant Daniel Appolon

NUTTER, McCLENNEN & FISH, LLP
By: Sarah P. Kelly, Esq.
Robert L. Ullmann, Esq.
Seaport West
155 Seaport Boulevard
Boston, Massachusetts 02210-2604
On Behalf of Defendant Latoya Haltiwanger

(The following proceedings were held in open court before the Honorable George A. O'Toole, Jr., United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, One Courthouse Way, Boston, Massachusetts, on April 5, 2010.

The defendants, Eric L. Levine, J. Daniel Lindley, Ernst Appolon, Daniel Appolon and Latoya Haltiwanger, are present with counsel. Assistant U.S. Attorneys Ryan M. DiSantis, Mary B. Murrane and Victor A. Wild are present.)

THE CLERK: All rise.

This is the United States District Court for the District of Massachusetts.

Court is now in session.

Please be seated.

For a trial in the case of United States of America versus Eric Levine, et al, 08-10121.

Will counsel identify yourselves for the record.

MR. WILD: Good afternoon, your Honor, Victor A. Wild, Ryan DiSantis, Mary Murrane for the defendant.

THE COURT: Good morning.

MR. BORENSTEIN: Good morning, Judge O'Toole. Isaac Borenstein and Bruce Levin on behalf of Mr. Levine.

MR. SHEKETOFF: Robert Sheketoff for Daniel Lindley. Good morning, your Honor.

THE COURT: Good morning.

MR. LEE: Good morning, Judge. Edward Lee on behalf of Daniel Appolon.

MR. ULLMANN: Good morning, Judge. Bob Ullmann and Sarah Kelly for Ms. Haltiwanger.

THE COURT: Good morning.

MR. SWOMLEY: John Swomley and James Haynes for Mr. Appolon.

THE COURT: Good morning.

Okay. We expect to have jurors momentarily. I just want to -- I think there were a couple of pending issues with respect to the selection. I just wanted to -- the mechanics, I just wanted to run by.

I'm not sure we had finally resolved what had been some concern among the defendants about the shared use of peremptories. And so I just wonder whether there's been some -- any development on that. And if not, I have a proposal which would -- if there's disagreement, that may solve the disagreement.

So I don't know -- I've forgotten who voiced it. Maybe it was Mr. Sheketoff? I don't know. Somebody. I've forgotten who it was.

MR. SWOMLEY: I had mentioned it.

THE COURT: This is not like law school and I want to call on you, but...

MR. SWOMLEY: I mentioned that there might be an issue

with respect to wanting different jurors.

THE COURT: Yeah. Okay. Has there been further discussion?

MR. SWOMLEY: Not to my knowledge, no.

THE COURT: Well, the gross numbers we had talked about, I think the side was expanding -- because of the number of defendants -- expanding from the customary to -- I think I said 18 plus two for the four alternates. So that would give a total of 20.

Another way to get at that is to give each of you three, which would total 15, and then give each of you one for the alternates. So you know how many you've got: Everybody's got three plus one. And that gets to the same number of maximum potential and it avoids any issues about disagreement on the exercise; you control your own.

MR. WILD: Your Honor, the government does not mean to complicate matters, but according to the rule, the two alternate -- the two additional for alternates may only be used as to alternates.

THE COURT: Correct.

MR. WILD: And it sounds as if the Court is providing three as to the alternates.

THE COURT: Actually, it would be five, but it would be one each.

MR. WILD: Right.

THE COURT: You know, I don't think the rule forbids more than that. It says -- I think the rule is not offended. I appreciate the government's view, but I don't think there would be a structural problem.

MR. WILD: Is the government given additional strikes for the alternates?

THE COURT: Yes; you'll get eight.

MR. WILD: As to alternates.

THE COURT: Six plus two, is what we had talked about.

MR. WILD: All right. Thank you, your Honor.

THE COURT: Mr. Borenstein?

MR. BORENSTEIN: You indicated that was a proposal, not an order?

THE COURT: Right. I just don't want chaos as you're trying to decide on the peremptories if there's no -- I'm happy to let you solve it yourselves, but if it's not going to get solved yourself, then I think we have to have a rule by which we operate, that's all.

MR. BORENSTEIN: I would just invite either allowing us five minutes now --

THE COURT: Okay.

MR. BORENSTEIN: -- so we could discuss that issue with counsel, or just do it as we go along.

THE COURT: You could do a different number, if you want. I mean, you could divide it up differently. I just want

it settled. I don't want to be halfway into the voir dire with jurors not knowing how we're going to handle peremptory counting for the defense side, that's all.

MR. BORENSTEIN: May I just have a moment?

(Counsel confer off the record.)

MR. LEVIN: Judge O'Toole, our request would be, if it's okay with the Court, that we have to consult in any event as counsel. So we would like to try to resolve this and we will avoid the chaos.

THE COURT: Okay. So you'll just -- you'll have one aggregate number?

MR. BORENSTEIN: Correct.

THE COURT: And may I look to someone to be the spokesperson?

MR. BORENSTEIN: You may.

THE COURT: Equity will not aid a volunteer.

Okay. I think that was it. So otherwise, the only other thing I wanted to -- I'm not sure -- let me just run over the mechanics. I think the jurors, using the box and the two sections -- the center section and, as I look at it, the right-hand section of the gallery -- will be enough to accommodate the number of jurors we expect.

I'll ask some general questions and get some general "yes" answers that we'll note. Some of the more sensitive questions I'm going to ask only individually as the individuals

come in.

So we'll have a brief introduction; I'll ask them general questions. Because of the number of witnesses, I'm not going to read the names of witnesses to ask if anybody recognizes them. We have prepared a multipage list of the witnesses which each individual juror would be given, and we'll ask them to read it and circle any names of people that they are acquainted with or have an affiliation with.

So after my general questions, the jurors, as a body, will move to Courtroom 8 where they will be given the witness lists. And you'll see --

Do we have a specimen that they can see?

-- there's a name -- a place for the juror to write his or her name at the top, and then -- well, they'll each get one -- and then just circle the witness. It's alphabetical and it incorporates defense witnesses in alphabetical order with the government witnesses.

Unfortunately, the defense list did not have, as we prepared this, the towns. So there are some names that don't have towns on there; it came too late to incorporate it. So they'll do that.

Then when the individual jurors come in one by one, they'll come up to the side here. You may all sit there because I think you'll be able to hear it anyway. I just don't want them sitting in the witness box and being intimidated,

that's all. So we'll have it a little less formal. I'll go over to the side of the bench, the juror will be here, we'll ask some questions.

That juror, when we're finished, will then go to Courtroom No. 7, different from where the -- so the interrogated jurors will be segregated after interrogation from the yet-to-be-interrogated jurors. Periodically we will pause, after having done this, to see if there are cause objections we can deal with rather than just do -- first of all, I don't do it juror by juror. In a simpler case, I might do the entire -- I wouldn't inquire of everybody anyway, but I might do all the necessary inquiry and then go back to consider cause.

So as we do it, note any issues you have about cause, but we'll do -- we'll do the -- as to groups of inquired-of jurors, okay? And I think maybe every ten or 15 or so we'll do that.

The magic number of cause-free jurors that we need, assuming maximum use of peremptories, will be 44. So if at some point we get to that, we'll stop. Okay?

MR. SWOMLEY: I don't know whether as a matter of formality you ask of the attorneys or of the defendants whether they are ready for trial. I would ask that you not do that in the presence of the jury, as to my client and myself.

THE COURT: I don't. I think that's a state

allocution but...

MR. BORENSTEIN: May I also inquire about a couple of issues?

If you're in an individual voir dire and the issue comes up that we may want some follow-up from the Court, how do you wish us to...

THE COURT: I think rise. I'll notice that.

MR. BORENSTEIN: And see you at sidebar?

THE COURT: Well, I guess.

MR. BORENSTEIN: A juror may say something that may not be clear or may raise issues for follow-up. I'm assuming your Honor --

THE COURT: I guess we could come over here and talk about it. Generally, I conduct it myself, but I'm open to suggestions or follow-ups. But I guess we'll come over here and then the juror will be over here.

MR. BORENSTEIN: Your Honor, we submitted this morning -- we filed this morning a proposed opening introductory remarks that includes a statement about the case and some basic fundamental principles that would apply.

My co- -- counsel for the other codefendants in the case support the request submitted.

And I submitted proposed voir dire questions. I know other counsel --

THE COURT: I've looked at all the proposals. I have.

And I've incorporated some of the suggestions but not all of them.

MR. BORENSTEIN: I have two objections to the government's proposed voir dire. Shall I raise it now?

THE COURT: Go ahead.

MR. BORENSTEIN: Question 7 and Question 8 of the government's proposed voir dire. Question 7 --

THE COURT: I won't ask either one of those.

MR. BORENSTEIN: Okay. Thank you.

MR. SHEKETOFF: Your Honor, that does --

THE COURT: And let me just say with respect to your own, I will, when the jury has been -- when the actual jury has been selected and before the -- in my introductory remarks I will give them an instruction concerning the presumption of innocence and proof beyond a reasonable doubt. I'm not going to go do this in this summary. The summary now is simply to let them know what the nature of the case is and not to get into legal principles. So I'm just going to tell them a very general overview of what the case is.

One of the questions that I'm going to ask them when they come in here is whether they have any reservations about applying the presumption of innocence and holding the government to its proof. But that's going to be -- I'm not going to address that in the general. I know that was part of the suggested questions.

MR. SHEKETOFF: Your Honor, Mr. Borenstein's objection raises an issue with me. Do we each have to -- in this case it doesn't matter; you're not going to ask half those questions. Do we each have to stand and object -- when one counsel has objected, one counsel moves to strike for cause -- or can we do what we've done in other trials, which is simply opt out if we have a different position than the first person to stand and object?

THE COURT: You mean a standing -- a standing agreement that the articulation by one is an articulation for all unless otherwise noted?

MR. SHEKETOFF: Yes.

THE COURT: That's fine with me. Your problem is not here, though. Your problem is with the Court of Appeals.

MR. SHEKETOFF: I think if it's clear on the record that you have accepted that.

THE COURT: I do accept that.

MR. SHEKETOFF: Thank you.

THE COURT: Mr. Wild?

MR. WILD: Just to clarify, your Honor, it's my understanding now we're back to where the Court first discussed the peremptory strikes, and that is for the pool at large, the defense has 18, and then they have two among them for the alternates?

THE COURT: Correct.

MR. WILD: We're back to the 20. But the 18 are for the large pool?

THE COURT: Correct. Well, for the 12 jurors.

MR. WILD: Yes. Thank you.

THE COURT: And we'll have to be alert as we get there -- but we will get to the point, I think, as the narrowing process -- that we will realize when we are in the zone of going above 12 and are now in the range of the alternate jurors who -- whatever seats they may be in.

I'm told the jury is ready to come up, so we just need to get them in here. So we'll take a short break while that happens, and then we'll come back out and begin.

THE CLERK: All rise.

(The Court exits the courtroom at 9:49 a.m.)

THE CLERK: The Court will take a short recess.

(There is a recess in the proceedings at 9:49 a.m.)

(The jury pool is escorted into the courtroom.)

THE CLERK: All rise.

(The Court enters the courtroom at 10:19 a.m.)

THE CLERK: For a trial, the case of United States of America versus Eric Levine, J. Daniel Lindley, Ernst Appolon, Daniel Appolon and Latoya Haltiwanger, Docket 08-10121.

Will counsel identify yourselves --

THE COURT: Well, no. Actually, I'll ask that in a minute.

Good morning, everyone.

THE JURORS: Good morning.

THE COURT: As you've heard, I'm Judge O'Toole. I'm going to preside over a trial which we're beginning. You see in front of me the participants in the trial, the lawyers and the parties.

Let me just tell you in very general terms the nature of the case and what it will be about in very broad terms. We're going to select some of you to be the jury to sit with us; to listen to the evidence in the case and ultimately on the basis of that evidence make some judgments that the controversy calls upon you to make.

This is a criminal prosecution brought by the United States of America. There are five defendants who are charged in the charging document, which is an indictment. And in the -- the names of the defendants are Eric Levine, Daniel Lindley, Ernst Appolon, Daniel Appolon and Latoya Haltiwanger.

The government charges these defendants with some offenses that arise under the laws of the United States. This is a federal court; we apply federal legal principles here. And the crimes that are charged in the indictment are those that arise under the laws of the United States.

The five defendants are all charged with the United States crime of conspiracy -- criminal conspiracy -- which is an illegal agreement among people to achieve unlawful or

criminal ends. Each defendant is also charged with some counts of a crime that we in shorthand refer to as "wire fraud," which is using the instrumentalities of interstate commerce to further a scheme to defraud.

And two of the defendants, defendants Levine and Lindley, are charged with offenses under United States statutes dealing, again colloquially, with what's called "money laundering." And there are specific provisions that we'll spell out in more detail to the actual jury. But just so you have an idea, this is generally a case, then, involving allegations of criminal fraud on the part of some or all of the defendants. That's just an overview so you know what the topic is as we go forward.

As I say, we're going to pick some of you to serve with us as the jury and make some judgments on the evidence in the case. We want to be sure that we have as jurors people who are completely fair-minded and impartial as to the issues presented. And so in order to be sure that if you personally are -- as a prospective juror have any difficulties in being fair or impartial, we want to hear from you about that at the outset.

So I'm going to -- the way we're going to do it is: I'm going to have some questions for you. And I'm going to ask some general questions now to all of you as a group, and then I'm going to have questions for each of you individually as we

go forward with the process. That's in addition to the general questions.

For my general questions now, I'd like you to listen to the question, and if you personally would answer "yes" to any of the questions, just stand where you are in place, or signal, and we'll note that you have a "yes" answer to that question. We won't follow up; we won't get any more details from you in the group here. But as we do talk to you individually later on, we will follow up on that.

If you would answer "no" to any of the questions that I ask now, generally make no signal and we will assume by your inactivity -- response, that your answer to the question is "no," all right?

This whole process is a very important one to the trial. The law requires that your answers to my questions to you be made under oath. So I would ask all of the prospective jurors to stand now and the clerk will administer the oath.

(Jury pool sworn.)

THE CLERK: Please be seated.

THE COURT: My first questions will deal with whether you have any connection with any of the people who are going to take part in the case. And so let me introduce those people to you now.

The case for the United States will be presented by assistant United States attorneys. The United States

Attorney's Office for the District of Massachusetts is a part of the Department of Justice of the federal government, and is responsible for presenting criminal charges and representing the government in the trial of those matters.

In this case the government is represented by assistant U.S. attorneys Victor Wild, Ryan DiSantis and Mary Murrane.

Thank you.

The defendants now: Defendant Eric Levine --

DEFENDANT LEVINE: Good morning.

THE COURT: -- is represented by attorneys Isaac Borenstein and Bruce Levin.

MR. BORENSTEIN: Good morning.

MR. LEVIN: Good morning.

THE COURT: Defendant Daniel Lindley is represented by Attorney Robert Sheketoff.

MR. SHEKETOFF: Good morning.

THE COURT: Attorney Daniel Appolon -- I'm sorry.

Defendant Daniel Appolon is represented by Attorney Edward Lee.

MR. LEE: Good morning.

THE COURT: Defendant Latoya Haltiwanger is represented by attorneys Sarah Kelly and Robert Ullmann.

Defendant Ernst Appolon is represented by Attorney John Swomley and -- I'm sorry, I --

MR. SWOMLEY: James Haynes.

THE COURT: -- James Haynes.

MR. SWOMLEY: Good morning.

THE COURT: So my first question for you all, jurors, is: Are any of you related to, or do you have any other relationship or connection -- personal, business, professional or otherwise -- with any of the defendants or any of the lawyers in the case?

No?

This next question, then -- I'm going to ask you about witnesses who may testify because, as I'm sure you realize, the testimony in a case like this comes from -- in great part from witnesses who appear in the courtroom to testify. There are a number of them. And for convenience, rather than read off the names and try to jot down your responses as we do, we have a list which we're going to give individually to each of you and ask you to look at it and then tell us whether anybody on that list is someone you are related to or have any business, professional, social or other connection or relationship with. And the names are all given on the list. We'll do that in a little bit.

Now, my next question -- and for my next several questions -- actually, there's only a couple more generally, and then I'm going to get to the individual ones.

For these questions I want you to think not only about

you, yourself, as an individual, but those people who are the closest to you as well as yourself. So people in your immediate household -- your family, folks you live with, for example -- anybody who is so close to you that, really, what affects them, affects you in a way, and so their experiences are a part of your experience. That's what I'm trying to get at here.

If you have any doubt whether you should answer "yes" or "no," we would ask you to err on the side of "yes." We would like to hear if there's any issue.

So with that, when I use the word "you" now, I mean it in the plural sense, you and those people close to you, okay?

Are you or have you been employed by any law enforcement agency? And by that I mean any federal, state or local agency which would include police departments; it would include prosecutorial agencies such as, of course, the United States Attorney's Office, on the federal level, but on the state level, district attorney's offices, local prosecutors and so on; state police, whatever. Any federal law enforcement agency.

We mean this to be a broad question, and so if you have -- again, if you have any doubt, we'll accept a "yes" and then we'll follow up with you on that, okay?

So I'm going to just go around the room and just ask you to identify yourselves, and then we'll follow up later on

that, okay?

THE JUROR: Jonathan Colby.

THE COURT: Number 3.

Thank you. When you've given me your name, you can sit down.

Sir?

THE JUROR: Stephen Thomas.

THE COURT: That would be Number 17.

Sir?

THE JUROR: Paul Faria.

THE COURT: Number 27.

THE JUROR: Maureen Latta.

THE COURT: Number 29.

THE JUROR: David Brierley.

THE COURT: Thirty-one. Thank you.

Ma'am?

THE JUROR: Karen Laugelle.

THE COURT: Thirty-five. Thank you.

THE JUROR: Kimberly Signori.

THE COURT: Number 41.

Okay. In the middle section.

MR. WILD: Excuse me, your Honor. I don't think we caught the last number.

THE COURT: The last one was 41.

MR. WILD: Thank you.

THE JUROR: Elizabeth Pelletier.
THE COURT: Number 48.
Sir?
THE JUROR: James Easton.
THE COURT: Number 50.
THE JUROR: Teri Pierre.
THE COURT: Number 68.
MR. LEE: Judge?
THE COURT: Sixty-eight.
MR. BORENSTEIN: What about Easton? I didn't --
THE CLERK: Easton was Number 50.
MR. LEE: Thank you.
THE COURT: Sir, in the red?
THE JUROR: James Ehwa.
THE COURT: Number 77.
Yes?
THE JUROR: Dan Smith.
THE COURT: Number 76.
I can't really see which rows there are, but...
THE JUROR: George Haines.
THE COURT: Number 63.
THE JUROR: Karen Lococco.
THE COURT: Number 65.
THE JUROR: Elaine Berube.
THE COURT: Number 85.

THE JUROR: Michael Collins.
THE COURT: Number 84.
THE JUROR: William Burke.
THE COURT: Number 82.
THE JUROR: James Aiello.
THE COURT: Number 87.
Okay. Did I get everybody?
Now, in this case what the government alleges was a scheme to defraud and the crimes that are charged are related to transactions in -- that involve mortgages on real estate and mortgage lending.
Have you -- or are you in the past or are you now, I mean the group of you and your close family and associates -- ever been involved in any of the following industries or professions or lines of work: banking; real estate; mortgage lending, in particular; or any field that touches on the buying and selling and financing of real estate?
Okay. Ma'am?
THE JUROR: Michelle Dionne.
THE COURT: Number 4.
THE JUROR: Marsha Hammond.
THE COURT: Number 8. Thank you.
Sir?
THE JUROR: John King.
THE COURT: Number 9.

THE JUROR: Kathleen Michaud.
THE COURT: Number 11.
THE JUROR: Richard Saltzman.
THE COURT: Fourteen.
THE JUROR: Frederick Haigis.
THE COURT: Twenty.
THE JUROR: Jeffrey Scannell.
THE COURT: Twenty-six.
THE JUROR: Paul Faria.
THE COURT: Twenty-seven.
THE JUROR: Stephanie Chapman.
THE COURT: Thirty-four.
THE JUROR: Karen Laugelle.
THE COURT: Thirty-five.
THE JUROR: Stephanie Lantz.
THE COURT: Forty-seven.
THE JUROR: Roseanne Zerola.
THE COURT: Forty-nine.
THE JUROR: Jessica Piegorsch.
THE COURT: Number 70.
THE JUROR: Teri Pierre.
THE COURT: Sixty-eight.
THE JUROR: Carol Matyka.
THE COURT: Seventy-three.
THE JUROR: Joyce Smith.

THE COURT: Seventy-four.

THE JUROR: Dan Smith.

THE JUROR: Seventy-six.

THE JUROR: Gail Sheldon.

THE COURT: Number 61.

THE JUROR: Mary Young.

THE COURT: Fifty-nine.

THE JUROR: Michael Lambert.

THE COURT: Number 66.

THE JUROR: Elaine Berube.

THE COURT: Eighty-five.

THE JUROR: Elizabeth Tibbert.

THE COURT: Eighty-three.

THE JUROR: David Potere.

THE COURT: Number 92.

THE JUROR: John Whittemore.

THE COURT: Number 100.

MR. LEE: Excuse me. The last one, Judge?

THE COURT: One hundred.

MR. LEE: Thank you.

THE COURT: Okay. Those are the questions I'm going to have for you here in the room as a group. As I say, we're going to follow up with each of you, one by one, with a few additional questions as well.

And let me just say, first of all, we appreciate your

presence here today. It is important service that citizens give when they serve as jurors. It is difficult service in many ways because the work is very serious, a lot rides on it, and it is, in a way, calling citizens to be at their best in serving as jurors.

We realize as well that it's an imposition. We know that it causes people to have to rearrange their schedules, to absorb some inconvenience and disruption in what would otherwise be routines. It's impossible to have the system that we have which calls upon citizens to sit in judgment of important issues such as these -- it's essential that we have people who do it with that good spirit of public service. And we appreciate your willingness to do that.

So I want you to be clear that we don't underestimate the costs of jury service, but the cost of not having juries are much, much greater.

So this is going to take a little bit of time. We ask your patience and forbearance as we do that -- as we get through the list. It's just a necessary part of making sure that when we commence the trial and have the evidence presented, we have people who are in the best condition to judge that because they are fair-minded, impartial and approaching it with the solemn sense that we expect of jurors.

Now, let me also say in connection with that a little bit about the schedule that we expect to follow in the case.

In this -- we do a lot of different things in this court. And conducting criminal jury trials is one of them, but we do many other things as well. We do other kinds of cases. We do civil lawsuits. We have a lot of action in those cases as well.

And so to organize our day, we conduct trials like this, jury trials, in the mornings between nine -- well, the first part of the day, between 9 and 1 p.m. -- 9 a.m. and 1 p.m. For jurors sitting, then, the service day is 9 a.m. to 1 p.m., give or take. We may go ten minutes over or we may finish ten minutes early. And that continues throughout the presentation of the case here in the courtroom.

Once the jury begins deliberating at the end of the case, that happens in a jury room in the back, in private, and we can continue to do things here in the courtroom. So then it goes to a full day. I should say, the reason we do the nine to one is because in the afternoons we attend to our other business; we do other kinds of matters. We have hearings on motions that are pending, we have case conferences and various other things of that sort to keep the caseload active so we're not just focused on one case. So we have two tracks in the day.

And when the jury is deliberating, then we can do the afternoon work here in the courtroom while the jury is working in the back in the afternoon. So once deliberations begin, the day would go to a full nine-to-five day. But for the bulk of

the presentation of the case, it will be nine to one.

This case is going to take a little while to present. There are a number of people involved in the case, a number of issues involved. The estimate is that the case will take in the range of five to six weeks to present. I tell you that because I want you to understand the significance of the service that we ask of you. And, again, I emphasize we appreciate the difficulty that that may cause for some of you, but it's something that we must do.

We will not sit in this case the week of April school vacation, which is the week of Patriot's Day. I think it begins the 19th, actually, this year. So April 19th, just for convenience of people generally, the jurors, of course, even some of the participants in the trial. So we factored that in to our schedule for convenience. So we'll sit this week and next week and then take a break for the following week, and resume the trial for whatever it needs to finish, okay?

Now, there are a lot of people involved here, including yourselves. Logistically, we have had to move people around a little. We're going to move you again to the courtroom next door, and that's where you'll be as we call you one by one in here to answer some of the further questions that I have.

One of the first things we're going to ask you to do is take a look at the witness list. Each of you will be given

a list of the potential witnesses. There's a place for you to write your name at the top of the list. That's the first thing you should do. Then go over the list very carefully and see if there is anybody there that you know or are connected with in some way. And if so, circle that name.

When you're called in for the one-on-one, as we have you in here, you'll bring the list with you. And if you've circled some names, we'll talk about that. If you haven't, well, we won't talk very much about it. But I would like you to take a look and go through the list of witnesses and see if there's anybody that you may be connected with, okay?

MR. BORENSTEIN: Judge, may I see you?

THE COURT: I'm sorry?

MR. BORENSTEIN: Just a brief inquiry of the Court.

THE COURT: Yeah, fine.

(Discussion at sidebar and out of the hearing of the jury:)

MR. BORENSTEIN: Your Honor may have said this already, but I'm concerned that they'll start talking with one another about the case, what it's about, what it isn't, witnesses and the like. So I want to ask your Honor to remind them not to --

THE COURT: Yeah.

MR. ULLMANN: I have a more substantive objection to make. I'm going to object to the composition of this jury

pool. By my calculation, the first African-American juror is Juror No. 68. This is not going to be a jury of my client's peers, and I would request -- first of all, I object to the composition, and then I would ask that if the Court is going to go forward with this jury pool, that after these 16 jurors, the Court starts with the last juror, Juror No. 100, and works backward. Because there are at least a couple of African-American jurors in the last 33 in the pool.

MR. SWOMLEY: I would join in that on behalf of Ernst Appolon.

MR. LEE: And I join on behalf of Daniel Appolon, Judge.

MR. ULLMANN: We understand it's not your Honor's fault, but the result of this process is not a fair process for our clients.

THE COURT: Does the government have anything to say?

MR. WILD: The only thing the government would say, your Honor, is that we have no idea what's in the total jury pool when it was randomly drawn, whether it's larger numbers or smaller numbers, and that this is nothing but a random draw of prospective jurors.

THE COURT: Under First Circuit law the objection is insufficient, but noted.

MR. BORENSTEIN: Okay. Thank you.

(In open court:)

THE COURT: Okay. So we're going to ask you to go with one of the court security officers now next door. I would ask you, since you have social conversation among yourselves while you're waiting, don't talk about the case or what the future holds in the case. You don't know anything about it yet. Don't be speculating about what it might be about and so on. You'll hear enough if you're lucky enough to be selected to be one of the jurors in the case, okay?

(Laughter.)

THE COURT: So you could talk about -- there was an interesting ball game yesterday, I guess. There are various other topics that maybe you can deal with, but stay away from the present matter.

So follow the clerk and the court security officer next door.

THE CLERK: All rise.

THE COURT: We'll take about a five- to ten-minute break, counsel, so the jurors can fill out the questionnaire -- the witness list.

(The Court and jury exit the courtroom at 10:47 a.m.)

(There is a recess in the proceedings at 10:47 a.m.)

THE CLERK: All rise.

(The Court enters the courtroom at 11:05 a.m.)

THE CLERK: One at a time?

THE COURT: One at a time, yes.

THE CLERK: One at a time: Ms. Walsh.

MR. SWOMLEY: Your Honor, I haven't gotten a copy of the juror -- the questions that were posed over there.

THE COURT: The list? The witness list?

MR. SWOMLEY: Yes. I didn't get a copy of that.

THE COURT: Do we have an extra list?

MR. SWOMLEY: No, no, no. I'm sorry, your Honor. I thought we were going to get a list of each juror's answer.

THE COURT: The jurors have them with them.

MR. SWOMLEY: Can we be seen at sidebar, please?

THE COURT: Yes.

(Discussion at sidebar and out of the hearing of the jury:)

MR. SWOMLEY: Your Honor, I thought we were going to get copies of what they filled out next door before we --

THE COURT: They're bringing it with them. They're just to circle names of the witnesses that they recognize. I'm going to go over it with them.

MR. SWOMLEY: Okay. Are you going to give us copies of those or not?

THE COURT: There's only one copy.

MR. SWOMLEY: Okay.

THE COURT: I'm going to look at them, and I'll announce if anybody is circled.

MR. SWOMLEY: Okay. All right.

THE COURT: I mean, that was...

MR. BORENSTEIN: Okay.

THE COURT: I mean, if you want, we're going to collect them so you could look at them, but it's just going to indicate who they know.

(In open court:)

THE COURT: Hi. You are Karen Walsh?

THE JUROR: Yes.

THE COURT: You have to speak up enough so that the lawyers can hear you. It's important that they hear you. I don't have a mic here, but the acoustics here are very good.

THE JUROR: Okay.

THE COURT: Let me just ask: We have a list of all potential jurors, and for -- there are some categories, where you live and your spouse's occupation and then an occupation for the juror herself.

For you it says "unemployed," but have you been employed?

THE JUROR: Yes.

THE COURT: What kind of work have you done?

THE JUROR: Just secretarial work.

THE COURT: And for whom? When was the last time you worked?

THE JUROR: Maybe six years ago. For Harvey Industries.

THE COURT: For Harvey Industries? All right.

Now, let me look at your list. Is there anybody here you recognize?

THE JUROR: No.

THE COURT: Okay. I'll give the list to the clerk. Thank you.

I have a few other questions. You didn't answer any of the questions that I asked as a group. Let me just ask you -- I'll just sit because it's easier for me to do my clerical work.

Having in mind the broad group of people -- not just yourself personally but people close to you -- has anyone in that group been the victim of fraud of any kind?

THE JUROR: No. No.

THE COURT: Has anyone in that group been the victim of identity theft?

THE JUROR: No.

THE COURT: Or any other crime? Any crime? Mugging? Bank robbery? Anything? Anybody in your close circle ever been the victim of a crime?

THE JUROR: No, nothing to my knowledge.

THE COURT: Okay. Let me ask the other side of that question: Has anybody in that small group been accused of a crime?

THE JUROR: Not to my knowledge, no.

THE COURT: This is a criminal case. In any criminal prosecution the person accused, the defendant, is presumed to be innocent unless and until the government proves to the contrary and proves that the person is guilty beyond a reasonable doubt. Those principles of presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law.

Would you have any difficulty in accepting and applying those principles faithfully?

THE JUROR: No.

THE COURT: I've told you about the schedule we intend to follow. And understanding that it's an inconvenience for anybody who has to serve, is there anything that is a particularly serious problem that you would suffer on that schedule?

THE JUROR: No, not to my knowledge. No.

THE COURT: Okay. Thank you. You will now go to Courtroom 7 and shortly be joined by others.

(The juror exits the courtroom.)

MR. ULLMANN: May we be heard, your Honor?

MR. SWOMLEY: Before we bring another juror in, your Honor, I want to --

THE COURT: I know. I want to see the clerk.

I don't want any other jurors. Is there another juror here?

THE CLERK: I'm sorry, Judge?

THE COURT: Who's the next juror?

Okay. There are no jurors present. Go ahead.

MR. SWOMLEY: Your Honor, I think that in an individual voir dire, at the very least you need to inquire with respect to their relationship with a mortgage company, if they have one; their own, first and second; problems making mortgage payments; issues with mortgage company; relationship and feeling towards any mortgage company. I think those are relevant questions that need to be posed to every juror.

MR. BORENSTEIN: I would join in that, Judge O'Toole. I think it's the nature of the case and the impact on society, recently with the bank crisis and the like --

THE COURT: Okay. I'm not -- go ahead.

MR. LEE: I had filed a request that inquired into whether they had any particular view on race or origin. We have three black defendants and one Jewish defendant. And I don't know if you're intending to inquire on that, but I would ask that you do.

THE COURT: I'm not going to ask those questions. I don't think there's anything in the case specifically that calls for that.

As to the mortgage issue --

MR. LEE: Note my objection.

THE COURT: Certainly.

MR. SWOMLEY: And I join in that.

THE COURT: Fine.

MR. ULLMANN: Your Honor, I would ask, without regards to naming any particular group, it would seem to me that it's essential that any juror not have any bias toward any particular race, ethnicity or religion. And I would request that each juror be asked if they do harbor any bias that could, in any case, prevent them from being impartial.

THE COURT: I will amend -- and we'll call back the juror that -- I'm going to ask a general question which sort of touches on both but is much more open-ended than either of you suggested. So to the extent it's otherwise, I reject the request. But --

MR. LEE: Judge, that was not a request.

THE COURT: -- the question will be something like, understanding, in general terms, what the nature of the case is, and the subject matter of the case, is there any reason why, given that subject matter, you would be unable to be a fair juror? I will ask that. But I'm not going to delve directly into mortgage interests, relationships, attitudes towards current events or anything like that.

MR. ULLMANN: On behalf of Miss Haltiwanger, I do request that the Court specifically ask each juror whether the juror has any racial or ethnic or other bias that could prevent them from being completely impartial in this case.

MR. LEE: And, your Honor, that was my voir dire question. I did not intend the voir dire question to be a reference to either the three defendants or the single defendant by race or anything.

THE COURT: I don't think it's necessary.

MR. SWOMLEY: I would join as well in that and I would, in addition, ask your Honor, beyond the race question, I think I would want to know, in terms of my exercising of peremptory challenges, whether or not they own or rent their home. I think those are important considerations in making a fair assessment of each juror.

THE COURT: Okay. Noted.

MR. WILD: Your Honor, I would just ask -- I'm assuming that the Court is going to give its standard instruction to the jury that they may not let prejudice, bias or emotions enter into their verdict?

THE COURT: They will eventually be instructed that way, yes.

MR. WILD: Thank you.

THE COURT: So would you bring back Juror No. 1?

MR. BORENSTEIN: Judge, if I may, you did not mention the defendants do not have the burden of proof, that it is on the government --

THE COURT: The jury will get that eventually. It's very rare that anybody has any problem with this because it's

such an emotional idea that people accept. They'll be appropriately instructed, the actual jury. This is just to see whether there's anything on the surface that is out of the ordinary.

THE CLERK: Judge, I have Juror No. 1, Ms. Walsh.

THE COURT: Yes. Thank you.

You don't have to come all the way up; I could ask you from there. One question I meant to ask you, which I didn't, you heard me describe generally the nature of the case, the kinds of criminal charges that are made and the fact that it may involve what is perhaps colloquially referred to as "mortgage fraud" or something like that.

Is there anything about the nature of the charges that are made or anything else you heard about the case that would cause you to have a problem in being a fair and impartial juror because of the subject matter of the case?

THE JUROR: No. I just don't really understand it.

THE COURT: Well, what do you mean, you don't understand it?

THE JUROR: Pretty much -- well, it all depends.

THE COURT: Do you have any preformed ideas that would lead you to be swayed one way or another apart from what the evidence shows you? In other words, would you have any pre-commitment to one outcome or another, not having -- despite what the evidence would indicate, or would you be able to

follow the evidence and decide, when the issues are presented to you, what you heard in the courtroom?

THE JUROR: I don't know. That's the problem. Like, I don't know a lot about the whole fraud thing. I'm not familiar with any of that stuff.

THE COURT: The case will present information on which you'll have to make a judgment. If the information isn't enough for you to make a judgment, you'll have to deal with that at the appropriate time. It may be enough for you to make a judgment.

My question is whether you have any bias in your judgment, one way or the other, because of some previous experience, belief or attitude or something like that?

THE JUROR: No. No.

THE COURT: Okay. Thank you.

(The juror exits the courtroom.)

THE COURT: The next juror, Paul?

THE CLERK: Yes, sir.

Juror No. 2, Lynda Fagerlund.

THE COURT: Good morning.

THE JUROR: Good morning.

THE COURT: You're Lynda Fagerlund?

THE JUROR: Correct.

THE COURT: Are you currently employed?

THE JUROR: Yes.

THE COURT: What do you do?

THE JUROR: I'm a labor and delivery tech at Emerson Hospital in Concord, and I attend school part time.

THE COURT: Where are you going to school?

THE JUROR: Middlesex Community College.

THE COURT: Studying?

THE JUROR: Getting into a nursing program.

THE COURT: Okay. How long have you been at the Emerson Hospital?

THE JUROR: Seven years.

THE COURT: In addition to the -- you didn't answer any of the questions that I had asked the group. Let me ask some additional ones. Referring to the family group that I was talking about of close friends and associates, has anybody in that group ever been the victim of fraud, to your knowledge?

THE JUROR: To my knowledge, no.

THE COURT: Has anyone in that group particularly been the victim of identity theft?

THE JUROR: Not that I'm aware of.

THE COURT: A very broad question: Anybody in that group ever been accused of any crime of any sort?

THE JUROR: No, unless they didn't tell me.

THE COURT: I'm just asking what you know about.

Let me ask the opposite of that question: Has anybody in that group ever been accused of committing a crime?

THE JUROR: No.

THE COURT: Any defendant in any criminal case is presumed to be innocent unless and until the government proves to the contrary, that he's guilty beyond a reasonable doubt. Those principles of the presumption of innocence for each defendant, proof beyond a reasonable doubt, are fundamental ones in our law.

Would you have any difficulty in accepting and faithfully applying those principles in a criminal case if you're a juror?

THE JUROR: I would not have any problems.

THE COURT: I told you in very general terms the nature of the prosecution, that this is -- if we could use just the casual or colloquial way of describing it as allegations of mortgage fraud. Is there anything about the nature of the case because of any past experience, any beliefs, attitudes, biases you might have that would interfere with your ability to be a fair and impartial juror?

THE JUROR: No.

THE COURT: I described the schedule, and it's going to be a case that may take a few weeks to present. Apart from the inconvenience that everybody has necessarily to be a juror, is there anything over the next several weeks that would be a serious impediment to your ability to serve as a juror?

THE JUROR: No. The only thing is my supervisor told

me that she only pays me for three days.

THE COURT: Well, there is some compensation for jurors to serve extended periods of time which can include expenses for travel and so on. I think you've been briefed on that?

THE JUROR: Yes.

THE COURT: Okay. Thank you.

THE JUROR: Do you need this?

THE COURT: Did you know anybody?

THE JUROR: No.

THE COURT: Thank you. You may go back to Room 7.

(The juror exits the courtroom.)

THE COURT: Next one?

THE CLERK: That's Juror No. 3, Jonathan Colby.

THE COURT: Good morning.

THE JUROR: Good morning.

THE COURT: You answered one of the questions that I asked to the group and that is whether you or somebody close to you had a connection with law enforcement.

THE JUROR: Correct.

THE COURT: You have to keep your voice up because they have to hear you too.

THE JUROR: Sorry.

THE COURT: Tell me what led you to answer that "yes."

THE JUROR: My brother works at the Cambridge city

police -- Cambridge Jail. He's a correctional officer, deputized by Middlesex.

THE COURT: How long has he done that?

THE JUROR: Two years now.

THE COURT: And did he have any other law enforcement work before that?

THE JUROR: No.

THE COURT: Do you -- do you and your brother live in the same residence?

THE JUROR: We do.

THE COURT: In a -- so he is one of the staff correctional officers in the Middlesex County Jail, is that it --

THE JUROR: Correct.

THE COURT: -- in East Cambridge? Is it still in East Cambridge? I don't know.

THE JUROR: I just thought Cambridge.

THE COURT: Anyway, does that give you any concern about your own ability to be impartial and fair in a criminal prosecution?

THE JUROR: A little.

THE COURT: Why?

THE JUROR: He just comes home and tells stories about how some of the prisoners are rude, how they treat other people. And I don't want them to give him any attitude for

something I might have done or been a part of.

THE COURT: Okay. Thinking of the group that I talked about, not just you but people very close to you, has anybody in that group ever been the victim of fraud of any kind?

THE JUROR: No.

THE COURT: Anybody in that group been the victim of identity theft?

THE JUROR: No.

THE COURT: How about any crime?

THE JUROR: No.

THE COURT: Has anybody in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal prosecution a defendant is presumed to be innocent of what he's charged with unless and until the government proves that he's guilty beyond a reasonable doubt. The principles of presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law.

Would you have any difficulty in a criminal case in accepting and applying those principles faithfully?

THE JUROR: No.

THE COURT: I told you generally what the case is about, allegations by the government of a scheme to defraud involving mortgages, mortgage lending. Is there anything in

your personal experience, your beliefs, your attitudes, potential biases that could affect your ability to be a fair and impartial juror in this case?

THE JUROR: No.

THE COURT: I outlined the schedule that we're going to follow, including the anticipated length of the trial. Apart from the general inconvenience that any juror would have, is there anything over the next several weeks that is a particularly serious problem for you if you were to be called to be serving on this jury?

THE JUROR: No.

THE COURT: Do I have the list? What did I do with it?

Anybody you recognize on the list?

THE JUROR: No.

THE COURT: Okay. Thank you. Courtroom 7.

(The juror exits the courtroom.)

MR. SWOMLEY: Your Honor, could I ask you to do some follow-up on that particular juror? That juror had said that he didn't want to get his brother into any trouble or grief for what he might do, and that was the open-ended question that you gave him that allowed him to expound upon that. And then you asked him a rather closed-ended question which said "nothing about this will prevent you from being able to be fair and impartial," and he says "no," but essentially the previous

answer flies in the face of the second answer which was suggested to you by -- suggested to him by you in terms of the answer.

So in terms of -- when you gave him the latitude to come up with his own answer, he demonstrated that he did have some bias. And I would suggest that giving him the closed-ended question that you gave him after that to rehabilitate him in my view doesn't rehabilitate him. And, in fact, I would suggest he may be a for-cause depending upon whether you allowed him to expound in a little more detail with respect to his worries about what he would do here that might impact on his brother.

And I would ask that he either be struck for cause at this juncture or you do further inquiry on him.

THE COURT: Well, I'm going to entertain cause objections in a bit when we've gotten more jurors. And we'll discuss the issue at that point, but I don't think it's necessary to inquire further.

MR. SWOMLEY: Unless you believe that cause has been established, I would submit cause does need to be inquired further.

THE COURT: I hear you. I understand.

Next one.

THE CLERK: Juror No. 4, Michelle Dionne.

THE COURT: Good morning.

THE JUROR: Good morning.

THE COURT: Michelle Dionne. And you had answered one of the general questions, I think, about connection with banking, real estate, mortgage lending, something like that. Tell me a little bit about that. Keep your voice up so the lawyers can hear you.

THE JUROR: I worked in a bank as a teller for a few years. That was a while back.

THE COURT: And how long did you do it?

THE JUROR: A couple of years.

THE COURT: When you say "a teller," this is at the counter when the public comes in to make deposits or whatever?

THE JUROR: Yes.

THE COURT: Anything about that experience that would affect your judgment in a case like this --

THE JUROR: No.

THE COURT: -- one way or another?

Let me just look at your list. Did you recognize anybody?

THE JUROR: No.

THE COURT: Now, in addition to the general questions I asked everybody, let me ask you a few more. Thinking of the group that I defined for you, the family and close associates and friends and so on, is there anybody in that group who has been the victim of any fraud of any kind?

THE JUROR: No.

THE COURT: Anybody in that group ever been the victim of identity theft?

THE JUROR: No.

THE COURT: Anybody in that group ever been a victim of any kind of crime?

THE JUROR: No.

THE COURT: Turning the question around, anybody in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case such as this, any defendant -- each defendant -- is presumed to be innocent of the crime charged unless and until the government proves contrary on the evidence and proves the person is guilty beyond a reasonable doubt. Those principles of the presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law.

Would you have any difficulty in accepting and applying those principles faithfully in a case like this?

THE JUROR: No.

THE COURT: Understanding in general terms the nature of the prosecution, what it's going to be about -- it's going to be allegations of fraud involving mortgage lending and so on -- is there anything in your personal experience, beliefs, attitudes, biases that would affect your ability to be an

impartial juror in this case given its subject matter?

THE JUROR: No.

THE COURT: I outlined in general terms the way we'll proceed, the schedule we'll follow and the fact that the case may take a few weeks. Apart from the common inconvenience that everybody has who has to serve on such a jury, is there anything over the next several weeks on that schedule that would be a serious out-of-the-ordinary impediment to your being able to serve?

THE JUROR: No.

THE COURT: All right. Thank you.

THE JUROR: Okay.

(The juror exits the courtroom.)

(There is a brief interruption in the proceedings.)

THE COURT: Renee Qualter. First of all, you've handed me the witness list. You didn't recognize anybody on that list?

THE JUROR: No.

THE COURT: I don't think you answered any of my general questions affirmatively, so let me ask you some additional questions that I didn't ask the group. Having in mind the small group of people that I -- members of your family household, closest of friends and associates and so on, anybody in that group ever been the victim of fraud of any kind?

THE JUROR: Insurance. Basically, some of the

policies were higher than they should have been as far as the premiums were for business.

THE COURT: Who was the person that was involved in this?

THE JUROR: My mom. She was the one who was getting those agreements, guess you would say.

THE COURT: What kind of insurance?

THE JUROR: Business insurance.

THE COURT: Her own company?

THE JUROR: The one that she's the manager of, that her duties are for the job listed to get those agreements, find a fair price.

THE COURT: What company?

THE JUROR: It's B-Dry, which is the waterproofing basement company.

THE COURT: And she's in charge of arranging for insurance?

THE JUROR: That's correct.

THE COURT: Tell me what you understand to have been a fraud that was --

THE JUROR: It's actually ongoing currently. An insurance company -- basically, they had worked with them in the past. But over the years the premiums, you know, had gone up. And then it was found out, I believe by the Attorney General, that they're charging more than they should to

business owners and basically pocketing, like, the money so they're charging higher commissions and not --

THE COURT: Is this -- you mentioned the Attorney General. Is your mother working with somebody from the Attorney General --

THE JUROR: She --

THE COURT: Wait a minute. Let me finish the question. Is she working with somebody in the Attorney General's office in an ongoing investigation?

THE JUROR: Yes.

THE COURT: So that -- all right. Anybody want to follow up on that issue? Any questions about that?

MR. WILD: I would ask the Court the general inquiry as to whether that would impact --

THE COURT: Any more details?

MR. BORENSTEIN: The name of the insurance company?

THE JUROR: Kilborn (ph).

THE COURT: Is it an agency or the company that actually issues the insurance?

THE JUROR: It's the company that issues the policies.

THE COURT: Have you personally been involved in the investigation other than talking to your mother about it?

THE JUROR: No.

THE COURT: You don't work for the company?

THE JUROR: Part-time I do, not my regular job but

just as they need me.

THE COURT: Is it a family business?

THE JUROR: It is but not my family.

THE COURT: Does your mother's experience and your familiarity with it give you any reason to be certain about your ability to be a fair and impartial juror in a case that will be allegations of some kind of fraud even if it's not the same?

THE JUROR: I would say so. I answered the question that I'm not really that impartial because at a certain point, with types of things, I do get involved. I don't think there's any question or doubt there's fraud and that it's mostly true.

THE COURT: Let me -- I asked you about that -- about any kind of fraud. Let me ask you a particular kind. Has anybody in your circle ever been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anybody been accused of any other kind of -- a victim of any other crime?

THE JUROR: I've actually --

THE COURT: Fraud, identity, anything else?

THE JUROR: Not for those types.

THE COURT: Anything else?

THE JUROR: I was a witness for a break-in at my own home. That was once. And then just for my job because I work in retail. I go to court because of shoplifting charges.

THE COURT: How often do you go to court?

THE JUROR: At least once every other year. I work for a gift shop here in Boston.

THE COURT: Ever been accused of a crime?

THE JUROR: I have an uncle that went to jail for a crime. Married my aunt.

THE COURT: What was he charged with?

THE JUROR: Molestation.

THE COURT: When was that?

THE JUROR: Ten years ago.

THE COURT: All right. Thank you.

MR. SWOMLEY: Your Honor, something that this juror said troubles me and that is that she --

THE COURT: Let me -- we'll come to the issues of what they say.

MR. SWOMLEY: It concerns, I think, all the jurors in this question.

THE COURT: Go ahead.

MR. SWOMLEY: She had indicated that she had even answered the question that she's not really that impartial, suggesting that there's some juror questionnaire that she's filled out somewhere else that we haven't seen here. Is that the case? Is there something that these jurors have sent in, for example, where they were asked questions or where they gave some answers in some other form? Because that -- the answer

she gave suggests that she had written down or had said something to someone previously.

THE COURT: I honestly don't know the answer to that question. I'll ask the clerk.

THE CLERK: I'm not entirely sure, but I can find out if that's something that's asked of them before they come in. I would tend to doubt that, but I can't say a hundred percent.

THE COURT: I think we should find that out.

(Discussion held off the record. )

THE COURT: This may take five minutes. Why don't we just take a break while --

(Recess taken at 11:39 a.m.)

(The Court entered the room at 11:53 a.m.)

THE COURT: Okay. There is a juror qualification questionnaire which asks questions, for example, about citizenship and age and so on to make sure the person is qualified to serve as a juror. There is a relatively open-ended question at the end which permits people to write things which are not confined to a pointed question. And then there's a place for extended remarks on the other side. I've asked the clerks to assemble these questionnaires for this pool so that counsel may review them. That's going to take a little time.

MR. BORENSTEIN: Thank you.

THE COURT: So I think what we should do is take our

lunch break now, from 12 to 1, and resume at 1:00, at which time -- if you come back early, at quarter of 1, we hope you would have a packet of questionnaires that you can look at.

MR. BORENSTEIN: We'll go till 5 p.m. today, your Honor?

THE COURT: I have a hearing that I have to do at 4, but I could take that hearing and then resume a little -- I don't know. I haven't figured it out. We might stop at 4. It depends on how much progress we've made. If another hour would do it, I'm inclined to do it. If it's another four or five hours' worth, I'll do it tomorrow.

MR. WILD: Was the Court going to do an in camera review of those collected questionnaires?

THE COURT: No, no. I think -- I think that the more direct way is to let counsel look at it and see what they -- what issues may arise from it. I'm -- I should say I'm most interested in the broad-ended question, which is something like grounds for requesting excuse rather than whether they are -- I don't know what the others -- whether there's a physical or mental -- I don't know. Whatever the information is, we'll deal with it.

So we'll resume the formal session at 1. If you're back here by quarter of 1, we hope to have some questionnaires that we can take a look at.

(Luncheon recess taken at 11:55 a.m.)

(The Court entered the room at 1:10 p.m.)

MR. WILD: We have a matter briefly at sidebar. It pertains to Defendant Latoya Haltiwanger.

(SIDEBAR CONFERENCE AS FOLLOWS:

MR. ULLMANN: My co-counsel, Sarah Kelly, has applied to the U.S. Attorney's Office to be an assistant U.S. attorney. Miss Kelly and I previously explained this to Miss Haltiwanger and, notwithstanding that, Miss Haltiwanger is completely comfortable having Miss Kelly at trial. My co-counsel (sic), in fact, wants her to be my co-counsel at this trial. The U.S. Attorney's Office wanted that on record before the jury was empanelled.

THE COURT: What does the U.S. Attorney's Office think?

MR. WILD: We would ask you to inquire directly of the defendant and get the confirmation.

THE COURT: Miss Haltiwanger, you understand the issue, the potential conflict of interest, that Miss Kelly might be less unilaterally on your side if she has some interest in joining the prosecution team at the U.S. Attorney's Office. You understand, I guess, the circumstances. Do you have any objection to her continuing as your counsel?

MS. HALTIWANGER: No. I'm fine with it.

THE COURT: Okay. Have you thought about it for a while?

MS. HALTIWANGER: (Nodding.)

THE COURT: I'm not encouraging you one way or another. I want to make sure you're not giving a snap reaction to --

MR. ULLMANN: I'll put on the record, we discussed it at some length, I think it was about a week ago, a week and a half ago.

MR. WILD: The only other thing, your Honor, we understand the application is in. It's our understanding among the AUSA that no interview has been scheduled yet. We don't know where it might be in the process at this point.

THE COURT: Anything else that anybody wants to say about that? Okay.

MR. WILD: Thank you, your Honor.

END OF SIDEBAR CONFERENCE.)

THE COURT: Where were we? Okay. Counsel have been provided with what we have been able to locate as questionnaires, and there are some attachments to some of those matters. What I'm most interested in and which provoked this was the open space for other remarks and comments. I've looked very quickly at the packet that I've been given, and it looks like there are relatively few who have written anything in that section.

I propose to simply, as we go through the list as we have been doing it, you can have the appropriate questionnaire.

And if there's something that appears there that you think is not covered by my questions, we can try to address that.

I would note that there apparently are three people in the pool for whom no questionnaire can be located. Whether it's that they didn't submit it or it has been misplaced somehow -- one of those is Juror No. 2, whom we've already inquired of, Linda Fagerlund. They simply weren't able to find any questionnaire for her. The other two in that category are Juror No. 33 on the list, Gary Chancey, and Juror No. 48, Elizabeth Pelletier. Other than that, we think we have questionnaires for all of the jurors in the pool.

Before we go on to the next juror, to Juror No. 6, I don't know whether -- as a result of seeing the questionnaires, are there any issues about any of the jurors we've inquired of other than Miss Qualter who raised the issue but -- I don't want to get ahead of myself, but she's not going to be on the jury. That would be one, two, three and four, I guess. Mr. Walsh; Fagerlund we don't have a questionnaire; Colby; and Dionne. Anything we need to do on any of them? No. Look at Colby's. He says on his form something he's already told us. Okay.

So we'll proceed, then, with Juror No. 6.

THE CLERK: Juror No. 6, Ellen Beck.

THE COURT: Good afternoon.

THE JUROR: Good afternoon.

THE COURT: I don't think you answered any of the general questions I had for people. I have some additional ones that I'd like to ask you. First of all, we have some rudimentary information about people, employment and so on and so forth. For you it says, "Organizer/Unemployed." It seems a little inconsistent.

THE JUROR: I'm currently unemployed.

THE COURT: And have been an organizer?

THE JUROR: Yes.

THE COURT: What did that entail?

THE JUROR: I worked for a children's advocacy organization rallying parents on Beacon Hill to fight for public education.

THE COURT: What was the name of the group?

THE JUROR: Stand For Children.

THE COURT: Okay. I have your juror -- counsel, one other mechanical difference is, over the lunch break, we collected all the witness forms, and I have them in order, and we'll -- rather than have the jurors bring them in.

Did you recognize anybody on the list?

THE JUROR: No.

THE COURT: Okay. Having in mind the group that I talked about, your closest family members, friends, associates and so on, is there anything in that group who, to your knowledge, has been the victim of fraud?

THE JUROR: Not that I'm aware of.

THE COURT: Keep your voice up a little.

THE JUROR: Not that I'm aware of.

THE COURT: And, in particular, anybody in that group -- has anybody in that group been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anybody in that group been the victim of any crime of any sort?

THE JUROR: No.

THE COURT: Okay. Reverse of that question, has anybody in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: A defendant in a criminal case such as this is presumed to be innocent unless and until the government proves otherwise by the evidence in the case and proves that the person is guilty beyond a reasonable doubt. Principles of the presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law. Would you have any difficulty in accepting and applying those principles faithfully if you were a juror in this case?

THE JUROR: No.

THE COURT: You know generally what the nature of the case is. It's a criminal prosecution involving alleged conspiracy or scheme to defraud involving mortgage lending.

Understanding that's the topic that the case is going to be about, is there anything in your personal experience, beliefs, attitudes, potential biases, that might interfere with your ability to be a fair and impartial juror in this case?

THE JUROR: No.

THE COURT: And I outlined for you the schedule that we'll follow and, as a consequence, the anticipated length of the trial. Apart from the inconvenience that all jurors will share to disrupt things for a period of time, is there anything over the next several weeks that would be an out-of-the-ordinary obstacle or hardship?

THE JUROR: The only thing is I am unemployed, so I have a job interview on Thursday morning that I'm looking forward to, hoping to get back to work. And I have a family wedding this coming weekend where I have a flight already scheduled on Friday and returning Monday afternoon. So --

THE COURT: What time is the job interview?

THE JUROR: The job interview is at 11:00.

THE COURT: That's here in Boston?

THE JUROR: Yes.

THE COURT: Do you have any sense as to whether it could be rescheduled to the afternoon, for example?

THE JUROR: I can try. I'm also feeling a little bit anxious about being unemployed, so --

THE COURT: How about your travel plans, are those --

THE JUROR: Those are set. I mean, they're nonrefundable tickets, so I incur the costs.

THE COURT: Okay. Thank you.

THE JUROR: Thank you.

THE CLERK: Juror No. 7, Tim Carney.

THE COURT: Mr. Carney. In addition to the general questions, I think none of which you answered, I have some additional ones. First, let me ask you about the witness list you went over.

THE JUROR: Uh-huh.

THE COURT: Is there anybody you recognized?

THE JUROR: No.

THE COURT: Now, having in mind the small group that I talked about, the closest people to you, your family members, household members and so on, anybody in that group who, to your knowledge, has ever been the victim of fraud?

THE JUROR: No.

THE COURT: In particular, is there anyone in that group who has been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anybody in that group ever been a victim of any kind of crime?

THE JUROR: No.

THE COURT: Has anyone in that group ever been accused of a crime?

THE JUROR: Family members?

THE COURT: Anybody in that circle, yes, anybody close to you, regardless of whether it was a conviction or not, whether there was an accusation of a crime.

THE JUROR: No.

THE COURT: A defendant in a criminal case such as this is presumed to be innocent unless and until the government proves otherwise by the evidence and proves that the person is guilty beyond a reasonable doubt. Those principles of presumption of innocence and of proof beyond a reasonable doubt are fundamental ones in our law. Would you have any difficulty in accepting and applying those principles faithfully in this case if you were a juror?

THE JUROR: I would not.

THE COURT: I told you in a very broad way what the case -- subject matter of the case is. It's allegations of a conspiracy or scheme to defraud in the mortgage lending area. Is there anything in your personal experience, your beliefs, attitudes, potential biases, that would interfere with your jury -- your service as a juror in this case understanding --

THE JUROR: No, it would not.

THE COURT: I outlined the schedule that we'll follow, and as a consequence of the schedule, the likely length of the trial, which is fairly long. Apart from the inconvenience that all jurors are going to share in having to rearrange things, is

there something over the next few weeks that makes it a particularly difficult situation for you to serve on the jury?

THE JUROR: No.

THE COURT: Thank you, sir.

THE JUROR: You're welcome.

THE CLERK: Marsha Hammond. Juror No. 8, Marsha Hammond.

THE COURT: Good afternoon.

THE JUROR: Hi.

THE COURT: I have your witness list here. Do you recognize anyone on that?

THE JUROR: Yes.

THE COURT: I don't see the circle.

THE JUROR: Levine.

THE COURT: Who's that?

THE JUROR: The defendant.

THE COURT: You know Mr. Levine?

THE JUROR: Yes.

THE COURT: Okay. I thought I had asked earlier.

THE JUROR: You did but I recognized the name. I couldn't see him because he was --

THE COURT: I see. How do you know him?

THE JUROR: He was a real estate agent, and he -- I almost bought a house from him. And I also did -- I also -- I said I know Mr. Levine. I almost bought a house from him about

-- maybe about six, eight years ago.

THE COURT: Where was the house?

THE JUROR: It was in Weymouth. It was a townhouse in Weymouth, Massachusetts.

THE COURT: Okay. You say you almost did. Something happened that led you not to do it?

THE JUROR: Yes.

THE COURT: What was that?

THE JUROR: My husband did not feel comfortable buying a house from Mr. Levine. We chose a different real estate agent.

THE COURT: And you had personal --

THE JUROR: Just business --

THE COURT: -- personal contact with him yourself, though?

THE JUROR: Yes.

THE COURT: Does that lead you to think that you would be unable to be an impartial juror in this case?

THE JUROR: Possibly, yes.

THE COURT: Okay. Thank you.

THE CLERK: John King.

THE COURT: Mr. King, I have your witness list. Do you recognize -- you've circled on the first page, under the name "Mark Borst, Stewart Title Guaranty," then you've written, "National account for my company, Aerotek."

THE JUROR: Correct.
THE COURT: Can you expand a little bit?
THE JUROR: Aerotek is a human resources capital company. We provide temporary employees to companies. That's one of our national clients.
THE COURT: You provide employees to Stewart Title?
THE JUROR: Correct.
THE COURT: This comes under the name of Mark Borst.
THE JUROR: I do not know that person, no.
THE COURT: Do you personally deal with Stewart?
THE JUROR: No. A gentleman who works for me sold the account nationally for us, so I do not directly work with Stewart Title. My employee does.
THE COURT: Has a relationship?
THE JUROR: Yes. He's in Houston, Texas.
THE COURT: You supervise him?
THE JUROR: Yes. I'm the vice president of national sales.
THE COURT: Stewart Title may be involved in some of the transactions that are involved here. I'm not as familiar with the evidence as the counsel are.
THE JUROR: That's why I thought I would let you know.
THE COURT: It may be they're a relatively prominent player here. Would that affect your ability to be an impartial judge of the evidence in the case?

THE JUROR: That why I noted it, yeah. We have a --

THE COURT: You think it would because of your business relationship?

THE JUROR: Correct.

THE COURT: Okay. I also -- you also had answered my general questions, a question about connection with the banking, real estate or mortgage lending.

THE JUROR: Correct.

THE COURT: Is there a different answer?

THE JUROR: No. It's the same. We do a lot of work within the mortgage industry, Bank of America, Wells Fargo. We provide a lot of temporary employees to the mortgage industry.

THE COURT: People who do mortgage work?

THE JUROR: Correct.

THE COURT: Do you yourself do that?

THE JUROR: I do not.

THE COURT: Okay. Thank you.

THE CLERK: Juror No. 10 is Liqing Chen.

THE COURT: Good afternoon.

THE JUROR: Good afternoon.

THE COURT: You have to -- everybody has to hear you, what you say, including, particularly, our court reporter who's taking everything down.

Let me look at your witness list. Did you recognize anybody on the list?

THE JUROR: No.

THE COURT: Okay. In addition to the questions I asked everybody, I have just a few more of you. Having in mind the small group of family and close personal friends and associates that I described earlier, people who are the closest to you, live in the household or immediate family and so on, focusing on that group, has anyone in that group ever been the victim of fraud to your knowledge?

THE JUROR: No.

THE COURT: In particular, has anyone in that small group ever been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anyone in that group been the victim of any kind of crime?

THE JUROR: No.

THE COURT: Has anyone in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case such as this, each defendant is presumed to be innocent of the charges made unless and until the government proves otherwise by the evidence and proves that the person is guilty beyond a reasonable doubt. Those principles of presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law. Would you have any difficulty in accepting and applying those principles

faithfully if you were a juror in this case?

THE JUROR: No.

THE COURT: No. Understanding in the broadest sense what the nature of the case is -- it's a criminal prosecution in which the government alleges a conspiracy or scheme to defraud involving mortgage lending. Given that subject matter, is there anything in your personal experience, your beliefs, your attitudes, potential biases, that would interfere with your ability to be a fair and impartial juror in this case?

THE JUROR: No.

THE COURT: I've described the schedule we'll follow and the likely duration of the case, that it may take a few weeks to complete. Understanding that it's an inconvenience for all jurors to serve on a trial of some length, is there anything over the next several weeks that makes it particularly difficult and out of the ordinary for you to serve if you were selected to be a member of the jury?

THE JUROR: I just need to send my daughter to school.

THE COURT: How old is your daughter?

THE JUROR: In high school, but I drive her to some games after school.

THE COURT: What are her school hours?

THE JUROR: 8 to 2.

THE COURT: You would be getting her in the afternoon after 2? Most of the trial will be finished by 1. Where does

she go to school? Boston?
THE JUROR: Brookline.
THE COURT: Anything else other than that?
THE JUROR: 2nd, I have an appointment.
THE COURT: We won't be going the 2nd. Thank you.
THE CLERK: Juror No. 11, Kathleen Michaud.
THE COURT: Miss Michaud, I have your witness list here. And did you recognize anybody on the list?
THE JUROR: No, I did not.
THE COURT: You answered one of the general questions I had, which was someone in your close circle having a connection with banking, real estate or mortgage lending.
THE JUROR: Right. My boyfriend is a realtor.
THE COURT: Okay. Where?
THE JUROR: Caldwell Banker on Cape Cod, out of Brewster. He doesn't do any, you know, mortgage lending or anything like that, but he is a realtor.
THE COURT: Meaning he --
THE JUROR: Sells real estate, domestic houses mostly.
THE COURT: How long has he been doing that?
THE JUROR: About 20 years, a long time.
THE COURT: Okay. Mostly representing sellers or both sellers and buyers?
THE JUROR: I would say mostly sellers, sometimes buyers, uh-huh.

THE COURT: Have you yourself ever engaged in that business at all?

THE JUROR: Never, no.

THE COURT: Does that give you any concern about your ability to be a fair and impartial juror in a case where the subject matter has to do with residential mortgages, the buying and selling?

THE JUROR: It really doesn't because even anything that we've ever talked about in terms of real estate, there's never been anything that sounds similar to this case. There's never been any fraud or any kind of problem like that.

THE COURT: Okay. Having reference to that same close group of people, has anyone in that group ever been the victim of fraud?

THE JUROR: No.

THE COURT: Has anyone in that group ever been the victim, in particular, of identity theft?

THE JUROR: No.

THE COURT: Has anyone in that group ever been the victim of any kind of crime?

THE JUROR: No.

THE COURT: Let me reverse the question. Has anyone in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: A defendant in a criminal case such as

this, every defendant, is presumed to be innocent of the charges made unless and until the government proves otherwise by the evidence at trial and proves that the person is guilty beyond a reasonable doubt. Those principles of the presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law. Would you have any difficulty or reservation in accepting and applying those principles if you were a juror in this case?

THE JUROR: No, I would not.

THE COURT: Other than perhaps what you've already told us about your boyfriend's connection with real estate work, understanding the nature of the case, again, is there anything in your own personal experience, beliefs, attitudes, potential biases, because of the nature of the case, that would make it difficult for you to serve fairly and impartially as a juror in the case?

THE JUROR: No.

THE COURT: I outlined for you all the schedule that we'll follow and the consequence in terms of what the length of the trial is likely to be. Apart from the inconvenience that all jurors will share in having to participate in a case of that length, is there anything over the next several weeks that the case might last that would be a serious impediment out of the ordinary that we should know about if you were to be called to serve?

THE JUROR: No.

THE COURT: All right. Thank you.

THE JUROR: Thank you.

THE CLERK: Juror No. 12, Mark Jewell.

THE COURT: Good afternoon, Mr. Jewel. I'm going to ask you a few more questions. You have to speak loud enough so they can all hear it. We're not amplified here.

I have your witness list. Did you recognize anybody on the list?

THE JUROR: I did not recognize anyone.

THE COURT: Thank you. Let me just -- you didn't have an answer to any of my general questions, I don't think.

THE JUROR: No.

THE COURT: I see that you are -- in your questionnaire had identified yourself as a journalist for the Associated Press. Any particular focus? Are you a business journalist as opposed --

THE JUROR: Currently, I cover mostly financial news, personal investment, write about mutual funds primarily for the past couple of years. Prior to that -- I've worked 18 years with the Associated Press, and I've covered a whole wide range of things including from time to time -- I covered a couple sentencing hearings in this courthouse on some matters. I've written about some mortgage issues over the years. I may have written a time or two about mortgage fraud.

THE COURT: Did any of that work leave you with any convictions or beliefs or anything that might interfere with your ability to be a fair, impartial juror in this case?

THE JUROR: I don't believe so. You know, I try to cover news objectively, and in covering it, I try to hear from both or all sides involved and don't take a particular view on mortgage issues.

THE COURT: Let me ask you about that group of people that I identified, family members, immediate family, household members and so on, closest people to you. Anyone in that group ever been the victim, to your knowledge, of fraud of any kind?

THE JUROR: Not to my knowledge, no.

THE COURT: In particular, has anybody in that group ever been the victim of identity theft?

THE JUROR: I can't think of anyone that's been a victim of identity theft.

THE COURT: Anyone in that group ever been the victim of any kind of crime, whether it's fraud or any other kind?

THE JUROR: I was a victim of some vandalism involving my automobile recently. No, nothing major that I can think of involving any immediate family members and crime.

THE COURT: Any identified perpetrators in the vandalism?

THE JUROR: No.

THE COURT: Just an unknown person?

THE JUROR: Unknown. Just someone came and knocked the car window out and never found out who it was.

THE COURT: The point is, there's been no criminal prosecution or investigation that you were involved in?

THE JUROR: Correct, uh-huh.

THE COURT: Has anyone in that circle of people close to you ever been accused of a crime?

THE JUROR: No. No one in my family or close friends that I know of have been accused of a crime.

THE COURT: Every defendant in a criminal case is presumed to be innocent unless and until the government proves otherwise by the evidence and proves that the person is guilty beyond a reasonable doubt. Those principles of the presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law. If you were a juror in this case, would you have any difficulty or reservation in applying those principles faithfully in this case?

THE JUROR: I would have no difficulty applying those principles.

THE COURT: We've maybe already touched on this at the beginning, but let me just ask again whether, given the nature of the case, the subject matter of the case, is there anything in your personal experience, beliefs, attitudes, potential biases that, because of the nature of the case, would make it difficult for you to serve as an impartial juror?

THE JUROR: I don't think so. Coincidentally, tomorrow I am refinancing my home and have a meeting to close on that, so I've been thinking about mortgages a lot lately. But I can't think of anything that I think would cause me to be unfair, impartial, about mortgage issues.

THE COURT: Okay. You say there is a closing tomorrow?

THE JUROR: Maybe.

THE COURT: You mentioned tomorrow.

THE JUROR: Depending on what happens here.

THE COURT: What I do to you, right?

THE JUROR: Yes.

THE COURT: Okay. I was going to ask what time it was scheduled for.

THE JUROR: 8:30, but it's sounding like I'll put it off.

THE COURT: I have given everybody an idea of the schedule to follow and the consequent likely length of the case, several weeks. As a result -- and, again, as I said, we understand that everybody has to rearrange and there's some inconvenience that is visited on all jurors. Is there anything over the next several weeks that would make it particularly difficult for you to serve if you were a member of the jury?

THE JUROR: Nothing unusual.

THE COURT: Thank you, Mr. Jewell.

THE JUROR: You're welcome.

THE COURT: We've come to the end of the first page. I think we'll maybe address some of the cause questions, keep ahead of them as we go page by page. I think it's maybe obvious to you that I have truncated the questions of some of those because I regarded it as a closed question as to whether they should be excused. Those were Jurors No. 5, 8 and 9. Qualter, Hammond and King I would excuse for cause.

Now, there are -- is there anyone else that ought to be excused for cause based on the first page?

MR. SWOMLEY: Number 3, your Honor, Mr. Colby, for cause. Doesn't want to get any grief for what he might do as a juror with his brother and his brother's employment. I would submit that it is a for-cause challenge as well.

MR. BORENSTEIN: I would join in that.

MR. LEE: Also, Judge, I join that challenge.

MR. SHEKETOFF: I thought we had agreed that --

MR. ULLMANN: Objection by one is presumptively an objection by all.

THE COURT: Fair enough. You don't want to undercut that ruling.

MR. SHEKETOFF: As the trial goes on, I think it becomes more and more important.

MR. LEE: I thought the word "challenge" to be separate from objections.

THE COURT: I see.

MR. LEE: I didn't understand.

THE COURT: Anything from the government?

MR. WILD: Yes, your Honor. I think -- I don't think -- as it was explained by counsel, I think the Court simply asked another question, a follow-up question, and asked whether anything about that -- and he said no.

THE COURT: I am going to excuse him. I am concerned he would be thinking about what people would think of the verdict.

Anybody else?

MR. SHEKETOFF: I have a general question, your Honor. One of these jurors, No. 6, Ellen Beck, said she has travel plans, leaving on Friday and coming back on Monday. I normally totally defer to the Court on these issues, but I don't know what you're thinking about people like that.

THE COURT: Unless there was a strong objection, I would be inclined to excuse her.

MR. WILD: Your Honor, could we ask Mr. Sheketoff, because he seems to be the one furthest from any microphone -- we cannot hear behind him and speak just slightly louder.

THE COURT: Maybe Mr. Lindley can slip that microphone over towards him.

Did you hear enough to hear what the gist of it was? If there's no objection, I will excuse, as a hardship matter,

No. 6, Ms. Beck.

MR. WILD: Yes.

THE COURT: Okay.

MR. LEE: I did not get one of these juror questionnaires with respect to Linda Fagerlund.

THE COURT: Right. It doesn't exist. We can't find it.

MR. LEE: Thank you, Judge.

THE COURT: Okay. Those we have not, on the first page, excused for cause have been passed on in a sense. We'll now go to Page 2. We'll do a similar exercise.

THE CLERK: Juror No. 13, Jean Restagno.

THE COURT: Hi. I have your list of potential witnesses. Did you recognize anybody on the list?

THE JUROR: No.

THE COURT: You have to keep your voice up good and loud.

THE JUROR: No one. Yes. I know nobody.

THE COURT: I don't think you answered any of my general questions. Let me just ask you a couple more that I didn't ask the group as a whole. Having in mind the group of close family members, household members, people who are closest to you, everyone in that group ever been the victim of any fraud?

THE JUROR: No.

THE COURT: No?
THE JUROR: No.
THE COURT: Anyone in that group ever been the victim of identity fraud in particular?
THE JUROR: No.
THE COURT: Has anyone in that group been the victim of any crime?
THE JUROR: Yes.
THE COURT: What?
THE JUROR: Drug arrest.
THE COURT: Well, I'm going to come -- accused of a crime?
THE JUROR: Accused.
THE COURT: I'll come to that. Let me ask if anybody has been a victim of a crime of any sort.
THE JUROR: Yes, granddaughter.
THE COURT: Tell me about that.
THE JUROR: Rape.
THE COURT: When was that?
THE JUROR: A few months ago. Actually, it's been going on for years.
THE COURT: Is there a prosecution?
THE JUROR: One pending.
THE COURT: Where is that?
THE JUROR: In Barnstable.

THE COURT: Have you been involved at all on the family side in the process?

THE JUROR: I have my grandson. I have to have my grandson with me.

THE COURT: So you take care of him if she's --

THE JUROR: She's with her parents.

THE COURT: Have you had any contact with the law enforcement people or the lawyers involved in the case at all?

THE JUROR: No.

THE COURT: Have you been attending any of the court sessions if there have been any?

THE JUROR: No.

THE COURT: Before I move on, anybody else besides that in your group that have been a victim of a crime?

THE JUROR: No.

THE COURT: Does her unfortunate experience leave you with any feelings about the justice system, for example, or about anything else that would affect your ability to be a fair juror in a case?

THE JUROR: No.

THE COURT: Now let me get to the question that you started to answer, whether anybody in that group have been accused of a crime.

THE JUROR: Yes.

THE COURT: Who was that?

THE JUROR: Daughter-in-law and son.

THE COURT: When was that?

THE JUROR: Years ago, many.

THE COURT: How many?

THE JUROR: Oh, good grief, twenty years ago.

THE COURT: Where was that?

THE JUROR: Barnstable.

THE COURT: What was the -- you're from Hyannis?

THE JUROR: Yes.

THE COURT: Where was the -- it was in the state courts, was it?

THE JUROR: Actually, I don't think it ever got that far. They were arrested and then they got gone.

THE COURT: Okay. What was the drug involved?

THE JUROR: Good grief. I think it was marijuana.

THE COURT: Okay. Anything about that episode in your family's history that would leave you with feelings that you might be affected by sitting as a juror in a case like this?

THE JUROR: I don't think so.

THE COURT: Every defendant in a criminal case is presumed to be innocent with the charges made unless and until the government proves by the evidence and proves that the person is guilty beyond a reasonable doubt. Those principles of the presumption of innocence and proof beyond a reasonable doubt are fundamental in our laws. If you were a juror in this

case, would you have any difficulty in faithfully applying those principles?

THE JUROR: Absolutely not.

THE COURT: Understanding, in very broad terms, that I described to the group what the case is about in general, that is, it's a criminal prosecution in which the government charges a conspiracy or scheme to defraud in the area of mortgage lending for residential mortgages --

THE JUROR: Okay.

THE COURT: -- understanding that's the nature of the subject matter of the case, is there anything in your personal experience, your beliefs, attitudes, potential biases that, given the nature of the case, might interfere with your ability to be a fair and impartial juror in this case?

THE JUROR: I don't think so.

THE COURT: I outlined for everyone the schedule we'll follow and the prospect, therefore, that the case will take a few weeks to try. And understanding that it is an inconvenience for all jurors, is there anything in your situation over the next few weeks that would make it an out-of-the-ordinary or more substantial hardship for you to serve on this case than --

THE JUROR: No.

THE COURT: Okay. Thank you.

THE CLERK: This is No. 14, Richard Saltzman.

THE COURT: Good afternoon, Mr. Saltzman.

THE JUROR: Sir.

THE COURT: I have a few more questions for you, and I'd ask you, when you answer, keep your voice up because everybody here and the court reporter has to be sure that we hear accurately, okay?

I have the witness list that we looked at. Did you recognize anybody?

THE JUROR: No.

THE COURT: Now, you had answered one of the questions I put to the group in whether you had any connection with banking, real estate or mortgage lending.

THE JUROR: Real estate.

THE COURT: You answered yes. Tell me about why you answered yes.

THE JUROR: I'm a licensed real estate broker in Massachusetts.

THE COURT: How long have you done that?

THE JUROR: I got my license probably about 30 years ago.

THE COURT: Have you been active as a broker?

THE JUROR: I've been active recently, not for most of the time, at the very beginning and very recently.

THE COURT: Are you employed by an agency or --

THE JUROR: I actually have two jobs right now. I

work in a one-person office that manages the property for 98 units, 96 units. That's my primary job. My other job is I do have a small real estate brokerage in Brighton Center that I am the managing broker.

THE COURT: You have associate brokers with you?

THE JUROR: Salespeople.

THE COURT: Tell me about the property management. How long have you done that?

THE JUROR: Four or five years.

THE COURT: And before that?

THE JUROR: Before that, I worked in a number of different jobs, including presale information for 52 computer products of America.

THE COURT: Non-real estate?

THE JUROR: Non-real estate businesses.

THE COURT: Is there anything about your experience in the real estate industry, putting it broadly, that would make it difficult for you to be a fair and impartial juror in this case which involves claims of --

THE JUROR: No, sir.

THE COURT: -- of conspiracy to commit mortgage fraud and so on?

THE JUROR: No.

THE COURT: Do you have any -- no. Now, let me ask you some additional questions. Having in mind that small group

of family members, household members, people closest to you, has anyone in that group ever been the victim, to your knowledge, of fraud?

THE JUROR: Not to my knowledge.

THE COURT: In particular, has anyone in that group ever been the victim of identity theft?

THE JUROR: Yes.

THE COURT: Tell me about that.

THE JUROR: My wife's car was broken in and her pocketbook stolen, and the thieves used her credit cards until she could stop everything.

THE COURT: How long ago was this incident?

THE JUROR: Probably about three months ago.

THE COURT: How long was it before she was able to stop the use of the -- the unauthorized use of the credit card?

THE JUROR: Probably about a few days to a week.

THE COURT: How much -- did it cost you some money?

THE JUROR: I don't believe it cost us anything.

THE COURT: It was absorbed --

THE JUROR: The credit cards absorbed everything.

THE COURT: Does that experience leave you with any possible feelings or attitudes that would interfere -- there may be some evidence in this case about identity theft -- to facilitate --

THE JUROR: Certainly, I would have some feelings

about it.

THE COURT: We can only do it one at a time. We want to make sure the reporter gets the full question.

If there was evidence in the case about identity theft to facilitate a scheme to defraud, and the fact that your wife had that experience, would it make it hard for you to be impartial in judging the evidence in this case?

THE JUROR: In that respect, yes, your Honor.

THE COURT: Why?

THE JUROR: Well, because identity theft is not only something that happened to my wife but something that I risk every time I go on the internet.

THE COURT: Right.

THE JUROR: And I do do banking over the internet and buy products over the internet.

THE COURT: Okay. The question isn't necessarily whether identity theft is a bad thing but whether it happened in this case, if there's evidence that maybe shows it did and maybe evidence that shows it didn't. The question is: Would you be able to impartially judge that evidence and make a conclusion based on the evidence that persuades you or fails to persuade you?

THE JUROR: I hope I would be impartial.

THE COURT: Or would you think that your personal experience makes you unduly sensitive to that so that you would

be not fairly evaluating the evidence but coming to a conclusion that sort of jived with your feelings as a result of your wife's problem?

THE JUROR: I think I could probably be impartial and fair.

THE COURT: Any other incidents of identity theft among your group besides the one you told us about?

THE JUROR: No.

THE COURT: Has anyone in that group ever been the victim of any other kind of crime?

THE JUROR: I've been a victim of a crime.

THE COURT: What?

THE JUROR: Car radio stolen out of my car. I don't see how that really has any bearing on this.

THE COURT: When was that?

THE JUROR: Long time ago.

THE COURT: Were you ever involved with the criminal justice system as a result of that?

THE JUROR: Only very indirectly. They made him pay me back the value of the radio.

THE COURT: They identified who had --

THE JUROR: Yes. They found the person.

THE COURT: Does that leave you with any feelings that would affect your ability to be a fair juror in this case?

THE JUROR: No, your Honor.

THE COURT: Has anyone in that close circle of people around you ever been accused of a crime?

THE JUROR: To the best of my knowledge, no.

THE COURT: Every defendant in a criminal case is presumed to be innocent unless and until the government proves otherwise by the evidence, proves that the person is guilty beyond a reasonable doubt. Those principles of presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law. If you were a juror in this case, would you have any difficulty in accepting and applying those principles faithfully in this case?

THE JUROR: I believe I would have no difficulty, your Honor.

THE COURT: Again, I think I've asked you this but just to be sure -- we've touched on it in talking about your real estate work. Given the nature of the issues that may be tried in the case, the subject matter, is there anything in your personal experience, your beliefs, your attitudes and your connection with the real estate brokerage business that would lead you to have concern yourself about your ability to be a fair and impartial juror in a case where that is some of the subject matter?

THE JUROR: No, no.

THE COURT: I've outlined for the group generally what our schedule will be and the consequence that it will be a

several-week trial. Understanding the difficulty that any person would have in adjusting things to sit on a trial for that length, is there anything over the next several weeks for you that would make it a serious or --

THE JUROR: Yes, your Honor.

THE COURT: -- undertaking?

THE JUROR: Yes, your Honor.

THE COURT: Tell me about that.

THE JUROR: First of all, in both of my jobs, the busy season is now. Ninety percent of leases in the Greater Boston Area start on September 1st due to the historical influence of the student population. It makes the apartment rental business very seasonal, and the season has just started. In both jobs, it would be an extreme hardship. In my primary job, I'm the only person who works in the house.

THE COURT: Where is that? I don't think I asked you where the property was.

THE JUROR: In Brookline. I deal with all the tenants. I make the decision on accepting all new tenants that brokers submit to me for vacant apartments. I enter all the rent checks into the bookkeeping system, and I write all the nasty letters to the tenants who don't pay the rent. And I am, at this time of year, spending actually most of my day writing leases for the tenants who are renewing.

My second job, which I spend much less time at, I

still have to be available all the time because I am the only broker, and all the other people who work there are salespeople. Any time they have a question, they have to ask me. I also am the check signer for the escrow account and the other checking accounts from my brokerage.

I see the timing of this being very negative -- having a very negative impact on my work, on my brokerage. We're -- I do keep some people employed. It could even end up closing the brokerage.

THE COURT: Okay. Thank you.

THE JUROR: Your Honor, there was one other thing I wanted to mention.

THE COURT: Okay, sure.

THE JUROR: I take six prescription medications a day, three of which make me drowsy. I nodded off twice during the --

THE COURT: While I was talking?

THE JUROR: No, sir. During the juror film downstairs.

THE COURT: All right. Thank you.

THE CLERK: This is Juror No. 15, David Sygowski.

THE COURT: Hi, Mr. Sygowski.

THE JUROR: Hi.

THE COURT: I have the witness list we asked you to look over. Did you recognize anybody from the witness list?

THE JUROR: No. I only was familiar with one name on there, and I'm not even sure it's the person who I think it is.

THE COURT: Who's that?

THE JUROR: Robert Ryan. I don't know him -- I'm not an acquaintance of his if it is the Robert Ryan --

THE COURT: Robert Ryan.

THE JUROR: -- I'm thinking of.

THE COURT: Esquire, I guess, a lawyer.

THE JUROR: Yes.

THE COURT: Where do you live? You live in Peabody. So they're in Quincy.

THE JUROR: Okay. That's not the guy I'm thinking of then.

THE COURT: That was the only name you saw there?

THE JUROR: Yup.

THE COURT: Let me ask you some additional questions to the ones I asked the whole group. Having in mind that group of people who are closest to you, family members, members of your household, so on, anyone in your group ever been the victim, to your knowledge, of fraud of any kind?

THE JUROR: No.

THE COURT: Anyone in that group in particular ever been the victim of identity theft?

THE JUROR: No.

THE COURT: Let me ask a broader question. Has

anybody in that group ever been the victim of any kind of crime?

THE JUROR: No.

THE COURT: Now, I'll flip it over. Has anyone in that group ever been accused of a crime?

THE JUROR: It all depends. I have been accused of a crime.

THE COURT: You have. Tell me about that. When was that?

THE JUROR: It was about 30 years ago, 20 years ago.

THE COURT: What was the offense?

THE JUROR: Driving under the influence.

THE COURT: Okay. On one occasion?

THE JUROR: Yeah.

THE COURT: What was the outcome of that? Was there a prosecution?

THE JUROR: I pleaded guilty, and I had to do probation for a year or so and they said it was dismissed.

THE COURT: Is there anything in that personal experience that leaves you with feelings about the criminal justice system or anything else that would affect your ability to be a fair and impartial juror in a criminal case?

THE JUROR: No.

THE COURT: Every defendant in a criminal case is presumed to be innocent unless and until proved by the evidence

that he is guilty and proved by the government beyond a reasonable doubt. Those principles of presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law. If you were a juror in this criminal case, would you have any difficulty in accepting and applying those principles faithfully?

THE JUROR: No.

THE COURT: Understanding in broad terms the nature of the accusations that are made here and what the case will be about, that is, the government charges the defendants with a conspiracy or scheme to defraud, and that includes allegations of fraud and mortgage lending -- so that's the subject matter. Given that subject matter, is there anything in your personal experiences, your beliefs, your attitudes, potential biases, that you think might interfere with your ability to be a fair-minded and impartial juror in this case?

THE JUROR: No.

THE COURT: I've outlined the schedule we'll follow in the case and then, as a consequence of that, the likely length of the trial. It will take several weeks. As I mentioned to the group, we understand that it's an inconvenience for all jurors to serve but particularly on that kind of a schedule. For you personally, over the next several weeks, is there anything that would be unusually difficult for you to serve beyond what was normal?

THE JUROR: No, just my job. I'm in a small warehouse, and I'm the only worker in the warehouse. So if I have to serve, then they'll have to -- I don't know what they'll do to replace me because, like I say, it's a small place. But I imagine --

THE COURT: Do you work on a shift basis?

THE JUROR: Yeah, eight-hour shift.

THE COURT: What's the normal --

THE JUROR: 8:30 to 5.

THE COURT: Is that it? They have people after 5?

THE JUROR: No, no. It's just a small place. There's only half a dozen people that work in the whole place.

THE COURT: Okay. Thank you.

THE JUROR: Okay.

THE CLERK: Number 16, Eugene Black.

THE COURT: Hi, Mr. Black. I have the witness list you looked over. Did you recognize anybody?

THE JUROR: No.

THE COURT: Now, in addition to the questions I asked everybody, I have just a few more particularly. Having in mind that small group of people, household members, family members closest to you, and yourself, of course, anyone in that group ever been the victim of fraud of any kind to your knowledge?

THE JUROR: Not that I know of.

THE COURT: Could you just keep your voice up?

THE JUROR: No.
THE COURT: Be sure the lawyers can hear you, too.
THE JUROR: No.
THE COURT: Anyone in that group in particular a victim of identity theft?
THE JUROR: No, no.
THE COURT: Let me ask a broader question. Anyone in that group ever been the victim of any kind of crime?
THE JUROR: Not that I can think of, no.
THE COURT: And the reverse of that, anyone in that group ever been accused of a crime?
THE JUROR: No.
THE COURT: Every defendant in a criminal case is presumed to be innocent unless and until the government proves otherwise by the evidence, proves that the person is guilty beyond a reasonable doubt. Those principles of the presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law. If you were a juror in this case, do you think you would have any difficulty in faithfully applying those principles?
THE JUROR: I don't think so.
THE COURT: You've heard me describe in broad terms the nature of the case: criminal prosecution. The government alleges the defendants participated in a conspiracy or a scheme to defraud in the mortgage lending area. Understanding that's

the subject matter and the nature of the case, do you have any personal experiences, any beliefs, attitudes, potential biases that would make it difficult, in your judgment, for you to be an impartial and fair juror in this case?

THE JUROR: Not in this case, no.

THE COURT: Are you thinking there are some cases where it might be difficult?

THE JUROR: I think, as far as the mortgage lenders and stuff, you know, the big thing that went on with all that -- you know, the owners of the companies and stuff like that, who --

THE COURT: Are you talking about issues that have been in the press about --

THE JUROR: Right, and who they lent out money to which they shouldn't have lent out to -- you know, mortgages that shouldn't have been lent because people can't afford them.

THE COURT: I don't know what the evidence is going to show in this case, but if it showed an example or two of something like that having happened and you thought the evidence would show that, would your feelings about that subject come to the place where they might influence your ability to be a fair and impartial juror, or would you be able to pay attention to the evidence in the case and make a sound judgment on the evidence?

THE JUROR: Probably could pay attention to the

evidence.

THE COURT: I'm trying to gauge how strongly -- people read the papers and they see what's an issue. They have reactions to it one way or the other. What we would be concerned about is if you couldn't keep those in the -- in their rightful place, in a sense, and would be taken over by them. We ask the jurors to decide the evidence as they hear it because the case might not be like what somebody read.

THE JUROR: Exactly.

THE COURT: Give me a sense. Are you feeling strong enough so that you should be concerned about it?

THE JUROR: I'm not really sure to tell you the truth.

THE COURT: Have you had any personal experience with mortgages or difficulties in mortgages yourself that would lead you --

THE JUROR: No. I have a mortgage. I haven't had any problems with it. I've had a few mortgages, and they've all been paid off. It's just when I tried to get another mortgage later on and it was just like -- it was -- earlier on it was difficult to get a mortgage. Later on they were just giving them out without any credit background or any of that stuff, you know.

THE COURT: Okay. I outlined for everybody the schedule that we would follow in the case and the consequences, that it's likely to be a multiple-week trial. As I said, we

understand that for everybody who serves there's some level of inconvenience. Over the next several weeks, for you personally, is there anything that would be out of the ordinary, more significant burden than ordinary people being called to serve?

THE JUROR: No. Just missing the work would be tough on the family. That's about it, financial-wise, depending on what work does, you know.

THE COURT: What is -- it says you're a plater for General Metal Finishing.

THE JUROR: We plate electronics for satellites and computers and stuff, gold plate, silver plate.

THE COURT: And your job is actually in the manufacturing process?

THE JUROR: Is the plating part of it, putting the gold onto the parts. We do a lot of work for the government, too, the satellites and anti-ballistic missiles and stuff like that.

THE COURT: Okay. Thank you, Mr. Black.

(Discussion held off the record.)

THE CLERK: No. 17.

THE COURT: Mr. Thomas?

THE JUROR: Yes.

THE COURT: You answered one of the questions that we had about a connection with law enforcement?

THE JUROR: That's correct. Many.

THE COURT: Many? Okay. Tell us about them.

THE JUROR: I have two brothers-in-law. One is a local cop, and the other is a Massachusetts State policeman who also worked on the Immigration and Customs Task Force, and he is now a member of the Department of Justice Task Force for the DEA.

My mother-in-law and my wife are both court reporters in the state of Massachusetts, and I have several cousins who are also with local law enforcement in Massachusetts and New Hampshire.

THE COURT: Okay. Let me just ask you whether any of those relationships would lead you to have any concern about an impact on your ability to be a fair and impartial juror.

THE JUROR: To be best honest, I think they do.

THE COURT: Why?

THE JUROR: I'm surrounded by law enforcement all the time; I hear one side of the story all the time. I think it's only natural to be somewhat biased, to be frank.

THE COURT: Let me ask you whether in that group of people that I mentioned earlier, the people closest to you -- whether anyone in that group has ever been the victim of any kind of fraud.

THE JUROR: I know people who have been victims of identity theft.

THE COURT: I'm going to get to that.
THE JUROR: Okay. Other types of fraud? Not that I'm aware of.
THE COURT: Okay. Now identity theft.
THE JUROR: Yes.
THE COURT: Tell me about that.
THE JUROR: I have very good friends of mine who were victims of identity theft. Actually, someone had broke into my parents' camp in New Hampshire and stole a bunch of wallets, and there were a bunch of people who were involved in identity theft. That was probably four, five years ago.
THE COURT: How about victims of other kinds of crimes?
THE JUROR: I don't believe so.
THE COURT: Anyone in that close circle of yours ever been accused?
THE JUROR: No.
THE COURT: Let me ask you about the length of the case. Every juror has to make adjustments --
THE JUROR: Yup.
THE COURT: -- otherwise, we wouldn't be able to have juries to serve, and so on.
THE JUROR: Understood.
THE COURT: Is there anything over the next several weeks that would make it more difficult than it ordinarily

would be?

THE JUROR: Yeah. I'm a director of finance for an Internet company. It is quarter end. I have an employee who is nine months' pregnant who is going out on maternity leave in the next couple of weeks. That would put me in a very precarious situation.

Also, I've served on a jury for 29 days in the state of Massachusetts about four and a half years ago, in Lawrence Superior Court, I believe it was. It was very taxing on me and my family, and it was basically going to court in the morning and going to work from two o'clock in the afternoon till nine o'clock at night for, you know, a month and a half. To be very frank, I think I've done my part for the good civic duty in the state.

But it would be very difficult for me to be out of the office, even if it's only part time, for the next month to month and a half, frankly. I just don't know when my employee is going out. And then I have another employee whose wife is pregnant. She's not due for a couple of months, but stuff can happen. Sometimes people go earlier and stuff like that. So it puts me in a very difficult situation.

I'm not afraid to do my part, as I've already done, but I think it's a lot to ask to do it twice in a span of five years.

THE COURT: Okay. Thank you.

THE JUROR: Thank you.

(The juror exits the courtroom.)

THE CLERK: Juror No. 18, Carol Cronin.

THE COURT: Hi.

THE JUROR: Hi.

THE COURT: I'm just looking at the list of witnesses you looked over. You didn't see anybody that you recognized there?

THE JUROR: No. No.

THE COURT: Let me ask you a few more questions than the one I asked the group at large.

THE JUROR: Sure.

THE COURT: Having in mind the small group of people I mentioned, your immediate family and household members and things like that, and yourself included in that group, has anyone, to your knowledge, been the victim of fraud?

THE JUROR: No.

THE COURT: In particular, has anyone in that group ever been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anyone in that group been the victim of any kind of crime?

THE JUROR: No.

THE COURT: I'll ask the reverse of that. Has anyone in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: Every defendant in a criminal prosecution such as this is presumed to be innocent unless and until the government proves otherwise by the evidence that the person is guilty beyond a reasonable doubt. Those principles, the presumption of innocence and proof beyond a reasonable doubt, are fundamental ones in our law.

Would you have any difficulty in faithfully accepting and applying those principles in this case if you were to be called as a juror in this case?

THE JUROR: Absolutely not.

THE COURT: I've described for you in very general terms the nature of the case, the subject matter. The government charges the defendants with a conspiracy or scheme to commit fraud in the mortgage-lending area transaction. Understanding that's the subject matter that you'll be hearing about, is there anything in your personal experiences, your beliefs, attitudes, potential biases that might interfere with your own ability to be a fair and impartial juror in this case?

THE JUROR: No.

THE COURT: I described the schedule we'll follow, including the likely length of the trial. It will be several weeks. And, as I said, we recognize that it's an imposition and an inconvenience for people. But is there anything over the next several weeks that would make it more than an ordinary

inconvenience, that would put it out of the ordinary for you?

THE JUROR: No; I'm retired.

THE COURT: Thank you, Ms. Cronin.

(The juror exits the courtroom.)

THE CLERK: Juror No. 19, Thomas Conley.

Please step up here.

THE COURT: Hi, Mr. Conley. I have some additional questions from the ones I asked the jurors. I'd like you to keep your voice up as you answer because they have to hear the answers, too.

THE JUROR: Okay.

THE COURT: I've looked over the witness list that you looked over. You didn't see anybody you recognized?

THE JUROR: No, I did not.

THE COURT: Let me just ask you about your employment. We have a summary of employment information. It says, "Job supervisor, construction," and then the company's name was cut off because they ran out of space.

THE JUROR: It's Coastal Restoration and Development Corporation.

THE COURT: And what kind of work do they do?

THE JUROR: Remodeling and general contracting.

THE COURT: Of what kinds of facilities?

THE JUROR: Typically, Martha's Vineyard Hospital; Carney Hospital in Dorchester; Brighton in Brighton, Brighton

Hospital.

THE COURT: So major institutions are the kind of buildings you work on?

THE JUROR: Correct.

THE COURT: Okay. Having in mind the group of people that I talked about earlier, not only yourself but people closest to you, household members, immediate family and so on, has anyone in that group ever been the victim of fraud of any kind, to your knowledge?

THE JUROR: No.

THE COURT: Anyone in that group ever been the victim of identity theft?

THE JUROR: Not in my family. Coworkers, yes.

THE COURT: Okay. People who you work with on a regular basis?

THE JUROR: Yes.

THE COURT: Has that affected you in any way that would -- if there were evidence in a case like this, as there may be, of some incidences -- some incidence of identity theft, would you be able to still maintain a fairness toward the evidence or would the fact that your coworkers had experienced it make that difficult for you?

THE JUROR: I think that would make it difficult for me.

THE COURT: Have you been involved at all with them in

their experience of the identity theft; in other words --

THE JUROR: Well, one of them I work with every day.

THE COURT: In terms of the incident of identity theft?

THE JUROR: No. No, I was not.

THE COURT: Anybody in your close circle ever been the victim of any other kind of crime?

THE JUROR: Not that I'm aware of.

THE COURT: Anyone in that group been accused of a crime?

THE JUROR: Not that I'm aware of.

THE COURT: Every defendant in a criminal case such as this is presumed to be innocent unless and until the government proves otherwise by the evidence, and proves it beyond a reasonable doubt. The principles of presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law. Would you have any difficulty in accepting and applying those principles in this case?

THE JUROR: I don't believe so.

THE COURT: Okay. You seem a little hesitant. Is it fair to say that?

THE JUROR: I'm not sure what the parameters of the whole case is. But with what's been going on with mortgage companies giving out mortgages to people that aren't qualified, I think it's led to a lot of issues we have with our economy.

I'm not sure if that's what the case is about.

THE COURT: Well, the question is: Would you be able to put any feelings you might have on that subject aside and judge the evidence here, or do you think that your feelings from other things you've observed or read about in the paper or whatever would influence your judgment in the case? That's really the question.

THE JUROR: I do.

THE COURT: You do?

THE JUROR: Yes.

THE COURT: Let me ask you about the schedule in the case. If you were to serve over the next several weeks, is there -- everyone will be inconvenienced to some degree. Is there anything that would make it a greater interference with your expectations than for other jurors?

THE JUROR: No, I don't think so.

THE COURT: Okay. Thanks.

(The juror exits the courtroom.)

THE CLERK: Juror No. 20 is Frederick Haigis.

Step up over here, please, if you would.

THE JUROR: Okay.

Hi.

THE COURT: Mr. Haigis.

THE JUROR: How are you?

THE COURT: Good.

Let me start with -- we have a little form that gives us basic information about jurors, and for you it says "unemployed."

THE JUROR: No, I'm employed.

THE COURT: Okay. They got that wrong. How are you employed?

THE JUROR: I'm at Mass. General. I'm the head of marketing planning there.

COUNSEL IN UNISON: We can't hear.

THE COURT: They have to hear this too.

THE JUROR: I'm sorry.

I work at Mass. General. I'm the head of marketing planning at Mass. General.

THE COURT: Okay. And how long have you been doing that?

THE JUROR: About two and a half years.

THE COURT: And have you been in that field for some time or would you --

THE JUROR: I've been in marketing for most of my career. I actually made a career change and became a nurse for two years and then went back into marketing.

THE COURT: You had answered the question about someone -- yourself or someone close to you being involved in banking, real estate or the mortgage lending business.

THE JUROR: My wife was involved in the Boston real

estate market for a number of years. She's not now.
THE COURT: In what role?
THE JUROR: Pretty much a market researcher and planner at companies like Spaulding.
THE COURT: Okay. Do any direct real estate selling or brokering --
THE JUROR: No.
THE COURT: -- or mortgage lending?
THE JUROR: No. No.
THE COURT: I have your witness list you looked over. Did you see anybody you recognized?
THE JUROR: No.
THE COURT: Let me ask you a few more questions in addition to those we asked the group.
Having in mind the small circle of closest people to you -- household members, family, immediate family and so on -- anyone in that group ever been the victim of a fraud of any kind, to your knowledge?
THE JUROR: Not that I can remember, no.
THE COURT: In particular, has anybody in that group ever been the victim of identity theft?
THE JUROR: I have.
THE COURT: When was that?
THE JUROR: About a year ago.
THE COURT: Tell me about it a little bit.

THE JUROR: I had an account at Amazon, and someone hacked into it, stole my credit card, identity, broke into my direct mail account. They ordered five or six very high-end cell phones and actually set it up to have them delivered to my house. I got the police involved, they set up a sting and never ended up catching anyone, but everything was resolved. But it was a pretty straightforward identity theft.

THE COURT: Did it cost you any money?

THE JUROR: No, nothing.

THE COURT: There may be some evidence in this case of what the government claims was identity theft. Having had that personal experience, would you be able to impartially and fairly judge that evidence or would your personal experience take over, do you think?

THE JUROR: I think my personal experience would take over. That was just a real violation of my space, so to speak, and I felt totally violated.

THE COURT: Anyone in this circle we've talked about been the victim of any other kind of crime?

THE JUROR: No, nothing.

THE COURT: Anyone in that circle ever been accused of a crime?

THE JUROR: No, not anything more than speeding or something like that.

THE COURT: Every defendant in a criminal case is

presumed to be innocent unless and until the government proves by the evidence to the contrary that the person is guilty beyond a reasonable doubt. Those principles of presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law.

Would you have any difficulty in accepting and faithfully applying those principles if you were a juror in this case?

THE JUROR: No, I don't think so.

THE COURT: I'd just add the general nature of the claims made by the government in the indictment that the defendants conspired or schemed together to commit fraud in the area of mortgage lending. That's the topic; that's what the subject matter will be about.

Is there anything in your personal experiences, beliefs, attitudes, biases that would interfere with your ability to be a fair judge in such a case?

THE JUROR: Not that I can think of.

THE COURT: Including your experience of identity theft.

THE JUROR: Well, that definitely would have an impact on how I feel about the case, if it was something that's directly related to that. That was a really bad experience.

THE COURT: Let me ask about the schedule.

THE JUROR: Yeah.

THE COURT: The case is expected to last a number of weeks. I know it's an inconvenience for all jurors. We recognize that. Is there anything over the next several weeks that would make it a particularly difficult experience for you?

THE JUROR: Yes. Because of my role -- I'm head of planning. We're in the middle of our budget and planning process right now, and I have people working for me that would rely on me. To be honest with you, it would be a real hassle to have to go through this for five to six weeks. And I say that with regret because I would love to be involved with this kind of a thing, but it really would be a problem.

THE COURT: Okay. Thank you.

THE JUROR: You're welcome.

(The juror exits the courtroom.)

THE CLERK: Next up is Juror No. 21, Linda Weber.

Follow me, ma'am. Just come around here, if you would. Thanks.

THE COURT: Hi.

THE JUROR: Hi.

THE COURT: I have the witness list you looked over. Do you see anybody you recognized?

THE JUROR: No, I didn't see anyone I recognized.

THE COURT: Let me ask you just a few questions in addition to the ones I asked the group. And I would ask you to keep your voice up because the group has to hear what your

answers are.

Talking about that group that includes yourself and the people closest to you -- your family members, household members and so on and so forth -- has anyone in that group ever been, to your knowledge, the victim of any kind of fraud?

THE JUROR: Not that I know of.

THE COURT: In particular, has anyone in that group ever been the victim of identity theft?

THE JUROR: Not that I know of.

THE COURT: Has anyone in that group ever been the victim of any kind of crime?

THE JUROR: Not that I know of.

THE COURT: Has anyone in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal prosecution such as this, every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence and proves that the person is guilty beyond a reasonable doubt. Those principles of presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law.

If you were a juror in this case, would you have any difficulty in accepting and faithfully applying those principles in this case?

THE JUROR: No, not that I know of.

THE COURT: Understanding the general tenor of the case, the charges that are made, the government accuses the defendants of conspiring or scheming together to defraud in the area of mortgage lending, that's the subject matter -- is there anything in your personal experience, beliefs, attitudes, potential biases that would interfere with your ability to be a fair-minded and impartial juror in this case?

THE JUROR: Not that I can think of at the moment.

THE COURT: I've outlined for everybody earlier the schedule we'll follow, including the length of the trial. And as I said then, we understand that it's an inconvenience and disruption for all jurors, no matter what they do.

Is there anything over the next several weeks that would make it a particularly difficult situation for you to serve on this jury?

THE JUROR: About a hundred students that are getting ready to take an MCAT science test that they really need me there for.

THE COURT: And you're a teacher in the Natick public schools. Is it the Natick High School?

THE JUROR: Natick High School. Chemistry teacher.

THE COURT: And does the school have provisions -- can they make provisions for substitute teachers?

THE JUROR: Well, they have substitutes; however, finding a teacher that's qualified to teach chemistry is not

going to happen. And even then, I can't -- liability-wise I can't put the kids back in the lab if I'm not there to supervise, so it's going to hurt their education.

THE COURT: Okay. Thank you.

(The juror exits the courtroom.)

THE CLERK: Juror No. 22, Amil Patel.

Step up here, please, sir. Just go around. Thanks.

THE COURT: Hi, Mr. Patel.

THE JUROR: Hi.

THE COURT: I'm looking at the witness list that you reviewed. Have you seen anybody that you know?

THE JUROR: No.

THE COURT: Let me ask you a few questions in addition to the ones I asked the group. Having in mind the small circle of people that I identified, yourself and the people closest to you -- family members, immediate family household members and so on -- is there anyone in that group who has, to your knowledge, been the victim of fraud of any kind?

THE JUROR: No.

THE COURT: In particular, is there anyone in that group that has ever been the victim of identity theft?

THE JUROR: No.

THE COURT: Broadening it out, is there anybody in that group that's ever been the victim of any kind of a crime?

THE JUROR: No.

THE COURT: Is there anyone in that group that's ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal prosecution every defendant is presumed to be innocent of the charges made against him unless and until the government proves otherwise by the evidence, and proves that the person is guilty beyond a reasonable doubt. The principles of the presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law.

Would you have any difficulty in accepting and applying those principles if you were a juror in this case?

THE JUROR: I would not.

THE COURT: I've described for the jury in general the subject matter of the case. The government charges the defendants with a conspiracy or scheme to defraud, and the area is mortgage lending practices. Understanding that that's the subject matter, is there anything in your own personal experiences, beliefs, attitudes, potential biases that would interfere with your ability to be a fair and impartial juror in this case?

THE JUROR: There is not.

THE COURT: I also outlined the schedule we'd follow, and the consequence that this looks like it will be several weeks to present. And as I said, we understand that there's

inconvenience and disruption for all jurors called to serve on a case like that. Beyond that that would affect all jurors, is there anything in your own circumstances that over the next six -- five to six weeks, whatever it is, would be out of the ordinary hardship for you to serve?

THE JUROR: There is not, no.

THE COURT: Okay, Mr. Patel. Thank you.

THE JUROR: Thank you.

(The juror exits the courtroom.)

THE CLERK: Juror No. 23, Susan Turner.

THE COURT: Hi.

THE JUROR: Hi.

THE COURT: I just have a few questions in addition to the ones I asked the group.

THE JUROR: Yeah.

THE COURT: Having in mind the circle of people that I identified, that includes yourself and people who are living with you, close, immediate family, the people closest to you, is there anyone in that group, to your knowledge, that has been the victim of any fraud of any kind?

THE JUROR: No.

THE COURT: In particular, has anyone in that group been the victim of identity theft?

THE JUROR: No. We had our phone -- my husband and I had our phone card number stolen a couple of years ago. It was

resolved, but...

THE COURT: How did that occur, do you know?

THE JUROR: This was actually a few years ago in the calling-card days. So either by computer or by spying at La Guardia. I was on my way home from a business trip, got home, AT&T called.

MR. ULLMANN: I can't hear.

THE COURT: Would you keep your voice up? The lawyers have to hear this too.

THE JUROR: Just a phone card number was stolen, and by the time I got home from La Guardia, there was $2500 on our phone. And then that was resolved by the fraud -- I had to fill out some papers and fax it back, and then their fraud department took care of it.

THE COURT: Were you out-of-pocket anything as a result of that?

THE JUROR: No.

THE COURT: Any other incidence that you can recall?

THE JUROR: No. And I had completely forgotten about that.

THE COURT: Has anyone in that group of people close to you been the victim of any other kind of crime?

THE JUROR: No.

THE COURT: Anyone in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: Every defendant in a criminal case, as I suspect you know, is presumed to be innocent unless and until the government proves otherwise by the evidence and proves the person is guilty beyond a reasonable doubt. The principles of presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law.

If you were a juror in this case, would you have any difficulty in accepting and faithfully applying those principles in this case?

THE JUROR: No.

THE COURT: You understand the general tenor of the case from my description that the government charges the defendants with a conspiracy or scheme to defraud, and it's in the area of mortgage lending transactions, real estate transactions and mortgage lending. Understanding that's the nature and the subject matter of the case, is there anything in your personal experience, beliefs, attitudes, biases, potentially, that would interfere with your ability to be a fair and impartial judge in a case like this?

THE JUROR: No.

THE COURT: If there were evidence in the case that included allegations by the government of incidents of identity theft, would you be able to maintain your impartiality and fairness in judging that evidence as to whether it's reliable

or not given your experience with the phone card, or would that experience interfere with your ability to fairly and impartially judge the evidence?

THE JUROR: I think I could do it. I think I am -- that stuff does make me really angry and worried, in general, you know, having that worry in your life that we all do. But I think I could overcome that.

THE COURT: Now, I've also outlined the schedule we'd follow and what that means for the course of the trial, which is that it will probably take several weeks to complete. Understanding that it is a difficulty for all jurors to have to spend time here when they could be doing other things, are there things over the next several weeks for you that would make it particularly burdensome or problematic to serve on this jury?

THE JUROR: Not impossible, but burdensome in that I'm the only -- mine is the only income. And I'm on contract for a very small company of three people, including me, as a contract worker. And it's graphic design projects that are -- you know, you have -- you're in there, you have the knowledge of the work and the client and so forth.

Both my husband and I were laid off last year.

THE COURT: Is this an agency that does work for outside clients? Is that it?

THE JUROR: I am doing work for a small firm that

works for financial services clients, primarily.

THE COURT: Produces materials and graphics for them?

THE JUROR: Yes.

THE COURT: And you're under contract to the agency which --

THE JUROR: Correct. And both my husband and I were laid off last year, so this contract work is the only source of our income right now. So that's the only -- like I said, not impossible but...

THE COURT: Well, does the fact that it's a nine-to-one schedule affect --

THE JUROR: It does help.

THE COURT: Okay. Thanks. Those are all the questions I have for you.

THE JUROR: Thanks.

(The juror exits the courtroom.)

THE CLERK: Juror No. 24 is Marianne Tyburski.

Just step up over here in the box, please. Just go around.

THE COURT: Hi, Mrs. Tyburski.

THE JUROR: Hi.

THE COURT: I have just a few questions in addition to what we asked the group. I'd ask you to keep your voice up because the lawyers need to hear what you're saying.

THE JUROR: Okay.

THE COURT: So I have the witness list that you looked over. Was there anyone that you recognized?

THE JUROR: Nope. No, sir.

THE COURT: I noticed that you -- for -- on page 4 --

THE JUROR: Excuse me. My name is right here.

THE COURT: This is Ms. Turner's list. She has counsel's. We'll call her back.

So you didn't see anybody?

THE JUROR: No, sir. I did not.

THE COURT: So I won't stop when I see circles on it like I did the last time. Okay. Fair enough.

I'll need to see Ms. Turner back, if you want to get her lined up. I just have a couple of follow-up questions.

THE CLERK: Okay.

THE COURT: Anyway -- okay. Having in mind that group of people closest to you that I identified -- yourself, your family members, household members, things like that -- is there anybody in that group, to your knowledge, that has been the victim of fraud of any kind?

THE JUROR: No, sir.

THE COURT: And, in particular, has anyone in that group been the victim of identity theft?

THE JUROR: No, sir.

THE COURT: Has anyone in that group been a victim of any kind of crime?

THE JUROR: No, sir.

THE COURT: Has anyone in that group ever been accused of a crime?

THE JUROR: No, sir.

THE COURT: Let me just ask you, your employment information says that you are a lead tax examiner for the U.S. -- the IRS.

THE JUROR: Yes, sir, I am.

THE COURT: In Andover or --

THE JUROR: Yes, sir.

THE COURT: And what does the lead tax examiner do?

THE JUROR: I oversee the goings-on of my unit, make sure work goes in and out timely, answer any and all questions, basically run the unit.

THE COURT: What's the examination part?

THE JUROR: Unreported issues. People who don't report all of their income on their tax return, we send out letters and then we follow up with correspondence that the taxpayer, in turn, sends to us.

THE COURT: Do you participate in fraud investigations?

THE JUROR: We will send anything that looks suspicious of fraud on the information to a fraud referral coordinator, and they handle that part of it. I don't personally, no, sir.

THE COURT: So if it gets to that point, it gets passed to someone else?

THE JUROR: Absolutely, sir.

THE COURT: Okay. In a criminal prosecution such as this, every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence, and proves that the person is guilty beyond a reasonable doubt. Those principles of the presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law.

If you were a juror in this case, would you have any difficulty in faithfully applying those principles?

THE JUROR: No, sir.

THE COURT: Understanding that the general nature of the case is that the government charges the defendants with a scheme, or conspiracy, to defraud, and it's in the area of mortgage lending and real estate transactions -- that's the subject matter of the case that we'll be talking about -- is there anything in your personal experiences, beliefs, attitudes, potential biases because of the nature of the case that would lead you to have concern about your ability to be a fair and impartial juror?

THE JUROR: No, sir.

THE COURT: I outlined the schedule we would follow, including what I expect the length of the trial will be, which would be multiple weeks. I'm not sure exactly how long. As I

said, we understand and appreciate that all jurors have to make arrangements to adjust if they're called to serve.

Apart from the kind of general inconvenience that any juror would have, is there anything over the next several weeks for you that would make it particularly difficult?

THE JUROR: Nothing critical, sir.

THE COURT: Okay. That's all the questions I have. Thank you.

THE JUROR: Thank you, sir.

THE COURT: Ms. Tyburski, follow me, please.

(The juror exits the courtroom.)

THE CLERK: Judge, I have Susan Turner.

Just step up here again, if you would, please.

THE JUROR: Okay.

THE COURT: I omitted to ask you about the witness list that you looked over. And you had circled on page 4 Citizens Bank and Bank of America. You have accounts at the branches?

THE JUROR: Yes.

THE COURT: Do you have any personal relationships with anybody there?

THE JUROR: No. I just got nervous about being truthful.

THE COURT: Fair enough. We appreciate that.

THE JUROR: And afterwards I thought, "probably not."

THE COURT: So this is just your normal household accounts?

THE JUROR: Yes. Yeah. Uh-huh.

(The juror exits the courtroom.)

THE COURT: We'll pause at this point to consider this page. Is Mr. Borenstein nominated to make the objections? We're going to consider cause objections.

MR. BORENSTEIN: I mean, I welcome, certainly, any personal disagreement or dissent, but I would start, Judge, with Number 24.

THE COURT: The last one?

MR. BORENSTEIN: Yes, the last one. She's a lead tax examiner. As a matter of fact, she works in a unit that doesn't directly investigate fraud but selects people out that may have underreported their income. It's a U.S. government prosecution, Judge. The issues are such that I would really question her ability to serve fairly and impartially, no matter what her best efforts would be. I would start with her.

MR. WILD: Response from the government?

THE COURT: Yes.

MR. WILD: I think that's just not an appropriate objection at all for cause. Just the fact that she works for the federal government -- she's answered all of your questions and said she could be impartial. The same thing would apply to people who work in the banking industry and work in finance of

any kind. You ask them the questions if they could be impartial despite their employment. That's all you're seeking from jurors.

I think there's nothing -- not a thing about what she said to the Court -- that indicated any inability to serve impartially as a juror in this case.

THE COURT: I don't know what the body of evidence here is going to be completely, obviously. Is the IRS involved here at all?

MR. WILD: The IRS was -- an agent from the IRS was with the postal inspectors and with the FBI, part of the investigative team. But there are no tax charges.

THE COURT: Are there IRS witnesses?

MR. WILD: No. The only possibility of an IRS witness is if one of the defendants, regarding his tax returns, answers certain questions in certain ways, there may be some impeachment with tax returns, but that would be all. We have tax documents that were part of the process of application that were falsified, but that's no more IRS material really -- there's nothing to compel IRS testimony any more than occupancy certificates or employment verifications or bank documents.

THE COURT: Okay. I'm going to allow the challenge for cause.

MR. LEE: Your Honor, if I may --

THE COURT: I'm going to allow the challenge for

cause. You win.

MR. LEE: All right. Well, simply, the difference between mortgage witnesses and this lady is the government pays her salary --

THE COURT: You win. You win.

MR. LEE: Oh, okay.

(Laughter.)

THE COURT: No, I -- she impressed me actually as being sincere when she said she thought she could be impartial, but I do think her affiliation with the federal government and looking for noncompliance with statutory requirements perhaps is going to, if nothing else, be an insidious factor in her considerations. We just don't need it in this case. So I'll strike her for cause, Number 24.

MR. BORENSTEIN: There's a Number 20, Frederick Haigis, who indicated because of the ID theft about a year ago, as I tried to write down exactly what he said, his personal experience will take over; definitely will have an impact when he hears the evidence.

MR. SWOMLEY: I think his quote was, "I felt totally violated."

MR. BORENSTEIN: In addition to, "I felt totally violated."

THE COURT: For the government?

MR. WILD: We'll submit that to the Court, your Honor.

THE COURT: Okay. I'll excuse him for cause.

MR. BORENSTEIN: Mr. Conley indicated -- he's Number 19. I'm sorry, Judge.

He indicated that the -- it would make it difficult to hear about ID theft. He also added things, that with what's been going on with companies giving out mortgages, he indicated he might have some difficulty, Judge. I would ask that he be excused for cause.

MR. WILD: We'll submit that one as well, your Honor.

THE COURT: I agree. I'll excuse him as well. Number 19 is excused for cause.

MR. BORENSTEIN: Number 17, Mr. Thomas, indicated he would be somewhat biased; surrounded by law enforcement; knows people who are victims of ID thefts who are very good friends; his parents' house was broken into -- I think he said their camp in New Hampshire; wallets were stolen. I believe he's the gentleman who said he has already served America in a long trial.

MR. WILD: Well, your Honor, that latter part is a matter of his convenience. He's pleading to the Court for his convenience. As far as being influenced by the law enforcement connections or anything, I don't recall anything that he said that he would be biased as a result of it, only that he had those relationships.

MR. SWOMLEY: I have him quoted as saying "only

natural."

MR. WILD: Is this the one who said he was surrounded by it?

THE COURT: Yes.

MR. WILD: I withdraw my comment.

THE COURT: My impression was he knew how to say what he needed to say, frankly, and he did. So I'll excuse him, Number 17.

THE CLERK: What number is that, 17?

THE COURT: Seventeen.

MR. BORENSTEIN: Number 14, Richard Saltzman, Judge, who -- in addition, he indicated a severe hardship. This is the gentleman who's a licensed real estate broker. I believe he has two cars. He talked about the ID theft, his car, his wife's car being broken into. He -- my recollection is he said it would be hard to decide the case fairly as a result of the ID theft although, again, in response to some follow-up questions, he said, "I think I could probably be impartial and fair."

I have serious doubts about Mr. Saltzman's abilities to serve fairly and impartially.

MR. WILD: We recall that he made a number of comments and submit it to the Court.

THE COURT: I'll excuse Mr. Saltzman as well.

MR. BORENSTEIN: That's it, Judge.

MR. SWOMLEY: Your Honor, there were other work hardships. I'm presuming we're taking no position, and that's purely to the Court's --

THE COURT: Is there any one you want to draw my attention to? I think --

MR. SWOMLEY: Number 15, he said he had a work hardship. Sygowski. But I don't --

MR. BORENSTEIN: I do recall --

THE COURT: It was manageable, it seems to me.

MR. BORENSTEIN: -- Number 21.

THE COURT: Oh, yes. The chemistry teacher.

MR. BORENSTEIN: My worst grade in high school, and she indicated she would have 100 students that would be destroyed.

MR. SWOMLEY: I like her. It's true: They end up being judges.

MR. WILD: Your Honor, we all know about MCATs, and we'll submit that to the Court.

THE COURT: Yeah. It's hard to evaluate the true significance of it, but there is a lot of emphasis placed on those tests these days, and if their regular teacher to this point in the academic year is going to all of a sudden disappear on them, I think it may be unfair to the kids. As reluctant as I am -- because I think sometimes people seize on these excuses, but it's hard to evaluate -- I'll excuse her.

Okay. So that leaves us on this page with 13, 15, 16, 18, 22 and 23.

MR. WILD: Your Honor, for clarification, are we now assuming, then, that those that -- Number 18 becomes -- Juror No. 3 and --

THE COURT: Well, we'll get to that. We'll -- yes. Yes --

MR. WILD: Not yet.

THE COURT: -- you can.

I mean, we have a virtual box right now; we'll have an actual physical box later. But what will happen is those numbers 1 through 16 who are excused will create holes, and those holes will be filled from the front of the box to the end with those next in line.

MR. WILD: Very well. Thank you.

Before the Court breaks, we do have another matter to raise here.

THE COURT: I wasn't going to break.

MR. WILD: Oh, okay.

(Laughter.)

THE COURT: What I wanted to do -- and we may do this. What I wanted to say is what I would like to do is maybe get through the next page, anyway, and that may be as far as we could go today. As I said, I have a four o'clock hearing that I have to get to, and if I'm ten minutes late for that, that's

okay. But I'm not sure we're going to get past, at this pace, doing the next page or so.

I would then propose, for those that we've excused for cause, unless you've done it already, is let those people go.

THE CLERK: I've already done the first group from the first page, and I'll let this group go next. They'll be gone.

THE COURT: So we've already been letting them go. And then we'll have everybody back in their respective courtrooms tomorrow, 7 and 8, and pick up where we left off.

MR. BORENSTEIN: Can we assume that we may get to openings tomorrow or should we plan it for Wednesday morning?

THE COURT: If we have to go into the afternoon to finish impanelment, we will, but we won't go into the afternoon to finish the business. And I don't think we're going to finish early enough in the morning -- so I'll save you from it. Don't worry about it. We'll start on Wednesday.

MR. SWOMLEY: Mr. Clerk, could you reiterate again who in the next round got knocked? Who is off?

THE CLERK: Number 14, Richard Saltzman; Number 17, Stephen Thomas; Number 19, Thomas Conley; Number 20, Frederick Haigis; 21, Linda Weber; and 24, Marianne Tyburski. Six of them.

MR. SWOMLEY: Thank you.

MR. WILD: May it please the Court, I just wanted to inform the Court of a topic that we wanted to bring to the

Court's attention before the end of the day. It relates to a juror that we will not likely get to during the next page at all, but one of the security officers informed us during the break of a matter he wanted us to relate to the Court, and that is that Paul -- and I'm not sure of his last name.

THE MARSHAL: Barton.

MR. WILD: Paul Barton -- one of the security officers for the marshals informs us that he knows -- and one of the jurors knows him -- one of the prospective jurors knows him, Mr. Aiello, Juror No. 87. And because they know each other, the prospective juror hailed Paul -- it was not the other way around; it was initiated by the juror through the security officer -- hailed him and made some comments to him about how's he doing and things of that nature. There were other jurors in the area who may have overheard it.

We're bringing it to the Court's attention not because we think anything untoward occurred, but for the Court to make any inquiry it wishes.

THE COURT: It sounds harmless enough, frankly. But that raises the question, if we're really going to do the next page, maybe we should let everybody else go. Why have them sit for another hour? So everybody above 36, that is, from 37 on, can go home and come back to be ready here at nine o'clock.

THE CLERK: Back in their respective courtrooms, Judge?

THE COURT: Right. So why don't you get us started with the next person and we'll -- then you can go do that.

THE CLERK: And then I'll take care of the rest of the logistics.

The next juror is going to be Kevin Spry, Juror No. 25.

THE COURT: Kevin Spry? Okay. I have the witness list you looked over. Have you seen anybody you recognize?

THE JUROR: No.

THE COURT: I have a couple of questions in addition to what we asked the group. Having in mind that -- yourself and the circle of people closest to you that I identified -- people you live with, people in your immediate family and so on and so forth -- has anyone in that group, to your knowledge, ever been the victim of any kind of fraud?

THE JUROR: Not that I know of.

THE COURT: Okay. Would you just keep your voice up a little, because all the lawyers have to hear your answer too.

THE JUROR: All right. Not that I know of.

THE COURT: In particular, has anyone in that group been the victim of identity theft?

THE JUROR: Identity theft? I think I was a long time ago. I went for a job interview.

THE COURT: And what happened?

THE JUROR: I remember the guy that was hiring me

called me back and had said that he come up with a woman's name from my Social Security number, but nothing was ever brought to my attention of it, so...

That's all I know of it. I ended up getting hire. But he never said anything about it after that, so...

THE COURT: Okay. By the way, I notice on your -- the little information we have it says you're a plumber --

THE JUROR: Yes.

THE COURT: -- for Spry Plumbing?

THE JUROR: Correct.

THE COURT: A family business?

THE JUROR: Yeah. My father owns it.

THE COURT: Okay. Has anyone in that circle of people closest to you ever been the victim of any other kind of crime? Any kind of crime?

THE JUROR: Not that I can think of. Nothing that comes to mind.

THE COURT: Anybody in that group ever been accused of a crime?

THE JUROR: Not that I can think of, no.

THE COURT: In a criminal prosecution such as this, each defendant is presumed to be innocent unless and until the government proves otherwise by the evidence and proves the person guilty beyond a reasonable doubt. Those principles of the presumption of innocence and proof beyond a reasonable

doubt are fundamental ones in our law.

As a juror in this case, would you have any difficulty in accepting and applying those principles faithfully?

THE JUROR: No.

THE COURT: I described for the group earlier, generally, the topics and the subject matter of the case, that the government charges the defendants with a conspiracy or scheme to defraud, and the area involved mortgage lending, real estate transactions and so on.

Knowing that that's what the subject matter is going to be throughout the course of the case, do you have any personal experiences, any beliefs, attitudes, potential biases because of the nature of the case that might interfere with your ability to be a fair and impartial juror?

THE JUROR: No, I don't.

THE COURT: I also outlined the schedule we'd follow, and said that as a result of the nature of the case it's going to take several weeks -- we're not sure exactly how long, but multiple weeks to present -- and that, of course, is an imposition on people. Apart from the general inconvenience that anybody would have, is there anything in the next several weeks that would make it a particularly difficult matter for you to serve as a juror?

THE JUROR: I'm flying out to St. Louis, I believe, the 18th through the 23rd.

THE COURT: Of April?

THE JUROR: Uh-huh.

THE COURT: That's the week we won't sit. You'll be back the 23rd?

THE JUROR: Yes.

THE COURT: Okay. Anything else?

THE JUROR: Not that I can think of. That would be it.

THE COURT: Okay. Thanks. You can go back to...

(The juror exits the courtroom.)

THE CLERK: Right up here, sir.

Jeffrey Scannell, Juror No. 26.

THE COURT: We have the witness list you looked over, Mr. Scannell.

THE JUROR: Uh-huh.

THE COURT: And you saw nobody you recognized?

THE JUROR: Nobody I recognized.

THE COURT: Okay. To my general questions -- one of the questions was whether anyone had any connections with banking, real estate, mortgage lending businesses and so on, and you answered affirmatively to that.

THE JUROR: Yeah.

THE COURT: Tell us about that.

THE JUROR: I write software for State Street Bank, securities-trading software.

THE COURT: Securities-trading software?

THE JUROR: Yes.

THE COURT: So that was -- any other reason why --

THE JUROR: No, that was it.

THE COURT: That was the connection you were talking about?

THE JUROR: Yeah.

THE COURT: Okay. Now, concerning the group of people closest to you -- yourself and family members and household members and so on -- has anyone in that group, to your knowledge, been the victim of fraud of any kind?

THE JUROR: Not to my knowledge.

THE COURT: In particular, has anyone in that group been the victim of identity theft?

THE JUROR: I have had credit cards stolen on several occasions, if that counts as identity theft.

THE COURT: Well, you tell me.

THE JUROR: Yeah. In fact, just recently, in January, charges were put on my credit card in London. I had been in London on business in November, and charges were put on my credit card in January.

THE COURT: And has anything --

THE JUROR: They were removed. Obviously, my presence was here, so -- in Boston. And it was demonstrable. So they removed those.

THE COURT: I think you said earlier that it happened on more than one occasion?

THE JUROR: Yeah, it happened quite some time ago. A charge card and a bank card were stolen back in the early '90s, and about $15,000 worth of charges were run up on the card. Again, it was demonstrated that I wasn't in that vicinity at that time, so the credit card company pursued that on their own, and the bank refunded the money to my account because the people who did it -- the signature was obviously not mine, so they refunded that money.

THE COURT: Okay. Anybody else? You said that was yourself. Anybody else in your circle that --

THE JUROR: Not that I'm aware of.

THE COURT: Anybody in that group ever been convicted of a crime or accused of a crime?

THE JUROR: No.

THE COURT: And in terms of victim -- being a victim, anybody been a victim of any other kind of crime other than fraud or identity theft? Any kind?

THE JUROR: Yeah. Yeah. I've got a brother who was hit by a drunk driver and who's still in a coma after 14 years.

THE COURT: Was there a prosecution in that case?

THE JUROR: There was.

THE COURT: And what happened?

THE JUROR: The defendant was sentenced to a year in

jail.

THE COURT: Did you participate in the court events or the prosecution of the case?

THE JUROR: Indirectly, in a written statement.

THE COURT: Okay. As a result of that experience in which your brother was severely injured, do you have any feelings about the criminal justice system or how it works that would interfere with your ability to be a fair-minded juror in a case?

THE JUROR: No, I don't think so.

THE COURT: Every defendant in a criminal prosecution is presumed to be innocent unless and until the government proves otherwise by the evidence, proves a person guilty beyond a reasonable doubt. The principles of presumption of innocence, proof beyond a reasonable doubt are fundamental ones in our law.

If you were a juror in this case, would you have any difficulty in accepting and faithfully applying those principles?

THE JUROR: I think I could do that.

THE COURT: Understanding the nature of the claims or allegations made by the government and the subject matter of the case -- that is, the government charges the defendants with a conspiracy or scheme to defraud, and the area of operation was mortgage lending, real estate transactions -- in general

terms, do you have any personal experiences, beliefs, attitudes, potential biases that might interfere with your ability to be a fair-minded and impartial juror in a case dealing with those subjects?

THE JUROR: No, I don't think so.

THE COURT: There may be evidence that a member of the conspiracy, or more than one member of the conspiracy, participated in some identity theft to facilitate transactions. Given what you've told me about having your credit card stolen, would your personal experiences interfere with your ability to -- would that change your view as to whether you would have the ability to be a fair-minded and impartial juror?

THE JUROR: No, I don't think so.

THE COURT: I outlined the schedule we'd follow and told the group that the estimate is this case would take several weeks. I'm not sure exactly how long. Obviously, it is a burden and imposition on any juror to serve on a lengthy trial.

For yourself, over the next several weeks are there matters that would make it out-of-the-ordinary difficult or burdensome?

THE JUROR: I do have several team members who are coming from China. One, in particular, is coming from China next week for two months. And I do have a project in China and in Japan that I have to -- that I'll have to continue to deal

with during that period. It will be tough, you know, but I think I could swing it. But it will be tough.

THE COURT: All right, Mr. Scannell. Thank you very much.

THE JUROR: Thank you.

(The juror exits the courtroom.)

THE CLERK: Juror No. 27, Paul Faria.

Step up here, if you would, sir. Go right around here. Thanks.

THE COURT: Hi, Mr. Faria. You answered a couple of my questions to the group affirmatively. I think one was connection with law enforcement agency?

THE JUROR: Yes, sir. I work for the Division of Youth Services, which works with juveniles. My job there is as transportation officer.

THE COURT: Transportation officer? A transportation officer drives residents from their place of residence to the courts and back, is that it?

THE JUROR: That's correct.

THE COURT: Any other connection for you or people close to you with law enforcement?

THE JUROR: No.

THE COURT: And how long have you been doing that?

THE JUROR: Since 1994.

THE COURT: Okay. I think you also said that you

had -- someone in your group, or yourself, had a connection with banking, real estate or mortgage lending?

THE JUROR: Yes. I have -- I had a real estate license and a mortgage origination license on -- part time. It was a job I held from 2001 to about 2006, 2007. I had my license to --

THE COURT: And where did you do that?

THE JUROR: Out of Taunton, Mass. Two local lending -- mortgage companies, local.

THE COURT: What were they?

THE JUROR: Small.

THE COURT: Do you know the names?

THE JUROR: Diamond Mortgage and One-Check Mortgage.

THE COURT: One-Check?

THE JUROR: One-Check.

THE COURT: And is there a reason you stopped doing it in 2006?

THE JUROR: Well, it was a -- for temp purpose. It was a part-time thing for me. With what I was doing and just the economic climate, you know, things changed.

THE COURT: Business wasn't as good, is that it?

THE JUROR: Business wasn't as good.

THE COURT: Now, I have the list of witnesses you looked over. Do you recognize anybody?

THE JUROR: Nobody personally I'm acquainted with, no.

THE COURT: I'm sorry?
THE JUROR: Nobody I'm personally acquainted with.
THE COURT: Are there people that you've heard of on the list?
THE JUROR: No.
THE COURT: There are companies that maybe you've heard of?
THE JUROR: Companies I've heard of, yes.
THE COURT: Any individuals?
THE JUROR: No, not on that list.
THE COURT: Having in mind the -- yourself and the group of -- small group of people who are closest to you -- your immediate family, household members, close relatives and so on and so forth -- within that group, to your knowledge, have any people in that group ever been the victim of fraud of any kind?
THE JUROR: No. No.
THE COURT: In particular, have any of them ever been a victim of identity theft?
THE JUROR: No.
THE COURT: Has anyone in that group ever been the victim of any kind of crime?
THE JUROR: Yes. Yes.
THE COURT: Tell me about that.
THE JUROR: I had a son that was assaulted as a young

man and a juvenile.

THE COURT: When was that?

THE JUROR: He's 26 right now. He was about 21; the defendant was about 18. So he was in his late teens, early 20s?

THE COURT: What were the general circumstances?

THE JUROR: He was assaulted -- attacked, and a -- there was some retaliation -- a kid thing, you know. And he was harassed for a while. And it went to court. The individual was given -- had a sentence of about two and a half years for assaulting him.

THE COURT: Any weapons used or anything?

THE JUROR: No. It was a number of people involved.

THE COURT: Where was the prosecution? Where was the court case?

THE JUROR: Taunton, Mass. In Taunton.

THE COURT: And you, I imagine, had some participation in the events in court, and so on and so forth?

THE JUROR: I went as a -- more as support, as a witness, what I knew.

THE COURT: Does that experience leave you with any feelings or concerns about the criminal justice system or how fair it is or isn't, and so on, and leave you with an inability to be a fair-minded and impartial juror?

THE JUROR: No, no concerns.

THE COURT: Anybody else? Any other incidents of people being crime victims?

THE JUROR: No. I'm pretty lucky, I guess. No.

THE COURT: Let me ask the opposite side of that question: Has anybody in that group of people close to you been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal prosecution every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence, proves the person guilty beyond a reasonable doubt. Those principles of the presumption of innocence and proof beyond a reasonable doubt are fundamental ones.

If you were a juror in this case, would you have any difficulty in accepting and applying those principles faithfully?

THE JUROR: No.

THE COURT: I told the group that the nature of the case, in general, is that the defendants have been charged with a conspiracy or scheme to defraud, and the area of transactions was real estate transactions, mortgage lending and so on. Given that that's the subject matter of the case that we'll be dealing with, do you have any personal experiences -- including your experience in the real estate business -- beliefs, attitudes, potential biases that might affect your ability to

be an impartial and fair-minded juror in this case?

THE JUROR: I don't believe so. I think I could be impartial. There's nothing preventing me from being impartial.

THE COURT: I outlined the schedule we'd follow and told the group that the case is expected to last several weeks, and that we recognize that's an imposition and inconvenience for people to varying degrees.

Apart from the kind of necessary inconvenience that anybody would have on a jury that served that length of time, is there anything over the next several weeks that would make it a particularly difficult matter for you to serve on the jury?

THE JUROR: I would like to say yes, but, you know, other than doctors' appointments and things that you already have planned in life -- you know, there are some things, particularly, you know, health reasons, I think, you know, that I'd have to adjust. I would have to adjust.

THE COURT: But they are adjustable?

THE JUROR: They're adjustable. A work schedule and everything.

THE COURT: I appreciate your candor.

THE JUROR: Thanks.

THE COURT: Thank you.

(The juror exits the courtroom.)

MR. SWOMLEY: Your Honor, I was wondering whether you

would consider posing a couple of additional questions to this potential juror. And really, it goes to the question of his knowledge of the industry is such that he may have a view of how it should run. And my concern is that he not supplant his own knowledge of anything for that of what he hears in court. And whether he's able to not do that is an important component of his being able to serve as a clean-slate kind of juror as opposed to one with too much baggage already.

THE COURT: Well, I don't think there was anything in his answers that indicates I need to follow up on that. If he is seated as a juror and serves, we can be sure that maybe a reminder that the evidence -- the judgments are based on what's in the evidence in the courtroom and not on things that they may have from other sources. That's something that we'll deal with.

MR. SWOMLEY: I would submit that his knowledge of the industry, if it -- as extensive as it is, would --

THE COURT: I don't know that we would -- we could ask questions that could reliably inform us about those matters. He'd be speculating; he'd be telling us what he might think under some circumstances that he doesn't know about.

MR. SWOMLEY: And I know you haven't asked for-cause questions at this point, but I think there are several things that might actually help determine whether there is a for-cause challenge here. And one has to do with the mortgage companies

he worked for in Taunton. Diamond Mortgage, in particular. And one of the questions that he very neatly answered was in response to your question, "beliefs, experiences" -- and you gave a whole litany of things, and he very carefully carved out "no beliefs that prevent me from being impartial," and ignored the rest of your question.

And one of my concerns is that, for all I know, Diamond Mortgage was part of their investigation. For all I know, there were, in fact, experiences that had to do with -- I mean, he got out of the mortgage business at precisely the time that this all -- the bubble was bursting, and there might have been improprieties in the very business he was involved in. I think that's the kind of question that should be posed to him.

MR. WILD: Your Honor, the government has something of the same concern. If we're going to strike an IRS employee because they worked for the government and they're paid by the government, I think that the possibility that a witness who worked in the very industry that is involved in this case, at the very time that was involved in this case, in the very form that some of the defendants in this case were involved, I think there is something of a risk that he may supplant either what he thinks he heard in the industry at the time or what he thinks he knew from the industry at the time and might not be able to take his own experience out of what the Court would instruct him.

THE COURT: Do those -- do the names of those companies mean anything to you, Diamond and One-Check?

(Counsel confer off the record.)

MR. WILD: There is an open -- pending investigation regarding Diamond, your Honor.

THE COURT: Okay. Maybe we don't need any further inquiry, then. Maybe he is just excusable.

Okay. Mr. Fagan. We'll come back.

MR. BORENSTEIN: Judge, as to his spouse's occupation, if you would note that.

THE CLERK: I'm sorry, Judge. I didn't hear you. Did you want him back?

THE COURT: No. Mr. Fagan, please.

THE CLERK: Juror No. 28, James Fagan.

Would you follow me, sir? Step up here to the box, if you would. Just go right around there.

THE COURT: Hello, Mr. Fagan.

THE JUROR: Hello.

THE COURT: I have the witness list you looked over.

THE JUROR: I did.

THE COURT: You didn't recognize anybody?

THE JUROR: No.

THE COURT: We have a brief summary of juror information that comes from the forms that you fill out, and for you it says, "CPA/unemployed."

THE JUROR: Right.

THE COURT: Is that correct?

THE JUROR: Right. Retired, if you will.

THE COURT: "Retired" has a nicer ring to it than "unemployed."

THE JUROR: Well, I'm officially retired for 12 years because of health reasons.

THE COURT: And were you in your own practice or were you in a larger practice?

THE JUROR: No, I was with one of the major firms, and then I was a CFO of a small publicly traded manufacturing company.

THE COURT: Okay. It also says your spouse is a banker?

THE JUROR: She is.

THE COURT: What bank?

THE JUROR: She's with a small savings bank, Watertown Savings Bank.

THE COURT: What type of work does she do?

THE JUROR: She was originally a stockbroker, and now she's just doing some treasury kinds of things, transactional things. Nothing in the lending arena.

THE COURT: I referred earlier to the group -- to some of the questions thinking about not only yourself but people closest to you: family members, household members, and so on

and so forth. Within that circle, has anyone, to your knowledge, ever been the victim of any fraud of any kind?

THE JUROR: No.

THE COURT: In particular, has anyone in that group ever been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anyone in that group been the victim of any kind of crime of any sort?

THE JUROR: Nothing of any significance that I can recall, no.

THE COURT: And conversely, has anyone in that group been accused of a crime?

THE JUROR: Again, not that I'm aware of.

THE COURT: In a criminal prosecution every defendant is presumed to be innocent of what he's charged with unless and until the government proves otherwise by the evidence, and proves that a person is guilty beyond a reasonable doubt. The principles of the presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law.

If you were a juror in this case, would you have any difficulty in accepting and faithfully applying those principles to your deliberations?

THE JUROR: No, not at all.

THE COURT: I gave a very general overview of the nature of the charges that are made against the defendants.

The government charges the defendants with a conspiracy or scheme to defraud, and it was in the area of real estate transactions, mortgage loans, and so on and so forth.

Understanding that that's what the subject matter is going to be about in the trial, is there anything in your personal experiences, beliefs, attitudes, potential biases that would make it difficult for you to serve as a fair and impartial juror in this case?

THE JUROR: Nothing really. I mean, I'm probably generally aware of all of these subprime issues as most of the public is, but nothing specific, or certainly nothing with regards to these individuals.

THE COURT: I outlined the schedule we'd follow, and that included a projection of the length of the trial, which may be several weeks. And as I said, we recognize that it's an inconvenience for people to have to rearrange things to serve as jurors, but necessary.

For yourself, over the next several weeks is there anything that would be out of the ordinary that would make it especially difficult for you to serve as a member of this jury?

THE JUROR: The schedule is over.

THE COURT: Thank you, Mr. Fagan. That's all I have for you.

THE JUROR: Thank you.

(The juror exits the courtroom.)

THE CLERK: Juror No. 29, Maureen Latta.

Follow me, ma'am. Just go right around here, if you would, please. Okay. Thanks. Right there.

THE COURT: Hi.

THE JUROR: Good afternoon.

THE COURT: I have the witness list you looked over to see if you recognized anybody. Did you recognize anybody on that list?

THE JUROR: Not at all. No.

THE COURT: Now, you did answer one of the questions that I asked the group generally, and that was you or someone close to you having connection with law enforcement of some sort. Would you tell me about that?

THE JUROR: My ex-husband, who's a police officer. That's the only connection. I don't know if that would mean anything or not.

THE COURT: Police officer where?

THE JUROR: Tewksbury.

THE COURT: And how ex? How long ago?

THE JUROR: Oh, 20-some-odd years ago.

THE COURT: Any other connections with law enforcement?

THE JUROR: No.

THE COURT: In a criminal prosecution, would that have any -- would that connection with a police officer have

any effect on your judgment in a case --

THE JUROR: It would have no bearing at all.

THE COURT: I'm sorry?

THE JUROR: No bearing at all.

THE COURT: Okay. Having in mind the group of people that I said besides yourself, the closest people to you -- household members, immediate family members and so on, thinking of those people -- anyone in that group been the victim of a fraud of any kind, to your knowledge?

THE JUROR: No, not that I'm aware of.

THE COURT: In particular, anybody in that group ever been the victim of identity theft?

THE JUROR: No. I've been very fortunate.

THE COURT: How about any other crime? A victim of any kind of crime?

THE JUROR: Oh, a victim?

THE COURT: A victim, yeah.

THE JUROR: No, I can't think of anything. No.

THE COURT: How about the other side of that? Has anybody in that group ever been accused of a crime?

THE JUROR: Well, a minor crime.

THE COURT: Yeah.

THE JUROR: My son had drinking and driving. My younger son. That's probably about it.

THE COURT: And when was that?

THE JUROR: Oh, it was probably about five years ago.

THE COURT: Okay. And what happened?

THE JUROR: He was drinking and driving.

THE COURT: And he has a conviction as a result?

THE JUROR: Small. It was his first-time offense, so he lost his license for 30 days.

THE COURT: How old was he at the time?

THE JUROR: Let's see. He was probably about 29, 30.

THE COURT: Do you have any feelings as a result of his incident that would affect your ability to be a fair juror in a criminal case? Any feelings about the system or how he was treated or anything?

THE JUROR: Oh, no. No.

THE COURT: In a criminal case every defendant is presumed to be innocent of what they're charged with unless and until the government proves otherwise, proves the person guilty beyond a reasonable doubt. Those principles of the presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law.

Would you have any difficulty in faithfully applying those principles in this case if you were a juror?

THE JUROR: No, I don't believe I would.

THE COURT: I gave a brief indication of the nature of the case earlier today, and you'll recall that I said that the government charges the defendants with a conspiracy or scheme

to defraud by transactions in the real estate or mortgage lending area.

Given that that's the nature of the subjects that will be talked about during the course of the trial, do you have any personal experiences, beliefs, attitudes, potential biases that would interfere with your ability to be a fair and impartial juror in this case?

THE JUROR: No. I would say no.

THE COURT: I also outlined the schedule we'd follow and said that the case is predicted to take several weeks. And as I acknowledge, we know that it's an imposition that people have to put up with.

Apart from the kind of inconvenience that anybody in the jury would serve, is there anything in the next several weeks that would make it exceptionally or particularly difficult for you?

THE JUROR: Well, it's just difficult for work right now, that's all. I'm a supervisor there, and for me to be gone any length of time.

THE COURT: And you work -- it says you work at Hanscom Air Force Base?

THE JUROR: That's correct.

THE COURT: Who's the employer, actually?

THE JUROR: DOD, Air Force.

THE COURT: And what do you do?

THE JUROR: I'm a logistics supervisor.

THE COURT: Which means what?

THE JUROR: We're right now in the middle of a BRAC, which is a -- it's a base closure. Hanscom is not closing down, but the laboratory that I support there is moving to Albuquerque. And we lost many of the support people there, and I have to oversee the moving of the equipment and the computers to Albuquerque by September of 2011.

THE COURT: I don't minimize it, but the difficulty that you're describing is a work-related rather than a personal-related --

THE JUROR: Yes, it's a work-related issue. I have no personal issues.

THE COURT: Okay. Thank you.

THE JUROR: Okay.

(The juror exits the courtroom.)

MR. BORENSTEIN: Judge O'Toole, very quickly as to the last juror. There is an alleged victim of identity theft in this case, a Mr. Gosselin, who I anticipate will be testifying, who is an employee of DOD, Department of Defense, in Virginia, not here. And I just wanted to bring that to the Court's attention. I'm not raising a cause challenge --

THE COURT: It's a big department.

MR. BORENSTEIN: I understand.

THE COURT: Okay, Paul.

THE CLERK: Juror No. 30, Chanel Scimemi.
Follow me. Why don't you step up here, if you can, please.
THE COURT: Ms. --
THE JUROR: Scimemi.
THE COURT: You looked -- and I'd ask you to keep your voice up because the lawyers have to hear you as well.
THE JUROR: I'm sorry.
THE COURT: You looked over the witness list?
THE JUROR: Yup.
THE COURT: Did you see anybody you recognized?
THE JUROR: No.
THE COURT: Now, let me ask you a few questions in addition to the ones we asked the group. Having in mind the circle of people closest to you that that I described -- family members, household members, things like that --
THE JUROR: Yup.
THE COURT: -- is there anybody in that group who has, to your knowledge, ever been the victim of fraud of any kind?
THE JUROR: No.
THE COURT: In particular, is there anyone in that group who has ever been the victim of identity theft?
THE JUROR: No.
THE COURT: How about any crime? A victim of any crime?

THE JUROR: No.

THE COURT: Anyone in that close circle around you who has been ever accused of a crime?

THE JUROR: Me.

THE COURT: Tell me about it.

THE JUROR: I was arrested.

THE COURT: You have to keep your voice up.

THE JUROR: I was arrested in 2003 with my boyfriend at the time. And we were arrested for drugs -- possession of drugs in a school zone, a couple of -- I don't remember specifically the charges, but there were a few of them.

THE COURT: And what happened?

THE JUROR: And I went to court and I pled not guilty. And then a couple of years after that there was a road-rage incident while I was driving, and she was cutting me off and stuff. So I actually was in fear of my life. So I had mace at the time that I didn't have a license for, and I sprayed her with mace. And I had to do probation, anger management and a couple of other things.

THE COURT: Was there a conviction in that?

THE JUROR: Yes. I think I have a misdemeanor. Yeah.

THE COURT: Hmm?

THE JUROR: A misdemeanor, yeah. There were a couple of charges, but a few of them were dropped.

THE COURT: Where was that? What court, do you

remember?

THE JUROR: Woburn.

THE COURT: Woburn District Court?

THE JUROR: Yes.

THE COURT: Both?

THE JUROR: No, the other one was in Somerville.

THE COURT: Do those experiences with the criminal justice system leave you with any feelings about the system that would affect or interfere with your participation as a juror in a criminal case?

THE JUROR: Somewhat.

THE COURT: How?

THE JUROR: I don't know. I just feel like -- well, when I got in trouble with my boyfriend -- my boyfriend at the time -- that they were looking for him but they just included me to kind of get me to talk about him. And I really had nothing to do with it, so it kind of left me with, like...

THE COURT: The question is whether you would be able to put your bad feelings about that aside and judge the evidence --

THE JUROR: Differences aside?

THE COURT: -- impartially here, not favoring one side or the other.

THE JUROR: I'll do my best.

THE COURT: Well, what do you think?

THE JUROR: Yeah.

THE COURT: Okay. You answered about yourself. Anybody else in your circle? I guess, implicitly, about a former boyfriend. But anyone else --

THE JUROR: Family members?

THE COURT: -- been accused of any offense?

THE JUROR: No.

THE COURT: In a criminal case every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence, and proves it beyond a reasonable doubt. The principles of the presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law.

Would you have any difficulty in accepting and applying those principles if you were a juror in this case?

THE JUROR: Uh-uh.

THE COURT: You have to say it for the court reporter.

THE JUROR: No. Sorry.

THE COURT: I outlined in broad terms what the nature of the case is. The government claims the defendants were engaged in a conspiracy or scheme to defraud in the area of real estate transactions, mortgage loans, and so on and so forth.

Understanding that's the topic or the subject matter that you'll be hearing about in the course of the trial, is

there anything in your personal experiences, beliefs, attitudes, possible biases that might interfere with your ability to be a fair-minded juror in this case?

THE JUROR: No.

THE COURT: I also described the schedule that we would follow and the projected possible length of the trial. And as I said, it's an inconvenience to serve at all, but my question is whether over the next several weeks there's a particularly difficult or serious matter that it would affect you if you served on this jury?

THE JUROR: No.

THE COURT: Okay. Thank you.

(The juror exits the courtroom.)

MR. WILD: May we address the Court as to the last prospective juror, your Honor?

THE COURT: Okay.

MR. WILD: The government is concerned because in this case, as the Court knows, this is an indictment with conspiracy and with aiding and abetting in each of the substantive charges.

THE COURT: Okay. Well, I mean, we'll come to the cause issues at the end of the page.

MR. WILD: I understand, your Honor. We want to put the Court on notice of our concerns at this point if the Court wanted to make any further inquiry before the juror went.

And we're concerned that this one has told -- this juror has told the Court she thought it would interfere somewhat with her decision-making, that she was charged with her boyfriend, including the fact that she thought that she was included because they wanted to get to him.

I'm concerned about her ability to keep that from influencing her as she's supposed to follow the Court's instructions on conspiracy liability, aiding and abetting liability and vicarious liability.

So we're making our record at this point, if the Court wants to make more inquiry, but we will, of course, make it at the appropriate time as well. Thank you.

THE COURT: Next juror.

THE CLERK: Next is 31, Andrew Brierley.

Step up here, sir, if you would, please. Thanks.

THE COURT: Mr. Brierley, how are you?

THE JUROR: All right, sir.

THE COURT: I have your witness list you looked over. Did you see anybody you recognized?

THE JUROR: I don't believe I know anyone on your list.

THE COURT: Okay. You didn't indicate you did, so I assumed you didn't.

THE JUROR: No.

THE COURT: You had answered one of the questions I

put to the group generally about connection with law enforcement, you or someone close to you.

THE JUROR: Yes, sir.

THE COURT: Would you tell me about that?

THE JUROR: Yes. I work as a telemarketer for the Massachusetts Police Association, 23,000 members of the Massachusetts law enforcement agency, raising funds for sporting events and their union, I guess.

THE COURT: Okay. Any other reasons why you answered "yes" to the question or is that the one?

THE JUROR: That's the only thing that I could think of that would be satisfactory, and I wanted to make sure I didn't overlook anything.

THE COURT: How long have you been doing that?

THE JUROR: Five years now, I think.

THE COURT: And what's your role?

THE JUROR: I call up individual citizens and read them a prepared presentation, practically verbatim, ask them if they're interested in participating, and then make arrangements to have a check picked up, tickets delivered and a receipt.

THE COURT: Okay. Would that affiliation with a law enforcement organization lead you to have any concern about your ability to be an impartial juror in a case brought by a law enforcement organization or group?

THE JUROR: In my eyes, no, but I just don't wish to

misrepresent anything in the courtroom.

THE COURT: No. That's why we're asking. You think it would not have an effect on you?

THE JUROR: I think I can remain impartial.

THE COURT: Let me just ask you. You said you have been doing this for five years with them?

THE JUROR: Yes.

THE COURT: How about before that? What kind of work did you do -- is this your full-time engagement?

THE JUROR: No, it's not, actually.

THE COURT: No, it's just one of several things you do?

THE JUROR: Yes.

THE COURT: What else do you do?

THE JUROR: I also work in sales for a collection agency.

THE COURT: Okay. What do you do there?

THE JUROR: I have a family, and I'm the sole breadwinner, and...

MR. SWOMLEY: I'm sorry. I can't hear.

THE COURT: They just said they have to hear.

THE JUROR: I'm sorry.

I have a family and I'm the sole breadwinner. And in order for me to make ends meet, I find myself working from seven in the morning to nine o'clock at night. And these

endeavors pay the bills.

THE COURT: Now, what I was interested in was what you do as sales for collection agencies, I guess.

THE JUROR: I approach our nation's largest banking institutions, financial institutions, names I'm not supposed to repeat, hospitals, and negotiate with their credit departments to place accounts in the collection agency for collection by the collection agency.

I've been engaged in that activity for 28 years. And I'm not saying that it doesn't pay well enough to feed my family, but, unfortunately, it's an expensive world we live in, and in order to provide the children with a proper education, I continue to march to this drum, sometimes seven days a week.

THE COURT: Okay. Okay. Now, thinking of the group of people that are closest to you -- immediate family, household members, and so on and so forth -- has anyone, to your knowledge, in that group ever been the victim of fraud of any kind?

THE JUROR: No, I don't think so.

THE COURT: In particular, has anyone in that group ever been the victim of identity theft?

THE JUROR: No, I don't think so.

THE COURT: Has anyone in that group been the victim of any other kind of crime?

THE JUROR: No, I don't think so.

THE COURT: Has anyone in that group ever been accused of a crime?

THE JUROR: No, I don't think so.

THE COURT: In a criminal prosecution, every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence at trial and proves that the person is guilty beyond a reasonable doubt. The principles of the presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law.

As a juror, would you have any difficulty in accepting and faithfully applying those principles in a case?

THE JUROR: I do not think I'd have any problem, sir.

THE COURT: Understanding the nature of this case -- and what is charged by the government is that the defendants engaged in a conspiracy or scheme to defraud in the area of real estate transactions, mortgage loan transactions, and so on. Just as a general subject matter, is there anything in your personal experience, beliefs, attitudes, potential biases because of the nature of the case that would interfere with your ability to be a fair and impartial juror?

THE JUROR: I don't believe so. I mean, personally, of course I have a mortgage.

THE COURT: Right. But you don't believe so? There was a cough when you said it.

THE JUROR: I don't believe I would have any problem.

THE COURT: The schedule in the case: The case is expected to last several weeks. And as I acknowledged to the group, I recognize that for everyone there is some level of inconvenience or disruption.

Let me ask about your own personal circumstances. And if you were on a jury that lasted several weeks, would the impact on you be out of the ordinary from what would be experienced by typical jurors?

THE JUROR: I believe the economic consequences caused by my absence from work would be dire. I telephoned my office from a pay phone in your building today at lunchtime, spoke with the president of my full-time job, and he was somewhat outraged that I was here today. I made sure that I promised to bring him the respective paperwork to prove my whereabouts. And I'm a 53-year-old-man.

THE COURT: Okay. Thank you, Mr. Brierley.

THE JUROR: Thank you, sir.

(The juror exits the courtroom.)

MR. SWOMLEY: Your Honor, could I ask, based upon the questionnaire, it appears he has answered "yes" to being a member of a governmental police or regular fire department, and I don't know that he answered that question any other way. Question No. 9, the second one down.

MR. LEE: Your Honor, may I approach the bench, please? Can I do it with my client? It's in connection with

my client.

(Discussion at sidebar:)

MR. LEE: Judge, my client is in some physical disgrace. He needs to go to the bathroom. But I want to put on the record the clerk spoke to him when he was slumped over and asked him to wake up, and we can ask the clerk his observations.

I met with him for two hours on Saturday, and he went from there to Boston Medical. And he was locked up overnight for a stomach virus. In addition, he has severe asthma, and he is taking some medication that makes him sleepy.

And he told me that he gave this information to the pretrial services officer. About two o'clock he asked me if he could go to the bathroom and I said we can't interrupt, but I think he's in bad shape.

THE COURT: Yeah, okay. We'll excuse him.

Do you mind if we continue in his absence?

MR. LEE: I don't mind.

MR. DiSANTIS: Does he mind?

MR. LEE: I'm going to ask him.

MR. DiSANTIS: Could we have that on the record?

THE COURT: Go ask.

MR. LEE: It's five minutes.

THE COURT: We'll get one or two jurors. Well, okay. We'll wait.

MR. LEE: I didn't want to do this, but I thought it was best to.

THE COURT: Go ahead.

MR. LEE: Thanks, Judge.

(There is a brief interruption in the proceedings.)

(In open court:)

THE CLERK: Juror No. 32, Tara Demoura.

THE CLERK: Step up here to the box, ma'am.

THE COURT: Hi.

THE JUROR: Hi.

THE COURT: We have some summary information about people, including their employment. For you it says, "director of sales strategy and planning," and there's a slash, and it starts to print the company, but it's cut off because there isn't enough space.

THE JUROR: And operations for Blue Cross Blue Shield of Rhode Island.

THE COURT: Blue Cross Blue Shield of Rhode Island.

What does that involve?

THE JUROR: Most of the job is overseeing the sales operations for the organization, so on-boarding new cases for health and dental insurance.

THE COURT: Okay. And how long have you done that?

THE JUROR: I've been with the company for ten years. For nine years I spent in underwriting, and I just recently

moved over to the sales position.

THE COURT: And I have the jury questionnaire you looked over -- the witness list that you looked over. You didn't see anybody you recognized on that list?

THE JUROR: No.

THE COURT: Now, in addition to the questions I put to the group, I have just a few more. Keeping in mind that group of people -- yourself and people closest to you, immediate family and household members, things of that sort, you regard in that way -- is there anyone within that group who, to your knowledge, has been the victim of fraud of any kind?

THE JUROR: No.

THE COURT: In particular, has there been anyone in that group who has been the victim of identity theft?

THE JUROR: My husband and I once had a situation where our credit card was exposed and we had charges that showed up on our bank account. That was rectified.

THE COURT: What do you mean "exposed"?

THE JUROR: Through the bank.

Someone got our credit card number, our check card number, whatever it be, I don't know, from a purchase over the Internet. And we noticed some purchases that were not ours, and the bank took care of it for us. And we never, obviously, found out who that was.

THE COURT: When was that?

THE JUROR: Maybe like a year ago.

THE COURT: And how extensive was it?

THE JUROR: It was small charges. A gas station in Utah, small things like that.

THE COURT: Anyone within that group of people closest to you who have been the victim of any other kind of crime? Any kind?

THE JUROR: No.

THE COURT: The reverse of the question: Anybody in that group ever been accused?

THE JUROR: No.

THE COURT: In a criminal prosecution such as this each defendant is presumed innocent unless and until the government proves otherwise by the evidence, proves the person guilty beyond a reasonable doubt. Those principles of the presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law.

If you were a juror in this case, would you have any difficulty in accepting and faithfully applying those principles?

THE JUROR: No.

THE COURT: Understanding in general terms what the nature of the subject matter of the case is going to be about, the government charges the defendants with the conspiracy or scheme to defraud in transactions involving real estate and

mortgage lending, and so on and so forth -- that's the general gist of the subjects that will be discussed -- having that in mind, do you have anything in your personal experiences, beliefs, attitudes, potential biases that in this case would interfere with your ability to be a fair and impartial juror?

THE JUROR: No, not that I can think of.

THE COURT: I outlined the schedule we'd follow and that the case is expected to last a number of weeks. As I said, we understand that it's an inconvenience, a disruption for people. Apart from the inevitable disruption that anybody would have under these circumstances, is there anything over the next several weeks that would make it unusually severe or hard for you to serve as a juror?

THE JUROR: No.

THE COURT: Okay. Thank you.

(The juror exits the courtroom.)

THE COURT: The next juror, Mr. Chancy, is one for whom we could not locate a questionnaire.

THE CLERK: Number 33, Gary Chancey.

Sir, just step up over here, if you would, please. Step right around there. Thanks.

THE COURT: Hi.

THE JUROR: Hi.

THE COURT: I was looking over the witness list we gave you. Did you recognize anybody?

THE JUROR: I didn't recognize anybody.

THE COURT: Okay. Good. Let me ask you just a few questions in addition to those we put to the group. Having in mind yourself and the people closest to you -- immediate family, household members and things like that, those who you regard are the closest people to you -- anybody in that group ever been the victim of fraud of any kind, to your knowledge?

THE JUROR: No.

THE COURT: In particular, has anybody in that group ever been the victim of identity theft?

THE JUROR: Not that I know of.

THE COURT: How about anyone being a victim of any kind of crime whatsoever?

THE JUROR: Nothing that I could really think of.

THE COURT: Okay. Let me ask the reverse of that: Has anyone in that group ever been accused of a crime?

THE JUROR: Not that I know of that either.

THE COURT: In a criminal prosecution such as this every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence and proves the person guilty beyond a reasonable doubt. Those principles of the presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law.

If you were a juror in this case, would you have any difficulty in accepting and faithfully applying those

principles?

THE JUROR: No.

THE COURT: I outlined in very broad and general terms for the benefit of the pool earlier the general nature of the case, the nature of the charges made, and so on, and that is that the government charges the defendants with a conspiracy or scheme to defraud in transactions involving real estate and mortgage loans, and so on and so forth.

Understanding that's the subject matter of what the case is going to be, is there anything in your personal experiences, your beliefs, attitudes, potential biases as a result of the nature of the case that would make it difficult for you to be a fair and impartial juror in this case?

THE JUROR: No.

THE COURT: I also outlined the schedule we'd follow and noted that the case is expected to last several weeks. We're not sure exactly how long, but it's going to be not a short case. And we recognize, as I said, that it will be an imposition and inconvenience to people to serve, but it's a necessary one for jurors to do. But sometimes there are people who have particular problems.

Is there anything over the next several weeks that would make it especially burdensome or difficult for you to serve if you were to be selected for this jury?

THE JUROR: Nothing.

THE COURT: Okay, Mr. Chancy. Thank you.

THE CLERK: Sir, follow me.

(The juror exits the courtroom.)

THE CLERK: Juror No. 34, Stephanie Chapman.

Step up here if you would, please.

THE COURT: Ms. Chapman, how are you?

THE JUROR: Hello. How are you?

THE COURT: Good. I looked over your witness list that you looked over. You didn't see anybody that you recognized there?

THE JUROR: No.

THE COURT: You did answer one of the questions that I put to the group earlier about a connection with banking, real estate, mortgage lending, and so on. Can you tell us why you answered affirmatively to that?

THE JUROR: Sure. Well, I work at State Street, so I technically work for a bank. So you said to err on the side of caution, so I stood up for a "yes" for that. And my mom is also a real estate agent, so...

THE COURT: Let me ask you about yourself first. What do you do for State Street?

THE JUROR: I work in the institutional relationship management area. So I manage -- like, my group manages pension plans, 401(k) plans.

THE COURT: What does "manage" mean? Do you make

investment decisions?

THE JUROR: No, I don't make the actual decisions. I work in the client reporting group, so I just work with not-for-profit organizations and their client reporting.

THE COURT: Okay. And your mother has been or is involved in real estate?

THE JUROR: Yes.

THE COURT: She's a broker or --

THE JUROR: She's just a real estate agent.

THE COURT: An agent?

THE JUROR: But it's something she does on the side.

THE COURT: Part time? Is that what you mean? By "on the side," you mean part time?

THE JUROR: Part time. Uh-huh.

THE COURT: How long has she done that?

THE JUROR: About two years.

THE COURT: Okay. Where is she doing it?

THE JUROR: Pennsylvania.

THE COURT: Have you been involved in any of her work in that capacity at all?

THE JUROR: No.

THE COURT: Having in mind the close circle of people around you, yourself and the people who are closest to you, immediate family members, household members, things like that, within that group is there anyone, to your knowledge, who has

ever been the victim of fraud of any kind?

THE JUROR: I don't believe so, no.

THE COURT: In particular, has anyone in that group ever been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anyone in that group ever been the victim of any kind of crime?

THE JUROR: No.

THE COURT: Let me ask the reverse of that: Has anyone in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal prosecution such as this, every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence in the case, proves that the person is guilty beyond a reasonable doubt. Those principles of presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law.

If you are a juror in this case, would you have any difficulty in accepting and faithfully applying those principles?

THE JUROR: No.

THE COURT: Understanding, as I described it earlier, what the general topics or subject matter of the case would involve, that is, the government charges the defendants with a conspiracy or scheme to commit fraud in the course of real

estate transactions, lending, mortgage lending and so on -- that's the general tenor of what the evidence would be about -- given that, is there anything in your own personal experiences, beliefs, attitudes, potential biases, perhaps, that would interfere with your ability to be a fair-minded juror in this case?

THE JUROR: I don't think so, no.

THE COURT: Also, on the schedule we follow -- and I said I expected the case is going to take several weeks to complete, and as I said, we recognize that it's necessary to ask jurors to put up with some level of inconvenience and disruption in order to be able to have jury trials such as this.

Apart from the type of inevitable disruption that any juror would have, are there things over the next several weeks that would make it a particularly difficult matter for you to serve on the jury?

THE JUROR: Just work. This is a particularly busy time for me at work, so it would be inconveniencing others at my job. Anything other than that would be just commitments that were on the weekend, but I don't see that being a problem.

THE COURT: Okay, Ms. Chapman. Thank you.

THE JUROR: Thank you.

(The juror exits the courtroom.)

THE CLERK: Juror No. 35, Karen Laugelle.

Step up here to the box, ma'am. Thanks.

THE COURT: Hi, Ms. Laugelle.

THE JUROR: Hi.

THE COURT: Keep your voice up because the lawyers have to hear what we say as well, okay?

THE JUROR: Okay.

THE COURT: Looking right now at your juror list -- I'm sorry.

THE JUROR: Witness.

THE COURT: -- witness list that you looked at, you didn't recognize any names?

THE JUROR: No names, no.

THE COURT: Now, you answered a couple of questions that we had affirmatively. One was connection with law enforcement?

THE JUROR: My husband's a retired police officer.

THE COURT: And where was he a police officer?

THE JUROR: Cohasset, Mass.

THE COURT: How long?

THE JUROR: Twenty-five years.

THE COURT: And how long has he been retired?

THE JUROR: Ten.

THE COURT: Is he -- does he have new employment? Is he working now?

THE JUROR: He owns his own company.

THE COURT: What's he do?
THE JUROR: Excavation.
THE COURT: When he was -- what was his final rank when he left?
THE JUROR: Patrolman.
THE COURT: Did he have any particular special area of assignment?
THE JUROR: No.
THE COURT: General police work?
THE JUROR: General.
THE COURT: Any other connection besides him between you and law enforcement people?
THE JUROR: No.
THE COURT: Okay. And the other was a connection with banking, lending --
THE JUROR: My brother-in-law is a floating manager for Sovereign Bank.
THE COURT: -- real estate?
Your brother-in-law?
THE JUROR: Uh-huh.
THE COURT: And what does he do, do you know?
THE JUROR: I don't really know. I just know he works for -- he floats to all the banks, and he's --
THE COURT: He goes to different branches; is that what you mean?

THE JUROR: Yes.

THE COURT: He's a kind of supervisor or something?

THE JUROR: Yes.

THE COURT: Do you know what kind of operations he's involved in, banking operations? Is it lending, for example?

THE JUROR: He does do lending. He has something to do with that.

THE COURT: Now -- well, we'll come back to that.

Let me ask you about the circle of people around you that are closest to you, as I outlined earlier, yourself included. Has anyone in that group ever been the victim, to your knowledge, of any fraud of any kind?

THE JUROR: No.

THE COURT: Has anyone in particular in that group been the victim of identity theft?

THE JUROR: No.

THE COURT: Now, broadening it out, has anyone in that group been the victim of any kind of crime?

THE JUROR: Yes.

THE COURT: Tell me about that.

THE JUROR: Drugs and alcohol, my son was involved in. A long time --

THE COURT: Well --

THE JUROR: A while ago.

THE COURT: -- I guess you could be a victim -- my

next question was going to be whether --

THE JUROR: Both sides.

THE COURT: -- anybody was accused of committing a crime.

THE JUROR: Both.

THE COURT: But let's put that aside for a minute.

Has anyone been just a victim and not involved in the commission side?

THE JUROR: No, I don't believe so.

THE COURT: All right. So you anticipated my other question, which was whether anybody in that circle has been accused of a crime. And your son had some trouble with drugs --

THE JUROR: And alcohol.

THE COURT: -- and alcohol at some point?

THE JUROR: Yes.

THE COURT: Involving criminal convictions?

THE JUROR: Yes. He was under-aged. He was a minor at the time. But, yes.

THE COURT: And what was the punishment, if he had any?

THE JUROR: He went to Gosnold. He was on a bracelet for six months.

THE COURT: And what court was he involved with, do you know?

THE JUROR: Quincy.

THE COURT: Was it district court?

THE JUROR: Yeah.

THE COURT: And how long ago was that?

THE JUROR: Eight years ago.

THE COURT: Now, let me ask you, does the fact that your husband used to be a police officer and on the prosecution side of things lead you to have any concerns about your ability to be an impartial juror where there's a prosecution on the one side and the defense on the other side, or would you be able to set aside anything that emerges from that relationship and judge the case here on the evidence without favor to either side?

THE JUROR: I think I could judge it without any bias.

THE COURT: Does the fact that your son works for a bank maybe -- I don't know whether Sovereign --

I could ask generally: Is Sovereign Bank particularly prominent in this, Mr. Wild, or --

MR. DiSANTIS: No, it's not, your Honor.

THE COURT: Okay. Any reason why your brother-in-law --

THE JUROR: Brother-in-law.

THE COURT: His relation with Sovereign Bank, would that have any effect in terms of sympathizing with the banks that may be involved or something like that?

THE JUROR: I don't think so, no.

THE COURT: And how about your experience though your son with the criminal justice system? Does that leave you with any feelings about the system itself that --

THE JUROR: I don't particularly care for it, but it is what it is.

THE COURT: The question is whether any opinions you might have -- whether they would affect your impartiality and your judgment in a case like this.

THE JUROR: I don't think so. I think I could be fair.

THE COURT: Every defendant in a criminal case is presumed to be innocent unless and until the government proves otherwise by the evidence, proves the person guilty beyond a reasonable doubt. Those principles of the presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law.

If you were a juror in this case, would you have any difficulty in accepting and applying those principles faithfully in a case?

THE JUROR: No, I don't think I would have difficulty.

THE COURT: The case involves allegations by the government that the defendants were involved in a conspiracy or scheme to defraud in the context of real estate transactions, mortgage loans, and so on.

Given that that's the subject matter that the jury will be dealing with, is there anything in your personal experiences, beliefs, attitudes, potential biases that you think would interfere with your ability to be a fair-minded and impartial juror --

THE JUROR: No.

THE COURT: -- in this case?

THE JUROR: No.

THE COURT: I outlined the schedule we would follow, and said earlier that it's anticipated the case will take several weeks to present. The witness list sort of suggests that, all of those people. And I said that we'll be -- we recognize some disruption and inconvenience for jurors who have to sit on a case.

Apart from the kind of inevitable inconvenience that anyone would have, is there anything over the next several weeks that would make it particularly difficult for you to serve if you were to be on this jury?

THE JUROR: No.

THE COURT: Okay. Thank you.

(The juror exits the courtroom.)

THE CLERK: This is Juror No. 36, Thao Tran.

Step up over here, if you would, please. Thank you very much.

THE COURT: Hi, Ms. Tran. I'm going to ask you a few

questions. I'd ask if you answer -- keep your voice up because the lawyers have to hear.

THE JUROR: Okay.

THE COURT: I'm looking at your -- you looked at the witness list?

THE JUROR: Yup.

THE COURT: Did you recognize anybody on it?

THE JUROR: Nope.

THE COURT: Okay. Now, in addition to the questions that I had asked everybody as a group -- and you didn't answer any of those when I asked them -- let me just ask you a few more.

THE JUROR: Sure.

THE COURT: Thinking of that group of people I defined earlier that includes you and people closest to you, family members, household members, things like that, is there anybody in that group, or yourself, who has ever been, to your knowledge, the victim of a fraud of any kind?

THE JUROR: No.

THE COURT: In particular, is there anyone in that group who has ever been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anyone in that group ever been the victim of any kind of crime?

THE JUROR: Not that I know of.

THE COURT: Let me ask the other side of that: Has anyone in that group ever been the victim of -- I'm sorry.

Has anyone ever been accused of committing a crime?

THE JUROR: No.

THE COURT: In a criminal case such as this, every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence, proves the person guilty beyond a reasonable doubt. Those principles of the presumption of innocence and proof beyond a reasonable doubt are fundamental ones in our law.

If you were a juror in this case, would you have any difficulty in accepting and faithfully applying those principles to this case?

THE JUROR: No.

THE COURT: I described in a very general way earlier what the nature of the case is and the nature of the allegations that are made, and the government accuses the defendants of a conspiracy or scheme to defraud in transactions involving real estate and mortgage loans, and so on and so forth. Understanding that's the subject matter of the case, is there anything in your personal experiences, beliefs, attitudes, potential biases that might interfere with your ability to be a fair-minded juror in this case?

THE JUROR: I don't think so.

THE COURT: Let me just ask, I see -- we have some

very basic information about jurors, including employment. And for you it says a cashier?

THE JUROR: Yeah.

THE COURT: But it doesn't say for whom or for what.

THE JUROR: Oh, for my school. My school has a grocery store, like a little market, and that's where I work.

THE COURT: Part time?

THE JUROR: Part time.

THE COURT: Are you a student?

THE JUROR: Yes.

THE COURT: At what school?

THE JUROR: Northeastern University.

THE COURT: A full-time student --

THE JUROR: Yes.

THE COURT: -- with a part-time job?

THE JUROR: Yes.

THE COURT: What are you majoring in?

THE JUROR: American Sign Language and human services.

THE COURT: I outlined the schedule we'd follow, and it appears that, as I noted earlier, the case is going to take several weeks to present. Every juror will have some disruption and inconvenience as a result. For you, particularly as a student, is that going to be a particular problem?

THE JUROR: Definitely. I have finals in two weeks,

just about, so...

THE COURT: And those are during the hours we would be sitting, nine to one --

THE JUROR: Yeah, like.

THE COURT: -- in the morning? They're day classes?

THE JUROR: Yes.

THE COURT: What year are you?

THE JUROR: Sophomore.

THE COURT: Okay. Thank you.

THE JUROR: Thank you.

(The juror exits the courtroom.)

THE COURT: Okay. That concludes that page.

I'm going to excuse Ms. Tran. As a student, I think it's an unreasonable imposition on her, particularly as we come to the end of a semester, unless there's some objection to that.

Okay. Other cause objections? Mr. Borenstein?

MR. BORENSTEIN: I do not have an objection -- Mr. Levine doesn't -- to removing that last juror. I think it makes sense because of the hardship.

I do want to point out, Judge, there have been two Asian women in the 36 jurors that have been called. No one of color, no African-Americans, no Hispanic prospective jurors. And that's of grave concern, especially with this last juror also now, understandably, having to be removed. And I'm going

to join Mr. Ullmann's earlier objection at the sidebar to protect Mr. Levine's rights also.

THE COURT: Noted.

MR. BORENSTEIN: Mr. Brierley, Number 31, Judge, who, for a number of reasons, I think --

THE COURT: I can shorten it. I think he sounds like a genuine hardship situation to me. So I would excuse him for hardship.

MR. BORENSTEIN: I would also -- although it may, on its face, appear to be a very distant connection, there's a postal employee, and obviously a postal -- at least one investigator -- I believe investigator for the government on this case now. You know, there may be issues of credibility that comes up. I don't know.

I'm concerned, and I want to request that because of that connection that he be considered for cause.

I want to raise the issue about --

THE COURT: Well, just so the record is clear, I think you're talking about Juror No. 33, Mr. Chancey?

MR. BORENSTEIN: I'm sorry. Yes, 33, Mr. Chancey.

THE COURT: Before you go on, let me hear from the government on that.

MR. WILD: If I may address that briefly, your Honor. We do not anticipate at this point that Mr. McGonagle, the postal inspector, would testify in this case. But furthermore,

as opposed to Juror No. 34, who the Court excused because she investigates fraud in connection with tax returns, in connection with government business and so forth, this is a letter carrier, and what he does has nothing to do with investigating for fraud; what he does, does not refer a matter to a fraud investigator for further matters that might further lead to criminal prosecution.

So I think it's a totally distinctive government employment position and has no bearing on his qualifications, and he answered all of your questions.

THE COURT: No, I don't think he should be excused for cause.

MR. BORENSTEIN: Judge, Number 27, Mr. Faria. I don't know if you had made a ruling earlier when --

THE COURT: Well, I think you were sort of in agreement about him, so I won't fight against that. I'll excuse Mr. Faria for cause.

MR. BORENSTEIN: And finally, Number 26, Joseph Scannell, who indicated some issue around credit card theft, his brother was a victim of a -- having been struck by a driver under the influence, his involvement in the criminal justice system, I raise some concerns about his ability to sit fairly and impartially and would ask that he be removed for cause.

MR. WILD: Your Honor, I think those matters are so far afield from what's at issue here, and he answered all of

your questions saying he didn't think that would be a problem. And he even said, "I have this Chinese business issue, but I think I can swing that as well."

So he didn't have anything that appeared to the government to be a conflict of any kind, his serving impartially in this case.

THE COURT: Yes, I was satisfied with his answers. I think I will deny a cause challenge to Mr. Scannell.

Okay. So we'll excuse Numbers 27, 31 and 36.

MR. WILD: Your Honor, we also addressed Juror 30. May I address that again very briefly?

THE COURT: All right. Go ahead. Yes.

MR. WILD: This was the witness -- I think Chanel Scimemi is the name. This is the one where we're very concerned because she expressed to the Court her very bad feelings about the fact that she was, in her mind, it appeared, vicariously brought into a case because of her boyfriend. And she did have a conviction, if not -- I know she had a mace conviction; I don't recall exactly whether she said she was convicted in the other matter or not.

But because of the conspiracy liability, vicarious liability in this case, and because aiding and abetting on all of the substantive counts is an issue in this case, I think the way she expressed herself to the Court shows that she would have a very difficult time with properly and legally applying

the principles in this case because of how she feels she was treated by the law enforcement system and by the court system.

MR. SWOMLEY: I didn't see, your Honor, anything -- I mean, I guess the real question is whether Mr. Wild believes that the government ever erroneously prosecutes someone else in order to get to the person they really want to get to. And obviously, I can imagine that the U.S. Attorney's Office would feel that they never do something awful like that. And yet a potential juror could very well, and very accurately, feel that that is, in fact, what happened and still be -- and answer your questions and conclude that they're capable of not being biased by that notion.

I guess what I take issue with is the notion that Mr. Wild is advancing that, in fact, that couldn't happen, that -- and that that, therefore, renders her incapable of being fair and impartial. And I would submit that that is certainly not and cannot be the case.

MR. WILD: May I respond to that? There is no need to make this personal, and that wasn't the theme I was expressing to the Court. I was discussing how the juror addressed the Court. And you asked her would that interfere, and she said yes, somewhat. I'm referring to her perspective.

MR. SWOMLEY: I'm referring to her perspective as well, and the fact that in her mind there is, as I believe Mr. Wild put it, vicariously brought in by -- she was

vicariously brought in by the government somehow suggests that she is somehow misplaced in her thoughts with respect to that. And I would submit that, one, he can't tell you or her that she is misplaced in her thoughts; but, two, if she is not misplaced in her thoughts, then there certainly is no objection to her having those thoughts, and there's nothing that having those thoughts does to render her an improper juror.

MR. ULLMANN: Could I be heard very briefly on this? I don't think she's excusable for cause. She was candid. For one thing, she admitted the fact that she has a misdemeanor conviction. She answered your questions thoughtfully and ultimately she decided she could be fair. And the fact that at times the government puts pressure on one witness to provide evidence against another is not controversial. It happens all the time, and we'll see it at this trial. That's certainly not a basis for excusing somebody.

The bottom line is does the person think that she can be fair, was she candid. And she satisfies both those criteria.

THE COURT: Well, no, I think I will excuse her. I mean, I think there's a difference between it being shown in the evidence, for example, by cross-examination that the government put pressure on somebody and somebody having personally experiencing it and resenting it. I think it's just a risk we don't need to have. So I will excuse her for cause

at the government's request.

Okay. So that would leave us, then, adding Number 30 to the ones we'll excuse, with 25, 26, 28, 29, 32, 33, 34 and 35. So by my count we are at, what?

MR. ULLMANN: Twenty-two.

THE COURT: Twenty-two. So we're halfway there.

I would think as we go along that, you know, beginning at nine, we should finish by midday tomorrow, at this pace. And certainly I mean both -- because this is the bulk of it, the getting the interrogations of the jurors. There will be some time taken up in the exercise of peremptories, but that won't be the major thing.

So I expect by the end of the day, but I don't think we will get any further that that.

MR. SWOMLEY: Can I ask your Honor tomorrow not to -- and I know that this is one of the stock questions -- but that when you preface the presumption of innocence, burden of proof as fundamental rights, essentially you're taking out of the question to the juror -- potential juror -- any ability to give anything other than the scripted answer which is, of course, if it's a fundamental right, I'm going to apply it.

If you leave out the qualifier there and just simply ask whether you can give someone the presumption of innocence and apply -- put the burdens where they belong and don't tell them, "We all believe this is a country; therefore, what's your

answer," I think you're more likely to get an honest answer. And I would ask you not preface that in that fashion, give it more open-ended, please.

THE COURT: Well, okay. I've asked the question for years, and I have had people say they couldn't, having asked the question.

MR. SHEKETOFF: Could we have --

THE COURT: I'll give it consideration.

MR. SHEKETOFF: Could we have the juror numbers? I count 21 jurors, your Honor. I must have missed somebody.

THE COURT: I'll give you --

Do you want to do it?

THE CLERK: Yeah. You're talking about ones that have not been challenged for cause?

MR. SHEKETOFF: The ones that are still in our venire.

THE CLERK: Starting from the beginning, Number 1, Karen Walsh --

MR. SHEKETOFF: Just the number.

THE CLERK: One, two, four, seven, ten, 11, 12, 13, 15, 16, 18, 22, 23, 25, 26, 28, 29, 32, 33, 34 and 35.

MR. SHEKETOFF: Okay. Thank you very much. That's what I have. That's 21, I believe.

MR. BORENSTEIN: Very quickly, Judge. So opening statements probably Wednesday morning?

THE COURT: Yes, probably Wednesday morning.

MR. BORENSTEIN: The government, I believe your Honor indicated, has up to an hour for their opening? I believe that -- maybe I'm wrong.

MR. DiSANTIS: Yes. We reserved an hour. It's not going to be anywhere close to an hour.

THE COURT: How many of defense counsel expect to open at the beginning of the --

MR. BORENSTEIN: Levine will.

THE COURT: Everybody?

MR. SWOMLEY: I will.

MR. SHEKETOFF: I expect I will.

MR. BORENSTEIN: How long for our openings? We won't need an hour, but 40 minutes?

THE COURT: I'll give you what you want, but you'd be wise not to use it.

MR. BORENSTEIN: I did file today a request for preliminary instructions before the openings.

THE COURT: I'll look at that.

MR. BORENSTEIN: Thank you.

MR. WILD: Your Honor, for witness scheduling purposes, we would like a little more definitive on whether all five counsel are going to open or some are going to reserve.

THE COURT: Why don't you talk to them over the recess and tomorrow, if there's an issue, we'll deal with it.

MR. WILD: Very well. Thank you.

MR. BORENSTEIN: Thank you.

THE COURT: Okay. So what we're going to do is -- I think we already know that the people who had been challenged and excused have been let go. So the people that will come back tomorrow are the 22 that we --

MR. SHEKETOFF: Twenty-one.

THE COURT: All right, if you say 21.

-- those who have passed, through page 3, and they're going to go to Courtroom 7 in the morning.

THE CLERK: Yup.

THE COURT: And the others who are still waiting, the other 65, or whatever there are there, will go back to Courtroom --

THE CLERK: Eight.

THE COURT: -- 8, and we'll assemble here and just begin the process at nine o'clock.

MR. DiSANTIS: And, your Honor, I apologize to reiterate this, just for our planning purposes, we should expect no openings tomorrow, openings on Wednesday morning?

THE COURT: Yes. If we, by some unexpected turn of events, were to finish, say, at 11:30, we would not go any further.

MR. LEE: Judge, I don't know if the clerk is going to take these back.

THE COURT: Yes. I'm glad you did that. We have to

collect -- you could have them back tomorrow, but you can't take them with you.

All right. If there's nothing else for me...

(The proceedings adjourned at 4:51 p.m.)

C E R T I F I C A T E

We, Marcia G. Patrisso, RMR, CRR, and Cheryl Dahlstrom, RMR, CRR, Official Reporters of the United States District Court, do hereby certify that the foregoing transcript constitutes, to the best of our skill and ability, a true and accurate transcription of our stenotype notes taken in the matter of Criminal Action No. 08-10121-GAO, United States of America v. Eric L. Levine, et al.

/s/ Marcia G. Patrisso
MARCIA G. PATRISSO, RMR, CRR
Official Court Reporter

/s/ Cheryl Dahlstrom
CHERYL DAHLSTROM, RMR, CRR
Official Court Reporter

Date: 4/5/10