UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ERIC L. LEVINE, J. DANIEL LINDLEY, ERNST APPOLON, DANIEL APPOLON and LATOYA HALTIWANGER,<br><br>Defendants. | Criminal Action No. 08-10121-GAO |

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**JURY TRIAL**

**DAY TWO**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts 02210
Tuesday, April 6, 2010
9 a.m.

Marcia G. Patrisso, RMR, CRR
Debra M. Joyce, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts 02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

APPEARANCES:

OFFICE OF THE UNITED STATES ATTORNEY
By: Ryan M. DiSantis, Mary B. Murrane and Victor A. Wild,
Assistant U.S. Attorneys
John Joseph Moakley Federal Courthouse
Suite 9200
Boston, Massachusetts 02210
On Behalf of the Government

DENNER PELLEGRINO, LLP
By: Isaac Borenstein, Esq.
Bruce D. Levin, Esq.
Four Longfellow Place, 35th Floor
Boston, Massachusetts 02114
On Behalf of Defendant Eric L. Levine

LAW OFFICES OF ROBERT L. SHEKETOFF
By: Robert L. Sheketoff, Esq.
One McKinley Square
Boston, Massachusetts 02109
On Behalf of Defendant J. Daniel Lindley

SWOMLEY & ASSOCIATES
By: John G. Swomley, Esq.
227 Lewis Wharf
Boston, Massachusetts 02110-3927
- and -
LAW OFFICES OF JAMES E. HAYNES
By: James E. Haynes, Esq.
10 Essex Avenue
Swampscott, Massachusetts 01907
On Behalf of Defendant Ernst Appolon

LAW OFFICES OF EDWARD J. LEE
By: Edward J. Lee, Esq.
65 Franklin Street, Suite 500
Boston, Massachusetts 02110
On Behalf of Defendant Daniel Appolon

NUTTER, McCLENNEN & FISH, LLP
By: Sarah P. Kelly, Esq.
Robert L. Ullmann, Esq.
Seaport West
155 Seaport Boulevard
Boston, Massachusetts 02210-2604
On Behalf of Defendant Latoya Haltiwanger

(The following proceedings were held in open court before the Honorable George A. O'Toole, Jr., United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, One Courthouse Way, Boston, Massachusetts, on April 6, 2010.

The defendants, Eric L. Levine, J. Daniel Lindley, Ernst Appolon, Daniel Appolon and Latoya Haltiwanger, are present with counsel. Assistant U.S. Attorneys Ryan M. DiSantis, Mary B. Murrane and Victor A. Wild are present.)

THE CLERK: All rise.

(The Court enters the courtroom at 9:09 a.m.)

THE CLERK: Continuation of jury selection in the case of the U.S. versus Levine trial, 08-10121.

Please be seated.

THE COURT: Good morning.

COUNSEL IN UNISON: Good morning, your Honor.

THE COURT: I'm not asking everyone to identify themselves. I'll report that all counsel and clients are present.

MR. WILD: Good morning, your Honor. On behalf of the government, Victor A. Wild.

You don't want our attendance.

THE COURT: See, she moved my microphone. I was going to save that by saying that all counsel and clients are present.

MR. WILD: I see.

THE COURT: Just before we resume where we had left off, the clerk advises me that there are two jurors that had been cleared yesterday who have something they'd like to talk about. So we'll get them first.

First, I believe, is Number 1.

THE CLERK: Karen Walsh.

MR. BORENSTEIN: Judge O'Toole, may I mention just briefly one concern I have. And would you mind -- I don't think it would take very long -- for you to ask the jurors if between yesterday and today they've discussed anything about the case --

THE COURT: Fine.

MR. BORENSTEIN: -- or --

THE COURT: Well, I guess I can. I'll have to ask it of each juror because I'm not going to -- which -- which pool -- I mean, we're only going to see uncleared people.

MR. BORENSTEIN: Just the ones today. Yeah, not that we had visited with, everybody else.

THE COURT: Okay.

(Pause.)

THE CLERK: Judge, I have Juror No. 1, Karen Walsh.

THE COURT: Good morning.

THE JUROR: Good morning. I probably should have told you this yesterday.

THE COURT: You have to keep your voice up.

THE JUROR: I have an anxiety disorder which would prevent me from doing the jury only because I can't drive on the highway and I can't take public transportation. And my doctor said that she would be more than happy to write a note stating that. And that's about it. I can't --

THE COURT: Tell me about it. How long have you had the diagnosis?

THE JUROR: Since I was about 18. So I'm on medication for it.

THE COURT: Right. And you take the medication regularly?

THE JUROR: Yes.

THE COURT: And does it help control the symptoms?

THE JUROR: It does. But I can't drive on highways or go on public transportation, because I feel very confined and --

THE COURT: And that's been true since you've been 18?

THE JUROR: Yes. Yes.

So, again, I should have brought it up yesterday. I didn't realize the whole process of all this.

THE COURT: Okay. Anybody interested in -- no?

Okay. Thank you.

THE JUROR: Okay.

(The juror exits the courtroom.)

THE CLERK: Next one?

THE COURT: Yeah.

While we're waiting for the next one, does anyone have any reactions?

MR. WILD: I guess I'm just inquiring because I don't know how one gets from Stoneham to here, particularly.

THE COURT: I guess we'll come back to it because we have the next one here.

THE CLERK: This is Juror No. 35. I believe Karen Laugelle.

THE COURT: Good morning. We have to share the microphone.

THE JUROR: When I got home last night, we had gotten a call. My father-in-law has pancreatic cancer. And he has to go in -- excuse me.

THE COURT: Take your time.

THE JUROR: I am the person that drives him. You know, he drives around town, but I take him into the doctor's and all that. He's 82.

THE COURT: Is this -- you just learned of the diagnosis yesterday?

THE JUROR: Yes. Well, they called last night. He went in last week and had some tests done, and they were very optimistic, and they said for us to call them this coming Friday. And they called last night and he has to see a

surgeon. And he's got an appointment Thursday at one o'clock.

THE COURT: All right. Thanks.

(The juror exits the courtroom.)

THE COURT: Okay. As to the last one, I'm inclined to excuse her -- I don't know if there's any dissent from that -- Number 35. That is something that was unknown yesterday.

As for the first one, somebody started to say something. Mr. Wild?

MR. WILD: I did, your Honor.

I understand she can't drive on highways or take public transportation. I guess I don't know whether one drives on the highway to get from Stoneham or whether it's a different kind of driving, or whether it makes any difference.

THE COURT: I don't know. To be frank, I don't believe her. But I'm not sure there's anything we can do about it. If she's that unwilling, I don't think it serves anybody's interest to have that unwilling a juror in the pool -- as a possible juror.

So I would excuse both.

THE CLERK: Okay.

(Pause.)

THE COURT: So, Paul, as you do that --

THE CLERK: I'm going to line up the next group, Judge, starting with Number 37.

THE COURT: Number 37? Yeah.

Let me just ask Mr. Borenstein, coming back to your request, what exactly is it?

MR. BORENSTEIN: I'm just concerned about jurors leaving yesterday and saying to themselves, "What are we getting ourselves into? Let's look this up or let's talk to one another." And so it's a brief --

THE COURT: I guess upon reflection the problem I'm having is that there's probably some range of legitimate discussion about what happened during the day. But they didn't hear anything about the evidence in the case. I'm afraid we won't get very reliable answers. I'm afraid talking about moving around the courthouse and being with other jurors and talking about that -- there's nothing wrong with that, it seems to me.

Sitting jurors, you know, you ask about whether they talked about anything in the evidence, and that's a legitimate concern. But I guess on reflection it would just add to the confusion.

MR. BORENSTEIN: Thank you.

THE COURT: And just following up on something yesterday, in response to Mr. Swomley's request, I will omit the reference to fundamental rights.

MR. SWOMLEY: Thank you, your Honor.

(Pause.)

THE CLERK: Judge, I have Juror No. 37, Mary Sherman.

THE COURT: All right.

THE CLERK: Step right up here.

THE COURT: Good morning.

THE JUROR: Good morning.

THE COURT: You didn't answer any of the questions I had generally, but I have a few more questions that I've been asking people individually.

THE JUROR: Sure.

THE COURT: First, I have the potential witness list that you've looked over. You didn't see anybody that you recognize?

THE JUROR: I wasn't sure what "keeper of the record" is. I bank with Citizens Bank in New Hampshire.

THE COURT: Okay. Regular personal banking?

THE JUROR: Uh-huh.

THE COURT: Now, yesterday I asked you to think of -- for some of the questions, not just yourself personally, but people who are particularly close to you, okay? Thinking of that group -- the immediate family, household members and so on -- has anyone in that group ever been the victim of a fraud of any kind, to your knowledge?

THE JUROR: Not a victim.

THE COURT: Well, what do you mean by that?

THE JUROR: There was a time when we were buying a gas furnace. And we went to the gas company, and somehow someone

sold our name to a person that came to the house and wanted money for the furnace. And it wasn't sanctioned by the company. It's close.

THE COURT: Somebody wanted to buy your old furnace?

THE JUROR: No, they wanted to replace it and wanted cash.

THE COURT: I'm not quite clear.

THE JUROR: I went to buy a gas furnace. I went to the gas company. We were going to order it; they were going to send somebody out. This person came and represented himself as being that person from the company.

THE COURT: From the company. But he was not?

THE JUROR: He was not.

THE COURT: I see.

And did you deal with that person?

THE JUROR: No, because something felt not right. So we called the gas company and they took it from there.

THE COURT: Okay. And when was this?

THE JUROR: Oh, God. A long time ago. I don't know if it's important.

THE COURT: No. Fine. Has anyone in the group that we've talked about ever been, in particular, the victim of identity theft?

THE JUROR: Not that I know of.

THE COURT: How about anybody in that group ever

having been the victim of any kind of crime?

THE JUROR: Someone tried to use our credit card, but the credit card *[sic]* called us and they cancelled it and chased down who was using that.

THE COURT: And when was that?

THE JUROR: Ten, 15 years ago, I guess.

THE COURT: Now, with respect to the incident with the furnace and with respect to the credit card, do those incidents leave you with any feelings or consequences that would affect your ability to be fair-minded in a case where there are allegations of fraudulent behavior?

THE JUROR: My problem is that I'm an accountant. And I work for a big company, and we deal with revenue and profit all the time. And we have to make sure we follow the rules of the company. So I don't -- so being the accountant, I'd have to see more facts.

THE COURT: So my question is whether there's anything in your personal experiences about the -- in particular, the ones you told us about, the fraud -- or potential fraud with the furnace, and the incident with the credit card, which could be identity theft -- whether those things leave you with feelings that you wouldn't be able to control, in other words, as you judge the case and would sort of take over, or whether those could be set aside and you would be able to judge the evidence fairly and --

THE JUROR: Truthfully, I don't know.

THE COURT: Has anyone in that small circle, anyone around you, ever been accused of a crime?

THE JUROR: Yeah, my nephew -- my stepson.

THE COURT: Your stepson? What was that?

THE JUROR: In Florida.

THE COURT: And what was the offense?

THE JUROR: I think drugs. It's been a long time.

THE COURT: And this was when?

THE JUROR: Ten, 15 years ago, I guess. It's been a while since we've seen him.

THE COURT: Okay. Anything in that family experience that would affect your fairness as a juror in a case?

THE JUROR: No. No. I had -- my brother did testify in a federal case.

THE COURT: In what capacity?

THE JUROR: It was Hanscom Air Force Base. He was a witness.

THE COURT: What kind of case?

THE JUROR: It was supplies being stolen from Hanscom Air Force Base.

THE COURT: When was that?

THE JUROR: About ten years ago.

THE COURT: Would that have any effect on your service as a juror?

THE JUROR: I don't think so.

THE COURT: Every defendant in a criminal case is presumed to be innocent unless and until the government proves otherwise by the evidence, proves that the person is guilty beyond a reasonable doubt.

Would you have any difficulty in applying those principles, the presumption of innocence and proof beyond a reasonable doubt, if you were a juror in this case?

THE JUROR: I would do my best. I think I could.

THE COURT: I described in general terms yesterday what the nature of the subject matter of the case would be, that the government accuses the defendants of conspiring or scheming to defraud in the area of real estate transactions, mortgage loans, and so on and so forth.

Understanding that's the general nature of the case, is there anything in your personal experiences, beliefs, attitudes, potential biases that would interfere with your ability to be a fair juror in this case?

THE JUROR: I just would feel bad for the people that were taken. I don't know how else to say it.

THE COURT: Well, okay. Would you be able to assess the evidence objectively or would you be affected by your concern for people in a way that would prevent you from --

THE JUROR: I would try my best to be open-minded.

THE COURT: Let me ask you about the schedule in the

case. I described how we'd proceed. And the consequences of the case is it's going to take several weeks to present. As I said yesterday, we know it's an imposition on anybody who's called to serve as a juror.

Is there anything over the next several weeks that would be more than the ordinary kind of inconvenience that would be especially burdensome for you?

THE JUROR: I'd have to check with my company. But I don't think so. I'm a supervisor of about ten people there, so I'd have to make arrangements. And then my husband drives me in to Boston.

THE COURT: Okay. The company is?

THE JUROR: BAE Systems in Nashua, New Hampshire. They're a defense company.

THE COURT: Okay. Thank you.

THE JUROR: Okay.

(The juror exits the courtroom.)

THE CLERK: Juror No. 38, Louise Strickland.

Why don't you come right around here and step up here, if you would, please.

THE COURT: Good morning.

THE JUROR: Good morning.

THE COURT: I just have a few questions in addition to the ones we asked everybody as a group yesterday. I'm looking at the witness list that you reviewed, and it looks like you

didn't recognize anybody?

THE JUROR: No one.

THE COURT: Okay. I'd like you to think about that group of people closest to you that I talked about yesterday: yourself, family members, household members, that sort of thing. Has anyone within that group ever been the victim of any fraud that you're aware of?

THE JUROR: No.

THE COURT: Has anyone in that group ever been, in particular, a victim of identity theft?

THE JUROR: No.

THE COURT: Has anyone in that group ever been the victim of any kind of crime?

THE JUROR: No.

THE COURT: Has anyone in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: Every defendant in a criminal case is presumed to be innocent unless and until the government proves otherwise by the evidence, proves the person is guilty beyond a reasonable doubt.

Would you have any difficulty in accepting and applying the principles of presumption of innocence and proof beyond a reasonable doubt in this case?

THE JUROR: No.

THE COURT: I've described in very general, broad terms the nature of the controversy here. The government accuses the defendants of conspiring, or scheming, to commit fraud in the area of some real estate transactions, mortgage lending, and so on, just to set the stage in general.

Understanding in general that that's the topic, or the area of topics that we'll be hearing about, is there anything in your personal experiences, beliefs, attitudes, potential biases that would interfere with your ability to be a fair-minded and impartial juror?

THE JUROR: No.

THE COURT: I described yesterday the schedule we'll follow in the case and told the jurors that it appears the case is going to take a few weeks to present. We're not sure exactly how many, but it will be a bit longer than usual.

And as we know, it's an inconvenience for any juror to serve on any terms, but is there anything over the next few weeks that makes it particularly difficult or burdensome for you to serve if you were to be selected for the jury?

THE JUROR: My only problem is my husband owns his own business, and I work full time to supply health insurance -- he has a heart condition -- and that's what pays for the health insurance weekly. And I will not be getting paid for it.

THE COURT: Who do you work for?

THE JUROR: I work for a pharmacy. Sedell's Pharmacy.

THE COURT: And why would they not pay the health insurance?

THE JUROR: I have to pay my health insurance into the company each week.

THE COURT: I see. And it's a small business?

THE JUROR: It's a small pharmacy, yes. There's three of us.

THE COURT: And you make a weekly -- what hours do you usually work?

THE JUROR: I work nine in the morning to seven at night. I work 40 hours a week. But it's about 160 to 180 dollars a week for my husband and I for insurance.

THE COURT: And would you be able to work part time and make the contributions?

THE JUROR: No, because you can only work until 7 p.m. So by the time I get home, it's too late to go on the second shift.

THE COURT: Berkley is where you live?

THE JUROR: Yes.

THE COURT: Okay. Thank you.

THE JUROR: Okay. Thank you.

(The juror exits the courtroom.)

THE CLERK: Juror No. 39, Patricia Hanides.

THE COURT: Good morning.

THE JUROR: Good morning.

THE COURT: I have just a few questions in addition to the ones we asked the group yesterday.

First of all, I've looked at the witness list that you looked over, and I don't see that you circled anybody. So you didn't recognize anybody on the list?

THE JUROR: No.

THE COURT: With reference to that group of people closest to you that I talked about yesterday -- yourself and people in your immediate family, household and so on, your closest circle -- has anyone in that group ever been the victim of a fraud, to your knowledge?

THE JUROR: No.

THE COURT: Has anyone in that group ever been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anyone in that group ever been the victim of any kind of crime?

THE JUROR: No.

THE COURT: Has anyone in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case the defendant is presumed to be innocent unless and until the government proves otherwise by the evidence, proves the person guilty beyond a reasonable doubt.

If you were a juror in this case, would you be able to faithfully apply the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: Given the evidence, if it goes -- whichever way it goes?

THE COURT: Yes. Follow the evidence and -- but understanding that it's a high burden of proof that the government has, and you would be given instructions about that, but do you see any difficulty in following those principles?

THE JUROR: No.

THE COURT: I've described in very broad terms the subject matter of the case, in a sense. The government accuses the defendants of a conspiracy, or scheme, to defraud in the area of real estate transactions, mortgage lending, and so on.

Understanding that that's the general gist of what we'll be hearing about, is there anything in your personal experiences, beliefs, attitudes, potential biases because of the nature of the case that would make it difficult for you to be a fair and impartial juror in this case?

THE JUROR: Possibly. I do have a very good friend who does mortgages that I talk with -- I wouldn't, obviously, talk about this -- about different scenarios and, you know, with the lending and what have you.

THE COURT: And what -- whom does that person work for?

THE JUROR: A real estate agent in Haverhill, Mass.

THE COURT: And other than knowing someone who does something in the industry, is there anything about that that would skew you to one side or the other if you heard the evidence?

THE JUROR: I don't know. Like I said, just from personally talking with her in the past.

THE COURT: I outlined the schedule we'd be following. And as a consequence of the nature of the case and so on, the case is probably going to take several weeks to be presented. And as I noted, we recognize that it can be disrupting and inconvenient for jurors to have to put things aside to serve.

Apart from the kind of inconvenience that all jurors have, is there anything over the next several weeks that makes it particularly difficult for you to serve?

THE JUROR: I just have a few appointments that I take my mother to for oncology, and a couple of other doctors that I do during the day.

THE COURT: And over the next several weeks, about how many would that be?

THE JUROR: Probably three.

THE COURT: You've been doing that for some time?

THE JUROR: Yes.

THE COURT: In the past, if you've had to, has there been any difficulty in rescheduling?

THE JUROR: One or -- yeah, one or two, possibly. One of them, I would go with her regardless.

THE COURT: When are they? Do you know off the top of your head?

THE JUROR: No. I know there's probably two this month and one at the beginning of May.

THE COURT: And where are they?

THE JUROR: Haverhill, Mass.

THE COURT: Okay. Thank you.

THE JUROR: Thank you.

(The juror exits the courtroom.)

THE CLERK: Juror No. 40, Brendan Malone.

Step up here to the box, sir, if you would.

THE COURT: Good morning.

THE JUROR: Good morning.

THE COURT: Just a few follow-up questions in addition to what I asked the group yesterday.

First of all, I've looked at the witness list that you've reviewed, apparently, and it doesn't look like you recognized anybody?

THE JUROR: No.

THE COURT: I want you to think about that group of people closest to you that I mentioned yesterday: immediate family members, people you live with, and so on. Is there anyone in that group that has ever been the victim of a fraud,

that you're aware of?

THE JUROR: No.

THE COURT: Has anyone in that group ever been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anyone in that group ever been a victim of any kind of crime?

THE JUROR: No, not that I can think of. Nothing, you know, above getting in an accident, you know, and someone yelling at someone.

THE COURT: Anybody in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case such as this, the defendant, any defendant, is presumed innocent unless and until the government proves otherwise by the evidence and proves the person guilty beyond a reasonable doubt.

If you were a juror in this case, would you have any difficulty in accepting and faithfully applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: For the most part, you know, I can be very stubborn. At least that's what everyone tells me.

THE COURT: And how does that affect you? What would that mean?

THE JUROR: I jump to -- not so much jump to conclusions. I see things a lot differently than a lot of other people look at them, almost -- I won't say outside of the box, but I just have much different viewpoints than a lot of other people, and I put a lot of emphasis on things people don't put an emphasis on.

THE COURT: Well, the question is whether, when the ultimate question is put to you, has the government proved the case against any particular defendants, and you're instructed that in order to convince you the government has to bring your mind to the condition that you can say you're satisfied beyond a reasonable doubt, would you be able to follow those instructions and live to that standard?

THE JUROR: I mean, I could do my best. I mean, like I said, there are times that -- like I said, I view things a little different, and I do put a little emphasis on things that others might not. So unless that's not there, yeah, I could definitely do that.

THE COURT: I described in very broad terms the subject matter that the case is going to deal with. The government accuses the defendants of conspiring, or scheming, to defraud in connection with some real estate transactions or mortgage loans, and so on.

Is there anything about that subject matter that would, because of your personal experiences, beliefs,

attitudes, potential biases, interfere with your ability to be a fair juror in this case?

THE JUROR: I would think so. I would think I would be able to. I do have issues with --

THE COURT: We may have a positive/negative question here.

THE JUROR: I'm sorry.

THE COURT: I asked you whether there was anything about the nature of the case that would interfere with your ability to be fair-minded.

THE JUROR: I do have issues with housing in general as far as the value with which we've applied to it as a society only in that I think -- I don't really know how to describe it. Do you know what I mean? I mean, in general, as far as what is actually involved, I don't think I would have an issue with it. I do have issues with housing being used to make money as opposed to living. I think that's probably about it.

THE COURT: Okay. I described the schedule yesterday and said that the case is expected to last a few weeks and that, as I said yesterday, we recognize that asking jurors to put things aside to serve as jurors at all, and particularly for a few weeks, can be an imposition.

Apart from the general inconvenience that anybody would have, is there anything over the next few weeks that would make it particularly difficult for you to serve as a

juror?

THE JUROR: I do have a partially herniated disk in my lower back, which rubs up against my sciatic nerve. Doing my regular job as a mechanic, because I'm standing and running around all day, it's not that big of an issue, but sitting is when I do have problems and it causes me a lot of pain. Yesterday afternoon, after sitting here as long as I was, I was in pain a lot of the night.

This morning I had about a half-hour period where it was very tough to walk. I mean, now that I've been up and moving, it is a little bit better. But I do see that I may be in some extended pain from sitting.

THE COURT: Can you relieve it by standing and so on, changing your position?

THE JUROR: Sometimes it's -- you know, just changing and shifting your position; sometimes it's not that simple. It can be an hour or so before it starts to be less painful.

THE COURT: Do you take medication for it?

THE JUROR: No. I had seen a chiropractor for a while because I couldn't afford to miss work so I couldn't do the surgery because I would have been out of work for about three months. And right now I stopped seeing the chiropractor because it was $50 every time I went to see him. And that was like two or three times a week, and I couldn't afford that anymore. So it was getting better, but now it's starting to

herniate again, so it's starting to get bad again.

THE COURT: All right. Thank you.

(The juror exits the courtroom.)

THE CLERK: Juror No. 41, Kimberly Signori.

Just step up here to the box, please. Thanks.

THE COURT: Good morning.

THE JUROR: Good morning, your Honor.

THE COURT: We asked everybody to review a witness list. I've looked at it. You've reviewed it. You didn't see anybody that you recognized?

THE JUROR: No.

THE COURT: Yesterday, to one of the questions I asked in general, you said that you or somebody close to you had a connection with law enforcement of some sort. Would you tell me about that?

THE JUROR: My husband is a former police officer, and my father-in-law is a retired police officer.

THE COURT: Okay. Where was your husband a police officer?

THE JUROR: Up in Hampton, New Hampshire.

THE COURT: And how long did he do that?

THE JUROR: Five years.

THE COURT: What does he do now?

THE JUROR: He is a finance manager at a car dealership.

THE COURT: How long ago was it that he was a police officer?

THE JUROR: I want to say it was about four years ago.

THE COURT: And your father -- or father-in-law --

THE JUROR: My father-in-law.

THE COURT: -- is a retired officer?

THE JUROR: He's a retired Brockton Police Officer.

THE COURT: And what does he do now?

THE JUROR: He's retired.

THE COURT: Just? Okay.

THE JUROR: Yes.

THE COURT: And how long was he a police officer?

THE JUROR: Oh, my goodness. Honestly, it was maybe 15, 20 years? I'm not sure. It was a while.

MR. SWOMLEY: I'm sorry. I can't hear.

THE COURT: Would you keep your voice up? They have to hear too.

THE JUROR: I'm sorry.

He was a police officer for -- I want to say about 15, 20 years, possibly? I'm not sure of the exact time period.

THE COURT: We have some sort of basic information about each of the potential jurors. It says for you, "Former accountant State Street Corp."?

THE JUROR: Yes.

THE COURT: It means you're no longer an account

manager at State Street Corp.?

THE JUROR: No, I quit a little over a year ago because I had a baby, my fourth child.

THE COURT: How long did you do accounting with State Street?

THE JUROR: I was there for 15 years.

THE COURT: Was there any particular aspect of the business that you were concentrating in?

THE JUROR: Mutual funds.

THE COURT: Thinking of the -- let me just go back to the police officer for a minute. Is there anything about your affiliation with family members who have been police officers that would give you concern about your ability to be a fair juror in a case where some of the testimony from one side will be from law enforcement people?

THE JUROR: I'm not quite sure. I mean, my experience with -- personally with police officers is -- I mean, my husband, he's a very fair, honest man, but I know of police officers that have not been honest. So I'm kind of -- it could go either way.

THE COURT: Well, the question is whether you would be able to make your judgment based upon the evidence in this case as opposed to stereotypes, for example, or prior impressions or something like that.

THE JUROR: I suppose I could.

THE COURT: Okay.

THE JUROR: Because, like I said, it's either way. I mean...

THE COURT: Let me call to your attention the little group that I mentioned yesterday: yourself, people closest to you, people in your family and so on and so forth. Having those people in mind, has anybody in that group ever been the victim of fraud, to your knowledge, of any kind?

THE JUROR: No.

THE COURT: Has anybody in that group ever been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anybody in that group ever been the victim of any kind of crime?

THE JUROR: No. I think the only kind of crime I can think of is having your car broken into.

THE COURT: Okay. And that happened to somebody?

THE JUROR: Yeah. It happened to me, my family.

THE COURT: When was that?

THE JUROR: Years ago. A few years ago when we lived in Brockton.

THE COURT: Was there any prosecution of anybody as a result of that?

THE JUROR: No. It was just one of those you call the police, and that's about it.

THE COURT: Has anyone in that group of people around you ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case such as this, each defendant is presumed to be innocent unless and until the government proves otherwise by the evidence and proves that the person is guilty beyond a reasonable doubt.

If you were a juror in this case, would you have any difficulty in accepting and applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: I described yesterday generally the nature of the -- or the subject matter that will be involved in the case. The government accuses the defendants of conspiring, or scheming, to defraud in connection with certain real estate transactions or mortgage loans, and so on.

Understanding that's going to be the general area of evidence and topics, is there anything in your experiences, beliefs, attitudes, potential biases that would interfere with your ability to be a fair-minded and impartial juror in this case?

THE JUROR: No, I don't think so because I don't even know what the case is.

THE COURT: Okay. I described the schedule yesterday and said that the case is expected to take several weeks to

present.

THE JUROR: Yeah.

THE COURT: And I also noted that we know that everybody's going to have some inconvenience imposed upon them to serve as a juror. Apart from the sort of level of inconvenience that anybody would have, is there anything in the next few weeks that would make it a particularly difficult situation for you?

THE JUROR: The fact that I have four children ages 10, 11 and 12, and I have a one-year-old, and I don't have child-care for them. That's why I don't work anymore. Because -- and that's pretty much it, in a nutshell. I mean, it was tough to get somebody to watch the baby yesterday. And my children came home alone yesterday, the older ones.

And today my husband is off. It's tough for him to get days off, but this was one of his off days, so he is with the baby today, and the children.

But other than that, it's -- I don't really have anybody consistently that could -- for that long a period.

THE COURT: Okay. Thank you.

THE JUROR: Thank you.

(The juror exits the courtroom.)

THE CLERK: Juror No. 42, Eric Brown.

THE COURT: Good morning.

THE JUROR: Good morning, Judge.

THE COURT: I just have a few questions in addition to what I've asked the group. I looked over the witness list we gave you, and you didn't see anybody that you recognized?

THE JUROR: No.

THE COURT: I want you to think of the group of people closest to you, as I mentioned yesterday: yourself, people in your immediate family, household members and people closest to you. In that group, has anyone been the victim of a fraud of any kind that you're aware of?

THE JUROR: Not that I could think of. I wasn't sure because I don't know about my sisters or anything like that.

THE COURT: But nothing that you know of?

THE JUROR: Nothing that I'm aware of as of right now.

THE COURT: Has anyone in that group ever been the victim of identity theft?

THE JUROR: Personally.

THE COURT: You have? Tell me about that.

THE JUROR: I checked my credit report last year, and I noticed a card that was opened up in my name that I didn't recognize. So I called the bank and found out that someone actually got ahold of my Social Security number. When that happened I was like, "Okay." I had to battle for about six months and got it fixed.

THE COURT: And that was within the last year, you say?

THE JUROR: Within the last two years.

THE COURT: Two years?

THE JUROR: I do that yearly credit check, on a yearly basis now.

THE COURT: When that was all over, were you out-of-pocket anything or did the bank --

THE JUROR: No, they took care of it. They released it; they took it off my credit report.

THE COURT: There may be evidence in the case, or the government may claim, that identity theft occurred in certain circumstances. Given your personal experience, would that affect your ability to be a fair-minded and impartial juror, or would you be able to set aside your personal experience and judge the evidence that you've heard here in the courtroom on its own terms without reference to your own personal experience?

THE JUROR: Most likely, I would probably be referring to my own personal experience on it.

THE COURT: Going back to the group of people, has anybody in that group ever been the victim of any kind of crime?

THE JUROR: Not that I'm aware of.

THE COURT: Other than the ones you mentioned, identity theft and --

THE JUROR: As far as I know, I don't think so.

THE COURT: Has anyone in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case each defendant is presumed to be innocent unless and until the government proves otherwise by the evidence, and proves the person guilty beyond a reasonable doubt.

If you were a juror in this case, would you be able to faithfully apply those principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: Yes.

THE COURT: Now, the nature of the -- or the subject matter that will be involved in the case has to do with real estate transactions and mortgage transactions. The government accuses the defendants of a conspiracy, or scheme, to defraud in those kinds of transactions.

Understanding that will be sort of the general area that will be involved in the trial, is there anything in your personal experience, your beliefs, your attitudes, potential biases that because of the subject matter would make it difficult for you to be an impartial juror in this case?

THE JUROR: No.

THE COURT: I outlined the schedule yesterday for the case and said that the estimates are that it will take several weeks to complete. I said also, yesterday, that we understand

that everybody who's called to be a juror in that kind of case suffers some kind of disruption and inconvenience.

Apart from what is inevitable for almost anybody, is there anything over the next several weeks that would make it especially difficult for you to serve?

THE JUROR: I have a temporary job now, and it's all temporary assignments. So if I can't do temporary assignments, they told me they'll have to let me go regardless --

THE COURT: What's the nature --

THE JUROR: I work for Disney. I work for Disney, doing DVD returns and things like that. And I talked to my boss yesterday, and he told me that most likely if I have to be out for a period of time, he can't guarantee my job.

THE COURT: What hours do you normally work?

THE JUROR: It varies.

THE COURT: Do you work eight-hour days?

THE JUROR: Some days it will be 16-hour days, and some days will be eight hours and other weeks it will be four hours. It depends on how heavy the load is at the different stores.

THE COURT: Okay. Thank you.

(The juror exits the courtroom.)

THE CLERK: Judge, Juror No. 43, Neil MacDonald.

THE COURT: Good morning, Mr. MacDonald.

THE JUROR: Good morning.

THE COURT: I just have a few questions that are in addition to what I asked the group yesterday. First of all, let me just look. You had a chance to look at the list of potential witnesses in the case?

THE JUROR: Yeah.

THE COURT: And did you recognize anybody?

THE JUROR: No.

THE COURT: We have some basic information about jurors which includes their current employment, if that's the case. Are you employed currently?

THE JUROR: No.

THE COURT: Let me ask you to think about that group of people that I described yesterday, the people who are closest to you: immediate family members, people who you live with, and so on and so forth.

Within that group, is there anybody who has been the victim of a fraud of any kind that you are aware of?

THE JUROR: No.

THE COURT: Within that group, is there anybody who has been the victim of identity theft?

THE JUROR: No.

THE COURT: How about anybody in that group who has been the victim of any kind of crime?

THE JUROR: No.

THE COURT: Has anybody in that group ever been

accused of a crime?

THE JUROR: Nope.

THE COURT: In a criminal case each defendant is presumed to be innocent of the charges made unless and until the government proves otherwise by the evidence, proves the person guilty beyond a reasonable doubt. If you were to sit as a juror in this case, would you be able to faithfully apply the principles of presumption of innocence for the defendants and proof beyond a reasonable doubt?

THE JUROR: Yeah.

THE COURT: I've described in very general terms yesterday the sort of nature of the evidence, what the case will be about. And to remind you, the government accuses the defendants of a conspiracy or scheme to defraud in the context of real estate transactions or mortgage loans.

Understanding that's the general topic to be addressed in the trial, is there anything in your personal experience, your beliefs, your attitudes, potential biases, that because of the nature of the subject matter would make it difficult for you to be a fair and impartial juror?

THE JUROR: No.

THE COURT: I described the schedule we'll follow and the estimate that the case will take several weeks to present. And I said also that we know that it is an inconvenience and a disruption for jurors to have to spend that much time with us.

But apart from that general level of inconvenience that any juror would have, is there anything for you personally over the next several weeks that would make it particularly difficult for you to serve?

THE JUROR: Well, I mean, you're asking whether -- if I'm going to be selfish, to do something that I really want to do, you know, you're asking me that. I'm not going to tell you that, so I'll have to say no.

THE COURT: Okay. I take that as an honest answer. Should I?

THE JUROR: Hmm?

THE COURT: Never mind.

THE JUROR: I want to go take a boat to Puerto Rico in a couple of weeks and, you know --

THE COURT: To be serious, people who have --

THE JUROR: -- I mean, I don't have to go but I would like to go.

THE COURT: Is it something that you have made plans for -- for example, I don't know what your situation is, but sometimes we have people who have already committed to a trip by paying the fares, and so on and so forth. Is that the case?

THE JUROR: No. It's a work thing. It's a work-type deal.

THE COURT: Okay. I thought you told me you weren't working.

THE JUROR: No. It's like you're delivering a boat.

THE COURT: Oh, I see.

THE JUROR: Obviously, I'm not -- I just get to do things once in a while.

THE COURT: I see.

THE JUROR: And if I have an opportunity, I like to do it.

THE COURT: And so you would deliver the boat to -- from here, from the northeast, to Puerto Rico?

THE JUROR: Yeah. Yeah.

THE COURT: Is it a time-sensitive matter? Is it something you could do two weeks later than you would otherwise plan to --

THE JUROR: Well, the people haven't paid their bill. They haven't paid their bill since September. Puerto Rican government, they still owe the shipyard a million and a half dollars, and they don't have any money to pay for it. So they've been saying month after month. It's still up in the air, and they don't know when it's going to go. It's up in the air.

THE COURT: So you have no present plans to do it?

THE JUROR: No.

THE COURT: All right. Thank you.

THE JUROR: That's it?

THE COURT: Yup.

THE CLERK: Follow me, sir.

(The juror exits the courtroom.)

THE CLERK: Juror No. 44, Leslie Feagley.

Step up here, ma'am, if you would, please. Thanks.

THE COURT: Good morning.

THE JUROR: Hi.

THE COURT: I have just a few questions in addition to what we asked the group yesterday. First of all, I have the witness list that you looked over, and it looks like you didn't recognize anybody on the list?

THE JUROR: (Nonverbal response.)

THE COURT: You have to answer affirmatively so the court reporter --

THE JUROR: No, I didn't recognize anybody.

THE COURT: And would you keep your voice up? The lawyers have to hear us as well.

THE JUROR: All right.

THE COURT: I've asked you to think about the group of people that I mentioned yesterday who were closest to you: immediate family members, people you live with, you know, the people that you regard as the closest to you. Has anybody in that group ever been the victim of a fraud of any kind, to your knowledge?

THE JUROR: No, not that I know of.

THE COURT: Has anyone in that group ever been the

victim of identity theft?

THE JUROR: No.

THE COURT: Has anyone in that group ever been the victim of any kind of crime?

THE JUROR: Yes.

THE COURT: Tell me about that.

THE JUROR: My sister was violently raped.

THE COURT: When was that?

THE JUROR: I was a junior in college. So, God, '79? '78?

THE COURT: Okay. And was there a criminal prosecution as a result of that?

THE JUROR: Yeah.

THE COURT: And where was that, by the way?

THE JUROR: That was in Michigan.

THE COURT: And what was the outcome?

THE JUROR: He was guilty. They didn't catch him for two years. And she had to go to court as a witness.

THE COURT: Did you participate at all in the court proceedings?

THE JUROR: No, I did not.

THE COURT: Do you have any residual feelings about the way the case was handled, about the system or anything like that that would affect your ability to be a juror in a criminal case?

THE JUROR: I don't think so.

THE COURT: Has anyone in that same group ever been accused of a crime?

THE JUROR: Not to my -- no.

THE COURT: Every defendant in a criminal case is presumed to be innocent unless and until the government proves otherwise by the evidence and proves the person guilty beyond a reasonable doubt.

If you were a juror in this case, would you have any difficulty in accepting and applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: The general subject matter of the case involves real estate transactions, mortgage loans. The government accuses the defendants of conspiring or scheming to defraud in connection with such transactions.

Knowing that that's the general area of interest in the case, is there anything in your own personal experiences, beliefs, attitudes, potential biases because of the nature of the case that would make it difficult for you to be an impartial juror in this case?

THE JUROR: I don't think so.

THE COURT: I outlined yesterday the schedule we would follow, and on that schedule it's estimated the case would take several weeks to present. We're not sure exactly how many, but

it could be a while. And as I said yesterday, we understand that for any juror there is disruption and inconvenience, and so on.

Apart from the inevitable level of disruption, is there anything over the next several weeks that would make it particularly difficult for you to serve as a juror?

THE JUROR: It would probably be a major financial burden.

THE COURT: Tell me about that.

THE JUROR: I work for myself. And obviously, the recession has hit me a little bit. And I do have some work scheduled. It's work that's timely, so I wouldn't be able to put it off.

THE COURT: Is that on a contract basis? Is that how you do it?

THE JUROR: Yeah. It's some photography. I shoot about nine portraits in the next month.

THE COURT: Having in mind that the trial day is over at one o'clock in the afternoon, would that mitigate the --

THE JUROR: A couple of shoots, which are situations that are -- have already been set, would be a problem where I would probably have to find somebody else to shoot those, so I would definitely lose money.

THE COURT: Okay. Thank you.

THE JUROR: Thank you.

(The juror exits the courtroom.)

THE CLERK: Juror No. 45, David Hastings.

If you would follow me, sir. Step right up here to the box, if you would, please.

Thanks.

THE COURT: Good morning, sir.

THE JUROR: Good morning, your Honor.

THE COURT: I have just a few questions in addition to what we asked the group yesterday.

First of all, I have the witness list that you looked over, and it doesn't look like you recognized anybody on the potential witness list.

THE JUROR: That's correct.

THE COURT: We have a little bit of information about people, employment and so on. It says you're a management consultant and a professor. Where are you a professor?

THE JUROR: I'm a part-time professor at Tufts University. I teach management control Monday nights, spring semester. I just recently closed my management practice and I started as the director of administration for the Department of Genetics and Complex Diseases at the Harvard School of Public Health.

MR. SWOMLEY: I can't hear.

THE COURT: The lawyers have to hear this, too.

THE JUROR: I'm sorry. I don't like to brag about

this.

So I teach management control for a nonprofit international health organization Monday evenings at Tufts University. I just closed my management practice and accepted a position as director of administration for the Department of Genetics and Complex Diseases at the Harvard School of Public Health. I started that on March 22nd. And the department is in an absolute outrage that I'm not there. I just started and it's -- they had the position vacant for four months; the place is a mess.

And I hate to use the word "hardship" because I've worked with people who are severely mentally ill and I understand what real hardship is, but it's really a bad situation for me not to be in that job having just started. I wouldn't use the word "hardship"; morally I can't have that come out of my mouth because I could eat and I have clothes, so...

THE COURT: Well, the question is whether for some period of time in the -- would the ability to get there in the afternoons -- I mean, after we finish at one o'clock, generally -- would that mitigate the difficulty?

THE JUROR: It would simply make my personal life miserable because I would still have to do the work. I can't get my job done in five hours. There's a first- and second-shift issue. Laboratories -- it's a wet laboratory;

chemistry and stuff. So those folks need somebody coming in at seven-thirty, eight o'clock in the morning to make sure the laboratory is in good shape, and then deal with the faculty who come in at ten, and then techs and grad students come in at approximately two o'clock. It's about a 14-hour operation.

THE COURT: Let me ask you some other questions --

THE JUROR: Yes, sir.

THE COURT: -- as well.

I want you to think about the group of people who are closest to you, as I identified them yesterday: family members in the immediate household, that sort of thing. Anybody in that group ever been the victim of a fraud of any kind?

THE JUROR: Not to my knowledge, sir.

THE COURT: Anybody in that group ever been the victim of identity theft?

THE JUROR: Not to my knowledge, sir.

THE COURT: How about being a victim of any kind of crime?

THE JUROR: No, sir.

THE COURT: Has anyone in that group ever been accused of a crime?

THE JUROR: No, sir.

THE COURT: In any criminal case, each defendant is presumed to be innocent unless and until the government proves otherwise by the evidence and proves that the person is guilty

beyond a reasonable doubt.

If you were a juror in this case, would you be able to faithfully accept and apply the principles of the presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: Absolutely.

THE COURT: The subject matter of the case involves real estate transactions, mortgage loans. And the government accuses the defendants of conspiring or scheming to defraud in connection with such transactions.

Knowing that that's the subject matter, is there anything in your personal experience, beliefs, attitudes, potential biases that might, because of the subject matter, interfere with your ability to be a fair-minded juror in a case like this?

THE JUROR: In all honesty, I've been -- I had several refinancings. And in the last one the bank told me I had a two-car garage. I don't have a two-car garage. That was supposedly an unbiased appraiser. I think the whole industry is suspect. Just a personal -- if someone tells you you have a two-car garage, and they saw your house and I only have one car in it, I don't understand how that works.

THE COURT: Okay. Thank you.

THE JUROR: You're welcome, sir.

(The juror exits the courtroom.)

THE CLERK: Juror No. 46, Michael Majndle.

Step up to the box, please.

THE COURT: Good morning.

THE JUROR: Hi.

THE COURT: Let me just ask you a few questions in addition to what we asked yesterday.

I looked over the -- you had a chance to look over the witness list?

THE JUROR: Yes, I did.

THE COURT: And you didn't recognize anybody?

THE JUROR: No, I did not.

THE COURT: Let me ask you to think about the group of people who are the closest to you, as I described them yesterday, yourself, people in your immediate family, people you live with, and so on. In that group has anyone ever been the victim of a fraud of any kind that you're aware of?

THE JUROR: I've had a couple of credit cards -- someone using my credit cards.

THE COURT: Tell me about that.

THE JUROR: Basically, someone got one of my credit card numbers, I guess offline, and I had charges on it.

THE COURT: And when was that?

THE JUROR: Last year.

THE COURT: Okay. Was it cleared up?

THE JUROR: Yes, it was.

THE COURT: Any other -- would it be fair -- well,

anybody else have an experience like that --

THE JUROR: No.

THE COURT: -- that you're aware of in your group?

THE JUROR: No.

THE COURT: Has anybody in that group been the victim of any other kind of crime? Any kind at all.

THE JUROR: Like my family as well?

THE COURT: Yeah. Yeah.

THE JUROR: My cousin is in jail now for drugs.

THE COURT: Well, I wanted to know if someone had been the victim of a crime.

THE JUROR: No. No.

THE COURT: Then I was going to ask you -- and you anticipate me -- whether anyone has been accused of a crime.

You have a cousin who was convicted of a drug offense?

THE JUROR: Yeah.

THE COURT: How long ago?

THE JUROR: Christmas Eve.

THE COURT: Just this past Christmas Eve?

THE JUROR: Yes.

THE COURT: And where was that?

THE JUROR: New Bedford.

THE COURT: Did you participate in the court proceedings or go to the court or anything like that?

THE JUROR: No. No, I did not.

THE COURT: Does that leave you with any feelings about the system that would affect your judgment --

THE JUROR: No, it does not.

THE COURT: -- as a juror?

THE JUROR: No.

THE COURT: Every defendant in a case is presumed to be innocent unless the government proves otherwise by the evidence and proves that the person is guilty beyond a reasonable doubt.

If you were a juror in this case, would you have any difficulty in accepting and applying faithfully the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No, I don't.

THE COURT: What's involved -- what will be involved in the evidence in the case will be the government's claims that the defendants have conspired or schemed to commit fraud in connection with mortgage loans or real estate transactions.

Understanding that's the general subject matter, is there anything about that subject matter that would lead you to have concerns based on your personal experiences, beliefs, attitudes or biases that would make it difficult for you to be a fair juror in this case?

THE JUROR: No, it doesn't.

THE COURT: I've described the schedule we'd follow

yesterday, and I said that we anticipate this is going to take several weeks to present. As I said yesterday, we know that it's an inconvenience and an imposition for people to serve on that, but let me just ask: Is there anything that would be -- apart from the general level of inconvenience that anybody would have, is there something over the next several weeks that would make it especially difficult for you?

THE JUROR: I actually have to go to the hospital every two weeks for liver treatments. I have a medical condition.

THE COURT: Okay. And when do you go?

THE JUROR: Every Wednesday *[sic]*.

THE COURT: When? What time of day?

THE JUROR: Whenever they schedule the appointment. Some weeks it's in the morning; some weeks it's in the afternoon.

THE COURT: What's the hospital?

THE JUROR: St. Luke's.

THE COURT: Which is in New Bedford?

THE JUROR: Yes, it is.

THE COURT: Now, did you say every week or every other week?

THE JUROR: Every other week.

THE COURT: Other than that, any other issues?

THE JUROR: No.

THE COURT: All right. Thank you.

(The juror exits the courtroom.)

THE CLERK: Juror No. 47, Stephanie Lantz.

THE COURT: Good morning.

THE JUROR: Good morning.

THE COURT: Let me just ask you a few more questions from the ones we asked yesterday of everybody. First of all, I have your witness -- the list that you reviewed of potential witnesses, and there's one person that you indicated you may possibly know: Michael Lyons.

THE JUROR: Yeah. My neighbor growing up had that name, so I'm not sure if it would be the same person or not.

THE COURT: You know -- you said your neighbor growing up. Do you know -- have you seen him in recent years?

THE JUROR: No.

THE COURT: And where was that, that you grew up?

THE JUROR: Saratoga Springs, New York.

THE COURT: How long has it been since you've seen him?

THE JUROR: Probably five, eight years. He was only a couple of years older than me. He graduated high school, probably 2000. I haven't seen him since then.

THE COURT: Do you know what happened to him after high school? Did he go to college or work?

THE JUROR: I'm assuming he went to college, but I

don't know where. We weren't really friendly.

THE COURT: No one else other than that?

THE JUROR: No.

THE COURT: Now, you also answered one of my general questions about a connection with banking, real estate, lending business.

THE JUROR: Yes.

THE COURT: Tell me about why you answered "yes."

THE JUROR: I work for Ernst & Young for fraud investigation and dispute services practice. I know colleagues of mine have been involved in lending loan reviews for corporations. I specifically haven't worked on any of those types of projects, but I did spend some time consulting for Fannie Mae as recently as December to February of this year.

THE COURT: And what did your work for Fannie Mae involve?

THE JUROR: Getting ready for their FIN 46, the new accounting pronouncement that's going to bring a lot of their off-balance-sheet loans onto the books. So I was kind of helping with the -- more or less on the technology side to make sure that their system was ready to account for all of these new transactions appropriately January 1st of this past year.

THE COURT: Okay. How long have you been with Ernst & Young?

THE JUROR: Since 2005. I interned 2005, started full

time fall of 2006.

THE COURT: And have you been doing forensic accounting full time?

THE JUROR: Yes.

THE COURT: And can you give me some other examples of the kinds of projects you've worked on?

THE JUROR: When I first started I worked on a lot of stock option accounting investigations, not necessarily just investigations, but sometimes we oversee the investigations done by other companies for audit clients. So we'd kind of take a look at the investigations being conducted, make sure they're being conducted properly, and assist with any restatements as a result.

Recently, I've been working on Foreign Corrupt Practices Act diagnostics for a local defense company.

THE COURT: Have you, in your work at Ernst & Young, worked with outside law enforcement people in any of your projects?

THE JUROR: A lot of our clients do have to report to the DOJ or the SEC. My specific interaction with those individuals has not been any. But, yes, a number of clients do report there.

THE COURT: I'm asking you about you personally.

THE JUROR: No.

THE COURT: You haven't worked with either --

THE JUROR: No.

THE COURT: -- any Treasury agents, SEC, Justice Department?

THE JUROR: No.

THE COURT: Okay. Now, I'd like you to think about that group of people closest to you that I described yesterday. Has anybody in that group ever been the victim of a fraud of any kind that you're aware of?

THE JUROR: No.

THE COURT: Has anybody in that group, in particular, been the victim of an identity theft?

THE JUROR: No, although I have had my credit cards stolen and used, but not identity theft.

THE COURT: When was your credit card stolen?

THE JUROR: I had my wallet stolen when I was on vacation in Spain September of this year, and then two weeks later I was robbed outside my apartment in Boston. So twice in, like, a three-week span.

THE COURT: Were the cards used subsequently?

THE JUROR: I had already cancelled them, luckily, so it wasn't an issue.

THE COURT: Anybody else in your group that --

THE JUROR: No, just me.

THE COURT: Anybody in that group been the victim of any other kind of crime? Any kind.

THE JUROR: No, not in my close group.

THE COURT: Okay. Has anybody in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case, every defendant is presumed to be innocent of the charges made unless and until the government proves otherwise by proving at trial on the evidence that the person is guilty beyond a reasonable doubt.

If you were a juror in this case, would you be able to faithfully accept and apply the principles of the presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: Yes.

THE COURT: The general area of evidence, events that are going to be described, are going to involve transactions in real estate, mortgage loans. The government accuses the defendants of conspiring to commit -- or scheming to commit fraud in connection with such transactions.

Understanding that's the general focus of the case, is there anything in your personal experiences, beliefs, attitudes, potential biases that because of the nature of the subject matter would make it difficult for you to be an impartial juror in this case?

THE JUROR: No.

THE COURT: I outlined a schedule we'll follow and gave the estimate that comes from all involved, that the case

will probably take several weeks to present. Now, I mentioned yesterday we appreciate that it can be a disruption and an inconvenience for people to have to respond as jurors.

Apart from the general level of inconvenience that would be inevitable that anybody would suffer in various ways, are there things in the next several weeks that would make it a particularly difficult situation for you?

THE JUROR: Currently I'm working on a project in New York City with a team based there. We have some pretty tight deadlines coming up; thus, I think that would be worth communicating.

THE COURT: Okay. Thank you very much.

THE JUROR: Uh-huh.

(The juror exits the courtroom.)

THE COURT: The next person, Elizabeth Pelletier, is one for whom we do not have a questionnaire.

THE CLERK: Juror No. 48, Elizabeth Pelletier.

THE COURT: Good morning.

THE JUROR: Good morning.

THE COURT: I want to ask a few more questions from the ones we asked to the group generally. But let me just ask you, before we get to that, we have some very basic information about jurors -- what their employment is, and so on and so forth.

THE JUROR: Okay.

THE COURT: And we don't have any information about employment for you.

THE JUROR: Yeah. I'm working for a start-up right now. It's called Silent Capital. We're in the seed stage. It's a private equity marketplace for family offices.

THE COURT: What's your role in that business?

THE JUROR: So I head up the product development group for the company.

THE COURT: What are some of the products?

THE JUROR: Well, it's an online private placement marketplace. And so clients -- family office clients can get online and purchase private equity products that are usually led by another -- the coinvestor is another family office. So that's kind of the secret sauce of the firm.

THE COURT: All right. How long have you been involved in this?

THE JUROR: Three months now.

THE COURT: And before that?

THE JUROR: Before that I was at Fidelity Investments for five years, and before that I was at Charles Schwab & Company for 18 years. So I have been developing financial service products for 23 years now.

THE COURT: Are you married?

THE JUROR: I am.

THE COURT: What does your spouse do?

THE JUROR: He does business development for a start-up as well. So he's working at the same start-up, Silent Capital.

THE COURT: The same company?

THE JUROR: Yeah.

THE COURT: Now, I think in response to one of my general questions you answered that you had some connection with law enforcement?

THE JUROR: I do. So my sister is an attorney. She works for the County of Los Angeles, and she protects the rights of abused children in court. And then her husband is a judge for the superior court in Los Angeles.

THE COURT: All right.

THE JUROR: Then I also have another brother-in-law who's an attorney for Arnold Schwarzenegger, so he works for the State of California doing special projects.

THE COURT: So you looked over the witness list that we gave everybody?

THE JUROR: Yes.

THE COURT: And you didn't recognize any names?

THE JUROR: No, I don't recognize any names.

THE COURT: Let me ask about that group of people who are closest to you that I mentioned yesterday: people in your immediate family, household, whatever.

Within that group is there anybody who, to your

knowledge, has been the victim of any fraud of any kind?

THE JUROR: No.

THE COURT: Anybody in that group ever been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anyone in that group been a victim of any kind of crime?

THE JUROR: No.

THE COURT: Has anyone in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case, each defendant is presumed to be innocent unless and until the government proves otherwise by the evidence, proves it beyond a reasonable doubt. If you were a juror in this case, would you be able to faithfully accept and apply the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: Yes.

THE COURT: The subject matter of the case is going to involve real estate transactions, mortgage loans. The government accuses the defendants of conspiring or scheming to defraud in connection with such transactions.

Knowing that that's the general subject matter focus of the case, is there anything in your personal experiences, beliefs, attitudes, potential biases that because of the nature

of the case, or the subject matter, would make it difficult for you to be a fair and impartial juror in this case?

THE JUROR: No, nothing.

THE COURT: Now, I described the schedule we'll follow and the estimate that the case will take several weeks to present. As I said, we know and realize that it's an imposition and an inconvenience for jurors to have to serve, particularly for extended periods of time, but it's a necessary one.

Apart from the inevitable level of inconvenience that anybody would have in serving on a jury of such duration, is there anything over the next several weeks that would make it especially difficult for you to serve?

THE JUROR: No.

THE COURT: Okay. Thank you very much.

THE JUROR: Thank you.

(The juror exits the courtroom.)

THE COURT: One way of doing this, which we didn't do yesterday, is simply to go down the list and see if there's any issues. So why don't we just take them in order.

Number 37?

MR. BORENSTEIN: On behalf of Mr. Levine, Judge, we would ask that she be excused for cause. On a number of occasions she made statements such as she feels bad for the people that were taken; she has been a victim of ID fraud and

theft. She indicated at one point, "Truthfully, I don't know that I could be fair and impartial."

Certainly, you asked questions after that, and she said she would try her best. And she may have even said, "I trust that I could." And I just think it's too many ifs, ands and buts to be impartial. So I would object on behalf of Mr. Levine.

MR. WILD: Your Honor, I suspect that if you ask the specific question of almost everybody who comes in here, "Do you have any concerns for victims of crime," they would all say "yes." She simply made a statement that I think everyone would say, if asked. As far as the connection with the victimology of the criminal justice system, she also had a stepson who was a defendant in a case, and was apparently convicted of drug charges.

So I think her answers to the Court were the ones we would expect and that she would be a fair and impartial juror.

THE COURT: The note that I wrote for her was "scrupulous." And it's something that I see in jurors. They want to be so candid and scrupulous that they will raise questions about their impartiality when they are really not well-grounded. And I think that was my impression of this juror.

So I'm going to reject the challenge for cause; I think she can be fair.

Number 38, Louise Strickland. This is a person -- the only note I made on her was that she has a financial problem with paying for health insurance. It's a little difficult to assess exactly how serious that is, but -- no objection if we excuse her?

MR. BORENSTEIN: Nope.

THE COURT: Number 39, Patricia Hanides?

MR. BORENSTEIN: She mentioned, again, a hardship for medical appointments, I think. No cause on behalf of Mr. Levine.

THE COURT: Again, it was hard to tell. It sounded like it could be manageable. I don't know. I would be willing to take a chance on her. As I recall, she has some appointments she has to get her mother to. It didn't seem to be an overwhelming hardship.

Number 40, Brendan Malone.

MR. WILD: My recollection is that this is one who said he had issues with the housing industry generally, but I'm not sure where that cuts.

THE COURT: It sounded like he was alluding to affordability. I don't know whether that plays into this -- the evidence here or not.

He also had some physical concern about sitting for a long time. Usually people can adjust to that. I mean, we can accommodate people who want to get up and stretch, and so on

and so forth, so I don't think that's a particular --

MR. WILD: I would say usually, but this is going to be a long trial, your Honor.

THE COURT: I will say this: It appeared to me it was a genuine pain concern.

Well, is there a consensus, or no?

MR. BORENSTEIN: Mr. Levine's content with this juror.

THE COURT: Okay.

Number 41, Kimberly Signori. She has a number of children at home. I think we'll excuse her.

Eric Brown who has a temporary job. I'm inclined to excuse him. He also had an incident of identity theft.

Neil MacDonald? No issue?

Leslie Feagley? Self-employed graphic designer. I tend to be soft on self-employed people, so if there's no objection, I will excuse her.

David Hastings?

MR. WILD: I'm not sure what his comment ultimately would mean, your Honor, but he's the one who said he thinks the whole industry is suspect, and to me that means the people who are on trial.

THE COURT: Well, he had two issues. One was his two-car garage, which I thought -- I could understand how things upset people, but it seemed a little out of proportion, which is a bad signal, if things that are relatively minor get

out of proportion.

He also had, he claimed, a hardship in his new position, which sounded genuine, actually.

MR. SWOMLEY: And I should note that my client's wife is in human resources at the department -- I mean, at the School of Public Health, so...

THE COURT: We'll excuse Mr. Hastings.

Number 46, Mr. Majndle. He had -- in terms of the hardship aspect, he has to go for treatments every other week. He was a little vague as to what times. He said sometimes in the afternoon, sometimes in the morning. I don't know what flexibility there is. I mean, he did say it involved his liver, which is a very serious matter, so...

MR. SWOMLEY: May I suggest, your Honor, if there is an appointment that can't be changed that is during the day, we could break on that day? I mean, in theory, he could change his appointments. And if that doesn't -- if that comes to be a problem, we're really looking at one day, maybe?

THE COURT: Yeah, I'm willing to try that. I mean, if it's true every other week, that means we might have three incidents of appointments we may have to deal with.

All right, so we'll leave him.

Stephanie Lantz, the forensic accountant. No? Okay.

And Elizabeth Pelletier, the last one.

Okay. So let's see. That gives us --

MR. SWOMLEY: I'm sorry, your Honor. On Number 47, if I could? She indicated that she had been the victim of credit card theft -- it had been used -- and that she was robbed outside of her apartment as recently as January of this year and the credit cards were used.

I actually would challenge her for cause. I think that both the violence perpetrated on her and the then-subsequent use of her credit card, I would submit, puts her in a position where she might, indeed, very well be prejudiced as a result of her personal experience.

MR. ULLMANN: I'm inclined to agree with that. I would add if you combine that with the fact that her work involves investigating forensics and works with people investigating fraud, that I think there's a likelihood, or at least a significant possibility, that she would bring a bias into play here.

So I think combining those two things, I would ask that she be removed for cause.

THE COURT: Mr. Wild?

MR. WILD: That may be a reason for one party or another to want to strike her, but I don't think that from her answers to the Court there's any indication that those factors would play into her decision here at all.

THE COURT: Yeah, I think that's right. I think it's a matter for peremptories.

Okay. So I think the yield on that page is seven. Is that it? The ones who remain will be 37, 39, 40, 43, 46, 47, 48.

Okay. We'll continue on.

THE CLERK: Okay.

MR. SWOMLEY: Your Honor, could I just add -- draw one more thing to your attention? I don't have a position one way or the other about Mr. MacDonald, the fellow in the wheelchair, but I will note in the way he answered his questionnaire, he -- and -- he checked a box which he was only supposed to check if he wished to be excused. Now, I don't know, you didn't ask him whether he wanted to be excused or not. But apparently he has the qualifications to permit him to ask that and excuse himself.

And I note that on the back, "If you have a physical handicap or disability that would affect but not prevent you from serving on a jury and you're willing to serve, you can ask for a reasonable accommodation." That's not exactly what he did. And Box 8 basically says he doesn't want to serve.

So I don't know whether that's something you want to inquire about. I certainly don't think that he's a for-cause unless he wishes himself to be.

THE COURT: I'm looking at his questionnaire. Under Question No. 8 is, "Do you have a physical or mental disability that would interfere with or prevent you from serving," and he

answered "no." And then on the back he says he has a handicap. But I don't think he links it to an inability to serve. There was no indication here, so...

MR. SWOMLEY: No. I'm just saying if you look on the front, on 14 --

THE COURT: Fourteen?

MR. BORENSTEIN: Yeah.

-- and you look below the arrow, it says, "Or if you wish to serve, do not show anything here"; don't check any of those boxes.

THE COURT: I think on balance, and particularly after we saw him, he did not give any indication that he thought his disability was going to be an interference.

So I think we're at 28. Is that right, Mr. Sheketoff?

MR. SHEKETOFF: I don't count very well.

THE COURT: I think, actually, you were right yesterday.

MS. MURRANE: I think it's 27.

THE COURT: Okay. Maybe. We'll do an accounting later.

THE CLERK: Juror No. 49, Roseanne Zerola.

Step up here, ma'am.

THE COURT: Good morning.

THE JUROR: Good morning.

THE COURT: Just a few more questions in addition to

the ones we asked in general.

First of all, I have the witness list that we asked everybody to look over, and you did that.

THE JUROR: Yes.

THE COURT: And didn't recognize anybody?

THE JUROR: No.

THE COURT: Yesterday when I asked some general questions, I think you said that you had some connection with banking, real estate, mortgage loans?

THE JUROR: Yes.

THE COURT: Would you tell us about that? And would you keep your voice up, because the lawyers have to hear you, too.

THE JUROR: I've worked in real estate 30 years, off and on. I'm still affiliated with a real estate association. And I also worked as a mortgage broker for a short time.

THE COURT: In the real estate, working as a broker or salesperson?

THE JUROR: No. I worked as a broker in real estate, and then I also worked for two firms as a mortgage broker. Two separate positions.

THE COURT: So you did some real estate brokering?

THE JUROR: Selling of homes.

THE COURT: Right. And then in addition to that -- was it an overlap? Did you do some --

THE JUROR: Mortgage lending.

THE COURT: Right. Did those overlap in time or were they sequential?

THE JUROR: No, they were at separate times.

THE COURT: And are you still doing any of that?

THE JUROR: No. But I do work for the Eastern Middlesex Association of Realtors as the education director.

THE COURT: Tell me about the association.

THE JUROR: We have about 1200 members. It's in the -- it's out of Reading. So they encompass several cities in the area, Woburn, Reading, Stoneham.

And what I do is I schedule classes for mandatory education and put together different venues for different things for the brokers -- or members, I should say.

THE COURT: And so since you've been doing that, you have not been acting as a broker, either a mortgage broker --

THE JUROR: No. I've been in this position going on four years.

THE COURT: Now, I'd like you to think about that group of people who are closest to you, as I described yesterday: people in your immediate family, people you live with, you know, as you would define it, the people you are most close to.

Within that group, has anyone ever been a victim of a fraud, to your knowledge?

THE JUROR: Not to my knowledge.

THE COURT: Has anyone in that group ever been the victim of identity theft?

THE JUROR: Not to my knowledge.

My husband may. I think once somebody, I think, wrote a check on -- something to do with his bank account. A check of some sort. It was one instance.

THE COURT: And when was that?

THE JUROR: It was probably 25 or 30 years ago.

THE COURT: Anyone in that group ever been the victim of any other kind of crime? Any kind.

THE JUROR: Any other kind of crime?

THE COURT: Yeah. Property crime, personal crime, anything like that?

THE JUROR: No.

THE COURT: Anyone in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal prosecution, each defendant is presumed to be innocent unless and until the government proves otherwise by the evidence, proves the person guilty beyond a reasonable doubt.

If you were a juror in this case, would you have any difficulty in accepting and applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: I wouldn't have any difficulty with that.

THE COURT: Given the nature of the case where the claims by the government, the accusations, are that the defendants conspired or schemed to defraud in connection with mortgage loans and real estate transactions, and given your own experience in the industry, is there anything in your personal experience, or your beliefs or attitudes or potential biases, that would make it difficult for you to be a fair and impartial juror in this case?

THE JUROR: I don't know all the facts, but I believe that I would have a very open mind in it.

THE COURT: Let me tell you about -- well, I told you yesterday, I guess, about the schedule and the projection that this would take several weeks to try. And we know, as I said yesterday, this is an imposition and a disruption for people to put aside things to serve as jurors, particularly in a case of that duration.

Apart from that inevitable inconvenience that anybody would have in serving on a jury, is there anything over the next several weeks that would make it especially difficult for you?

THE JUROR: A vacation that I have planned.

THE COURT: When is that?

THE JUROR: May 9th.

THE COURT: May 9th. And tell me a little bit about

the details.

THE JUROR: Myself and two other girls are taking our surrogate aunt -- she's about 82 -- away for a few days. That's Mother's Day.

THE COURT: Sunday is Mother's Day? The 9th is -- okay. Yes.

And so you'll be gone from the 9th through what?

THE JUROR: Back on Tuesday, the 11th.

THE COURT: Okay. Anything else?

THE JUROR: I do have anxiety, so...

THE COURT: Do you treat it?

THE JUROR: Sometimes.

THE COURT: Are you currently doing that?

THE JUROR: I just did.

THE COURT: And how do you treat it? Do you take medication?

THE JUROR: I take a relaxant.

THE COURT: Has it been manageable?

THE JUROR: It has been.

THE COURT: Okay. All right. Thank you.

THE JUROR: Okay. Thank you.

MR. SWOMLEY: Your Honor, can I ask the names of the mortgage companies --

THE COURT: Oh, sure. Fair enough.

MR. SWOMLEY: -- and the real estate firms.

THE COURT: Any mortgage companies that you've dealt with?

THE JUROR: Oh, boy. It was a while ago. It was up in Danvers. And honest- -- Peabody. And honestly, I don't remember that particular one. That was the one that I started with. And I think that was -- that office closed, so then I went to another place in Newton. And I honestly don't remember the names of the companies. I wasn't there long, between one to the other. And then I was just getting training and getting rolling. I did do some mortgages, but then I did have to take a leave.

I can try -- well, I don't know if I'll be here, so... I don't know the name.

THE COURT: Just your present recollection. If you're not able to recall, that's fine.

Okay. Thanks.

MR. SWOMLEY: Was there a real estate firm that --

THE JUROR: Yes. Morrano Real Estate in Stoneham.

MR. SWOMLEY: Thank you.

THE COURT: Okay. Good. Thanks.

(The juror exits the courtroom.)

MS. MURRANE: I was wrong; it's 26.

THE COURT: Twenty-six? All right.

THE CLERK: Judge, are you ready for the next one?

THE COURT: Yes.

THE CLERK: Juror No. 50, James Easton.

Follow me, sir. Please step up here to the box. Watch your step.

THE COURT: Good morning, sir.

THE JUROR: Good morning, your Honor.

THE COURT: You had looked over the witness list that we gave you yesterday?

THE JUROR: That's correct.

THE COURT: And you didn't recognize anybody?

THE JUROR: No.

THE COURT: Now, in response to my general questions, I think you said that you had some kind of -- somebody -- you, yourself, or somebody close to you had a connection with law enforcement or something?

THE JUROR: Yes. My brother-in-law's sister is a Braintree Police Officer. I don't know if that's an issue or not.

THE COURT: How close are you to your brother-in-law's sister?

THE JUROR: Not very. I mean, but you said to err on the side of caution.

THE COURT: No, we want to know. But my question is: Is that anything that would influence you as a juror? Would you have any partiality to law enforcement witnesses, for example, or the prosecution --

THE JUROR: Either way, no, I wouldn't.

THE COURT: Yeah. Thinking about the group that I defined yesterday for you, the people closest to you, household members, immediate family and that sort of thing, has anyone in that group ever been the victim of a fraud of any kind, to your knowledge?

THE JUROR: I would say no.

THE COURT: Has anyone in that group ever been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anyone in that group ever been the victim of any other kind of crime? Anything.

THE JUROR: Well, it depends on how you define "crime." My deceased wife was involved in an accident that she was found responsible for. So I don't know if you classify that as a crime as such, but if --

THE COURT: When you say "found responsible," in a civil sense? I mean, was this a criminal penalty or was this a civil lawsuit for --

THE JUROR: It was a criminal penalty.

THE COURT: It was. And when was that?

THE JUROR: It's been so long now. It was early 2000. Maybe 2003/2004.

THE COURT: And what was the outcome? What happened?

THE JUROR: She was ordered to serve community

service. And I forget what else the sentence was. But it was suspended. There was no jail time or anything like that.

THE COURT: Was this a -- and where was it? What court, do you know?

THE JUROR: Quincy.

THE COURT: Quincy District Court?

THE JUROR: Yes.

THE COURT: Was it an operating-under-the-influence charge?

THE JUROR: No.

THE COURT: It was a negligent operation?

THE JUROR: That's what they charged her with, yes.

THE COURT: Negligent operation.

Does that experience leave you with any feelings about the criminal justice system or anything --

THE JUROR: I'm afraid it does.

THE COURT: -- that would affect your judgment?

THE JUROR: I don't know about in this particular proceeding. But in general, I'd say at least I'm bitter.

THE COURT: I'm concerned about its effect on this proceeding. Do you think that that experience would have a distorting effect on your ability to be a fair and impartial juror in this case?

THE JUROR: As far as the defendants are concerned, I don't think so. My bitterness is more towards the legal system

itself, the lawyers in general, so...

THE COURT: Well, what we ask jurors to do is to pay attention to all of the evidence in the case, and after it's all been presented, the issues are presented to you, that you give your serious efforts in resolving it according to -- that apply without regard to other events that have happened elsewhere, and so on and so forth. So the question is: Sometimes there are things that are so much a part of you that you can't filter them out; sometimes you can filter them out.

And so there's nobody who could tell us except you, I guess, what your estimate is. Nobody can say for sure because it's -- we're talking about the future.

THE JUROR: Right.

THE COURT: The question is: Are your feelings so strong that you think they would influence you in a way that would lead you to make judgments that were not solely based on what you've heard here in this case?

THE JUROR: I don't think they're so strong that it would adversely impact my decision-making. If you want to give me -- have me give you a percentage of where I would sit, maybe 30 to 50 percent might be a good range for me.

THE COURT: Okay. The subject matter in the case involves mortgage -- real estate transactions, mortgage loans. And the government accuses the defendants of conspiring or scheming to defraud in connection with those kinds of

transactions.

Given that that's the subject about which the evidence will pertain, is there anything in your own personal experiences, beliefs, attitudes, potential biases that, because of the subject matter in the case, would make it difficult for you to be impartial in this case?

THE JUROR:  No.  No, none.

THE COURT:  I outlined yesterday the schedule we'd follow and the case was likely to take several weeks to present.  And as I said, we understand that it's an inconvenience for everybody to serve, if at all, but it's a necessary one.

Is there anything over the next several weeks that would make it for you not just the kind of inconvenience that everybody would have but something particularly difficult?

THE JUROR:  Nothing extraordinary, no.  I called work yesterday and informed my boss of the potential of what might happen, and he said there's no problem.  You know, "That's your duty.  We have no problem with it," so...

THE COURT:  Okay.  Thank you.

THE JUROR:  Thank you.

(The juror exits the courtroom.)

THE CLERK:  Judge, Number 51 is Courtney Cossette.

Step up to the box, please.

THE COURT:  Good morning.

THE JUROR: Hi.

THE COURT: Keep your voice up because the lawyers have to hear what we say as well.

THE JUROR: Okay.

THE COURT: You've looked over the witness list that we gave you yesterday?

THE JUROR: Uh-huh.

THE COURT: And you didn't recognize any names on the list?

THE JUROR: No.

THE COURT: Let me just ask you a couple of questions in addition to what I asked generally yesterday.

I want you to think about the group of people that I defined yesterday: the people who are closest to you, immediate family members, members of your household, so on and so forth. With respect to those people, is there anyone in that group who has, to your knowledge, been the victim of a fraud of any kind?

THE JUROR: Not to my knowledge. Not that I know of.

THE COURT: Anyone in that group who has ever been the victim of identity theft?

THE JUROR: No, not that I know of.

THE COURT: Has anyone in that group been the victim of any kind of crime?

THE JUROR: I'm sure at some point, but not that I can

think of.

THE COURT: Nothing that comes to mind?

THE JUROR: No, nothing big.

THE COURT: Has anybody in that group ever been accused of a crime?

THE JUROR: Possibly, but not in that way.

THE COURT: What do you mean?

THE JUROR: I mean, I think I have cousins who have, like, been in jail, like third cousins.

THE COURT: I'm talking about people who are closest to you; third cousins may be a little far out.

THE JUROR: Okay. Then no.

THE COURT: The point is anybody whose experience -- you're so close to, that their experience is your experience, in a sense.

THE JUROR: Then I'll say no. No.

THE COURT: In a criminal case, every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence and proves the person guilty beyond a reasonable doubt.

If you were a juror in this case, would you have any difficulty in accepting and applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No, I wouldn't have a problem with it.

THE COURT: In general, the case is going to be about

what the government alleges was a conspiracy or a scheme to defraud involving real estate transactions and mortgage loans, and so on. So just taking that as a general area of -- subject matter area that the case will be about, is there anything in your own personal experience, belief, attitudes, potential biases because of the nature of the case that would make it difficult for you to be a fair and impartial juror in the case?

THE JUROR: No. No, I don't think so.

THE COURT: I described the schedule we'd follow yesterday, and the estimate is that on that schedule this case will take several weeks to present. And as I said yesterday, we understand and appreciate that for everyone there's a level of inconvenience involved to be called to serve as a juror in such a case.

But what I'd like to know is: For you personally, beyond the inevitable level of inconvenience that anybody would have as a member of the jury, is there anything over the next several weeks that would make it particularly difficult for you?

THE JUROR: Well, it's pretty hard because I work on commission only. So if I don't go to work and do clients, then I don't get paid. Because I'm a hairdresser. So to be out of work for that length of time, it's really hard for me.

THE COURT: And what are your ordinary hours? What are your hours?

THE JUROR: Tuesday through Saturday, an eight-hour day.

THE COURT: Beginning?

THE JUROR: Nine to five or twelve to eight, depending on the day.

THE COURT: Okay. Thank you.

(The juror exits the courtroom.)

THE CLERK: Juror No. 52, Kathleen DiPietro.

Follow me. Step up to the box, please. Watch your step.

THE COURT: Good morning.

THE JUROR: Good morning.

THE COURT: I just have a few questions in addition to what we asked the group yesterday. You had a chance to look over the witness list that we gave you, and you didn't recognize anybody on the list?

THE JUROR: No.

THE COURT: Keep your voice up. The lawyers have to hear you too.

THE JUROR: No.

THE COURT: Let me ask you to think about that group of people who are closest to you, as I described yesterday, people in your immediate family, your household and so on.

Within that group, is there anybody who, to your knowledge, has been the victim of a fraud of any kind?

THE JUROR: Not that I know of.

THE COURT: Anybody in that group ever been the victim, in particular, of identity theft?

THE JUROR: No.

THE COURT: Anybody in that group ever been the victim of any kind of crime?

THE JUROR: Not that I...

THE COURT: Okay. And the reverse of that: Has anybody in that group been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case such as this, every defendant is presumed to be innocent of the charges made against them unless and until the government proves otherwise by the evidence, proves the person guilty beyond a reasonable doubt.

If you were called to serve as a juror in this case, would you have any difficulty in faithfully accepting and applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: What do you mean, what you said, there's like five of them on there?

THE COURT: There are five defendants, yes.

THE JUROR: Well, if I told you how I feel now about it?

THE COURT: Go ahead.

THE JUROR: Guilty.

THE COURT: Why do you feel that way? You haven't heard anything yet.

THE JUROR: It doesn't matter. There's five of them.

THE COURT: So the answer is you would have difficulty applying the presumption of innocence?

THE JUROR: Right.

THE COURT: Have you had any personal experiences with respect to mortgage loans or real estate transactions, or do you have any beliefs or attitudes about those subject matters that would interfere with your ability to be a fair juror?

THE JUROR: I didn't understand that. I'm sorry.

THE COURT: The subject matter of the case involves real estate transactions, mortgage loans that the defendants are accused of conspiring a scheme to defraud in connection with those kinds of transactions. Since that's the subject matter, is there anything about that subject matter which, because of any personal experience you've had, or any beliefs or attitudes or bias, would interfere with your ability?

THE JUROR: No.

THE COURT: Okay. I described the schedule that we'll follow, and the estimate is that the case will take several weeks to present. Understanding that every juror has to make some accommodations and be disrupted to some degree, is there anything for you over the next several weeks that would make it

particularly difficult for you to serve on the case?

THE JUROR: Plenty.

THE COURT: Tell me.

THE JUROR: Well, my husband's out of work, not getting paid. I'm the only one -- I'm making ends meet right now. I get anxiety very easy. It's not that I don't sleep; I have sleep apnea. And just focusing on what you were saying in the other room, I don't recall what this whole case was all about because I forget sometimes and I can't focus as good.

THE COURT: Okay. Thank you.

THE CLERK: Follow me.

(The juror exits the courtroom.)

THE COURT: We're going to take a short break. We're going to change stenographers. And everyone deserves a little break anyway. So we'll take about a ten-minute break.

(The Court exits the courtroom at 11:04 a.m.)

(There is a recess in the proceedings at 11:04 a.m.)

(After recess, start at 11:20 a.m.)

THE CLERK: Next up is Paul Wilkins. That's the next one.

THE COURT: Okay.

THE CLERK: Juror number 53, Paul Wilkins.

Step up here, if you would, please.

THE COURT: Good morning, Mr. Wilkins.

THE JUROR: Good morning.

THE COURT: I just have a few questions in addition to what we put to the group generally.

Firstly, I have the witness list that you took a look at, and you did not recognize any names on the witness list?

THE JUROR: No, I did not.

THE COURT: Keep your voice up. All the lawyers have to hear you as well.

Let me ask you about the -- that small group of people who are closest to you, as I defined it yesterday, people in your immediate family, your household, so on, so forth. Having that group in mind, is there anybody in that group who, to your knowledge, has been the victim of any fraud of any kind?

THE JUROR: No.

THE COURT: Has anyone in that group in particular been the victim of identity theft?

THE JUROR: No.

THE COURT: Anybody in that group ever been the victim of any kind of crime?

THE JUROR: No.

THE COURT: Has anybody in that group ever been accused of a crime?

THE JUROR: Yes.

THE COURT: Okay. Tell me about that.

THE JUROR: My brother.

THE COURT: Okay. What was it and when was it and --

THE JUROR: Drunk driving.

THE COURT: How -- when?

THE JUROR: Ten years ago.

THE COURT: What was the consequence? What happened?

THE JUROR: Nothing really, lost his license.

THE COURT: Period of probation, something like that?

THE JUROR: Yeah.

THE COURT: Did he go to jail or anything?

THE JUROR: No.

THE COURT: Anybody else in that --

THE JUROR: (Nodded head.)

THE COURT: Were you involved at all in the proceedings when he was going through that?

THE JUROR: No.

THE COURT: Do you have any feelings as a consequence of that about the criminal justice system that would affect your judgment in a case like this?

THE JUROR: No.

THE COURT: In any criminal case each defendant is presumed to be innocent unless and until the government proves otherwise by the evidence and proves the person is guilty beyond a reasonable doubt.

If you were a juror in this case, would you have any difficulty in accepting and applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: The subject matter we'll be dealing with in this case involves real estate transactions, mortgage loans. The government accuses the defendants of conspiring or scheming to defraud in connection with those kinds of transactions. Given that that's the nature of the evidence you'll be hearing about, is there anything in your personal experiences, your beliefs, attitudes, potential biases, that because of the nature of the subject matter of case would make it difficult for you to be an impartial juror in this case?

THE JUROR: No.

THE COURT: I described the schedule we're going to follow, and on the basis of that schedule the estimate is it's going to take several weeks to present a full case. As I said yesterday, we understand that it is difficult and an inconvenience for people to respond, particularly to that length of a case, but it's a necessary one. Apart from the inevitable level of inconvenience that anybody would have by being a juror, is there anything over the next several weeks that for you would be an especially difficult obstacle?

THE JUROR: No.

THE COURT: No?

THE JUROR: No.

THE COURT: All right. Thank you, sir.

THE CLERK: Juror number 54, Ray De Marquez.

Follow me, sir. Step up to the box, please. Thanks.
THE COURT: Good morning, sir.
THE JUROR: Good morning.
THE COURT: Let me just ask you a few questions in addition to what I asked the group generally.
First of all, let me start with -- we have a little sheet that gives us some basic information about the jurors. Is usually says what the employment is. Yours just said "employed."
THE JUROR: Employed. I can clarify that. I do drapery and shade, window covering installations.
THE COURT: Are you self-employed?
THE JUROR: I am not.
THE COURT: Who do you work for?
THE JUROR: I work for Home Decor Group in Peabody, Mass.
THE COURT: Thank you.
You had a chance to look over the witness list that we gave you yesterday.
THE JUROR: I have, yes.
THE COURT: You didn't recognize any names on the list?
THE JUROR: I did not.
THE COURT: I would like you to think of that group that is closest to you, your immediate people, people within

your households, so on. Within that group has anybody, to your knowledge, been the victim of fraud of any kind?

JUROR: I don't think so.

THE COURT: Anybody in that group been the victim of identity theft?

THE JUROR: I have to think about that one. I would say no.

THE COURT: Has anybody in that group been the victim of any kind of crime?

THE JUROR: In that group?

THE COURT: Yes.

THE JUROR: Of --

THE COURT: Of people that are closest to you.

THE JUROR: Would that include --

THE COURT: It's really who you think is closest to you.

THE JUROR: I'm trying to think --

THE COURT: In other words, the point is -- I'm interested in people whose feelings are your feelings because you're so close to them.

THE JUROR: I'm just thinking of things that -- I'm -- to give an example, just recently was something with my banking account. I had charges that were on there that weren't supposedly mine, so I had to report that.

THE COURT: Where did that come from, do you know?

Where did the charges come from?

THE JUROR: The charges came from an adult website.

THE COURT: So somebody was using your --

THE JUROR: They used my card. Somehow they got the number, and I had to report to the police, and the police -- well, I gave the police report to the bank and then they put the money back in. It was a small amount but -- that was my --

THE COURT: That's the sort of thing I was referring to when I was talking about identity theft.

THE JUROR: Okay.

THE COURT: Broadly speaking. That's an incident.

Did that happen fairly recently to you?

THE JUROR: It happened within the last month.

THE COURT: How about anybody else in your close circle, that kind of thing happen to any of them?

THE JUROR: No, just myself.

THE COURT: I think you said they put the money back. You're not out of pocket anything?

THE JUROR: That's correct. I made a police report. That was following the directions of the bank. And then from the police report to the bank and then the bank did their investigation and then they put the money back in my account. And then I had to make explanations to my family it wasn't me.

THE COURT: Has anybody in that circle of people close to you ever been accused of a crime?

THE JUROR: No, never.

THE COURT: In a criminal case every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence, proves the person guilty beyond a reasonable doubt. If you were a juror in this case would you have any difficulty accepting and applying those principles, the presumption of innocence, proof beyond a reasonable doubt?

THE JUROR: No difficulty.

THE COURT: I described the subject matter. It involves in general terms allegations that the defendants conspired or schemed to defraud in connection with real estate transactions, mortgage loans, so on, so forth. There may be some evidence that stolen identities were used in connection with this scheme, and I mention that particularly because of what you just told me about your experience.

THE JUROR: Correct.

THE COURT: Understanding that's going to be the general subject matter of the case, is there anything in your personal experiences other than what you've already said, your beliefs, your attitudes, potential biases that because of the nature of the case and what the evidence will be about would make it difficult for you to serve as an impartial juror?

THE JUROR: I would say no.

THE COURT: Let me ask you about the schedule in the case. We're going to be sitting 9:00 to 1:00 and so on.

THE JUROR: Yes.

THE COURT: On that schedule we expect the case to last several weeks. That's a lot to ask of jurors, but it's something we have to do.

Apart from the level of inconvenience that anybody would have on serving on a case like that, is there anything over the next several weeks for you that would make it particularly difficult or bothersome?

THE JUROR: For me during the regular work week, probably not. We're talking about employer? It probably would. Being in the job I am, as an installer, product that doesn't get put in doesn't get collected; but, you know, that happens and that's beyond his or our control.

THE COURT: Okay. Thank you, sir.

THE JUROR: Thank you.

THE CLERK: This is juror number 55, Michael Buras.

Step up here, please. Watch your step.

THE COURT: Good morning, sir.

THE JUROR: Good morning.

THE COURT: I have just a few more questions from the ones we asked the group.

First of all, we gave you all a list of potential witnesses to look over. You did, and you didn't see anybody you recognized?

THE JUROR: No, I did not.

THE COURT: Okay. Let me ask you about the group of people that I defined yesterday for you that were closest to you, people in your immediate family, household, whoever you think of as people particularly close to you.

Within that group is there anyone, to your knowledge, who has been the victim of a fraud of any kind?

THE JUROR: No.

THE COURT: Has anyone in that group, to your knowledge, been the victim of identity theft?

JUROR: No.

THE COURT: Has anybody in that group been the victim of any kind of crime?

THE JUROR: No.

THE COURT: Has anyone in that group been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case such as this, every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence and proves the person guilty beyond a reasonable doubt. If you were to participate as a juror in this case would you have any difficulty in accepting and applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No, no difficulty.

THE COURT: I've given you a very broad sense of what

the case is going to be about. The government accuses the defendants of conspiracy or scheme to defraud in connection with certain real estate transactions and mortgage loans in connection with those transactions and so on.

Understanding that's the general tenor of the evidence is there anything in your personal experiences or beliefs, attitudes, potential biases because of the nature of the case that would make it difficult for you to be a fair and impartial juror?

THE JUROR: No.

THE COURT: I described the schedule we will follow yesterday. On that schedule the estimate is this will take several weeks to present. As I said yesterday we realize that that's a lot to ask of people, but it's necessary to do so.

Apart from the general inevitable level of inconvenience that anybody would have in serving on a case that long, is there anything over the next several weeks for you that would make it especially or particularly difficult to serve?

THE JUROR: It is -- work-wise it's my busiest three weeks of the year by far.

THE COURT: Starting this week?

THE JUROR: I work in a sports venue where our opening day is the 19th of April, so we're getting ready for opening day. But other than that, no.

THE COURT: What would the impact be? Having in mind that the day here ends at 1:00.

THE JUROR: Right.

THE COURT: There's still some day left.

THE JUROR: I would still have flexibility, yes.

THE COURT: Okay.

Okay. Thank you.

THE JUROR: Okay.

THE CLERK: Juror number 56, Lynne Morin.

Step up here if you would, please. Watch your step.

THE COURT: Good morning.

THE JUROR: Good morning.

THE COURT: You had a chance to look over the witness list we distributed yesterday?

THE JUROR: I did.

THE COURT: And it looks like you didn't recognize anybody?

THE JUROR: Nobody.

THE COURT: Okay. Let me just ask you about -- think about those people who are closest to you, as I defined it yesterday. People who you live with, people who are in your immediate family, those are people you consider closest to you.

Within that group has anybody, to your knowledge, been the victim of any fraud of any kind?

THE JUROR: No.

THE COURT: In particular has anybody in that group been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anybody in that group ever been the victim of any crime?

JUROR: No.

THE COURT: Other side of that question. Has anybody in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal prosecution such as this, each defendant is presumed to be innocent of the charges made unless and until the government proves otherwise by the evidence and proves the person guilty beyond a reasonable doubt. If you were a juror in this case, would you have any difficulty in accepting and applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: I described in general terms the nature of the case yesterday. It is a case in which the government accuses the defendants of conspiring or scheming to defraud in connection with certain real estate transactions and mortgage lending transactions. Given that that's the nature of the -- what the evidence is going to be about in general terms, is there anything in your personal experiences, beliefs, attitudes, potential biases that because of the nature of

the -- or the subject matter of the case it would make it difficult for you to be a fair and impartial juror in this case?

THE JUROR: No.

THE COURT: I described the schedule we will follow, and it's estimated on that schedule the case will take several weeks. As we said yesterday, we appreciate the burden that that places on people to serve as jurors, but it's a necessary one.

Apart from the inevitable level of inconvenience that anybody would have in serving on a lengthy trial, is there anything over the next several weeks that would make it for you particularly difficult to serve in this case?

THE JUROR: I have chronic nerve pain in my mouth, and I see doctors every other week to help me manage the pain.

THE COURT: And when -- dentists?

THE JUROR: No, I go to MGH pain clinic.

THE COURT: Pain management.

THE JUROR: Yes, pain management.

THE COURT: When are you next --

THE JUROR: My next appointment is next Wednesday.

THE COURT: At what time?

THE JUROR: I think at 1:15, and then they give me the new schedule.

THE COURT: So you have just the one.

THE JUROR: For right now, yes. It's been ongoing for three years.

THE COURT: Does that have any impact on your attention span or --

THE JUROR: No, it's just I don't know how much pain I'm going to be in from one day to the next.

THE COURT: Do you take medication for it?

THE JUROR: Yes.

THE COURT: Does that have any effect on your perception or anything like that?

THE JUROR: No, it's controllable.

THE COURT: All right, thanks.

THE JUROR: You're welcome.

THE CLERK: Juror number 57, Drew Floyd.

Step up to the box, please.

THE COURT: Good morning, sir.

THE JUROR: Hi.

THE COURT: Just a few more questions to the ones we asked generally.

You've looked at the witness list we distributed yesterday?

THE JUROR: Yes, I have.

THE COURT: And you didn't see anybody you recognized?

THE JUROR: No, I did not.

THE COURT: Okay. Let me ask you to think about the

group of people who are closest to you, as I talked about yesterday, people in your immediate family, people you live with, so on, so forth.

In that group is there anyone whom -- who, to your knowledge, has been the victim of a fraud of any kind?

THE JUROR: No.

THE COURT: Anybody in that group ever been the victim of identity theft in particular?

THE JUROR: No.

THE COURT: Has anybody in that group ever been convicted -- not convicted -- a victim of any crime?

THE JUROR: No. A burglary. Ten years ago.

THE COURT: Who was that?

THE JUROR: My wife and I.

THE COURT: Okay. Did that result in any prosecution of anybody, anybody apprehended or punished --

THE JUROR: No.

THE COURT: Has anybody in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case such as this, every defendant is presumed to be innocent, unless and until the government proves otherwise by the evidence, proves the person guilty beyond a reasonable doubt. If you were a juror in this case, would you have any difficulty in accepting and applying

faithfully the principles or presumption of innocence or proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: As I mentioned yesterday in a very broad way, that the nature of the case involves real estate transactions, mortgage loans; and the defendants are accused of a conspiracy or a scheme to defraud in connection with those kinds of transactions. Understanding that, is there anything in your personal experiences, your beliefs or attitudes, potential biases that because of the nature of the subject matter of the case it would make it difficult for you to be a fair and impartial juror?

THE JUROR: Well, I haven't had great experiences in refinancing my home, if that has something to do with it; but, you know, that I guess is somewhat related.

THE COURT: Well, you've had some difficulty in refinancing, is that what you're saying?

THE JUROR: Yeah, I mean, it's just -- it's, you know, I don't think it's -- yeah, I've had difficulties in the past.

THE COURT: Recent past?

THE JUROR: No, 12 years ago, 10 years ago.

THE COURT: Well, you're really the only one that can answer this. Would that have an effect on your ability to be impartial --

THE JUROR: No. I learned how to overcome what issues

we had at the time and tried to steer around it.

THE COURT: Right.

And if you sat in this case and heard evidence that had something to do in general with those kinds of things, even though they may not be the same exact transaction, but would that affect your ability to be impartial?

THE JUROR: No, I don't think so.

THE COURT: And the most recent experience was 12 years ago that you had with that?

THE JUROR: Yes.

THE COURT: So you've had no experience in recent years with current market conditions?

THE JUROR: No negative experiences.

THE COURT: Okay.

I just described the schedule we'll follow, and the estimate is that on that schedule the case will take several weeks to present. As I said yesterday, we understand that for every juror there is some disruption and inconvenience in being asked to serve on a jury at all, but particularly for that length of time.

Apart from the inevitable level of inconvenience that anybody would experience by serving on a jury for a several-week trial, is there anything over the next several weeks that in your case would be a particularly severe hardship?

THE JUROR: I have meetings at the end of April down in Dallas.

THE COURT: Tell me about those. What kinds of meetings and --

THE JUROR: Well, I'm a chairman of a committee for a trade organization, and so I have to attend, like, board of directors meeting down in Dallas.

THE COURT: Do you know exactly when those are?

THE JUROR: I'd have to look at a calendar, but I think it's the last Wednesday, Thursday -- Tuesday, Wednesday, Thursday of the month of April.

THE COURT: And what's the general business that's done at a meeting like that?

THE JUROR: Planning for upcoming conference. So, you know, long-range planning.

THE COURT: Okay. Thank you.

THE CLERK: Juror number 58, Ellen Thompson.

THE COURT: Good morning.

THE JUROR: Good morning.

THE COURT: I just have a few more questions in addition to the ones we asked generally.

When you answer, I ask you to keep your voice up. The lawyers have to hear as well as me.

THE JUROR: Okay.

THE COURT: You had a chance to look at the list of

potential witnesses that we gave yesterday?

THE JUROR: Yes.

THE COURT: You didn't recognize anybody?

THE JUROR: No.

THE COURT: I'd ask you to think about the group of people who are closest to you, as I talked about them yesterday, people in your immediate family, your household, so on, so forth. Has anyone in that group ever been, to your knowledge, the victim of any fraud of any kind?

THE JUROR: No.

THE COURT: Anybody in that group in particular ever been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anybody in that group ever been the victim of any kind of crime?

THE JUROR: No.

THE COURT: Turning that question around, has anyone in that group ever been accused of a crime?

THE JUROR: I'm not sure.

THE COURT: Well, what do you --

THE JUROR: When my brother was a teenager, he was just involved in -- played an ad hoc football game, went back to catch a pass, he knocked someone over and they did file suit.

THE COURT: That was a civil matter. It wasn't a

prosecution.

THE JUROR: Right, right, that's it.

THE COURT: Okay. In a criminal case such as this every defendant is presumed to be innocent of the charges made unless and until the government proves otherwise by the evidence.

THE JUROR: Right.

THE COURT: And proves the defendant's guilty beyond a reasonable doubt. If you were a juror in this case, would you have any difficulty in accepting and applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: As I described to you yesterday in general terms, what the government charges the defendants with here is a conspiracy or a scheme to defraud in connection with certain real estate transactions or mortgage loan transactions. Understanding what the sort of body of evidence will be about in general, is there anything in your personal experiences, beliefs, attitudes, potential biases that because of the nature or subject matter of the case that would make it difficult to serve as an impartial juror?

THE JUROR: No.

THE COURT: As I said yesterday, the case on the schedule that I've outlined will probably take several weeks. It's a relatively longer case. I also said that that -- we

recognize that's an imposition on people, but we have to ask them to do it.

Apart from the sort of inevitable level of inconvenience that anybody would have in serving on a case that long, is there anything in the next several weeks in your particular case that would make it especially difficult?

THE JUROR: No, I mean, like other people who are waiting outside, I have a job.

THE COURT: Right.

THE JUROR: But my company allows us to serve. So as long as it doesn't go too late in the month of May, I have some maybe personal commitments, but they're appointments that could be rescheduled.

THE COURT: All right. Thank you very much.

THE JUROR: Okay. Thank you.

MR. ULLMAN: Your Honor, could we just ask what Ms. Thompson does?

THE COURT: Fine.

Ms. Thompson, come back for a sec.

We have very rudimentary and sometimes abbreviated information about what people do for employment. You work for Blue Cross/Blue Shield?

THE JUROR: Yes.

THE COURT: All it says is "insurance health." It doesn't tell us --

THE JUROR: I'm an analyst. I work in a claims area, an operations area. We maintain the pricing files that we pay our providers through.

THE COURT: Okay.

Thank you.

THE JUROR: Okay.

THE CLERK: Juror number 59, Mary Young.

Step up here to the box, ma'am.

THE COURT: Good morning.

THE JUROR: Sorry, my hands are cold.

THE COURT: Let me just ask you a few things beyond what we asked yesterday.

You work for a firm called O'Conor, Wright Wyman. What kind of firm is that?

THE JUROR: Financial banking.

THE COURT: You're a financial consultant?

THE JUROR: Yes, primarily mergers and acquisitions.

THE COURT: Okay. How long have you been doing that?

THE JUROR: Thirteen years.

THE COURT: You had a chance to look at the witness list that we distributed. You didn't see anybody you recognized?

THE JUROR: I did not.

THE COURT: I want you to think of the group of people who are closest to you, immediate family members, household

members, so on, that group. Is there anyone in that group, to your knowledge, who has been the victim of any fraud of any kind?

THE JUROR: Victim of a fraud. Doesn't come to mind.

THE COURT: In particular has anybody in that group ever been the victim of identity theft?

THE JUROR: Doesn't come to mind.

THE COURT: Has anybody in that group ever been the victim of any kind of crime?

THE JUROR: Any kind of crime. You mean criminal or civil?

THE COURT: I mean criminal and whether anybody close to you has been a victim in any way, whether it's a property crime or maybe a personal assault type of crime or something like that.

This isn't a test. So if nothing comes to you, maybe the answer is no.

THE JUROR: Well, a friend of mine was convicted of a crime.

THE COURT: I'm going to come to that. First of all, I wanted to know about the victim.

THE JUROR: No.

THE COURT: Now let me ask you if anybody close to you has ever been accused of a crime.

THE JUROR: Yes.

THE COURT: Tell me about that.

THE JUROR: One of my closest friends in college was just convicted of securities fraud.

THE COURT: Recently?

THE JUROR: Yes.

THE COURT: Okay. Have you remained friends since college?

THE JUROR: Yes, very close, yeah.

THE COURT: So you're still close friends.

THE JUROR: Yes.

THE COURT: Okay. Where was that?

THE JUROR: Federal court in Hartford, Connecticut.

THE COURT: Okay. Can you briefly summarize what the case was?

THE JUROR: Well, it was the AIG General Re case. And my friend was sentenced to incarceration a year ago.

THE COURT: What term, do you know?

THE JUROR: Eighteen months.

THE COURT: Did you participate in those proceedings in any way, being a support or anything like that?

THE JUROR: Support, yes.

THE COURT: Did you go to the court proceedings?

THE JUROR: Yes, I did, yes.

THE COURT: Does that experience leave you with any feelings that would affect your ability to be a fair-minded

juror in this case?

THE JUROR: Well, it would -- it was unfair. The proceedings were unfair.

THE COURT: Right. And --

THE JUROR: She got railroaded.

THE COURT: And would that affect your judgment here, or would you be able to make judgment in this case by putting that aside in considering the evidence here?

THE JUROR: Well, I came away skeptical about the system --

THE COURT: Okay.

THE JUROR: -- to be honest.

THE COURT: Okay.

Well, okay. Let me ask you this then. In a criminal case every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence, and the government is required to prove anybody guilty beyond a reasonable doubt. If you were a juror in this case, would you have any difficulty in applying the principles of the presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: I don't think I'd have any problem, no.

THE COURT: The general subject matter of the case involves real estate transactions, mortgage loans, and so on. The government accuses the defendants of conspiring or scheming to defraud in connection with those kinds of transactions.

Understanding that's the general tenor of the case, is there anything, perhaps including your recent experience, but anything in your experience or your beliefs or attitudes or potential biases that would make it difficult for you to be an impartial juror in this particular case?

THE JUROR: Not that I know of, no.

THE COURT: Okay.

THE JUROR: I'm familiar with, you know, those types of frauds. I mean, it's garden variety stuff.

THE COURT: When you say you're familiar with it, how familiar -- have you actually worked in the area or --

THE JUROR: Well, I've worked for a number of lending institutions and I'm in the financing business, so I've seen just about every kind of fraud and, you know, financial chicanery that you can imagine. I've been doing this for 30 years. I've seen it all. I know all these schemes, frauds. I'm familiar with it.

THE COURT: What we're interested in is what the evidence in this case indicates or not. Would you be able to judge the evidence in this case without being unduly influenced by what you think may have been the case in other situations?

THE JUROR: Oh, I think so, yeah.

THE COURT: Let me ask you about the schedule. We expect the case to last several months.

THE CLERK: Weeks.

THE COURT: Several months -- weeks. I don't want to make it worse. Several weeks. As I said yesterday, we understand that it's an imposition in any degree to ask people to put things aside to serve as jurors on a case, more significantly the longer the case goes.

Apart from the inevitable inconvenience that anybody would have serving on a jury of several weeks, is there anything over the next few weeks that makes it particularly difficult for you to --

THE JUROR: I think it would pose a financial hardship for me because I'm unmarried and I'm self-employed and my means of income is working continuously. And I have a client right now that I -- is expecting me to do heavy work over the next month. I have one client, and it would pose a very large financial hardship, difficult. I mean, extremely difficult. Business is not great right now.

THE COURT: Okay. Thank you.

THE CLERK: Juror number 60, Marie Calvo.

Step up, ma'am. Watch your step.

Thanks.

THE COURT: Good morning.

THE JUROR: Good morning.

THE COURT: You had a chance to look at the witness list we distributed yesterday?

THE JUROR: I did.

THE COURT: And you didn't see anybody that you recognized?

THE JUROR: No.

THE COURT: Let me ask you a few questions about that circle of people who are closest to you, immediate family, people you live with, and so on. In that group has anyone, to your knowledge, ever been the victim of a fraud of any kind?

THE JUROR: No.

THE COURT: In that group has anyone, to your knowledge, ever been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anybody in that group ever been the victim of any kind of crime?

THE JUROR: No.

THE COURT: Has anyone in that group ever been accused of a crime?

THE JUROR: DUI.

THE COURT: That would count.

THE JUROR: Yes. One of my daughters.

THE COURT: Okay. When was that?

THE JUROR: About five years ago.

THE COURT: And where was it?

THE JUROR: In New Hampshire.

THE COURT: What happened?

THE JUROR: She lost her license for three years

because she was under age. She wasn't at the legal limit but there's a zero tolerance and she did a Breathalyzer and found something.

THE COURT: All right. Do you have any feelings as a result of that experience that would affect your ability to be a fair juror in a criminal case?

THE JUROR: No.

THE COURT: In a criminal case every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence, proves the person guilty beyond a reasonable doubt. If you were a juror in this case, would you have any difficulty in accepting and applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: I've told you -- I told the group yesterday in general what the nature of the case is. The government charges the defendants with a conspiracy or a scheme to defraud in connection with certain real estate or loan, mortgage loan transactions. Understanding that's the general tenor of what the case is going to be about, is there anything in your personal experiences, beliefs, attitudes, potential biases because of the nature or subject matter of the case that would make it difficult for you to serve in this case?

THE JUROR: No.

I did not stand yesterday when you asked if anybody

worked in the real estate industry because I never have, but I did get my license a few years ago. I've just never worked, never used it.

THE COURT: Okay. You took the licensing exam or whatever?

THE JUROR: Yes.

THE COURT: But have never practiced?

THE JUROR: Never.

THE COURT: Okay. On the schedule that I outlined yesterday, the case is expected to take several weeks to complete. As I said yesterday, we understand and appreciate for everybody who has to serve as a juror there's some inconvenience and rescheduling and so on, so forth.

Apart from that inevitable level that anybody would have being on such a jury, is there anything over the next several weeks that would make it especially difficult for you to serve?

THE JUROR: No.

THE COURT: Okay. Thank you.

Okay. Let's start at the top of the page. 49, Roseanne Zerola.

MR. SWORMLEY: She's the one who said she's away.

THE COURT: Away May 9th.

MR. BORENSTEIN: Sunday, Monday, Tuesday, coming back the 11th.

THE COURT: How big a problem is that?

MR. WILD: I think it may be a problem, your Honor. I also noted that she indicated that she -- 30 years in the real estate field, she's teaching people, training people, providing seminars for them. She may think -- in the jury room she may think she knows more about the business than anybody there and attempt to instruct them.

THE COURT: Well, as to the second one, I don't think that's an issue I would excuse for cause. Bias, she didn't say one way or the other she has any in the area. I don't think that's disqualifying.

I don't know about the vacation issue or the time away. That would be -- let's see -- I guess it's within the zone, pretty much. I think we have to excuse her.

MR. SWORMLEY: Can I suggest, your Honor -- how many alternates do we have, four?

THE COURT: We'll have four alternates.

MR. SWORMLEY: If we make it that far with four alternates, then we can still lose one.

THE COURT: I'd rather not plan to lose one, though, I guess.

All right. Number 50, anybody?

MR. WILD: Yes, your Honor. This is the individual, you may recall, he's an accountant, and leave it to an accountant to tell you how much his bitterness may have a thumb

on his decision. He told you he was 30 to 50 percent. He indicated that he has serious bitterness about the legal system and the court system and I think he said and lawyers in particular. Two of the defendants are lawyers and there are an awful lot of lawyers in the courtroom. But he was the one who actually quantified how much it would affect him.

MR. SWORMLEY: I think he also, though, your Honor said that while he may have -- he may have bitterness to the system and lawyers, he has no bitterness to defendants and no -- none of his bitterness is so strong that it would adversely affect his decision making. And then you asked him to quantify, I don't know, bitterness or something you asked him to quantify. I don't know what that quantification was exactly, but the real question is whether he can set aside those feelings and be fair and impartial. He said the subject matter is okay, this wasn't a subject matter that would fit into his discomfort zone. And the bitterness was something that had to do with what happened to his wife, which was in a motor vehicle accident, as opposed to anything that is white collar, quote-unquote.

I think he's the gentleman who said that his brother-in-law's sister is a Braintree police officer. To quote my brother, jurors come in with attitudes about lawyers. It's understandable that they would express them.

THE COURT: Well, I think he expressed a little too

much, frankly. I think I'll excuse him for cause.

Ms. Cossette is the hairstylist who works on commission. I'd be inclined to let her go.

Number 52, DiPietro.

MR. SWORMLEY: I think there are at least five reasons to let her be excused for cause.

THE COURT: I'll excuse her.

53, Mr. Wilkins.

54, Mr. De Marquez.

55, Mr. Buras.

56, Ms. Morin.

MR. SWORMLEY: Your Honor, Mr. Buras, 55, had a hardship issue. While I can say that working outside doesn't seem like -- not being able to work outside doesn't seem like a hardship, but I understand the business he's in probably this is the business. This is making, you know, making it work. So I would certainly agree that he has a hardship, if that's something your Honor --

THE COURT: Anybody else?

MR. ULLMAN: I thought he said he could work around it.

THE COURT: Could work around it.

MR. ULLMAN: Could.

THE COURT: I think he did. I think we'll leave him.

Okay. Ms. Morin, anybody?

57, Mr. Drew? I'm sorry, Mr. Floyd.

He's got a meeting the last week of April. I don't think -- I mean, if we -- it's the same as the first one on the list. There's a commitment that's there in the middle of the case. So I don't think -- and it's a meeting that doesn't look like it can be changed. It's a group meeting.

Ms. Thompson, number 58.

Ms. Young, 59.

MR. WILD: Yes, your Honor. This is the individual who said in 30 years I've seen it all, and she started articulating all of her experience about how she's seen every kind of fraud there was and she can recognize it, she's investigated it. And I think that she's a very problematic witness in that regard. And she did say in one part of it she's terribly skeptical about the legal system and highlighted that to say to be very honest, and I think she was trying to be honest with you.

THE COURT: Okay. Actually, I would excuse her for hardship because she's self-employed and has a contract she's working on right now that would take her away.

So Ms. Calvo?

So that leaves then 53, 54, 55, 56, 58, and 60.

(Discussion off the record.)

THE COURT: Okay. So we're at 32.

MR. BORENSTEIN: Mr. Sheketoff has confirmed that we

are at 32.

MR. SHEKETOFF: No, I didn't. That was my client.

THE COURT: So we'll just keep going.

It looks to me we're going to be doing this this afternoon. We'll just keep going until we -- I don't want to just run it to tomorrow.

THE CLERK: This is juror number 61, Gail Sheldon.

Follow me, please.

Step up to the box, please.

THE JUROR: Okay.

THE COURT: Hi.

THE JUROR: Hi.

THE COURT: You had a chance yesterday to look over the potential witness list that we gave you?

THE JUROR: I did.

THE COURT: And you didn't recognize any of the names that were on it?

THE JUROR: I did not.

THE COURT: You did answer one of the questions I asked yesterday about some connection with banking, real estate, mortgage lending businesses. Can you tell us why you answered that affirmatively.

THE JUROR: I did. Sure. I am in the middle of litigation right now myself. It's my husband and our small company are in a lawsuit against TD Banknorth. That's

happening in the Lawrence District Court. I do have that court case number if you want that. No?

THE COURT: What's it about?

THE JUROR: There was a salesman in our company that has been convicted of a Ponzi scheme, and essentially he was stealing from us through this Ponzi, through wire transactions and a whole -- it's -- it was a very long, involved case last year, both civilly and criminally.

What has happened since is because TD Bank wants their entire credit line returned to them, most of which was stolen through this Ponzi scheme, Barry and I, my husband and I, don't have that kind of money to return it to them. So we are in litigation suing them because we feel that there's some responsibility on their part because of all the reporting I did for the two-and-a-half years that -- when the Ponzi scheme took place.

They are countersuing us and, as a matter of fact, tomorrow there's a foreclosure hearing of a property that I own, as well as they put a restraining order on a couple of my accounts.

THE COURT: Okay. Counsel, I don't think I have to ask any more questions here, unless somebody dissents.

This is not the case for you.

THE JUROR: I don't think so. As a matter of fact, I've been in these courtrooms for the last 14 months.

THE COURT: I'm going to excuse you. Thank you.

THE JUROR: Thank you.

THE CLERK: This is juror number 62, Joseph Soares.

Follow me, sir.

Step up to the box, please. Watch your step. Thanks.

THE COURT: Mr. Soares.

You had a chance yesterday to look over the list of potential witnesses?

THE JUROR: Yes.

THE COURT: You didn't recognize anybody there?

THE JUROR: No.

THE COURT: Let me ask you some questions about that group of people that I talked about yesterday who are the closest to you, people in your immediate family, people you live with, so on, so forth.

In that group, is there anyone, to your knowledge, who has been the victim of a fraud?

THE JUROR: I was.

THE COURT: Tell me about that.

THE JUROR: Credit card.

THE COURT: Okay.

THE JUROR: They stole my identity and they banged up like 50, 60,000 worth of bills.

THE COURT: Would you keep your voice up? The lawyers have to hear your answers.

THE JUROR: I was involved in credit -- my identity was stolen. It took eight months for me to correct that.

THE COURT: When was that?

THE JUROR: About ten years ago.

THE COURT: Okay. Were you out of pocket any amount of money?

THE JUROR: No, I didn't lose any money out of pocket.

THE COURT: But you had the inconvenience and so on.

THE JUROR: A very big inconvenience.

THE COURT: Anybody else been involved in that circle who's been affected by fraud or identity theft, people you are close to?

THE JUROR: Not that I know of, no.

THE COURT: Has anybody been involved in any other kind of crime?

THE JUROR: Not that I know.

THE COURT: Has anybody in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case each defendant is presumed to be innocent unless and until the government proves otherwise by the evidence, proves guilt beyond a reasonable doubt. If you're a juror in this case, would you have any difficulty in applying the principles of presumption of innocence?

THE JUROR: I would.

THE COURT: And why is that?

THE JUROR: Because of what happened to me.

THE COURT: Because of your personal experience.

THE JUROR: Right. I know what I went through.

THE COURT: Thank you, sir. I appreciate your honesty, and I'll excuse you.

THE CLERK: Juror number 63, George Haines.

Step up to the box, please.

THE JUROR: Good morning, Judge.

THE COURT: Good morning.

You answered one of the questions yesterday about a connection with law enforcement. I see from the sheet you're a court officer in the Massachusetts court system.

THE JUROR: Correct.

THE COURT: Trial court?

THE JUROR: Correct.

THE COURT: How long have you done that?

THE JUROR: Fifteen years.

THE COURT: Any other law enforcement connection --

THE JUROR: No.

THE COURT: -- besides that.

THE JUROR: I have a daughter that works in Norfolk County District Attorney's Office.

THE COURT: In what capacity?

THE JUROR: Victim witness advocate.
THE COURT: Is she an attorney or --
THE JUROR: No.
THE COURT: Does -- and where do you serve in the trial court?
THE JUROR: South Boston District Court.
THE COURT: South Boston. And during your 15 years have you been there?
THE JUROR: Different places. Started in Chelsea, went to the Norfolk superior, Norfolk juvenile, Quincy, now I'm in Southie.
THE COURT: Okay. Obviously you are familiar with court proceedings and what goes on and so on. Is there any reason for you to feel that because of your position your ability to be a fair and impartial juror would be affected by your --
THE JUROR: It's hard to say. I couldn't answer that either way to be honest with you, Judge.
THE COURT: Because you don't know enough about the case?
THE JUROR: No, I've just seen so much stuff myself, you know. I don't know any of the lawyers. I'm familiar with one of them. I've never had any interaction with him. I know I've seen him either in town or somewhere. No interaction with him or anything like that. I'm sure he doesn't even know me.

THE COURT: Without identifying who it is, any feelings that would affect your judgment in the case?

THE JUROR: No, no.

THE COURT: Let me go back to the -- you were asked to look at a witness list, potential witness list, yesterday. It looks like you didn't recognize anybody?

THE JUROR: I don't believe so. No, I went over it twice, and I don't believe I knew anybody on there.

THE COURT: Let me ask you about the people who are closest to you, as I described yesterday, people in your immediate family, your household, anybody that you would regard as very close to you. Within that group is there anyone that you are aware of who has been the victim of a fraud?

THE JUROR: No.

THE COURT: Has anybody in that group been the victim of identity theft in particular?

THE JUROR: My immediate family, no.

THE COURT: Thinking of somebody else?

THE JUROR: No, I'm just trying to think of my extended family.

THE COURT: All right. Has anybody in that group been the victim of any kind of crime?

THE JUROR: Immediate family?

THE COURT: People closest to you.

THE JUROR: Sons, daughters?

THE COURT: People that you would regard as closest to you.

THE JUROR: No.

THE COURT: Anybody in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: Do you sit in both the civil and criminal sessions?

THE JUROR: Correct.

THE COURT: What are you doing now in particular?

THE JUROR: They have civil over there. On Thursdays they do civil, and the rest is all arraignments and district court stuff.

THE COURT: Well, you know that a defendant in a criminal case is presumed to be innocent unless and until the government proves otherwise by the evidence in the case.

THE JUROR: Correct.

THE COURT: And the obligation of the government is to prove guilt beyond a reasonable doubt.

THE JUROR: Mm-hmm.

THE COURT: If you were a juror in a criminal case like this one, would you have any difficulty in applying the presumption of innocence?

THE JUROR: No.

THE COURT: Or the requirement of proof beyond a

reasonable doubt?

THE JUROR: No.

THE COURT: I gave some general idea of what the nature of the controversy here involves, what the evidence would be about, and the government accuses the defendants of conspiring or scheming to defraud in connection with real estate transactions or mortgage loan transactions. Understanding that's the general subject matter that the case will be about, is there anything in your personal experience, beliefs, attitudes, potential biases that because of the nature of the case would make it difficult for you to be an impartial juror?

THE JUROR: No.

THE COURT: As I said yesterday, we expect the trial on the schedule that I described to take several weeks.

THE JUROR: Mm-hmm.

THE COURT: That's a disruption for almost every juror. Apart from the level of inconvenience that is inevitable in that circumstance, is there anything over the next several weeks that would make it especially difficult for you?

THE JUROR: I had prostate cancer surgery several months ago. It's much better than it was. It could run into some problems. Nothing major. You know where I'm going.

THE COURT: Do you have any --

THE JUROR: A little incontinence once in a while, that's what I'm getting at.

THE COURT: We can always take breaks for people who need to take a break, so on, so forth. Other than managing that is there anything?

THE JUROR: No.

THE COURT: All right. Thank you.

THE JUROR: All right. Thanks, Judge.

THE CLERK: Juror number 64, Michael Dearruda.

Step up here, sir. Watch your step.

THE COURT: Mr. Dearruda. You had a chance to look at the potential witness list that we gave yesterday?

THE JUROR: Mm-hmm. Nobody in there I recognize.

THE COURT: Okay, thank you.

Let me ask you some questions about that circle of people who are closest to you, as I described yesterday, people in your immediate family, people you live with, so on, so forth. Within that group is there anyone who, to your knowledge, has been the victim of a fraud of any kind?

THE JUROR: No.

THE COURT: Has anybody in that group ever been the victim of identity theft in particular?

THE JUROR: No.

THE COURT: How about being the victim of any kind of crime, anybody in that group?

THE JUROR: Not to my knowledge.

THE COURT: The other side of things. Has anybody in that group ever been accused of a crime?

THE JUROR: Yes.

THE COURT: Tell me about that.

THE JUROR: Me. Nineteen -- let's see, my daughter was born in '85 and -- and in 1990 I was accused of rape and abuse of a child under 14.

THE COURT: And what happened?

THE JUROR: I was convicted, spent a year in jail and 12 years in therapy.

THE COURT: Okay. Any other offenses?

THE JUROR: No, that's it.

THE COURT: So that was, again, what year, 1990 --

THE JUROR: Nineteen -- well, it started in '85, and I was convicted in 1990.

THE COURT: As a consequence of that, do you have any feelings about the criminal justice system that would affect your ability to be a fair-minded juror in a criminal case?

THE JUROR: As far as I'm concerned, they were only doing their job.

THE COURT: In a criminal case, as I'm sure you know, a defendant is presumed to be innocent unless and until the government proves otherwise by the evidence and proves guilt beyond a reasonable doubt. If you were a juror in this case,

would you be able to faithfully apply the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: Well, I only have myself and what my circumstances were. I'm not sure. I did jury duty in Wareham District Court about three months ago, and -- yeah, I think I can do it if necessary. Yeah.

THE COURT: What was the case you did in --

THE JUROR: A woman was arrested for a DUI. We went through a -- we went through the trial and we convicted the woman -- we convicted her, said she was guilty, and we found out later when the judge came in and talked to us that this had been the woman's fifth offense. And we discussed it in jury and we came to a consensus that, yes, she was guilty. She had -- she had refused to get out of the car when the police asked her to. They actually had to pull her out of the car. She refused to take the field sobriety test, and she was not a very cooperative person.

THE COURT: What this case is about is accusations by the government that the defendants conspired or schemed to commit fraud in connection with mortgage loan transactions, real estate transactions. That's the subject matter that the jury will hear about. Is there anything in your personal experience, your beliefs, your attitudes and potential biases because of the nature, the subject matter of case that would make it especially difficult for you to be an impartial juror

in the case?

THE JUROR: Well, at the moment I am unemployed, not collecting any money, and picking bottles and cans to make ends meet. Believe me, my opinion would not be very nice towards the defendants.

THE COURT: Okay. Okay. Thank you, sir.

THE JUROR: You're welcome.

THE CLERK: Juror number 65, Karen Lococo.

Step up here, ma'am. Watch your step.

THE COURT: Hi. First I want to -- you had a chance to look at the witness list we distributed yesterday?

THE JUROR: Yes.

THE COURT: And you didn't recognize anybody on the list?

THE JUROR: No.

THE COURT: You answered one of the questions yesterday about connection -- somebody -- you or somebody close to you had a connection with law enforcement. Tell me what led you to --

THE JUROR: I wasn't real clear with your question, but my cousin is the senior adviser to Martha Coakley. And I also have -- my next door neighbor works for the Middlesex D.A. office. He's at the D.A.'s office.

THE COURT: You have a cousin who works for the Attorney General who is a lawyer or not? Do you know?

THE JUROR: No, he's the senior adviser.

THE COURT: Okay. And the person who works for the Middlesex D.A.?

THE JUROR: He is a lawyer.

THE COURT: He is a lawyer. I'm sorry, who is that?

THE JUROR: Kyle Reed.

THE COURT: The connection with you?

THE JUROR: He's my next door neighbor. We've grown up together.

And then I also have two close friends that are detectives on the police force but in my local town.

THE COURT: Which is Chelmsford?

THE JUROR: Chelmsford.

THE COURT: Do any of those relationships give you concern about your ability to be impartial as a juror in a criminal case where someone on one side will have people from the law enforcement community perhaps?

THE JUROR: I don't believe so.

THE COURT: Let me ask you about the small circle of people I mentioned yesterday, those who are closest to you, people in your immediate family, people who you live with, so on, so forth. Has anyone in that group ever, to your knowledge, been the victim of a fraud of any kind?

THE JUROR: No.

THE COURT: Has anyone in that group in particular

been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anybody in that group ever been the victim of any kind of crime?

THE JUROR: No.

THE COURT: On the other side of things, has anybody in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence, proves guilt beyond a reasonable doubt. If you were a juror in this case, would you have any difficulty in accepting and applying the principles of presumption of innocence of proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: I mentioned yesterday in very general terms what the nature of case will be, the subject matter. The government in its indictment accuses the defendants of conspiring or scheming to defraud in connection with certain real estate transactions, mortgage loan transactions. Is there anything in your personal experience, beliefs, attitudes, potential biases that because of the nature or subject matter of the case would make it difficult for you to be an impartial juror in this particular case ?

THE JUROR: No. I do have a sister-in-law that works

for a mortgage company and a close friend who owns the mortgage company. But other than that, no.

THE COURT: Would that affect you? Would you be --

THE JUROR: No.

THE COURT: What's the name of that mortgage company?

THE JUROR: Home Advantage Mortgage in Littleton, Mass.

THE COURT: I described the schedule we would follow yesterday, and on that schedule it's estimated the case will take several weeks to complete. As I said then, we know that it is an inconvenience for jurors to have to put things aside to serve as jurors.

Apart from the inevitable level of inconvenience that anybody would have in being on a case of that length, is there anything over the next several weeks that would make it especially difficult for you to serve?

THE JUROR: Actually, I'm a mother of four. I have a ten-year-old, nine-year-old, six-year-old, and three-year-old. So the past two days I've had to have my mother come sleep at my house to make sure she gets them off to where they need to be. My six-year-old is deaf. There's not that many people that can communicate and understand her.

The second part of that, I'm also a sixth grade teacher. So for the next six weeks they are finishing up the English Language Arts MCAS this week. And for the next four

weeks I have a lot of cramming of math material to finish off before they start MCAS math, which is the second week of May. And I have a lot of students who depend on me for their stability. I had to warn them on Friday I have to call tonight, I might not be in on Monday, just to warn them. So that I feel is an issue.

THE COURT: Okay.

THE JUROR: Because that would be basically the rest of that fourth term that has just begun.

THE COURT: Okay. Thank you.

THE CLERK: Juror number 66, Michael Lambert.

Step up here to the box. Watch your step. Thanks.

THE COURT: First of all, you had a chance to look over the witness list yesterday?

THE JUROR: Yes.

THE COURT: And you didn't recognize anybody?

THE JUROR: No.

THE COURT: Now, you did answer one of the questions yesterday that I asked the group about connection with banking, lending, so on, so forth.

THE JUROR: Yes.

THE COURT: And I see from the list here it says you work for State Street Corporation as a loan operator?

THE JUROR: Yes.

THE COURT: Is that the right title for --

THE JUROR: Yes.
THE COURT: What does a loan operator do?
THE JUROR: Basically I manage loans and lines of credit for mutual fund clients, corporations, insurance services and individuals.
THE COURT: How long have you been doing that?
THE JUROR: I've been doing that for about three years.
THE COURT: Do you do any real estate loans or transactions, mortgage loans?
THE JUROR: Not in general. A lot of our lines of credits are used to finance home buying, but not mortgages straight up.
THE COURT: I want you to think about the people who are closest to you, as I described yesterday, immediate family, people you live with, so on. Within that group is there anyone, to your knowledge, that has been the victim of a fraud of any kind?
THE JUROR: Yes.
THE COURT: Tell me about it.
THE JUROR: My mother-in-law has been -- her identity was stolen. Probably about four years ago.
THE COURT: And what happened?
THE JUROR: Basically, actually, it was her daughter who stole her identity and was using her to access, like,

credit cards and everything. So it ruined my mother-in-law's credit score but helped out her daughter. So --

THE COURT: Okay. And what was the upshot of it all?

THE JUROR: Basically no charges were pressed, but there's no communication between my mother-in-law and the daughter.

THE COURT: Did your mother-in-law have any funds restored to her account or was she out of pocket any losses?

THE JUROR: No, nothing out of -- just her credit score was ruined because of the access, but nothing was lost from her.

THE COURT: Anybody else?

THE JUROR: No.

THE COURT: Has anybody in that group been the victim of any other kind of crime? Not necessarily a financial crime?

THE JUROR: Yeah. No.

THE COURT: Has anybody in that group of close people to you ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case the defendant -- each defendant is presumed innocent of the charges made against them unless and until the government proves otherwise by the evidence. The government is required to prove guilt beyond a reasonable doubt. If you were a juror in this case, would you have any difficulty in applying the principles of presumption

of innocence and proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: You heard me yesterday say in general what the nature of the case is. The government accuses the defendants of conspiring or scheming to defraud in connection with certain real estate or loan transactions. There may be evidence that some participants alleged to have been in the conspiracy may have committed identity fraud. Understanding that's the nature and subject matter of the case, is there anything in your experiences, including your mother-in-law's experience to the extent it's affected you, or any other attitudes, beliefs, potential biases that would make it difficult for you to be an impartial juror in this particular case?

THE JUROR: Yes. Dealing in financial I've seen a lot of people lose a lot of money in this recession. I feel that the real estate -- mortgage companies had a big effect in that by basically their practices by approving people for mortgages that they didn't think that they would be able to afford. So I kind of have a bias in that perspective. I think identity fraud is wrong. I mean, could it totally affect? Maybe -- I mean, I'm a criminal -- I studied criminal justice in college, so I know the court system and respect the system, and I understand that everybody is innocent until proven guilty, so --

THE COURT: Well, what we ask jurors to do in a case is to listen to the evidence in that case --

THE JUROR: Yeah.

THE COURT: -- make a judgment based on that evidence and the applicable principles of law, including the presumption of innocence as one, and to do that as fairly and as impartially as possible without being influenced by thoughts of other cases and other circumstances.

So the question is how -- you assess your own ability to do that going forward given your professional experiences and perhaps given your family incident of identity theft that you identified. So it's an assessment, in a sense, we have to rely on you to give us.

THE JUROR: I mean, I guess I could. I could -- yeah, I could.

THE COURT: Well, I'm not trying to talk you into it, I want an honest assessment.

THE JUROR: No, I could.

THE COURT: Okay. Let me ask you about the schedule of the case. The case will take several weeks to present. As we said yesterday, we know asking jurors to put things aside to serve causes some inconvenience and disruption, and that's particularly true the longer the trial is. But it's inevitable.

So apart from that kind of inevitable inconvenience

that everybody would have as part of a jury, is there anything over the next several weeks that would make it especially difficult for you to serve if you were seated on this jury?

THE JUROR: No.

THE COURT: Okay. Thank you.

THE CLERK: This is juror number 67, Luba Popovski. Step up here, ma'am. Watch your step. Thanks.

THE COURT: Hi.

THE JUROR: Good afternoon.

THE COURT: You had a chance yesterday to look over the potential witness list that we handed out?

THE JUROR: Yes, I did.

THE COURT: You didn't recognize anybody?

THE JUROR: No, I did not.

THE COURT: Let me ask you to think about the people who are closest to you, family members, household members, so on. Within that group has anyone, to your knowledge, ever been the victim of a fraud of any kind?

THE JUROR: Not that I'm aware of.

THE COURT: In particular, has anybody in that group been the victim of identity theft?

THE JUROR: No.

THE COURT: How about any other crime?

THE JUROR: Not that I'm aware of.

THE COURT: Has anybody in that group ever been

accused of a crime?

THE JUROR: No.

THE COURT: In a criminal prosecution every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence and proves the defendant guilty beyond a reasonable doubt. If you were a juror in this case, would you have any difficulty in accepting and applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No, I don't believe I would. But I do have a concern, though. With the longevity --

THE COURT: I'm going to come to that.

THE JUROR: I'm sorry.

THE COURT: We're two questions away from that.

THE JUROR: Okay, sorry.

THE COURT: Let me just ask you about the subject matter of the case. You heard in this case the government charges the defendants with conspiring or scheming to defraud in connection with certain real estate or mortgage transactions. That's the general area or subject matter that we're going to be hearing about. Is there anything in your personal experiences, beliefs, attitudes, potential biases that because of the nature or subject matter of the case that would make it difficult for you to be a fair and impartial juror?

THE JUROR: No.

THE COURT: Now let me get to the question of scheduling. As I said, it's going to take several weeks. And, as I said, we know it's an inconvenience for anybody to serve; there's some common level of inconvenience. In particular, we want to make sure whether there's something over the next several weeks that would make it unusually or especially burdensome.

THE JUROR: Okay. I called my job to find out they cover to a certain extent, and right now I support the household. I support my mother, who's on disability. So if it goes over that time and I'm not getting a routine paycheck, I'm paying the mortgage and everything. So it's a big concern of mine.

THE COURT: And you work for --

THE JUROR: Haemonetics in Braintree.

THE COURT: Okay. And environmental support engineer is what we have.

THE JUROR: Yes.

THE COURT: What kind of work is that?

THE JUROR: Well, they make medical devices, and essentially I make sure that the rooms are up to GMP's FDA's guidelines.

THE COURT: Okay, thank you.

THE JUROR: Okay. Thank you, sir.

THE CLERK: This is juror number 68, Teri Pierre.

Step up here, ma'am.

THE COURT: Ms. Pierre.

THE JUROR: Hi.

THE COURT: You had a chance yesterday to look at the list of potential witnesses?

THE JUROR: Mm-hmm.

THE COURT: You didn't see anybody you recognized?

THE JUROR: No.

THE COURT: You did answer a couple of the general questions affirmatively. Let me start with the first one I asked, whether there's any connection between you or somebody close to you in law enforcement.

THE JUROR: Mm-hmm.

THE COURT: Tell me about that.

THE JUROR: My father is a retired Secret Service agent. And then I have a cousin --

THE COURT: Let me stick with that for a minute.

Where did he work?

THE JUROR: Boston.

THE COURT: In Boston?

THE JUROR: Mm-hmm.

THE COURT: How long was he with the Secret Service?

THE JUROR: How long was --

THE COURT: Was he with the Secret Service?

THE JUROR: Twenty-five years maybe.

THE COURT: Is he doing something else now?
THE JUROR: Yeah, he lives in Florida.
THE COURT: I guess that's doing something.
And you started to say something else.
THE JUROR: I have a cousin that works on the Boston police force.
THE COURT: Is that a first cousin?
THE JUROR: Yes.
THE COURT: Okay. What's that person's name?
THE JUROR: Darren Bradshaw.
THE COURT: Okay. And how long has he been a member of the Boston Police?
THE JUROR: Maybe three years, two, three years.
THE COURT: Does he have police experience prior to Boston?
THE JUROR: No.
THE COURT: All right.
THE JUROR: And then I have someone that works in Customs, a cousin in New Jersey who works in Customs.
THE COURT: Okay.
THE JUROR: And then I have an uncle on the Cambridge police force.
THE COURT: And is he a patrolman, or does he have a higher rank than that?
THE JUROR: No, patrolman.

THE COURT: How long has he been doing that?

THE JUROR: Maybe 35 years.

THE COURT: Okay. This is a criminal prosecution, there will be law enforcement people on one side. Do you have any concern about your ability to be impartial in a case because of your relatives who have been on the law enforcement side of things?

THE JUROR: Uh-huh.

THE COURT: You have to answer no.

THE JUROR: Sorry.

THE COURT: Now, the other question was in connection with banking, lending, so on, real estate.

THE JUROR: Yeah. So I took a real estate exam maybe like four years ago. I didn't pass that. I'm not a licensed realtor.

THE COURT: Do you have an interest in the future?

THE JUROR: Possibly.

THE COURT: Right now you're working for Boston College?

THE JUROR: Right.

THE COURT: As Accounts Payable Assistant. General office work or --

THE JUROR: General office work. I audit and review expense reports, and I also print their checks for payment for outside vendors and employee travel and some student refund

checks as well.

THE COURT: I'm sorry?

THE JUROR: Student refund checks.

THE COURT: I didn't know there were such a thing.

Let me ask you about the people closest to you, people in your immediate family, people in your household, so on, so forth.

THE JUROR: Okay.

THE COURT: Within that group of people who are close to you, is there anyone, to your knowledge, who has been the victim of any fraud of any kind?

THE JUROR: Been the victim of a fraud of any kind?

When you say close to me, in my household?

THE COURT: It's how you define it, the people you feel very close to you. What affects them, affects you.

THE JUROR: Yes.

THE COURT: Tell me about it.

THE JUROR: My sister-in-laws, they had a case brought against by the government, against fraud and something.

THE COURT: Do you know --

THE JUROR: Do I know --

THE COURT: -- the details?

THE JUROR: I know it had something to do with real estate, but I don't know the details.

THE COURT: Well, let me back up. Your sister-in-law,

so how is that exactly --

THE JUROR: My husband's sister.

THE COURT: Sister?

THE JUROR: Sisters.

THE COURT: Plural.

THE JUROR: Yes.

THE COURT: How many?

THE JUROR: Two.

THE COURT: And they had a case brought against them of some kind?

THE JUROR: Right.

THE COURT: When was that and --

THE JUROR: Here.

THE COURT: Here meaning?

THE JUROR: Here, this building.

THE COURT: What are their names?

THE JUROR: Dotty Pierre and Charlotine Duverge.

THE COURT: Is that case still going on?

THE JUROR: Not that I know of. They've been sentenced.

THE COURT: They were convicted?

THE JUROR: Mm-hmm.

THE COURT: Of a real estate fraud?

THE JUROR: Yes.

THE COURT: Did you attend any of the court

proceedings or get involved at any point?

THE JUROR: Just when she was on the bracelet -- when she was on the bracelet, one of them -- I don't know, they had malfunction with the bracelet. Then she got brought in that day, and then they took her away because I guess they gave her some kind of leniency on the bracelet. I don't know, something like that. So that was the only day.

THE COURT: You may have said this, maybe I missed it, how recently was this?

THE JUROR: We're in 2010, so I want to say -- she had a baby in 2006, so probably 2006.

THE COURT: And do you know what the case was about underlying -- real world events.

THE JUROR: Real estate, identity. I didn't attend, you know.

THE COURT: Did your sisters-in-law have a business of some kind that they were working with?

THE JUROR: No.

THE COURT: Is this something they did as a personal transaction that they --

THE JUROR: A personal transaction for their benefit?

THE COURT: Yeah, was like it buying their own house or something?

THE JUROR: Yeah.

THE COURT: Did you, for example, attend the

proceedings when they were sentenced?

THE JUROR: No. Again, they had already been sentenced. But one of them had had a baby and she was released, like, on a bracelet maybe, like, for a suspended sentence I guess is what they call it. And supposedly her bracelet malfunctioned and they said that, you know, I guess that didn't work or whatever. And that last day when she had to appear again, they took her away. So, I mean, that's --

THE COURT: In this case the government alleges against the defendants they conspired or schemed to defraud people in real estate transactions and mortgage loan transactions.

THE JUROR: Mm-hmm.

THE COURT: The experience that you've just described of your sisters-in-law, is that likely to have any effect on your ability to be a fair and impartial juror in this case?

THE JUROR: I would say no because I didn't attend the proceedings. And again, I don't know from A to Z exactly what happened.

THE COURT: Okay. I had asked you whether anybody was a victim of fraud. You kind of, I guess, told me about somebody who had committed a fraud.

THE JUROR: Right. Oh, a victim --

THE COURT: Has anybody been on the other side of things, been the victim of any fraud?

THE JUROR: No.

THE COURT: Or of identity theft?

THE JUROR: Identity theft. No, not close to me that I can think of.

THE COURT: In a criminal prosecution such as this each defendant is presumed to be innocent unless and until the government proves otherwise by the evidence and proves guilty beyond a reasonable doubt.

THE JUROR: Right.

THE COURT: If you were a juror in this or any criminal case, would you have any difficulty in faithfully applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: Apart from your sisters-in-law's experience, is there anything about the nature of this case, subject matter, based on your own personal experiences or beliefs or attitudes or potential biases that would make it difficult for you to be an impartial and fair-minded juror in this case?

THE JUROR: No.

THE COURT: I've described yesterday in general to people about how we proceed, and on that schedule it's likely to last several weeks.

THE JUROR: Okay.

THE COURT: That's a fairly lengthy trial, and it requires jurors to put up with some disruption and inconvenience. Apart from the level that any juror would have of inconvenience, is there anything over the next several weeks that would make it especially difficult for you to serve as a juror in this case?

THE JUROR: For me personally -- for my employer there would be a problem.

THE COURT: Is it a problem that would impact you?

THE JUROR: What do you mean impact me?

THE COURT: Well, would you have any consequences at work?

THE JUROR: No. My co-worker that covers for me is going on vacation for next week and I'm her coverage. So that would be a problem.

THE COURT: Okay. Thank you very much.

THE JUROR: Thank you.

MR. WILD: May we have a moment, your Honor, so that I could confer with the agent in connection with the last --

THE COURT: Yes.

(Discussion off the record.)

MR. WILD: May I relate to the Court what the agent has informed me about the investigation that did take place?

I think you heard some of the facts. My understanding of it is that Dotty Pierre was the lead subject of the

investigation. She was arrested. Another girl was -- a woman was arrested and other family members as well. It involved a mortgage fraud sting operation, and so they were arrested as part of the sting incident itself. And it involved stolen identifications. The identifications were apparently obtained by an RN or someone in the nursing industry who provided the identifications that were used in connection with the mortgage fraud itself.

And so this juror clearly had family members who were intimately involved in the arrest and in the investigation, and it did involve stolen identifications.

THE COURT: I'm just trying to see if I can pull up the case.

MR. WILD: Approximately five years, your Honor.

(Pause.)

MR. WILD: And for the record, your Honor it, was a local prosecution by our office, our economics crime unit.

THE COURT: There it is.

(Pause.)

THE COURT: I believe I have the case. I mean, it requires some studying.

It looks like there are four defendants. It was in front of Judge Young. Disposed of in 2007. The docket number of the case is 05-10265. And one of the defendants is a Dotty Pierre, apparently represented by James Krasnoo, committed to

the Bureau of Prisons for a term of 60 months.

Another Frantzcia Pierre, apparently represented by James Budreau, committed to the custody of the Bureau of Prisons for 30 months.

And then there are some other defendants with surnames that are other than Pierre.

Anyway.

Okay. Let's continue. I'd like to finish the page. We'll take a break for lunch then and pick up probably around 2:00.

MR. BORENSTEIN: Judge O'Toole, is it your intention today to go until 5:00?

THE COURT: Or midnight.

MR. BORENSTEIN: I vote for 5:00.

THE CLERK: Juror number 69, Elizabeth Corcoran.

Step up here, ma'am.

THE JUROR: Thank you.

THE COURT: Ms. Corcoran, how are you?

THE JUROR: How are you?

THE COURT: Good. We gave everyone a list of potential witnesses yesterday. You looked it over, and it looks like you didn't find anybody that you recognized.

THE JUROR: Correct.

THE COURT: Okay. What's an ABA therapist?

THE JUROR: I work in a public school district working

with kids with special needs helping with, you know, behavioral issues or things like that.

THE COURT: What does the ABA stand for?

THE JUROR: Applied Behavior Analysis.

THE COURT: Thank you.

Let me ask you about the group of people who are closest to you, your immediate family, household members, people that you regard as really close to you. Within that group of people is there anyone, to your knowledge, who has been the victim of any fraud of any kind?

THE JUROR: Not to my knowledge.

THE COURT: In particular, has anybody in that group been the victim of identity theft?

THE JUROR: My husband.

THE COURT: Tell me when that happened.

THE JUROR: Several years ago. It was somebody who was a temp at an insurance company and they were temping there and I guess they got ahold of his Social Security Number.

THE COURT: And what happened?

THE JUROR: It got all cleared up --

THE COURT: How much use was the -- how much use was the illegitimate use of your husband's Social Security Number?

THE JUROR: It wasn't very much. It was just in the beginning when we found out.

THE COURT: Any other incident like that?

THE JUROR: No.

THE COURT: In that same group is there anybody who has been the victim of any other kind of crime of whatever nature?

THE JUROR: No.

THE COURT: And on the other side of things, has anybody in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case such as this every defendant is presumed to be innocent unless or until the government proves otherwise through the evidence and proves it beyond a reasonable doubt. If you were a juror in this case, would you have any difficulty accepting and applying the presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: As I mentioned yesterday generally about the subject matter, this case involves allegations by the government that the defendants conspired or schemed to defraud in connection with certain real estate or mortgage loan transactions. There may be evidence of identity theft in some circumstances. Understanding that that's the nature or subject matter of the case, is there anything in your personal experiences, including your husband's experience with the use of his Social Security Number, or anything else, beliefs or attitudes, potential biases because of the nature of the case

would make it difficult for you to be a fair and impartial juror?

THE JUROR: No.

THE COURT: I described the schedule that we will follow, and on that schedule it looks like the case is going to be several weeks. I believe that's relatively lengthy, and, as I said yesterday, significant imposition and burden on jurors, but it's a necessary one.

Apart from the inevitable burden that anyone would have in a lengthy case, is there anything that would make it especially difficult for you?

THE JUROR: Well, I have a plan to close on a house coming up. I'm not sure what time that will be, like time of day, but I guess if everybody gets dismissed at 1:00, it will be possible for me to do this.

THE COURT: Is this your first house purchase or --

THE JUROR: I purchased a home; this is our first house. I have a condo now. So we're moving up in the world.

THE COURT: And I just have to ask you about the parties to the transaction. Who's the lender, do you know?

THE JUROR: NE Moves, Northeast moves is the --

THE COURT: Is the real estate broker.

THE JUROR: Is the broker.

THE COURT: And how about the mortgage lender?

THE JUROR: No, that's the lender. Coldwell Banker,

the real estate agent is Coldwell Banker.

THE COURT: I see.

Okay.

Anything on that subject from anybody?

Okay. Thank you.

THE JUROR: Okay. What do I do now?

THE CLERK: Just wait right over there for one second, Ms. Corcoran.

THE JUROR: Sure.

THE CLERK: This is juror number 70, Jessica Piegorsch.

Step up here, ma'am, to the box.

THE COURT: Hi.

THE JUROR: Hello.

THE COURT: You had a chance to look at the witness list that we distributed yesterday?

THE JUROR: Yes.

THE COURT: And the only thing you circled is on page 4, the keeper of records for Bank of America. You circled Bank of America.

THE JUROR: I work for them.

THE COURT: That's because you have your personal accounts there?

THE JUROR: I work for them.

THE COURT: You work for them. Tech analyst. What's

that?

THE JUROR: I set up computer access for the bank employees.

THE COURT: So IT kind of work, is that it?

THE JUROR: Yeah.

THE COURT: Okay. And where do you work?

THE JUROR: Boston.

THE COURT: Yesterday you answered one of the general questions about connection with bank, real estate. Is it because of your own employment?

THE JUROR: Yes.

THE COURT: Any other connection?

THE JUROR: No.

THE COURT: How long have you worked for the Bank of America?

THE JUROR: Five years.

THE COURT: Let me ask you about the small group of people who are closest to you, immediate family members, household members, things like this. Has anybody in that group ever been the victim of any fraud of any kind to your knowledge?

THE JUROR: Not that I'm aware of.

THE COURT: Anybody in particular in that group ever been the victim of identity theft?

THE JUROR: Not that I'm aware of.

THE COURT: How about whether anybody in that group has ever been the victim of any kind of crime?

THE JUROR: Not that I'm aware of.

THE COURT: Has anybody in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case, as you probably know, every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence and proves guilt beyond a reasonable doubt. If you were a juror in this case, would you have any difficulty accepting and applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: Would I have difficulty? No.

THE COURT: As you've heard, the case involves allegations by the government that the defendants conspired or schemed to defraud in connection with certain real estate transactions or mortgage loan transactions. Given that subject matter as the general tenor of the case, is there anything in your personal experience, beliefs, your attitudes, potential biases because of the nature of the case that would cause you to have concern about your ability to be an impartial juror?

THE JUROR: I don't think so.

THE COURT: Let me ask you about the schedule.

We talked about the schedule a little yesterday, and I

said our estimate is the case will take several weeks to complete. Obviously that's something that's significant for any juror who sits on a jury that takes that long.

Apart from the general level of inconvenience that anybody would have on the jury, is there anything over the next several weeks that would make it especially difficult for you to serve as a juror?

THE JUROR: No.

THE COURT: Okay. Thank you.

THE JUROR: Am I all set?

THE COURT: Well, I don't know what happened to the clerk. Just go back -- I guess you can go to lunch actually, and then when you come back, go to courtroom 7.

THE JUROR: Okay, thank you.

Tom, can we have the next -- Patricia Lombardi.

MR. McALEAR: Juror number 71, Patricia Lombardi.

THE COURT: Ms. Lombardi, how are you?

THE JUROR: Fine, your Honor. Thank you.

THE COURT: You had a chance yesterday to look at the proposed witness list?

THE JUROR: That's correct.

THE COURT: You didn't recognize anybody?

THE JUROR: No, I did not.

THE COURT: Let me ask you about the group of people who are closest to you, as I described yesterday, family

members, immediate family, household members, anybody you would regard as particularly close to you. Within that group is there anyone to your knowledge who has been the victim of a fraud?

THE JUROR: No.

THE COURT: In particular, has anybody in that group been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anybody in that group been the victim of any kind of crime?

THE JUROR: No.

THE COURT: Reversing it. Has anybody in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal prosecution every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence and proves guilt beyond a reasonable doubt. If you were selected to be and serve as a juror on this case, would you have any difficulty in accepting and applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: You've heard yesterday the general tenor of the case, the government accuses the defendants of conspiring or scheming to defraud in connection with certain

real estate transactions or mortgage loan transactions. Understanding that's what the general subject matter that the case will be about, is there anything in your personal experience, your beliefs or attitudes or potential biases because of the nature of the case that would lead you to have concern about your ability to be an impartial juror?

THE JUROR: No.

THE COURT: Let me ask you about the schedule. I outlined the schedule yesterday, and on the schedule we'll follow it's estimated the case is going to take several weeks to present. That is a not an inconsiderable imposition on people. We recognize that. It's a necessary one. Apart from the inevitable level of inconvenience that any juror would have, is there anything on the next several weeks that would make it particularly or especially difficult for you to do that?

THE JUROR: Yes, and I'm hoping that the mercy of Court will be on me.

I am a grandparent who is a permanent guardian to a almost 14-year-old girl who has had a very troubled past. She's lived with me for the last four years. She has been in placements for trying to hurt herself. She's been under counseling for the last couple of years.

Tomorrow we are scheduled for our second meeting at the Dedham juvenile court. She wishes to be removed from my

home. I have no one else but myself to take care of her. Her father would be the only other person and currently, I hate to say this, he is actually being hospitalized for depression in a psychic ward in the state.

THE COURT: All right. Thank you very much.

THE JUROR: Thank you.

Your Honor, at any other point in my life, it would be something I would be willing to do.

THE COURT: I understand.

THE CLERK: Juror number 72 is Ramona Fryer.

Step up here, please.

THE COURT: Ms. Fryer.

Let me just ask you, I just want to confirm the information we have about you on our little sheet here. It says you're unemployed.

THE JUROR: Yes.

THE COURT: Have you worked in the recent past?

THE JUROR: Yes, I was just laid off in August.

THE COURT: What kind of work did you do?

THE JUROR: Sales.

THE COURT: What kind of sales?

THE JUROR: Technology sales, Dell, IBM, Xerox.

THE COURT: You had a chance yesterday to look at the list of potential witnesses?

THE JUROR: I did. My only issue is the dates.

THE COURT: We'll get there.

You didn't recognize anybody on the list?

THE JUROR: No.

THE COURT: Okay. Let me just ask you about the people who are closest to you --

THE JUROR: Okay.

THE COURT: -- family members, household members. Is there anyone in that group, to your knowledge, who has been the victim of any fraud of any kind?

THE JUROR: Embezzlement.

THE COURT: Tell me about that.

THE JUROR: My son was convicted of embezzlement.

THE COURT: Okay. He's the committer of the embezzlement.

I want to know if anybody has been -- in your circle been victimized of any fraud?

THE JUROR: No.

THE COURT: How about anybody in that group, has anybody been the victim of identity theft?

THE JUROR: No.

THE COURT: Or any other crime, any kind of crime?

THE JUROR: No.

THE COURT: Okay. Now, you started to tell me, I was going to -- my next question would be if anybody in that group had been accused of a crime. Your son was accused of

embezzlement?

THE JUROR: He was convicted of embezzlement.

THE COURT: When was that?

THE JUROR: Let's see, he was about 25. He was born in '67, in the '90s. Does that help?

THE COURT: All right. Generally what were the circumstances?

THE JUROR: He was working for a bank and managing an account for an elderly woman and trying to find money to buy a new house for him and his wife and new baby and took some of her money and paid his own bills. So he went to jail.

THE COURT: And where was the court that he was in?

THE JUROR: Hartford, Connecticut.

THE COURT: Was it a state court or federal court, do you know?

THE JUROR: Federal because it's a federal offense, I guess. I don't know.

THE COURT: Okay. And did you attend any of the proceedings?

THE JUROR: Oh, I did, of course. It was horrible.

THE COURT: Does it leave you with feelings that would affect you in as a juror in a case alleging fraud?

THE JUROR: Yeah, I mean, it kind of scars you forever, having to go through that sort of thing.

THE COURT: Well, let me just ask this. Every

criminal case a defendant is presumed innocent unless and until the government proves otherwise by the evidence and proves guilt beyond a reasonable doubt.

THE JUROR: He was clearly guilty.

THE COURT: If you were a juror in a criminal case, would you be able to faithfully apply the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: I'd like to think so, you know. I don't know how much that scarred me. I have some pretty bad feelings about it, but -- you know, I don't think he should have gone to jail, for example, but --

THE COURT: Okay.

THE JUROR: I was pretty mad actually at the whole thing.

THE COURT: That's understandable. But is that something you think might affect you if you sat on a case like this?

THE JUROR: I don't know. I'm not pleased with prosecutors in general.

THE COURT: Okay.

THE JUROR: I hate to say that, but I really --

THE COURT: We want to hear it if it's the case.

THE JUROR: I know.

THE COURT: This case is about allegations of conspiracy or scheming to defraud in mortgage loans or real

estate transactions.

THE JUROR: I know, I know.

THE COURT: Is there anything about the subject matter of the case based on your experience or beliefs that would make it difficult for you to be an impartial juror?

THE JUROR: Well, I think it's vile. I think I have pretty strong feelings against people who do that.

THE COURT: The question here is --

THE JUROR: I would listen to it all. You know, without knowing anything. As I stand here, you know, I just think it's heinous that people who do these things, but -- because we're so unable to protect ourselves against that kind of thing. You know, I worry about it all the time.

THE COURT: Let me ask you about the schedule of the case. The case is expected to take several weeks. That's a burden in general on any juror that has to sit. In the next few weeks would it be a burden that would be out of proportion to what others --

THE JUROR: Well, I've been saving and scrimping for this trip to Europe which is scheduled for October -- October. What month are we in? April 20th. We leave on the 20th, at 5:55 on the 20th, and we return May 1st, which is in the middle of this I would think, right?

THE COURT: And are you committed to that?

THE JUROR: Yeah, it's all long paid for.

THE COURT: Okay.

I'm going to let you go on your trip.

THE JUROR: Oh, thank you. Thank you. I appreciate it.

THE COURT: Okay. Counsel, let's spend -- near the top of the page, we already did the first two, I think, of the page.

Number 63, Mr. Haines.

MR. BORENSTEIN: A number of times he did say, and I have a quote from him, he has seen so much. It's hard to say he could follow the principles that you mentioned about presumption of innocence, proof beyond a reasonable doubt. He did certainly come back and say I think I can, but he raised so many issues, Judge. I'm going to ask that he be removed for cause. Haines, the court officer.

THE COURT: Anybody else?

MR. SWORMLEY: I'll opt out of that objection.

THE COURT: The government have anything?

MR. WILD: Well, we'll submit it to the Court. He seemed to answer the questions appropriately ultimately and indicated that he could be fair and impartial.

He did say at one point I think it's hard to say he had seen so much, and I don't want to ignore that note.

THE COURT: I don't think that indicates leaning one way or the other. He has seen a lot. If he's been primarily,

which it sounded like, in the district courts, he's seen relatively simpler cases. So I don't know there would be much -- I guess I don't think there's such taint there that I would excuse him.

Mr. Dearruda.

MR. BORENSTEIN: Need I say anything, your Honor?

THE COURT: I'll excuse him.

Ms. Lococo, number 65.

MR. BORENSTEIN: I'm going to raise an issue on cause for her, Judge.

Let's see --

THE COURT: Well, she's -- maybe I can trim this. She has young children as well. We've already excused a mother of four young children. I think to be evenhanded we have to do the same here.

MR. SWORMLEY: For the record, did you just excuse 64, Dearruda?

THE COURT: Yes.

MR. SWORMLEY: You did.

THE COURT: Yes.

MR. SWORMLEY: Excused.

THE COURT: 66, Michael Lambert.

MR. WILD: The government would point out, your Honor, that this is the one that the Court had to say, Well, geez, I don't want to be talking you into it.

He had so much difficulty with the concept of personally being totally fair in the case that it took a number of questions of inquiry and finally the point of almost he was relenting, Okay, I'll try to be fair. And I suggest that there's great question about how he actually feels. He tried to answer to the Court in a way that would be acceptable to the Court.

MR. SWORMLEY: I think you rehabilitated him admirably.

THE COURT: Well, I think -- I do think he was shaky, and he is in the banking industry to some degree. I think it's probably best to excuse him.

67, Ms. Popovski.

MR. SWORMLEY: I think you had -- I don't have a position, but in terms of for cause for hardship, she sounded like she was in the same boat as some of the others.

THE COURT: Hard to assess. She did say she was the sole support of her household.

MR. ULLMAN: My sense is that her employer, which is a large employer, would cover her for some period of time. It wasn't clear how long that period of time was.

THE COURT: Right. And then there's -- the government contributes something after that. It doesn't probably make up everything, but --

MR. ULLMAN: I'd be inclined not to excuse her at this

point. She may be one of those jurors that comes back at the end of the day or tomorrow morning after further inquiry, but she did specifically say she'd be covered for some period.

THE COURT: We might even find out what the employer's policy is. I think it's a public company, isn't it? Probably available.

Anyway. Okay. We'll leave her for now.

Ms. Pierre.

MR. WILD: The government has concern there, your Honor. The reason the Court asked questions about whether there are any victims, close family members and friends is to determine whether there is any potential for influence that the Court can discern. It's not just what the person says but what the Court can discern. And the same thing applies when the court asked the converse. It says flipping the coin over is there anybody who is among your close circle of family and friends who has been a defendant in a case. And what you have here is multiple family members in the courts of this building prosecuted by the government in this district for precisely the matters that are before the Court here, and that is mortgage fraud involving stolen identifications and with people who have gone to jail for significant periods of time, 60 months as I recall the Court reading as to Dotty Pierre and 36 months for the other Pierre. And we didn't read the others because they had different last names.

One of your last prospective jurors said my son was convicted and that, I think in her words, scarred her forever.

I can't imagine any of us, your Honor, with intimate family members that are prosecuted for exactly the thing they're asked to sit on in this court now not having influence from the fact that we know that intimate family members were convicted of exactly the same thing. Indeed, as a highlight to that, in the same building recently and received very significant sentences.

It's for the Court to discern, and I think the Court must discern in this case that Teri Pierre would have difficulties sitting on this case. Maybe not on others in other locations, but certainly in this case I think the Court must see that it would be a very difficult matter that could well be influenced by her personal experience with her family members.

MR. SWORMLEY: Your Honor, I mean, I understand Mr. Wild would not like to use any of his peremptory challenges, but she did say she could be fair and impartial.

If he wants to say that nobody that has been the victim of a crime should serve, then let's go back. There are some peremptories I don't want to have to use. I'm happy to, if that's the standard we're going to use, go back and visit other people who said that they could be fair and impartial despite the fact that they were victims of crimes.

I think that ultimately if she passes the muster that she did pass, which was that she could be fair and impartial, for you to look beyond that in an inquiry that Mr. Wild would like to do, well, then I think you need to do that inquiry to everyone else that is similarly situated that might have government leanings.

MR. BORENSTEIN: If I may add, she also indicated I think it was her father who worked for the Secret Service. She has a number of family members including the Cambridge Police, the Boston Police. So there's certainly a law enforcement component also.

THE COURT: My impression of her was that she was rather indifferent to the past proceedings, frankly. Actually, almost surprisingly so. So I think my impression was that she could be impartial. So I'll leave her.

Ms. Corcoran.

Anybody? No.

Ms. Piegorsch.

I think that's it.

MR. ULLMAN: Your Honor --

MR. BORENSTEIN: What about Lombardi?

MR. ULLMAN: Ms. Piegorsch is an employee of Bank of America. There are allegations in the indictment that my client's account was used -- at Bank of America was used as a means of the alleged fraud. And so if there's -- if there's

going to be any evidence of that, I would think that it puts this juror in the position of being potentially a juror whose employer is going to be portrayed as a victim.

THE COURT: Go ahead.

MR. WILD: There's no suggestion that Bank of America is a victim in this case. There was an account at Bank of America, just as there were accounts at Citizens Bank --

THE COURT: It doesn't seem like an important enough affiliation. Particularly given her position, which is apparently in the IT area, not even in the business side of things. So I -- denied I guess is the answer.

MR. SWORMLEY: Your Honor, I don't know if you admitted Ms. Lombardi. She had a for-cause --

THE COURT: It almost went without saying to excuse her. Excuse the last two, both Fryer and Lombardi.

So it leaves us with number 63, Haines; 67, Popovski; 68, Pierre; 69, Corcoran; 70, Piegorsch. Which I think is five, right?

THE CLERK: Yes.

THE COURT: Which gets us to 37.

John Swormley 37.

THE COURT: We're getting in the range. So we'll -- I'd like to keep this going. It's only a half an hour break, but I'd like to get going and begin again at 2:00.

THE CLERK: All rise. Court will be in recess.

(Recess taken until 2:07 p.m.)

MR. WILD: Your Honor, we would like to renew the issue of Ms. Teri Pierre with further information and with the Court making further inquiry.

Our concern is that none of the parties know what the relationship is or was between Ms. Pierre and the people who were convicted, as we do with the woman who told us it was her son and made clear what her direct relationship and feeling was. And I think we should make an inquiry as to whether -- what her real personal reaction to the conviction was and what the relationship was.

In addition, I have an additional piece of information to give the Court that I did not have to articulate before, and that is that Matt Galas, the FBI agent who is going to be in the courtroom with us under the rule as our lead investigator, was part of the arrest team when the arrest took place. He was at the arrest of Dotty Pierre and was part of the arrest and is on the witness list as part of the witness of the case and is the lead investigator who would be sitting across the courtroom from Ms. Pierre.

THE COURT: Was that case tried or was there a plea?

MR. WILD: Your Honor, I frankly don't know because we were discussing the matter in the office upstairs and didn't pull up the case.

THE COURT: All right.

MR. BORENSTEIN: If I can inquire, your Honor. Is his name on the witness list?

MR. WILD: Yes.

MR. BORENSTEIN: Presumably the juror reviewed it and answered honestly.

MR. WILD: But what we don't know is what other communications she may have either around the matter or during the trial that would indicate some knowledge of this individual, or when she discovers who he is, if he testifies, if there's any conversation that might influence her in the middle of the trial.

But I think it's a factor for the Court to consider as well, independently.

THE COURT: It looks like they were guilty pleas in the case.

So I know there were a couple of comments. Anything else from anybody?

MR. WILD: Your Honor, one other comment that I think the government should and wants to put on the record is that is in light of the association between the prior case involving exactly the same kind of charges as in this case involving a family member and so forth, this is not a discussion the government would be having at all if it weren't for the Batson issue. We're sensitive to it, and that's why we're raising this matter to the extent that we are with the Court.

This is a juror with this association that any prosecutor would almost in any event strike, but particularly where it involves the same charges.

THE COURT: But that's a reason why I'm not sure it's as big an issue. Because I don't think given what we know a peremptory could be challenged on Batson grounds under these circumstances. It's certainly palpable justification for it.

I know you're concerned about that. Maybe that makes you feel better that that's my view. But obviously, you know, we're sensitive to the composition of the jury. But cause or not, it seems to me that there's certainly adequate justification for exercise of a peremptory by the government of Ms. Pierre if they chose to do that.

MR. WILD: What we're asking at this point is just some additional inquiry to the impact that conviction had and the relationship between her and the defendants.

THE COURT: I think we covered it.

THE CLERK: Juror number 73, Carol Matyka.

THE COURT: Hi.

THE JUROR: Hi.

THE COURT: First of all, have you had a chance to look at the witness list that we gave everybody yesterday?

THE JUROR: Yes.

THE COURT: You didn't recognize anybody on the list?

THE JUROR: No, sir.

THE COURT: Now, you did answer a question yesterday about connection with banking, real estate, mortgage lending.

THE JUROR: Mm-hmm.

THE COURT: Can you tell us what that is?

THE JUROR: Many years ago, my first job out of graduate school I worked for the Federal Reserve. Do you want me to go into details?

THE COURT: What kind of work did you do?

THE JUROR: I was in their public information office. So I would translate some of the regulations that were -- that the Fed was responsible for, translate them so they could be understood by bankers and the lay public.

THE COURT: You mentioned graduate school. What is your academic training?

THE JUROR: Undergraduate degree in history and political science, and graduate degree in library information sciences.

THE COURT: And the little form we have to give basic information about jurors lists you as unemployed.

THE JUROR: Yes.

THE COURT: What was your last --

THE JUROR: I'm a health advocate.

THE COURT: Okay. And when did you last work in that capacity?

THE JUROR: In -- I left my job in February of '09.

THE COURT: And for whom did you work?

THE JUROR: My last paying job was with Up to Date. It's an online clinical information resource.

THE COURT: Thinking of the people who are closest to you, immediate family members, any household members, so on, to your knowledge has anyone in that group ever been the victim of a fraud of any kind?

THE JUROR: I don't believe so, no.

THE COURT: In particular, has anybody in that group ever been a victim of identity theft?

THE JUROR: No.

THE COURT: Has anybody in that group been the victim of any other kind of crime?

THE JUROR: A home break-in, my mother.

THE COURT: And when was that?

THE JUROR: That was about 17 years ago or so.

THE COURT: Briefly what were the circumstances?

THE JUROR: Suburban home break-in, somebody -- she went to the store and somebody broke into the house --

THE COURT: While she was away?

THE JUROR: While she was away.

THE COURT: Anyone apprehended or prosecuted?

THE JUROR: I don't recall that they were. I think they just thought it was kids in the neighborhood or something.

THE COURT: Has anybody in the group of people who are

close to you ever been accused of a crime?

THE JUROR: Yes.

THE COURT: Tell me about that.

THE JUROR: That would be me. A drunk driving charge.

THE COURT: When was that?

THE JUROR: Seventeen years ago.

THE COURT: And what was the disposition of the case?

THE JUROR: It was -- I resumed treatment and I've been sober ever since.

THE COURT: And where was that?

THE JUROR: In Lowell.

THE COURT: In a criminal case, as I'm sure you know, every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence, proves the defendant guilty beyond a reasonable doubt. If you were a member of the jury in this case, would you have any difficulty in applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: I don't believe I would.

THE COURT: The general subject matter of this case involves real estate and mortgage lending. The government accuses the defendants of conspiring or scheming to defraud by reason of transactions in real estate and mortgage loans, so on.

Understanding that's the general nature of the case,

the subject matter, is there anything in your personal experience, your beliefs, your attitudes, potential biases that because of the nature of the case would make it difficult for you to be an impartial juror?

THE JUROR: No, I don't think so.

THE COURT: The schedule of the case we discussed yesterday. As we said then, it's expected to last a few weeks, several weeks. We're not sure exactly, but we know it's not going to be a brief matter. That is an inconvenience and an imposition on jurors but it's a necessary one.

Apart from the level of inconvenience that any juror impaneled would have, is there anything over the next several weeks for you that would be a particularly serious burden?

THE JUROR: The only thing that I'm committed to is a speaking program for a conference in D.C. May 24th, fifth and sixth.

THE COURT: Okay.

Okay, thanks.

THE JUROR: Thank you.

THE CLERK: Juror number 74, Joyce Smith.

Step up to the box, please. Watch your step.

THE COURT: Ms. Smith. You had a chance yesterday to look at the witness list that we distributed?

THE JUROR: I did.

THE COURT: You didn't see anybody that you recognized

there?

THE JUROR: Not at all.

THE COURT: You did answer one of the questions yesterday when I asked about if you or anybody close to you had any affiliation with the banking, real estate, mortgage lending.

THE JUROR: Right. I worked as a temporary at one time, and I worked at a bank in the commercial lending department.

THE COURT: When was that?

THE JUROR: Between 1994 and maybe '96.

THE COURT: What was the bank?

THE JUROR: Andover Bank in Andover.

THE COURT: Any banking connection after that period of time?

THE JUROR: No, no.

THE COURT: Thinking of the people who are closest to you, immediate family, household members, and so on, is there anybody in that group, to your knowledge, who has been the victim of a fraud of any kind?

THE JUROR: Yeah, actually, my daughter had -- her ATM card was compromised, and she found out through one of the companies that -- it was -- I guess they had been asked to keep an eye on anything that comes quickly and wants to be -- a large expense item that comes quickly and wants to be shipped

overnight to an address that's not the billing address, and that's how she found out. And I actually --

THE COURT: Was that a debit card or something?

THE JUROR: It was a debit card.

THE COURT: So somebody was using it to purchase something?

THE JUROR: Correct. It was a computer, and whoever it was that was processing called and asked if she had ordered that computer to be delivered overnight at some place other than her address. And she said no. So that one was caught.

I myself on my American Express card had 14,000 and some-odd dollars charged to me in one day's transaction that was in Johannesburg, South Africa. Now, normally if I travel at all, I will call the credit card company and let them know there's going to be some activity. They didn't notify us. My husband saw it online and it was on my card, you know, the subsequent card, the secondary card. And took a while, but we got it taken off.

THE COURT: When was that incident?

THE JUROR: It was maybe two years ago. I think it really was tied into that T.J. Maxx thing. I have no way of knowing that for sure, but being that it was my American Express card, that would be my best guess.

THE COURT: And when was your daughter's experience?

THE JUROR: Maybe three, four years ago.

THE COURT: Has anybody in the group of people close to you been the victim of any other kind of crime?

THE JUROR: Not that I can think of. I mean, I'm sure if I thought about it long enough I'd come up with something.

THE COURT: Anybody in that group ever been accused of a crime?

THE JUROR: Not to my knowledge.

THE COURT: A defendant in a criminal case, as I'm sure you know, is presumed to be innocent unless and until the government proves otherwise --

THE JUROR: Correct.

THE COURT: -- by the evidence in the case and proves guilt beyond a reasonable doubt.

THE JUROR: Correct.

THE COURT: If you were to be seated as a juror in this case, would you have any difficulty in applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No, I would have no problem with that.

THE COURT: In general, this case is going to deal in the area of financial transactions. The government accuses the defendants of a conspiracy or a scheme to defraud in connection with real estate transactions and mortgage lending transactions. Understanding that's the subject matter involved in the case, is there anything in your personal experience --

oh, I should add, there may be evidence that in the course of proceedings there will be accusations by the government that there was some identity theft involved in what's alleged to be the scheme.

Now, in light of your experience with the cards and so on, but in light of anything else is what I want to know, anything in your experience or beliefs or attitudes, potential biases that because of the nature of the case might make it difficult for you to serve as an impartial juror in this case?

THE JUROR: I don't think so. I -- I mean -- you know, it's got to be with the evidence, I would think. Just because you're accused of something doesn't mean you did it.

THE COURT: Let me talk about the schedule. I told you how we proceed on our daily schedule. On that estimate -- on that schedule the estimate is it will take several weeks to present.

THE JUROR: Right, I understand that.

THE COURT: Everybody on the jury is going to be inconvenienced to some degree by that.

THE JUROR: Correct.

THE COURT: Apart from that common inconvenience level, is there anything over the next several weeks you would have planned that would make it a serious imposition for you?

THE JUROR: Not unless it got into June. Then I would be a little concerned.

THE COURT: All right, thank you.

THE JUROR: You're welcome.

THE CLERK: Next juror is Pyong Deletis, number 75.

Step up here, ma'am. Watch your step.

THE JUROR: Hi.

THE COURT: How are you?

THE JUROR: Okay.

THE COURT: You had a chance yesterday to look at the witness list, proposed witness?

THE JUROR: Yes, I have.

THE COURT: You didn't recognize anybody there?

THE JUROR: No.

THE COURT: I'd ask you to keep your voice up. The lawyers have to hear your answers as well.

THE JUROR: Okay.

THE COURT: If you want to use the mic, you can use that.

THE JUROR: I been asked to see you because I've been sick for the last three days. I have a really bad cold so I was going to ask to see you, but I couldn't see you anyway.

THE COURT: I'm sorry you're not feeling well. I'll keep this brief. Let me just ask you a few things.

JUROR: Okay.

THE COURT: I want you to think of the people who are closest to you, people in your immediate family or household,

so on, that circle of people who are close to you. And in that group is there anybody that you are aware of who has been a victim of a fraud of any kind?

THE JUROR: No.

THE COURT: In particular, has anybody in that group been the victim of identity theft?

JUROR: No.

THE COURT: Has anybody in that group been the victim of any kind of crime, whatever?

THE JUROR: Not that I'm aware of, no.

THE COURT: Okay. Has anyone in the group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence and proves guilt beyond a reasonable doubt. If you were a juror in this case, would you have any difficulty in applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: I don't think so, no.

THE COURT: In -- yesterday I gave a general overview of what the case is about, just to remind you, that the government accuses the defendants of a conspiracy or a scheme to defraud in connection with certain real estate transactions or mortgage loans, so on, so forth. So that's the subject

matter generally of the case. With that in mind, is there any -- do you have any personal experience, any beliefs or attitudes or potential bias that because of the nature or subject matter of the case would make it difficult for you to serve as an impartial juror?

THE JUROR: No, I don't think so.

THE COURT: Okay. Let me ask you about the schedule. I described the schedule we will follow during the course of the trial, and as a consequence the trial is going to take several weeks to try.

Apart from the inconvenience that any juror would suffer from having to be on a case that long, is there anything you have in the next several weeks that are planned or upcoming that would make it a more serious difficulty for you to do that?

THE JUROR: Yes.

THE COURT: Tell me about that.

THE JUROR: I'm going to France on April 27th.

THE COURT: France?

THE JUROR: Yes.

THE COURT: Okay. Is that a business trip or vacation?

THE JUROR: It's my anniversary so my husband and I are going to vacation.

THE COURT: Okay. And how long will you be there?

THE JUROR: Ten days.

THE COURT: Okay. That's enough. I'll excuse you.

THE JUROR: Thank you.

THE COURT: Enjoy your trip.

THE JUROR: Thank you.

THE CLERK: Daniel Smith, juror number 76.

Step up here, sir. Watch your step.

THE JUROR: How are you, your Honor?

THE COURT: Mr. Smith. Let me first begin with the witness list which you looked at yesterday, you reviewed. You didn't see anybody you recognized?

THE JUROR: No. It did make a reference to Citizens Bank on the second-to-last page. I was employed there for a period of time. I'm not familiar with that department or those people.

THE COURT: We're going to get to your experience, because that's one of the questions you answered yesterday when I asked generally, connection with banking. I see here you're employed by Sovereign Bank?

THE JUROR: I am.

THE COURT: What do you do?

THE JUROR: I work in the loan area in the satisfaction of mortgages and the UCCs.

THE COURT: Can you be a little more particular about that?

THE JUROR: Sure. When a loan is all set and needs to be removed from the bank, I'm one of the guys who goes ahead and discharges from the bank, after it's been completed, it's all paid off.

THE COURT: So you deal with the end of the loan?

THE JUROR: Correct, the very end.

THE COURT: Okay. How long have you been doing that?

THE JUROR: That's recent, sir. That's since just the first of the year.

THE COURT: And before that?

THE JUROR: I was over in another area that handled auditing those same loans when they came in just after they were closed -- after they were taken care of with the client, they would come into us, and we would audit them and put them away until the duration, until they were paid off.

THE COURT: So right after the loan was written you'd get involved?

THE JUROR: Yes.

THE COURT: So you've been at both ends.

THE JUROR: Yes.

THE COURT: How long did you do that?

THE JUROR: That's been about two-and-a-half years.

THE COURT: And before that?

THE JUROR: I did a little bit of underwriting before that, and before that I was a business banker.

THE COURT: And all with Sovereign or with different banks?

THE JUROR: Bank of America and Sovereign, a short stint with Citizens.

THE COURT: Can you give us dates on those, roughly?

THE JUROR: Let's see, I would say I think in probably mid-2003 with Citizens for a short time, then I moved on to Sovereign for seven years, then I went to Bank of America for about six months and then there was a downsizing and I went back to Sovereign.

THE COURT: And where is your office?

THE JUROR: Right down here on Morrissey Boulevard.

THE COURT: Okay. You also answered, I think, the other question I asked about law enforcement connection.

THE JUROR: Correct.

THE COURT: Tell me about that.

THE JUROR: My father is a policeman. He was a detective.

THE COURT: Where?

THE JUROR: New York State Police.

MR. BORENSTEIN: I'm sorry?

THE COURT: New York State Police.

They have to hear, too. You can talk into the mic if you like.

Is he still --

THE JUROR: No, sir.

THE COURT: Retired?

THE JUROR: Deceased now.

THE COURT: Okay. How long had he served as a state police officer, detective?

THE JUROR: Twenty -- I'm not sure, 20, over 20, 25, I think.

THE COURT: So as you were growing up was he a detective?

THE JUROR: Correct.

THE COURT: Obviously in a criminal case there's a prosecution side and defense side. The law enforcement will be on the prosecution side. The fact that your father was for many years a law enforcement person, would that have an effect on your ability to be an impartial juror?

THE JUROR: I don't think it would have any effect at all.

THE COURT: Let me ask you to think about those people who are closest to you, your immediate family, household, so on, so forth. Within that group, to your knowledge, has anyone been a victim of a fraud of any kind?

THE JUROR: No, not to my knowledge.

THE COURT: Has anybody in that group ever been the victim in particular of identity theft?

THE JUROR: No, not that I'm aware of.

THE COURT: Has anybody in that group been the victim of any kind of crime?

THE JUROR: I don't believe so. Not of this nature anyway.

THE COURT: Well, any kind. Property crime, personal violence crime, anything.

THE JUROR: I think handbag taken from a niece about 15 years ago.

THE COURT: Has anybody in that group of people close to you ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case such as this, as I'm sure you know, every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence and proves guilt beyond a reasonable doubt. If you were a juror in this case, would you have any difficulty in faithfully applying the principles of a presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No, not at all.

THE COURT: As you've heard, I think in my general description, in this case the government accuses the defendants of a conspiracy or scheme to defraud in transactions involving real estate and mortgage lending. You've been involved in some mortgage lending in some ways. Understanding that's the general subject matter of the case, is there anything in your

personal experiences, in your beliefs or attitudes, perhaps, potential biases that because of the nature of the case would make it difficult for you to be an impartial juror in this case?

THE JUROR: No, I feel I'd be open-minded about it.

THE COURT: Let me ask you about the schedule. On the schedule that we've outlined the case is expected to last several weeks. That's a fairly big commitment for jurors. It's one we have to ask them to make. It involves some disruption and inconvenience.

Apart from the necessary inconvenience that any juror would have, is there anything for you over the next several weeks that would be a particularly difficult burden if you were asked to serve?

THE JUROR: Nothing at all.

THE COURT: Okay. Thank you.

THE JUROR: Thank you, your Honor.

THE CLERK: Next juror is number 77, James Ehwa.

Step up to the box, please. Watch your step.

THE COURT: Hi. Yesterday you had a chance to look at the proposed witness list. You didn't recognize anybody on the list?

THE JUROR: No, sir.

THE COURT: You did answer one of the questions I asked about affiliations, either you personally or somebody

very close to you, and that was with law enforcement.

THE JUROR: I'm not sure if it was law enforcement. My wife works for the IRS.

THE COURT: Okay. Would you keep your voice up? The lawyers have to hear you, too, and you can use the mic if you want.

THE JUROR: My wife works for the IRS, International Examiner.

THE COURT: What does that involve?

THE JUROR: They go in and audit a company. The company does export business. They'll request an international examiner who specializes in import/export taxes. I thought that might have been a type of police thing.

THE COURT: I would rather you be overinclusive than underinclusive.

How long has she been doing that?

THE JUROR: The last 25 years.

THE COURT: Does any of that involve fraud investigations on her part?

THE JUROR: I don't know for sure.

THE COURT: Okay. And according to the information we have about you, it says you're an electrician.

THE JUROR: Yeah, I have my --

THE COURT: Are you self-employed?

THE JUROR: Yes, sir. I'm also a stay-at-home dad,

too.

THE COURT: Let me ask you to think about the people who are closest to you, immediate family, household members. To your knowledge has anybody in that group ever been the victim of any fraud of any kind?

THE JUROR: No.

THE COURT: In particular, has anybody in that group ever been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anybody in that group been the victim of any kind of crime?

THE JUROR: Yes, my wife was sexually molested when she was about six years old.

THE COURT: Okay. And was there a criminal prosecution as a result of that?

THE JUROR: Went to the police about it. This was part of the Catholic church thing. And when she described what happened to her, they recommended going but she said she didn't want to proceed.

THE COURT: And this was when?

THE JUROR: Six years ago.

THE COURT: Six years ago --

THE JUROR: Yes.

THE COURT: -- that the suggestion was that she prosecute?

THE JUROR: Yes.

THE COURT: The event itself was when?

THE JUROR: Oh, back when she was six years old, which would have been 1963.

THE COURT: More recently when people began to come forward in that respect --

THE JUROR: Yes.

THE COURT: -- it was suggested she might do so as well?

THE JUROR: Yes.

THE COURT: Okay. Has anyone in the close circle of people around you ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case, as I'm sure you know, every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence and proves guilt beyond a reasonable doubt. If you were a juror in this case, would you have any difficulty in applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No, sir.

THE COURT: As I described yesterday the general nature of the case, in this case the government charges the defendants with conspiracy or a scheme to defraud involving real estate transactions or mortgage loans or similar transactions. Given that that's the subject matter of the

case, is there anything in your personal experience, your beliefs or attitudes, potential biases because of the nature of the case that would make it difficult for you to be an impartial juror?

THE JUROR: No, sir.

THE COURT: As I said to people yesterday, the case is expected to last several weeks because of the volume of evidence that will be necessary. Probably got an idea of that from the length of the witness list.

Apart from the kind of inconvenience that any juror would have to be asked to serve on a case that goes that length of time, if you were asked to be serving over the next several weeks, is there anything that would be a particularly difficult burden for you above the ordinary?

THE JUROR: Other than I have an eight-year-old, no.

THE COURT: Well, will you be able to take care -- somebody take care of the eight-year-old?

THE JUROR: That would be hard.

THE COURT: Boy or girl?

THE JUROR: Girl.

THE COURT: Is she at school?

THE JUROR: Yes.

THE COURT: And so what would her daily school schedule be?

THE JUROR: A bus picks her up a little bit before

8:00 and then I pick her up at 4:00.

THE COURT: If we're sitting from 9:00 to 1:00, is that a problem?

THE JUROR: No, that shouldn't be -- well, I live in Bellingham, so I have to leave Bellingham at 7:00 to be at this court by 9:00. That's with good traffic.

THE COURT: Are you the only one that could see her to the bus or --

THE JUROR: Yes.

THE COURT: So the mornings would be a difficulty for you, is that --

THE JUROR: Yes. My wife usually starts -- she goes to her office by 7:00. Sometimes she can work at home, but for the most part she goes to her office.

THE COURT: Okay. And there aren't any other arrangements for the morning, any neighbors or anything like that, that could -- other kids going to the same bus stop or something like that?

THE JUROR: I couldn't say definitely I could get the neighbors to do it. We have neighbors that are down the end of the street -- I drive her to the bus stop. Neighbors about a tenth of a mile away, but --

THE COURT: Well -- okay. I guess --

THE JUROR: I never broached the subject with them.

THE COURT: Is it a serious problem for you? That's

the question. Is it something that you could work around?

THE JUROR: I think it's a serious problem.

THE COURT: All right, thanks.

THE CLERK: Next juror is number 78, Carol Carty.

Step up to the box, please. Watch your step.

THE COURT: Ms. Carty, how are you?

THE JUROR: Good.

THE COURT: You had a chance yesterday to look at the potential witness list here?

THE JUROR: Yes, I did.

THE COURT: And you I guess didn't recognize anybody on the list?

THE JUROR: No one on the list, no.

THE COURT: Before we get to some of the other questions, we have some sort of basic information about jurors, including employment. Yours says you're a finance supervisor for Sensata.

THE JUROR: Sensata Technologies.

THE COURT: What's the nature of the business?

THE JUROR: They actually manufacture OEM parts to automobile, aircrafts and such.

THE COURT: Okay. And what do you do as a finance supervisor?

THE JUROR: I actually evaluate credit for potential customers.

THE COURT: Okay. How long have you been doing that?

THE JUROR: Nine years.

THE COURT: Nine years.

Let me ask you to think about the people who are closest to you, immediate family, anybody who lives with you in your household, so on, so forth. With respect to those people, is there anybody in that group who to your knowledge has ever been the victim of any fraud of any kind?

THE JUROR: No.

THE COURT: In particular, has anybody in that group ever been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anybody in the group ever been the victim of any kind of crime?

THE JUROR: No.

THE COURT: The other side of that question, has any member of that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case such as this every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence and proves guilt beyond a reasonable doubt. If you were a juror in this case, would you have any difficulty in faithfully applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: I don't think so, no.

THE COURT: I described yesterday in general terms the nature of the case, the subject matter sort of, and just to remind you, the government accuses the defendants of conspiring or scheming to defraud by means of various real estate transactions and mortgage loan transactions and similar.

Understanding that's the general subject matter that the case would be about, is there anything in your personal experience, in your beliefs or attitudes, potential bias that because of the nature of the case would lead you to have a concern about your ability to be an impartial juror?

JUROR: No.

THE COURT: Let me ask you about the schedule of the case. As I said yesterday, it's estimated the case is going to take several weeks to try. That's a not small burden to put on jurors. It's one we have to do, and so everybody who serves on the jury is going to have some level of disruption and inconvenience and so on.

Apart from the common level that everybody is going to share, is there anything on the next several weeks that for you personally would make it an out of the ordinary or especially hard burden?

THE JUROR: I would have to say no, nothing.

THE COURT: Okay. Ms. Carty, thank you very much.

(Discussion off the record.)

THE COURT: Are you willing to proceed a little bit --

MR. SWORMLEY: He says he's going to be really quick.

THE COURT: Can Mr. Borenstein say something or not?

MR. SWORMLEY: I'm sorry, yes.

MR. BORENSTEIN: I have an urgent matter that I need to attend to briefly. Mr. Levin is willing to sit with Mr. Levine if you're willing to resume. I'll be no more than five or ten minutes.

THE COURT: Fine.

(Mr. Borenstein left the courtroom.)

THE CLERK: Next juror is number 79, Alexander Prenza Castillo.

Step up to the box, please. Watch your step.

THE COURT: Hi.

THE JUROR: Hi.

THE COURT: Yesterday you had a chance to look over the witness -- potential witness list that we distributed. Did you see anybody you recognized?

THE JUROR: No, I don't write anything.

THE COURT: Okay. Let me ask, we have some very basic information about potential jurors, including employment. For you it says, "private employee of the Schnitzer Steel Industries."

THE JUROR: Yes.

THE COURT: Can you tell me what you do?

THE JUROR: Maintenance.

THE COURT: Maintenance, okay.

THE JUROR: Sorry, my English not good, only speak Spanish.

THE COURT: Okay.

THE JUROR: When you talk, a little slow, please.

THE COURT: Okay. Yesterday when I was talking to the entire group, were you able to follow and understand what I was saying?

THE JUROR: No, I understand some, something, don't understand everything.

THE COURT: You did not understand everything, is that what you're saying?

THE JUROR: I not understand everything everybody said yesterday.

THE COURT: I'm sorry, you did or did not?

THE JUROR: Not.

THE COURT: *No entiende*.

THE JUROR: *No entiende*.

THE COURT: If you sat as a juror, would you able to follow what is being said or would you have trouble understanding?

THE JUROR: I don't understand.

THE COURT: Counsel -- I think we're going to have to excuse you --

THE JUROR: Yes.

THE COURT: -- under the circumstances. Sorry. Okay.

THE JUROR: Okay.

THE COURT: Thank you.

THE CLERK: Juror number 80, Vivian Paige.

Come up to the box. Watch your step.

THE COURT: Hi.

THE JUROR: Hi.

THE COURT: Yesterday we gave all potential jurors a possible witness list. You haven't circled anything. You didn't recognize any names on that?

THE JUROR: No.

THE COURT: Let me ask you to think about the people who are closest to you, immediate family members, household members and so on. Within that group, however you would define it, you know, your feelings for people, so on, is there anyone who to your knowledge, has been the victim of a fraud of any kind?

THE JUROR: No.

THE COURT: Has anyone in that group in particular been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anybody in that group ever been the victim of any kind of crime?

THE JUROR: Not that I know of.

THE COURT: Okay. Has anybody in the group ever been accused of a crime?

THE JUROR: Yeah.

THE COURT: Tell me.

THE JUROR: My son.

THE COURT: Your son?

THE JUROR: Yeah.

THE COURT: What was the offense?

THE JUROR: DUI.

THE COURT: When was that?

THE JUROR: About ten years ago.

THE COURT: Would you keep your voice up? The lawyers have to --

THE JUROR: I'm sorry. About ten years ago.

THE COURT: And that was where, in Massachusetts?

THE JUROR: Yes.

THE COURT: Was there a prosecution in the state courts?

THE JUROR: Yeah, if I remember right he got probation.

THE COURT: How old was he at the time?

THE JUROR: Forty-one.

THE COURT: And any other incidents of that for him or anybody else?

THE JUROR: A neighbor, but that's --

THE COURT: Okay. As a result of his run-in, in a sense, do you have any feelings about the criminal justice system or anything that would affect your impartiality as a juror in the case?

THE JUROR: Kind of.

THE COURT: In what way?

THE JUROR: Well, not that it affected him, but when I was in the court, I saw other people and I just didn't think they were being treated fairly by the judge. My own opinion.

THE COURT: Well, fair enough to have that opinion. The question is would it affect your judgment in this case?

THE JUROR: I don't know.

THE COURT: I mean, is it a strong enough feeling that you think it's, in a sense, near enough to the surface that as you heard a case that was completely different maybe in the circumstances but that it would still break through or --

THE JUROR: I don't know. I couldn't say yes, and I couldn't say no.

THE COURT: Okay. In a criminal case every defendant is presumed to be innocent unless and until the government proves otherwise on the evidence, proves guilt beyond a reasonable doubt. If you were a juror in a criminal case such as this, would you have any difficulty in applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: As you heard yesterday, this case involves allegations by the government that the defendants conspired or schemed together to defraud in connection with mortgage loans or residential real estate transactions. Understanding that's the general subject matter of the case, is there anything in your personal experience, beliefs, attitudes, potential biases that because of the nature or subject matter of the case would make it difficult for you to be an impartial juror?

THE JUROR: No. I worked for a real estate investment firm once.

THE COURT: And when was that?

THE JUROR: 1980 to '96.

THE COURT: What was the firm?

THE JUROR: Metropolitan Life.

THE COURT: And what kinds of things did you do there?

THE JUROR: I was an office manager.

THE COURT: Okay. So the answer to the question was the subject matter would not give you concern about your ability to be impartial?

THE JUROR: I don't think so.

THE COURT: Let me ask you about the schedule in the case. On the schedule we will follow the case is expected to last several weeks. That's without any question a burden on the jurors who have to participate and give up other things

they were doing. It's one that the jurors commonly share. What I'd like to know, is there anything in the next several weeks for you that would make it unusual or particularly burdensome to serve in that respect?

THE JUROR: Other than the fact that I have a serious bad back problem and my husband's handicapped, he's blind and has heart problems.

THE COURT: Tell me about your back problem.

THE JUROR: It's degenerative arthritis and a herniated disk.

THE COURT: Okay. And how does it manifest itself?

THE JUROR: It hurts constantly. Especially sitting down. And I had to call my doctor last night I was in such pain, it hurt so bad. I'm supposed to be getting a note from her.

THE COURT: And in your normal daily activities do you have to be moving around, is that it --

THE JUROR: Well, I can take medication at home. If I take it, if I'm going someplace I get groggy, can't concentrate.

THE COURT: Are you working?

THE JUROR: I work one day a week.

THE COURT: One day a week. And what happens then? Are you able to deal --

THE JUROR: I'm up and down a lot. I get up, I sit

down.

THE COURT: Okay. Thank you.

THE JUROR: Thank you.

THE CLERK: Juror number 81, Ronald Trinque.

Step up there, please.

THE COURT: Hi. You had a chance yesterday to look at the witness list we distributed?

THE JUROR: Correct.

THE COURT: You didn't see anybody on there that you recognized?

THE JUROR: No.

A lot of areas I recognized but not the people.

THE COURT: Who do you mean, "areas"?

THE JUROR: Florida, North Carolina.

THE COURT: Oh, I see, okay.

We have some sort of basic information on the sheet about potential jurors, which includes employment. For you it says "unemployed." Is that your current status?

THE JUROR: No, I'm -- I work for NES Clothing Company. I put that on additionally.

THE COURT: NES Clothing?

THE JUROR: Correct.

THE COURT: What's that?

THE JUROR: It's a large distribution company that either brings in clothing and they -- all the orders come in,

and I take and pick the orders and send them out to the various companies.

THE COURT: Send them to retail stores?

THE JUROR: Correct.

THE COURT: So it's coming in from --

THE JUROR: I work part-time.

THE COURT: Okay.

THE JUROR: I did retire in '62.

THE COURT: In '62 -- at age 62.

THE JUROR: I mean at age 62.

THE COURT: '62 was a long time ago.

THE JUROR: 2002.

THE COURT: What did you do before retirement?

THE JUROR: I was in education.

THE COURT: Doing?

THE JUROR: I taught school and I was an administrator.

THE COURT: Where was that?

THE JUROR: Town of Easton.

I have -- when you asked the second question yesterday, I was thinking of immediate people that had any real estate --

THE COURT: Yes.

THE JUROR: I have a daughter that's a paralegal that works for a real estate company. And I also --

THE COURT: Do you know the name of the firm?
THE JUROR: The first one is Atkinson but it's out of North Carolina.
THE COURT: Okay.
THE JUROR: And my accountant is also a real estate lawyer.
THE COURT: Who's that?
THE JUROR: Greg Medeiros.
THE COURT: And he is located where?
THE JUROR: In Middleboro, Mass.
THE COURT: Okay.
THE JUROR: So I just wanted to mention those two because I remembered that.
THE COURT: Okay.
Let me ask you about people who are in your close circle of family and friends, people who are the closest to you. Within that group is there anybody, to your knowledge, who has been the victim of any fraud of any kind?
THE JUROR: Not that I know of.
THE COURT: In particular has anybody in that group ever been a victim of identity theft?
THE JUROR: Not that I know of.
THE COURT: Has anybody in the group ever been the victim of any kind of crime?
THE JUROR: Not that they've confided to me.

THE COURT: Anybody in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: Every defendant in a criminal case is presumed to be innocent unless and until the government proves otherwise by the evidence at trial and proves guilt beyond a reasonable doubt. If you were a juror in this case, would you have any difficulty applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: I believe I might have one with this case.

THE COURT: Why?

THE JUROR: I've just -- I'm just too familiar. I've read a lot recently with this type of situation, and I'm really not too fond of what's happening.

THE COURT: In the case the government accuses the defendants of conspiring or scheming to defraud in mortgage or residential real estate transactions. That's the issue to be proved, the government has the burden of proof of that. The defendants are going to start out presumed innocent of that. But do you have any personal experience or beliefs or attitudes with regard to the nature of the case that you believe would interfere with your ability to be a fair and impartial juror in the case? Is that what you're saying?

THE JUROR: Yes, that's what I'm saying.

I just would say any of the examples the schemes that

have been going on recently, I really don't feel very well towards the people who --

THE COURT: Okay.

THE JUROR: That's the way -- I just been brought up that way. I just don't have --

THE COURT: Let me ask you about the schedule in the case.

The case is going to take several weeks probably to complete. Is there anything for you over the next several weeks that would make it a particular hardship to serve on the jury, more than any juror?

THE JUROR: I have two. One is I have a surgery with a surgeon for skin cancer scheduled, and I have --

THE COURT: When is that scheduled?

THE JUROR: In the next month or two. I just got the call yesterday I had this one removed. This is number 28.

THE COURT: Okay.

THE JUROR: And the other one is my son-in-law is going in for an operation, and I can't give you a date with this, and he is going to have renal -- removal of tumor in the renal area. And we're going down to my daughter's house and take care of the children so she can go with him.

THE COURT: Where is that?

THE JUROR: Florida. He's going to Michigan to have it done, as I know of right now.

THE COURT: Okay. Thank you, sir.

(Discussion off the record.)

THE CLERK: Next up is Juror No. 82, William Burke.

THE COURT: Mr. Burke.

THE JUROR: Good afternoon, your Honor.

THE COURT: You had a chance to look at the proposed witness list?

THE JUROR: I did.

THE COURT: You didn't see anybody you recognized there?

THE JUROR: Correct.

THE COURT: You did answer one of my questions about a question about law enforcement.

THE JUROR: I'm in local public health.

THE COURT: So this is about yourself then?

THE JUROR: Yes.

THE COURT: It says here you're the director of public health for the city of Beverly.

THE JUROR: That's correct. We do initiate court actions, district court, housing court, non-criminal dispositions, citations.

THE COURT: Enforcing the health code?

THE JUROR: Sanitary code and health code.

THE COURT: Does that have any effect on your ability to be an impartial juror?

THE JUROR: I don't think so.

THE COURT: Let me ask you to think about the people who are closest to you, family members, household members, anybody in that group. To your knowledge, have they ever been the victim of a fraud of any kind?

THE JUROR: Not that I'm aware of.

THE COURT: In particular, has anybody in that group ever been the victim of identity theft?

THE JUROR: Not that I'm aware of.

THE COURT: Has anybody in that group ever been the victim of any crime?

THE JUROR: I'm sure but --

THE COURT: Nothing that comes to mind?

THE JUROR: No.

THE COURT: Anybody in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case, as I'm sure you realize, every defendant is presumed to be innocent unless and until the government proves otherwise and proves guilt beyond a reasonable doubt. If you were a juror in this or any other criminal case, would you have any difficulty in applying the principles of the presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: As you've heard, the case involves charges by the government that the defendants conspired or schemed together to defraud in connection with mortgage loans, real estate transactions. Understanding that's the general subject matter of the case, is there anything in your personal experience, in your beliefs or attitudes, potential biases, that because of the nature of the case would make it difficult for you to be an impartial and fair-minded juror?

THE JUROR: No.

THE COURT: Let me ask you about the schedule in the case. As I said yesterday, this is going to be a relatively lengthy case. It's going to take several weeks to complete. We understand that's a burden on any juror who sits. It requires rescheduling and repositioning of things. Apart from that sort of inevitable inconvenience that any juror would have, is there anything for you over the next several weeks that would make it a substantially more serious burden?

THE JUROR: There is. Specifically, professionally, we do have a standing Board of Health meeting. It is posted for this coming month, which is a week from Thursday. As the director, I'm responsible for running the meeting.

THE COURT: When is that? What time of day?

THE JUROR: It is at 7:30 in the morning. It will run till midmorning. This time of year municipal budgets are being deliberated. I'm scheduled for a meeting with the mayor

tomorrow for my budget, which, as we know in these fiscal times, fighting with the department to hold onto what little we have.

Then, obviously -- obviously, with the fiscal constraints facing all agencies now, to be at a hearing or a meetings to fight for my department about sources of revenue for next fiscal year. There would be a standing Board of Health meeting come the following month.

THE COURT: Those meetings are in the mornings?

THE JUROR: Yes.

THE COURT: Any possibility of shifting them for a short period of time?

THE JUROR: They're standard through the community. Usually meet on a regular basis. So it's beyond -- it's not just my meeting. It's the Board.

THE COURT: How many people participate?

THE JUROR: It's a three-member board. This month's agenda, we have three parties coming in as well as we have to deliberate the budget. We've been asked to prepare two budgets: one with a 5 percent cut and one with a funding alternative. There's union issues we have to take into consideration.

THE COURT: Okay. Thank you.

THE JUROR: Thank you. Also, family vacation a week from Thursday.

THE COURT: A week from Thursday is?

THE JUROR: I think it's the 15th.

THE COURT: For how long?

THE JUROR: A week.

THE COURT: Okay.

THE JUROR: Thank you.

THE CLERK: Next juror is No. 83, Elizabeth Tibbert.

THE COURT: Miss Tibbert. You had a chance yesterday to look at the lists of proposed witnesses?

THE JUROR: Uh-huh.

THE COURT: Didn't recognize anybody?

THE JUROR: I did not.

THE COURT: You did answer one of the questions that I asked, I think, about connection with banking or real estate or mortgage lending or something like that. Can you tell me about that?

THE JUROR: Yes. My mother worked in real estate for approximately about ten to fifteen years, both in the state of Massachusetts and in Florida.

THE COURT: Was that as a broker?

THE JUROR: She was a realtor.

THE COURT: You yourself ever worked in the --

THE JUROR: No.

THE COURT: Was she employed -- self-employed or employed by somebody else?

THE JUROR: I know that up here she was employed by Century 21. And then down in Florida it was a smaller realty, two different realties, one in Fort Lauderdale and one in Jupiter.

THE COURT: I want you to think about the people who are closest to you in your family or household or so on. In that group is there anyone, to your knowledge, who has ever been the victim of a fraud of any kind?

THE JUROR: Not to my knowledge.

THE COURT: In particular, has anybody in that group ever been the victim of identity theft?

THE JUROR: I've personally had credit cards stolen and used, but that's --

THE COURT: No --

THE JUROR: So, yes.

THE COURT: When was that?

THE JUROR: 2001.

THE COURT: Tell me a little about it.

THE JUROR: My car got broken into and my purse was stolen. I had somebody take two of my credit cards and one of my bank cards and used them for a day before they got canceled. But nothing -- no new accounts were opened. It was just that instance.

THE COURT: Anybody ever apprehended or anything?

THE JUROR: No.

THE COURT: Were you out of pocket anything?

THE JUROR: Yes.

THE COURT: How much?

THE JUROR: Only about a hundred -- yeah, about a hundred, not including other things that were stolen from the vehicle.

THE COURT: Has anybody in that same circle of people, close to you, been the victim of any other kind of crime?

THE JUROR: Possibly, but off the top of my head, I can't think of anything.

THE COURT: Anybody in that group ever been accused of a crime?

THE JUROR: Not to my knowledge.

THE COURT: In a criminal case, such as this, every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence. The government has to prove guilt beyond a reasonable doubt. If you were a juror in this case, would you have any difficulty in applying the principles of the presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: I indicated yesterday the general gist of the case or the subject matter. The government accuses the defendants of conspiracy or scheming to defraud in connection with certain residential real estate transactions and mortgage

lending and so on. Understanding that's the subject matter that will be addressed, is there anything in your personal experience, in your beliefs or attitudes or potential biases that because of the nature of the subject matter of the case would make it difficult for you to serve as an impartial juror?

THE JUROR: It's a topic that's been in the news a lot. It's hard not to read a good deal about it. Obviously, I still have memories of various stories that have been told either on radio or on television that it's hard to forget. But given the fact that it's something that needs to be looked at completely separate from that, I suppose there's really no other way of doing it.

THE COURT: The question is whether you would be able to make a judgment based on the evidence in the case as opposed to ideas you might have from newspaper stories.

THE JUROR: Well, yes.

THE COURT: You would be?

THE JUROR: Yes.

THE COURT: You would be able?

THE JUROR: Yes.

THE COURT: Let me ask you about the schedule in the case. We estimate that on the schedule the case is going to take several weeks to present. That's a burden to anybody who serves as a juror, obviously. Is there anything in the next several weeks for you personally that would make it an

out-of-the-ordinary kind of burden, make it especially difficult?

THE JUROR: Can I ask for a little bit of a clarification on schedule? Would this be from 9 a.m. to 1 p.m.?

THE COURT: Generally, yes, until deliberations begin, so the bulk of the trial. It's a multi-week trial. Most of the weeks will be 9 to 1.

THE JUROR: I have other people who are going to be out of the office on vacation, whose work I'm going to have to pick up the slack for. I'm assuming that's across the board with anybody else that's here today, but nothing out of the ordinary.

THE COURT: Okay. Thank you.

MR. SWOMLEY: Your Honor.

THE CLERK: Next juror is No. 84. Michael Collins.

THE COURT: Want them back out?

MR. SWOMLEY: No, it can be later.

THE COURT: Mr. Collins, how are you?

THE JUROR: Good. Yourself?

THE COURT: Good. You looked over your witness list?

THE JUROR: I have.

THE COURT: You have selected the name of Paul Durand of Marshfield.

THE JUROR: Yes. I thought about that all last night,

and it wasn't the name I thought it was. The name was Paul Drummond. That can be nixed.

THE COURT: Okay. You also answered one of the questions I asked of the group yesterday which was about affiliation with law enforcement, you or somebody close to you.

MR. COLLINS: I have an uncle that's the chief investigator of the Alcohol Beverages Association of Massachusetts, and my father is an investigator for the IRS.

THE COURT: Where does your father work?

THE JUROR: Quincy. I can't remember the name of the office right now.

THE COURT: Do you know what his work involves? You say he's an investigator.

THE JUROR: Over the years I know he's done different investigations, issues with taxes, red flags with taxes. My mother also works for the IRS, but she's in property management.

THE COURT: Is he a tax examiner or on the enforcement side?

THE JUROR: No. He's in the investigation. I know his title has changed a few times over the years. He's been on 30-some-odd years.

THE COURT: This case, which is a federal prosecution, there are federal law enforcement officers involved. Your father is broadly considered to be one. Would that give you

any concern about your ability to be an impartial judge of the evidence in the case?

THE JUROR: I probably tend to side with people in federal situation -- or federal positions due to the fact that a lot of my family has worked for the federal government. I know they're all good people, and all the people I met through them are all good people. I tend to side with somebody who works for the federal government due to the fact that everybody I've met in the federal government has always been good to me.

THE COURT: Let me ask you about the people who are closest to you, family members, members of your household and so on. Anyone in that group ever been the victim of a fraud of any kind to your knowledge?

THE JUROR: I've had issues with my credit cards being stolen.

THE COURT: You yourself?

THE JUROR: Yes.

THE COURT: Tell me about that.

THE JUROR: It was before this winter so, like, October, November of last -- of 2009. I had a bunch of different charges on my credit card that weren't from me. I had to go through the process of sending affidavits saying it wasn't me, that somebody along -- probably through the internet, I guess, was -- compromised my card and used my card for fraudulent purchases.

THE COURT: Didn't cost you any money?

THE JUROR: No. The credit card company took care of it.

THE COURT: Anybody else in your circle that you know of that has had an experience like that?

THE JUROR: Not that I can recall.

THE COURT: Anybody in your close circle of family or friends ever been the victim of any other kind of crime, any crime?

THE JUROR: Nothing major.

THE COURT: Anybody been accused of a crime?

THE JUROR: My brothers -- my brother, excuse me. He was accused of burglary.

THE COURT: When was that?

THE JUROR: Two years -- two and a half years ago.

THE COURT: Was he prosecuted?

THE JUROR: The case was continued without a finding. He was put on probation for two years.

THE COURT: What were the circumstances?

THE JUROR: He supposedly had broken in a car to steal items with two or three other gentlemen, at night.

THE COURT: In a criminal prosecution, including this one, every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence and proves guilt beyond a reasonable doubt. Would you have any

difficulty in abiding by the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: I ask you particularly in light of what you said earlier, that you might tend to favor the federal officers' side of things.

THE JUROR: I would but -- I'd more lean towards them. In a situation of viewing somebody off the bat, there's no judgment off the bat if that's what your question is asking. In a whole spectrum of questions, I'd tend to side with law enforcement, yes.

THE COURT: The subject matter of the case is going to involve charges that the defendants conspired or schemed to defraud in connection with real estate or mortgage lending. Understanding that's the topic or subject matter of the case, do you have any personal experience or any beliefs or attitudes about that subject matter which would affect your ability to be impartial in the case that involved that subject matter?

THE JUROR: Nothing major, no.

THE COURT: Anything minor?

THE JUROR: I mean, I have issues with the mortgage crises that have gone on throughout the country. It's one of the reasons for the economic issues we're having right now. But I think everybody does now.

THE COURT: The case is expected to last several

weeks. That's a burden on anybody that serves as a juror, and it's one that all jurors in some sense share. But is there anything that, if you were called to be a juror in this case, that would make it especially difficult?

THE JUROR: Yes, affording my rent. I pay 85 to 90 percent of all of our bills and the rent. I live with my girlfriend. There's no way I could do that with the stipend given by the state -- the federal government. She doesn't work. She's in school.

THE COURT: You're an electrician's apprentice?

THE JUROR: I am.

THE COURT: That's a wage job?

THE JUROR: Yup, I get paid hourly.

THE COURT: You wouldn't be paid if you didn't work, is this it?

THE JUROR: Correct.

THE COURT: Okay. Thank you.

I'm sorry, Mr. Swomley.

MR. SWOMLEY: Your Honor, the only thing I wanted to bring to your attention, the last witness, who worked for the Department of Public Health, Mr. Appolon's wife is Director of Human Resources at Harvard. That juror clearly doesn't know him by name, but she goes by a maiden name and may not -- may be a witness or may be --

THE COURT: We can call him back and ask him if he

knows -- what's Mr. Appolon's wife's name?

MR. SWOMLEY: Alexis Harding.

THE COURT: I think she's on the list.

MR. SWOMLEY: Yes. I'm just raising that as an issue.

THE COURT: She's on the witness list. I think maybe we can leave it.

Going down from the top of the page, No. 73, Miss Matyka? No problem.

Miss Smith? No.

I have excused Miss Deletis.

Mr. Smith, 76? No.

Mr. Ehwa?

MR. SWOMLEY: Hold on. Your Honor, if I may, with respect to Mr. Smith, he does deal with auditing right after the loans come in and has worked for at least two of the banks that are, if not part of the fraud, at least part of the witnesses concerning them. And his father is a detective for over 20 years.

MR. LEE: New York State Police.

MR. SWOMLEY: My suggestion is that he knows -- has the particularized knowledge of the industry and, in that respect, either further inquiry should be asked of him whether or not he will be able to put aside his own knowledge of the industry in order to consider only the evidence that's put in front of him and through the court process. Other than that, I

would ask that he be struck for cause.

THE COURT: Okay. Mr. Wild?

MR. WILD: I think we'd essentially submit, but I would add the additional note that he did do underwriting, apparently, and presumably he does know the procedures and in the auditing would have done look-back procedures. He may -- we didn't flesh those out with the Court when he was here, but he may know things or impute things from his own knowledge into the evidence of the case. But we'll submit the matter to the Court.

THE COURT: I don't think general familiarity with the topics is itself disqualifying. He seemed pretty vanilla on that subject.

MR. SWOMLEY: I think he has specific knowledge. I don't think he's generally. If he was dealing with the auditing right after a loan came through, if he does essentially some of the fact checking, that would or could have been done in this case.

THE COURT: I mean, it would be different if he knew something about the documents or the loans in this case. But just to know that there are loans and how you process them, I don't think that's particularly skewed one way or the other.

MR. SWOMLEY: Can I ask, you're not requiring that the government's witnesses be qualified as experts, right? And so if someone who's not testifying as an expert, not holding

themselves out as an expert, resonates with someone who also is not an expert but has the exact same basis of the knowledge as the witness that the government puts forward, I think there is an issue with respect to how that juror approaches the knowledge that they're going to adopt.

Certainly, they are not allowed to adopt -- I mean, as a -- well, the theory behind an expert would be that beyond the average knowledge of the average juror. And my problem with this particular witness is he's got more than the average knowledge. And if the government's not required to put on an expert, I don't like this quasi-expertise filtering to the jury through another juror.

THE COURT: It may be that I don't know the details of what the proof might be. I mean, I don't know to what extent it calls for expert understanding and so on, in other words, that might affect what we do with this juror. I mean, is there going -- is the jury going to be asked to interpret documents, to see things from the internal make-up of the documents that something is kosher or not kosher or routine or not routine or whatever?

MR. WILD: Yes, your Honor. I'd like to back up just a half step because the government first proposed -- I'll take Mr. Pannone, for example, as someone who didn't need to qualify as an expert to testify to the standards and the normal practice of the mortgage loan processing industry. There was

an objection from the defense that he is an expert and he must be qualified as an expert. We addressed it with the Court, and the Court said in the event that he's going to testify, since he can qualify as an expert, why don't you just go ahead and qualify him as an expert and the issue is moot.

So we were treating it as that may be how we end up, but we were reserving the argument that he didn't need to qualify as an expert in the first place. So I would want to just make sure we're clear on what defense counsel has just said, that the Court is not requiring us -- I think that may be the Court's position.

THE COURT: I guess my question is more whether issues in the case turn on what the jurors understand documents mean beyond what might be irrefutable from just reading them; in other words, some sort of analysis or understanding of the documents as opposed to the fact that they contain a dollar amount and a certain figure, so that they contain somebody's signature or something like that. Is there going to be something the jurors will be asked to decide about, what the meaning of Box 89 is in light of Box 73 or something like that?

MR. WILD: Not in that context, your Honor. It only goes this far and only this far. One of the elements of the fraud, of course, is materiality. And so we have witnesses prepared to say, yes, of course, that would have been material to represent that they were going to be occupants of the

property when they weren't because that affects whether they could get a hundred percent financing, whether they could get variable rates versus fixed rates, whether the loan would have been funded at all, that sort of thing.

They're going to be told about the factors that are imputed into the documents when the documents say what they say. So if, for example, the document says "occupancy" or "owner occupied," that has a meaning to the lender. If the document says the purchase price is $520,000 when, in fact, the purchase price was $430,000, that has a material meaning to the lender. But I think it's only in that context that the jury's going to be called upon to, if you will -- and I'll put it in quotes -- "interpret" anything out of that. But there will be testimony saying here's why that kind of factor is material in the loan application.

THE COURT: Well, I guess there's a close question. I think we're maybe -- we're better off without him.

Okay. Mr. Ehwa seems to have a childcare problem, so I guess we'll excuse him.

Miss Carty? No issues.

Miss Paige has a back problem, which I think we have to accommodate. Sounded severe, that she would not be able to stay with us.

Mr. Trinque, Trinque, No. 81?

MR. WILD: May I have just a moment, please?

Your Honor, my note indicated to me that I anticipated you would strike Mr. Trinque on hardship grounds: taking care of the grandchildren in Florida.

THE COURT: Right. Yes, I will.

Mr. Burke, Public Health Director?

MR. SWOMLEY: He had a family vacation a week from Thursday.

THE COURT: That's right, he does. We'll have to excuse him.

Miss Tibbert?

And Mr. Collins?

MR. BORENSTEIN: He had the financial hardship, Judge O'Toole. And he also is the gentleman with -- his father's an investigator for the IRS.

THE COURT: I'll excuse him for the self-employment area.

That leaves us, on this page, with 73, 74, 78 and 83.

MR. LEE: Could you repeat the first one, Judge? I'm sorry.

THE COURT: 73. These are people who remain: 73, 74, 78 and 83. That gets us to 41. I should tell you that we had a couple of noises from people that have already passed, so we may have to go a little above 44. We don't know yet. Let's do the next page and that should be enough, I hope.

THE CLERK: Next up is Juror No. 85, Elaine Berube.

THE COURT: How are you?

THE JUROR: Hello.

THE COURT: You had a chance to look at the proposed witness list?

THE JUROR: Yes.

THE COURT: Didn't recognize anybody on the list?

THE JUROR: No.

THE COURT: You did answer a couple of my questions yesterday to the group about you or somebody else affiliated with, first, law enforcement. Would you tell me about that.

THE JUROR: My son was a constable for a few years, three years, and he's got --

THE COURT: Where was that?

THE JUROR: In Lowell.

THE COURT: Middlesex County?

THE JUROR: Yes.

THE COURT: What he's doing now?

THE JUROR: He has a criminal justice degree. He is now -- I forget exactly, something in the computer fields. He also worked for Citizens Bank and has applied for their accounting department and ultimately their bank fraud department where he's got the criminal justice degree and accounting degree.

THE COURT: Okay.

THE JUROR: And that was that part of it. The

personal part is my mother that I'm concerned with. She is in a nursing home now. She lived with us for a while, but she has Parkinson's for over 30 years, and she can't feed herself. So I go daily to feed her because she can't swallow. The muscles just don't pull the food down. She's on pureed food, but even that doesn't always want to go down. The nurses will try to feed her, but they don't take the time that it needs. So I go to feed her. So that's my big --

THE COURT: How many times do you go to feed her?

THE JUROR: Once or twice a day. My sister tries to go at night, but she lives a half hour away, so it's not always easy for her. Our big concern is that she's lost over 40 pounds. She's down to, like, 90 pounds. You know, we keep trying to get as much into her as we can.

THE COURT: Your practice is to go there during the day, is that it?

THE JUROR: Uh-huh, and sometimes at night.

THE COURT: Okay. Let me ask you -- maybe you've answered both of them, both the other question you answered yesterday about banking, real estate -- is that also your son and his plans with Citizens?

THE JUROR: Yup, uh-huh.

THE COURT: I think, in light of the circumstances of your mother, I'm going to excuse you from service.

THE JUROR: Thank you. That was what I was most

concerned about.

THE CLERK: The next juror is Juror No. 86, Virginia Warren.

THE COURT: Yesterday you had a chance to look at the list of potential witnesses. Looks like, from no circles, that you didn't recognize anybody?

THE JUROR: No.

THE COURT: Let me ask you to think about the people who are closest to you, immediate family members, household members and so on. Has anyone in that group, to your knowledge, ever been the victim of a fraud of any kind?

THE JUROR: No.

THE COURT: Has anyone in that group ever been -- in particular, ever been a victim of identity theft?

THE JUROR: No.

THE COURT: Anybody in that group ever been a victim of any other kind of crime?

THE JUROR: Been a victim, no.

THE COURT: Has anyone in that group ever been accused of a crime?

THE JUROR: You mean been arrested?

THE COURT: Yes.

THE JUROR: Yes. My son.

THE COURT: Just come over to the mic.

THE JUROR: My son.

THE COURT: When was that?

THE JUROR: This last September.

THE COURT: What was the charges?

THE JUROR: DUI and speeding.

THE COURT: Has it been disposed of or pending?

THE JUROR: No. It's been disposed of. We're still appealing everything.

THE COURT: Where was that?

THE JUROR: In Peabody.

THE COURT: Peabody District Court?

THE JUROR: Yes.

THE COURT: Does that experience leave you with any feelings about the criminal justice system?

THE JUROR: Oh, yes.

THE COURT: That would affect your ability to be a fair juror?

THE JUROR: Definitely.

THE COURT: In what way?

THE JUROR: In a way, I just felt that rulings were unfair. What was supposed to happen didn't happen. He ended up with jail time when it was supposed to be loss of license. So it's still being -- we had to hire a lawyer and going through all that. Lost his job.

THE COURT: Would those feelings affect your ability to be a fair juror in this case?

THE JUROR: Yes.

THE COURT: Okay. Thanks. I'll excuse you.

THE CLERK: Miss Warren, hang on one second, please.

Next juror is No. 87, James Aiello.

THE COURT: Mr. Aiello, how are you?

THE JUROR: Your Honor.

THE COURT: You had a chance to look at the proposed witness list yesterday?

THE JUROR: Yes, sir.

THE COURT: You didn't recognize anybody on the list?

THE JUROR: No.

THE COURT: You answered one of the questions I asked yesterday about connection with law enforcement. I see from the form you yourself are a corrections officer?

THE JUROR: Yes, sir.

THE COURT: Was that the reason for your answer?

THE JUROR: Yes, sir.

THE COURT: Anybody else in your circle involved in law enforcement?

THE JUROR: Family members.

THE COURT: Who?

THE JUROR: Locally, no one.

THE COURT: How long have you been a corrections officer?

THE JUROR: Eighteen years.

THE COURT: Did you do anything before that?

THE JUROR: College.

THE COURT: Where are you stationed?

THE JUROR: I'm in the Middlesex Sheriffs Office, Billerica House of Correction.

THE COURT: Have you been there for the 18 years?

THE JUROR: Yes, sir.

THE COURT: What are your general duties?

THE JUROR: I'm a captain in charge of the Inner Perimeter Security Unit.

THE COURT: Would your services as a corrections officer affect your ability to be an impartial juror in a criminal case?

THE JUROR: I would like to say no, but I'm not a hundred percent sure.

THE COURT: Is there any particular reason you think you may not be able to or you just --

THE JUROR: Just playing for one team for so many years. It tends to taint you.

THE COURT: You think you'd tend to drift towards that side?

THE JUROR: I'd like to say no but honestly --

THE COURT: Every defendant in a case is presumed to be innocent unless and until the government proves otherwise by the evidence and proves the person is guilty beyond a

reasonable doubt.

THE JUROR: Yes, sir.

THE COURT: Do you think you would have difficulty in respecting and applying those principles in a criminal case?

THE JUROR: No.

THE COURT: This case involves charges by the government that the defendants conspired or schemed to commit fraud in connection with real estate -- residential real estate and mortgage loan matters. Knowing that that's the subject matter, is there anything about that subject matter, based on your personal experiences or beliefs or attitudes, that would affect your ability to be an impartial juror because of the nature of the case?

THE JUROR: No.

THE COURT: Has anyone in your close circle, family or friends, ever been the victim of fraud to your knowledge?

THE JUROR: Identity theft basically.

THE COURT: Tell me about that.

THE JUROR: Both me and my wife. I think me -- we ordered a part off the internet actually for our computer. Imagine that? And the place was in, like, New Mexico. And lo and behold, they stole my identity. I got -- I never lost anything financially, but they did contact me about my card. Similar with my wife. Both off the internet.

THE COURT: Anybody close to you ever been accused of

a crime?

THE JUROR: No. Similar crime, like a wire --

THE COURT: Any crime.

THE JUROR: No.

THE COURT: Let me ask you about the schedule in the case. It's going to be a multi-week case to be tried. That's a burden on anybody who has to serve as a juror, but it's one that all jurors will share. Is there anything that would make it particularly difficult for you to serve on a case that goes for several weeks?

THE JUROR: Just the fact that I'm responsible for my unit. I'm the boss.

THE COURT: What do they do when you're not there?

THE JUROR: God knows. I have a sergeant, four officers assigned to me on three different shifts, so it's hard enough to keep track of them 24 hours a day, seven days a week. I'm sure they're enjoying the fact that I've been here two days.

THE COURT: All right. Thank you, sir.

THE CLERK: Next juror is Bruce Bonman, No. 88.

THE COURT: Mr. Bonman, how are you?

THE JUROR: Your Honor.

THE COURT: Yesterday you had a chance to review the list of potential witnesses in the case?

THE JUROR: Yes.

THE COURT: You didn't see anybody you recognize?

THE JUROR: I don't know nobody on there.

THE COURT: We have a little information about jurors that say what they do for employment. It says you are a mental health associate at the Arbour Hospital. Can you tell me a little bit about what you do in that work?

THE JUROR: I work the 11-to-7 shift.

THE COURT: Can you come to the mic?

THE JUROR: I work the 11-to-7 shift. My job is help keep the patients in good control.

THE COURT: Okay. How long have you been doing that?

THE JUROR: Twenty-one years.

THE COURT: All at the Arbour Hospital?

THE JUROR: Yes.

THE COURT: Let me ask you to think about the people who are closest to you in your family, friends, household, so on. In that group, to your knowledge, has anybody ever been the victim of a fraud of any kind?

THE JUROR: My brother.

THE COURT: Tell me about that.

THE JUROR: Happened in Chicago, about 20 years ago.

THE COURT: What happened?

THE JUROR: I wasn't at the house at the present time, but I heard different stories about it.

THE COURT: What happened?

THE JUROR: I basically blocked out my mind because he was in and out of jail all the time.

MR. SWOMLEY: Can't hear you.

THE COURT: You may have misunderstood my question. I'm wondering if anybody in your family or close friends have been a victim of a fraud.

THE JUROR: My brother.

THE COURT: What was the fraud that he was a victim of?

THE JUROR: I really don't remember, but he was sent to jail for it.

THE COURT: Was accused of the offense?

THE JUROR: Yes, yes.

THE COURT: You don't remember what that was?

THE JUROR: No.

THE COURT: That was 20 years ago?

THE JUROR: Yes. I was living in Boston when this goes on.

THE COURT: So were you involved at all in what was going on?

THE JUROR: No.

THE COURT: I mean in the court proceedings or anything like that.

THE JUROR: No.

THE COURT: Did you attend the court or the trial or

anything?

THE JUROR: No. I'm working in Boston at that time.

THE COURT: Okay. Anybody close to you ever been the victim of identity theft?

THE JUROR: No.

THE COURT: Besides your brother, has anybody in your close circle ever been accused of a crime?

THE JUROR: Not to my knowledge.

THE COURT: In a criminal case such as this, every defendant is presumed innocent unless and until the government proves otherwise by the evidence, proves guilt beyond a reasonable doubt. If you were a juror in this case, would you have any difficulty in applying those principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: Hard to say.

THE COURT: Well, what do you think?

THE JUROR: I have to see the case.

THE COURT: So you would make your mind up based on the evidence that you actually heard in the case, is that fair?

THE JUROR: That would be the only way.

THE COURT: This case involves allegations by the government that the defendants conspired or schemed together to defraud in connection with real estate mortgages or real estate transactions. That's the subject matter that we'll be hearing about. With that in mind, is there anything in your personal

experience, in your beliefs or attitudes or possible biases, that in light of the nature or subject matter of the case would make it difficult for you to be an impartial juror?

THE JUROR: When they take money from the poor people -- all that money transaction from people that's struggling to try and get something, yes, I would have something to say.

THE COURT: Let me ask you about the schedule in the case. This case is going to take a number of weeks to try. What's your daily schedule? You said 11 to 7.

THE JUROR: 11 to 7.

THE COURT: You're on the night shift?

THE JUROR: Night shift.

THE COURT: If we were on a 9-to-1 schedule, would that be compatible? Could you come here from your work?

THE JUROR: Be up all night, sit up in court all day?

THE COURT: Yeah.

THE JUROR: No. I sleep in the daytime. I sleep.

THE COURT: All right, Mr. Bonman. Thank you.

THE CLERK: Next up is No. 89, Robert Martin.

THE COURT: Mr. Martin, how are you?

THE JUROR: Fine.

THE COURT: Yesterday we gave out a list of the potential witnesses and asked people to look it over. You didn't see anybody on the list that you recognized?

THE JUROR: No, I didn't recognize anybody, your

Honor.

THE COURT: Let me just ask you about -- we have a little information about what people do. It says you're a drinking water treatment operator.

THE JUROR: Yeah.

THE COURT: What is that?

THE JUROR: I operate the plant that supplies the water for Gloucester.

THE COURT: Okay. Does the -- there wasn't enough room on the line, I guess. Your employer, or whatever, is cut off. Is it V-e-o --

THE JUROR: V-e-o-l-i-a, Veolia, Water.

THE COURT: Is this a private company that contracts with the City of Gloucester?

THE JUROR: Yes.

THE COURT: I want you to think about the people who are closest to you in your family and friends and so on, people who live with you. Within that group, has anybody, to your knowledge, ever been the victim of a fraud of any kind?

THE JUROR: Yeah, myself.

THE COURT: Tell me about that.

THE JUROR: Well, I -- it was on the net, and I had -- they were advertising for a free sample of, like, toothpaste or whatever. I forgot what it was, like, teeth whitener. So I took the free sample, and two weeks later they charged me $169

for the -- for a year's supply, which is in dispute right now with Visa. That's one instance. That's the most recent one. I really can't think of --

THE COURT: Okay. Anybody in that group ever been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anybody in that group ever been the victim of any kind of crime?

THE JUROR: I can't think of any right now.

THE COURT: Has anybody in your close circle ever been accused of a crime?

THE JUROR: Can you give me an example? Like a federal --

THE COURT: Anything that there was an accusation of a criminal act.

THE JUROR: No, no criminal acts.

THE COURT: Every defendant in a criminal case, as I'm sure you know, is presumed to be innocent unless and until the government proves otherwise by the evidence in the case, proves guilt beyond a reasonable doubt. If you were a juror in this case, would you have any difficulty in applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: I don't believe I would.

THE COURT: As I said yesterday, people are familiar

with the general nature of this case. It involves allegations by the government that the defendants were in a conspiracy or scheme to defraud involving residential real estate transactions and mortgage lending.

THE JUROR: I might have a problem.

THE COURT: Let me just finish the question.

THE JUROR: Yup.

THE COURT: That being the subject matter, is there anything in your personal experiences or your beliefs or attitudes, potential biases because of the nature of the case that would make it difficult for you to serve?

THE JUROR: I would have a problem if senior citizens were involved and they were defrauded of whatever. I'd have a problem with that big time.

THE COURT: What about the general topic of residential lending and so on, is that something that -- or would you --

THE JUROR: It angers me.

THE COURT: -- or would you be able to assess the evidence?

THE JUROR: I would be angry that somebody who takes advantage of people like that because most people don't have a lot of money, you know, so I'm pretty much aware of that.

THE COURT: Okay. Let me ask you about the schedule in the case. It's going to take several weeks to try the case.

THE JUROR: Yeah.

THE COURT: That's going to be an inconvenience for anybody who sits as a juror. There will be a sort of shared inconvenience, if you will.

THE JUROR: Yup.

THE COURT: In your particular situation, is there anything over the next several weeks that would make it unusually or exceptionally hard?

THE JUROR: I supply probably 75 percent of the income for my family, and it doesn't really pay a lot here. I also have a --

THE COURT: Are you an hourly wage --

THE JUROR: Yes.

THE COURT: -- employee?

THE JUROR: They do allow me -- I believe they're going to allow me ten days total, which I've used up two already. They'll reimburse me for ten days. After that they won't do anything. I do have a small procedure on the 30th, a colonoscopy.

THE COURT: 30th of April?

THE JUROR: Yeah. I got the paperwork here.

THE COURT: What time of day is that, do you know?

THE JUROR: Yeah. It's 9 a.m., I believe.

THE COURT: First thing in the morning? Okay, Mr. Martin. Thank you.

THE CLERK: Next up is Juror No. 90, Patricia Apollonio.

THE COURT: Hi. Yesterday we gave potential jurors a list of the possible witnesses in the case. You looked it over and you didn't see anybody you recognized?

THE JUROR: No.

THE COURT: Let me ask you to think about the people who are closest to you, family and friends who are the closest to you. Anybody in that group, to your knowledge, ever been the victim of a fraud of any kind?

THE JUROR: No. My father-in-law had a builder for his house, and he was, like -- $50,000 he gave him to build the house and then this builder claimed bankruptcy. So he was out $50,000. I don't know if that applies.

THE COURT: When was that?

THE JUROR: That was a good 20 years ago.

THE COURT: Any other incidents you can think of?

THE JUROR: Not that I can think of, no.

THE COURT: In particular, anybody in that particular group ever been the victim of identity theft?

THE JUROR: No.

THE COURT: Or has anybody in that group ever been a victim of any other kind of crime?

THE JUROR: My brother, not in relation to this kind of thing. He was under --

THE COURT: Victim of a crime?
THE JUROR: Oh, a victim? No.
THE COURT: Now, my next question, which you've anticipated a little bit, has anybody in your close circle ever been accused of a crime?
THE JUROR: Yes.
THE COURT: Okay. Was that your bother?
THE JUROR: Yes.
THE COURT: What was that?
THE JUROR: Child pornography.
THE COURT: When was that?
THE JUROR: That was -- well, I was in high school. No, actually, I wasn't. I'd say it was a good 20, 25 years ago.
THE COURT: Was there a prosecution?
THE JUROR: Yes. He was in jail for three years due to it.
THE COURT: Do you have any feelings about the criminal justice system that come from that experience that would affect your ability to be a fair juror on this case?
THE JUROR: No, I don't think so. I have a medical situation I'd like to pass on to you at some point.
THE COURT: Yup. We'll come to that.
Every defendant in a criminal case is presumed to be innocent unless and until the government proves otherwise by

proof beyond a reasonable doubt.

THE JUROR: Yes.

THE COURT: If you were a juror in a case like this, would you be able to apply the principles of the presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: Yeah, I would think so.

THE COURT: This case involves claims or allegations by the government that the defendants were in a conspiracy or scheme to defraud involving residential real estate transactions, mortgage lending and so on. Given that that's the subject matter, is there anything in your personal experience or in your beliefs or attitudes or potential biases because of the nature of the case that would lead you to be concerned about your ability to be an impartial juror in such a case?

THE JUROR: I'm not sure because of the situation my father-in-law went through and how he felt being tricked like that. You know, I don't know. I can't give you an honest answer there because he was just a farmer. Everything was done by a handshake. And then to be taken advantage of by that was very, you know, bad for him. So I really can't give you an honest answer.

THE COURT: The case is going to -- expected to take several weeks to try. This may come to what you wanted to bring up.

THE JUROR: Yes.

THE COURT: Is there a particular difficulty you would have in serving on that schedule?

THE JUROR: Yes. I have a problem with my side, with muscles and bone. I have a physical therapy appointment for evaluation. I had an MRI. I had an X-ray. And they put me on Prednisone for six days and then on these pills that I have. I don't take the pills when I'm working or -- the only time I take them is if I'm really in pain. And, unfortunately, I had to take one this afternoon at lunch because I was really uncomfortable. And that makes me kind of dizzy -- I'm sorry -- emotional and lightheaded and stuff. So I don't take them. That would be something.

THE COURT: Do you have some appointments scheduled?

THE JUROR: Yes, I do. I'm sorry. This is terrible.

THE COURT: That's okay.

THE JUROR: I have one this Friday for the physical therapist, for an evaluation, and then I have one with the doctor, the neurologist, in a couple of weeks as a follow-up appointment to see where I'm at. I mean, I think I would have difficulty -- these two days have shown me that I have difficulty sitting for a long length of time. I have to get up all the time just to move around, so I apologize for my --

THE COURT: No problem.

THE JUROR: It's probably the pills. I don't know.

THE COURT: Okay. Thanks.

THE JUROR: Do you need paperwork or anything?

THE COURT: No.

THE CLERK: Next juror up is No. 91, Billie Gordon.

THE COURT: Hi. We distributed a list of potential witnesses yesterday to all the jurors. Looks like you didn't find anyone on the list you recognized.

THE JUROR: No one.

THE COURT: I'd ask you to keep your voice up a little. The lawyers have to hear as well.

THE JUROR: Sorry.

THE COURT: Let me ask you about your closest circle of family and friends, people that you would put in that category, including yourself.

THE JUROR: Right.

THE COURT: Has anyone in that group, to your knowledge, ever been the victim of a fraud of any kind?

THE JUROR: Not to my knowledge.

THE COURT: In particular, has anybody in that group ever been the victim of identity theft?

THE JUROR: Again, not to my knowledge.

THE COURT: Or, more broadly, has anybody in that group ever been a victim of any kind of crime?

THE JUROR: My son was arrested for drunk driving.

THE COURT: He was the committer of the crime?

THE JUROR: I see.

THE COURT: Anybody the victim of any other crime? I'll come to your son.

THE JUROR: No.

THE COURT: Your son has a conviction for driving under the influence?

THE JUROR: Many years ago.

THE COURT: Where was that?

THE JUROR: In Easton, North Easton, Massachusetts.

THE COURT: Any other incidents?

THE JUROR: (Shakes head.)

THE COURT: Does that leave you with any feelings about the criminal justice system? Would it affect your judgment as a juror?

THE JUROR: No.

THE COURT: In any criminal case every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence and proves the person guilty beyond a reasonable doubt. If you were a juror in this case, would you have any difficulty in applying the principles of the presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: As you heard yesterday, this case involves allegations by the government that the defendants were in a conspiracy or a scheme to defraud that occurred in the course

of real estate transactions, mortgage lending and so on and so forth. Understanding that that's the subject matter that the case will be addressing, is there anything in your personal experience, your beliefs or attitudes, potential biases because of the nature of the case that would make it difficult for you to be an impartial juror in this case?

THE JUROR: No.

THE COURT: I told the group yesterday that on the schedule that we'll follow it's anticipated the case is going to take several weeks to present, unfortunate but necessary that we have to ask jurors to disrupt their lives for a period of time to do that. Apart from the general level of inconvenience that everybody would have by being in a case that long, is there anything over the next several weeks in your life that would make it especially difficult for you to serve?

THE JUROR: Yes, because I'll be out of state for ten days, from the 16th to the 26th.

THE COURT: That's a --

THE JUROR: I'll be in Arizona.

THE COURT: And you made those arrangements --

THE JUROR: Yes. I'm attending a conference. It's a done deal.

THE COURT: Okay. Thank you. I'm going to excuse you.

MR. ULLMANN: How many of those days will be court

days in light of the school --

THE COURT: 16th through the 26th.

MR. ULLMANN: That might only involve one day of court.

THE COURT: It does, actually. I revoke my -- only because it's something to discuss.

THE JUROR: I'm leaving Friday morning and won't be back until Monday evening.

THE COURT: You're leaving on Friday morning, the 16th. Okay. That's all right. We'll still discuss it.

THE CLERK: Next up is No. 92, David Potere.

THE COURT: Hi. Yesterday we distributed a list of potential witnesses I asked you to review. Looks like you did not recognize anybody on the list?

THE JUROR: That's right. That's correct.

THE COURT: You did answer one of my questions that I put to the group generally about you or anybody close to you being affiliated with the banking, real estate or mortgage lending business.

THE JUROR: Yeah. My dad trained three years ago as a real estate agent for Century 21. He did it for about six or eight months before the bust, then hasn't been associated since.

THE COURT: The little form we have about each juror gives a short description of employment. For you it says,

"Management strategy consultant," and then the name of the company or whatever is cut off.

THE JUROR: Okay.

THE COURT: There's not enough space.

THE JUROR: I work for Boston Consulting Group.

THE COURT: What kinds of consulting do you do?

THE JUROR: So we do strategy in management consulting, so I've worked across industries and across function areas since joining.

THE COURT: DO you work in a particular financial services industry?

THE JUROR: We as a firm do but I have not.

THE COURT: I want you to think about your close circle of friends and family, people who are the closest to you. In that group, are you aware of anybody who has been the victim of a fraud of any kind?

THE JUROR: So my father was a victim of identity theft and was in New York just recently testifying there.

THE COURT: Can you give us some details about that?

THE JUROR: So I think there was a ring of folks that were doing the identity theft, and he was one of the witnesses in a federal prosecution of that group of people. So he was brought down to New York to testify.

THE COURT: What happened to him particularly?

THE JUROR: So he lost about $5,000 in the episode.

THE COURT: How did it happen, do you know?

THE JUROR: I think it was just an internet phishing kind of scam, so you get some kind of email and respond. And they got some of his -- enough personal information to apply for banking cards and use them, like, obscure cards like JCPenney, and it took a while to figure out what was going on. But he got all the money back.

THE COURT: He actually testified as a witness in a federal prosecution?

THE JUROR: He did, yeah.

THE COURT: And that was completed?

THE JUROR: That's finished, yeah. That happened over the summer.

THE COURT: Last summer, summer of 2009?

THE JUROR: That's right.

THE COURT: The outcome of the case?

THE JUROR: So I think they were convicted.

THE COURT: Okay. Anybody else in your circle affected by fraud or identity theft?

THE JUROR: No.

THE COURT: Anybody in that circle a victim of any other kind of crime?

THE JUROR: No, no, not really.

THE COURT: Anybody in that circle ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case, and in this case, every defendant is presumed innocent unless and until the government proves otherwise on the evidence and it proves guilt beyond a reasonable doubt. If you were a juror in this case, would you have any difficulty applying the principles and presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: As you've heard, the subject matter of the case involves the government's allegations that the defendants were involved in conspiracy or scheme to defraud in connection with residential real estate transactions, mortgage lending and so on. Understanding that's the general subject matter that we'll be hearing about in the case, is there anything in your personal experience, beliefs, attitudes, potential biases because of the nature of the case that would make it difficult for you to be an impartial juror?

THE JUROR: No.

THE COURT: As I said yesterday, we anticipate the trial is going to take several weeks to present. That's an inconvenience for any juror who serves and requires some rearranging of things. Apart from the sort of inevitable common level of inconvenience that any juror would have, is there anything in the next several weeks that would make it a substantially greater hardship for you to serve?

THE JUROR: I mean, I'm in a client-service business, and I'm in the midst of a case, so there will be an impact for my client. But I imagine that's not a unique story, and it's something that, you know, we can accommodate as a firm. The firm can stand behind me on it. There's some inconvenience there for me. And I also have a three-month-old at home, so I will be a little bit sleep deprived, unlike your average juror, but other than those two things, no.

THE COURT: Thanks.

THE JUROR: Thanks a lot.

THE CLERK: Next juror is No. 93, Timothy Caffarella.

THE COURT: Mr. Caffarella. Yesterday we gave out a list of people who may be witnesses in the case and asked people to look it over and circle any they recognize. I don't see any circles, so you didn't recognize anybody on the list?

THE JUROR: No.

THE COURT: Let me ask you to think about the people who are closest in your circle of family and friends. Within that group is there anybody, to your knowledge, who's been the victim of a fraud?

THE JUROR: They had some -- at work. They stole our identities at work so --

THE COURT: Tell me about that.

THE JUROR: They just called us and told us somebody tapped into the computer and took -- they might have taken our

identities. So they gave us Identity Guard for, like, six months to make sure nothing happened.

THE COURT: So they detected a breach?

THE JUROR: Yeah.

THE COURT: Do you know whether any information was ever used?

THE JUROR: I don't know because I used that free stuff they gave us.

THE COURT: When was this?

THE JUROR: A couple years ago.

THE COURT: And the breach or whatever was in your company?

THE JUROR: Something to do with work, yeah.

THE COURT: Any other experiences for you or anybody close to you?

THE JUROR: My wife had a wallet stolen and her license and a credit card stolen before. We had to issue all new stuff.

THE COURT: Were the credit cards used?

THE JUROR: I canceled them right away. Checkbook was in there and everything. I canceled everything right away.

THE COURT: That was how long ago?

THE JUROR: About seven years ago.

THE COURT: Has anyone close to you ever been a victim of any other kind of crime?

THE JUROR: Victim of any crime?

THE COURT: Yeah.

THE JUROR: Possibly has, but I just can't think of it now.

THE COURT: Anybody in your close circle, family, friends, ever been accused of a crime?

THE JUROR: Yeah. I have an uncle that's in -- I got three uncles, they've all been in jail.

THE COURT: For what kinds of offenses?

THE JUROR: Stupid stuff. Stealing refrigerators, arson, just plain stealing everything that they can get their hands on.

THE COURT: Okay.

THE JUROR: One just got out. He was out for six weeks, and he's back in for parole violations.

THE COURT: They around here?

THE JUROR: Yeah. They live in my area.

THE COURT: As a consequence of any of those things, attempted fraud or so on that you experienced or your uncles experienced or any feelings you have one way or the other about the criminal justice system that would impact your ability to be a fair-minded juror?

THE JUROR: No. I figure, if somebody's been arrested, they must have did something, so they would be here for a reason.

THE COURT: In a criminal case, every defendant is presumed to be innocent unless or until the government proves otherwise on the evidence, and the government is required to prove that beyond a reasonable doubt. Would you have the ability to faithfully apply the principles of the presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: I probably could, yeah.

THE COURT: The subject matter of this case involves claims by the government that the defendants were engaged in a conspiracy or scheme to defraud involving residential real estate transactions and mortgage lending. That's the general subject matter that you will be hearing about. With that in mind, is there anything in your personal experiences or beliefs or attitudes with respect to the subject matter of the case that would make it difficult for you to be an impartial juror?

THE JUROR: No, I don't think so.

THE COURT: Let me ask you about the length of the trial. It's estimated to last several weeks. It's a burden and imposition on any juror to do that. It's one that all jurors would share to some degree or another. Is there anything in your circumstances over the next several weeks that would make it especially difficult for you to serve?

THE JUROR: Yeah. I work about 14 to 15 hours a day. My company will pay me my ten hours. After that I'm losing four to five hours of overtime a day. Just this two days

alone, I've lost $300. I won't be able to pay my mortgage. My paycheck will be cut in half basically.

THE COURT: Okay. Thank you.

THE CLERK: Next juror is No. 94, Holly White.

THE COURT: Hi. Yesterday we gave everybody a list of the possible witnesses in the case and asked them to identify anybody they recognize. It doesn't look like you recognized anybody.

THE JUROR: No.

THE COURT: I just have a few more questions in addition to the ones we asked the group yesterday. I'd like you to think about that group of people who are closest to you, friends and family who are the most close to you. In that group, are you aware of anybody who has been the victim of a fraud of any kind?

THE JUROR: No.

THE COURT: In particular, has anybody in that group been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anybody in that group been the victim of any other kind of crime?

THE JUROR: No.

THE COURT: Has anybody in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case, such as this, every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence at trial, and the government must prove guilt beyond a reasonable doubt. If you were a juror in this case, would you have any difficulty in applying the principles of the presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: As you've heard, the subject matter of the case involves allegations by the government that the defendants were engaged in a conspiracy or scheme to defraud involving residential real estate transactions, mortgage lending transactions and so on. Understanding that that's the general topic or subject of the case, is there anything in your personal experience or your beliefs or attitudes or the potential biases because of the nature of the case that would make it difficult for you to serve as an impartial juror in this case?

THE JUROR: No.

THE COURT: Let me ask you about the schedule. It's estimated the case is going to take several weeks to try. Obviously, it's an inconvenience and a burden on any jurors to serve in a case of that length. Apart from the sort of common level of disruption and inconvenience that anybody would have, is there anything over the next several weeks that would make

it especially difficult for you to serve?

THE JUROR: I'm a kindergarten teacher. That's all I can say basically, so --

THE COURT: What's the impact?

THE JUROR: They would miss me for all those weeks.

THE COURT: Are there substitutes available, people who can fill in or people who can take over for the time?

THE JUROR: Yes.

THE COURT: Okay. Thanks.

THE CLERK: Juror No. 94, William O'Hara.

THE COURT: Mr. O'Hara, how are you?

THE JUROR: How are you?

THE COURT: We gave everybody a list of the potential witnesses yesterday, and we asked them to look it over, and apparently you didn't recognize anybody.

THE JUROR: No.

THE COURT: Let me ask you to think about the people who are closest to you in your family and circle of friends. Within that group, including yourself, of course -- within that group, has anyone, to your knowledge, been the victim of a fraud?

THE JUROR: Not to my knowledge.

THE COURT: In particular, has anybody in that group been the victim of any identity theft?

THE JUROR: No.

THE COURT: Are you aware of any persons within that group having been a victim of any kind of crime?

THE JUROR: No.

THE COURT: To your knowledge, has anybody in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case, such as this, every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence in the case and proves guilt beyond a reasonable doubt. If you were a juror in this case, would you have any difficulty in accepting and applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: As you've heard, the general subject matter of this case will be the government's allegations in the indictment that the defendants were engaged in a conspiracy or scheme to defraud involving certain real estate transactions, mortgage lending practices and transactions. Understanding that's the general tenor and subject matter of the case, is there anything in your personal experience or in your attitudes or beliefs or potential biases because of the nature of the subject matter of the case that would interfere with your ability to be a fair juror in this case?

THE JUROR: No.

THE COURT: Let me ask you about the schedule in the case. As you've heard, this is anticipated to take several weeks to present on a 9-to-1 schedule. Obviously, it's a burden for anybody to sit on a trial for multi-weeks like that. It's necessary that we ask jurors to be able to do that when we have such trials. Apart from that sort of common level of inconvenience that anybody would have just by reason of being in the case, is there anything over the next several weeks that would make it particularly difficult for you to serve?

THE JUROR: No. I own my own business. I would have to do some juggling in my schedule, but other than that, no.

THE COURT: Okay. All right. Thanks.

THE CLERK: Next up is Juror No. 96, Mirela Bancu.

Step up to the box, please.

THE COURT: Hi.

THE JUROR: Hi.

THE COURT: Yesterday we gave everybody a list of the possible witnesses in the case and asked them to look it over and circle any that they recognized. It doesn't look like you recognized any, right?

THE JUROR: Right.

THE COURT: I want to ask you about people who are in the group of people closest to you: immediate family members, household members, closest friends. In that group, are you aware of anybody who has been the victim of fraud of any kind?

THE JUROR: No.

THE COURT: Has anyone in that group been the victim of identity theft?

THE JUROR: No.

THE COURT: Has anybody in that group ever been the victim of any kind of crime, that you know?

THE JUROR: No.

THE COURT: Has anyone in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case such as this, every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence, and the government is required to prove guilt beyond a reasonable doubt.

If you were a juror in this case, would you have any difficulty in applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: As you've heard, the general subject matter in the case involves allegations against the defendants, that they were engaged in a conspiracy or a scheme to defraud involving real estate transactions and mortgage loans, and so on and so forth.

Understanding that's the general subject matter of the case, is there anything in your personal experience, your

beliefs or attitudes, potential biases because of the nature of the case that would make it hard for you to be an impartial juror in this case?

THE JUROR: No.

THE COURT: No?

THE JUROR: No.

THE COURT: On the schedule that we're going to follow, it's estimated it's going to take a while. This case is going to take several weeks. Obviously, that's a substantial commitment of time that we ask of jurors, and it will result in a disruption and inconvenience that jurors will have to go through in order to serve.

Apart from the sort of commonly shared level of inconvenience that any member of the jury would have, is there anything in the next several weeks for you that would make it an unusually serious hardship?

THE JUROR: I have a pre-planned trip for Europe. We bought the plane tickets.

THE COURT: When is that?

THE JUROR: April 22nd to May 2nd.

THE COURT: To May 2nd?

THE JUROR: Yes. I think I can change the plane tickets.

THE COURT: I'm sorry?

THE JUROR: I could change the plane tickets, if

needed.

THE COURT: You could?

THE JUROR: Yes.

THE COURT: How much of an imposition would that be? I'll be straight with you: Normally, if people have pre-bought their tickets, we allow them to go on their trips. But if you could change it and it's no inconvenience and it's something you could do, I mean --

THE JUROR: I mean, I would be willing to do that.

THE COURT: You would be willing to do that?

THE JUROR: If needed, yes.

THE COURT: All right. Thank you.

(The juror exits the courtroom.)

THE CLERK: The next juror is Juror No. 97, Judith McLaughlin.

Step up here, ma'am. Watch your step.

THE COURT: How are you?

THE JUROR: Just fine.

THE COURT: Yesterday we distributed a list of potential witnesses in the case to potential jurors, asking you to circle any names that you recognized. It doesn't look like you recognized anyone.

THE JUROR: No, I didn't recognize anyone.

THE COURT: We have this very perfunctory information about people. It says you're on the faculty of Harvard

University?

THE JUROR: That's right.

THE COURT: Can you tell us what you do?

THE JUROR: Sure. I chair the higher education -- I run the master's and doctoral programs, higher education.

THE COURT: You have to keep your voice up.

THE JUROR: I'm sorry. I run -- I chair the master's and doctoral programs in higher education, so I'm a faculty member, and I have an academic/administrative role.

THE COURT: Do you have a teaching role as well?

THE JUROR: Yes, I teach. I teach and I advise, yes.

THE COURT: And how long have you been in that capacity?

THE JUROR: Twenty-five years.

THE COURT: In addition to the questions I asked generally yesterday of the group, I have a few questions that I ask individually. I would like you to think about the people who are closest to you, in your circle of family and friends. And in that group, is there anyone, to your knowledge, who has been the victim of a fraud of any kind?

THE JUROR: No. A victim of a crime but not a fraud. I did want to answer one of those questions later.

THE COURT: Fraud, no?

THE JUROR: No.

THE COURT: How about identity theft?

THE JUROR: Not that I'm aware.

THE COURT: Okay. Now, somebody in that group has been the victim of a crime?

THE JUROR: Yes. And I thought about your first question yesterday. Because it was long enough ago, my brother-in-law -- my late brother-in-law, Paul McLaughlin, was an assistant AG, and so our family has been through that.

THE COURT: Okay.

THE JUROR: My husband's older brother -- younger brother.

THE COURT: Would that have any impact on you as a potential juror in the case? In other words, would that have any influence on your ability to fairly --

THE JUROR: I don't know. The only time I've been in a courtroom, I sat through, you know, three weeks of that trial. And I will tell you that I thought of that a lot yesterday sitting in a courtroom, and then I read -- you know, coincidentally, in today's paper there's an article about what assistant DAs earn and they mentioned Paul's name, and it was sort of -- I found myself in tears this morning, which I had not anticipated, because it's been a long time. But there's still a lot of power of that, obviously, in our family.

THE COURT: Right. Let me ask you another question, and I don't mean any offense by it, but has anybody in your close circle ever been accused of a crime?

THE JUROR: No. No.

THE COURT: In a criminal case, as I'm sure you know, the defendant is presumed to be innocent unless and until the government proves otherwise --

THE JUROR: Of course.

THE COURT: -- by the evidence, and the government is required to prove guilt beyond a reasonable doubt.

Would you have any difficulty in applying the principles of presumption of innocence and guilt beyond a reasonable doubt?

THE JUROR: No, I don't think I would.

THE COURT: As you heard yesterday, the general subject matter of the case is that in this case the government charges the defendants with a conspiracy or scheme to defraud in connection with certain residential real estate transactions and related mortgage lending practices.

Just understanding that's the general tenor of what the case will be about, is there anything in your personal experience, beliefs or attitudes, potential biases because of the nature of the case that would make it difficult for you to be an impartial juror?

THE JUROR: I don't think so, no.

THE COURT: Now, let me ask you about the schedule.

THE JUROR: Right.

THE COURT: Because this is going to take a while to

try.

THE JUROR: Yeah.

THE COURT: And the estimate is several weeks. We don't know exactly, you know, at the beginning how things will go, smoothly or not so smoothly.

THE JUROR: Of course.

THE COURT: So we can't be precise.

Obviously, it is a burden and an inconvenience for any juror --

THE JUROR: Right.

THE COURT: -- to some degree.

THE JUROR: Uh-huh.

THE COURT: And all jurors, in the end, share that in some nominal way.

THE JUROR: Of course. Of course.

THE COURT: Over the next several weeks are there things that would make it especially difficult for you to serve on that schedule?

THE JUROR: Well, it's the last three and a half weeks of the semester at Harvard. And my master's students are graduating in late May, and I'm expected to teach them. One of my doctoral students is trying to get his dissertation in to graduate. And so I don't know what would happen with my classes, to be honest. That's a concern.

THE COURT: What times are your classes?

THE JUROR: On Wednesdays and Fridays, nine to twelve, so...

THE COURT: That would run through what point?

THE JUROR: Till -- the last classes are -- it's a new calendar this year at Harvard -- so I think it's the second week in May, and then commencement, which I pass -- I read the names and provide the robe. My doctoral student is not till the end, and it's the last Thursday in May, so...

That's my concern, to be honest.

THE COURT: Okay. All right. Good. Thank you very much.

THE JUROR: Okay.

(The juror exits the courtroom.)

THE CLERK: Next up is Juror No. 98, Maryse Desrosiers.

THE COURT: Hi.

THE JUROR: Hello.

THE COURT: Yesterday we asked people to look over a list of people who are planing to testify in the case and circle any names that they recognize. It looks like you didn't recognize anybody on the list --

THE JUROR: No.

THE COURT: -- because none are circled.

We have a little bit of basic information about what people do for employment. It's just kind of an odd way of

saying -- it says "trade" and the "VA hospital"?

THE JUROR: Yes.

THE COURT: What does "trade" mean?

THE JUROR: Trade.

THE COURT: I'll show you. What do you do at the VA?

THE JUROR: Oh, I'm working in the psych unit.

THE COURT: In the psych unit?

THE JUROR: Yeah.

THE COURT: And what do you do?

THE JUROR: I'm an LPN. I'm a nurse.

THE COURT: I'm sorry?

THE JUROR: I'm a nurse.

THE COURT: A nurse. An LPN, is that what you said?

THE JUROR: Yes.

THE COURT: I don't know where "trade" came from.

THE JUROR: Trauma. I don't know.

THE COURT: Okay. How long have you been doing that?

THE JUROR: For the past six years.

THE COURT: Now, I want you to think about the people who are closest to you in your family and friends. And in that group, I want to know if you are aware of anybody who has been the victim of a fraud of any kind?

THE JUROR: No.

THE COURT: In particular, has anybody in that group been the victim of identity theft?

THE JUROR: No.

THE COURT: No?

THE JUROR: No.

THE COURT: Has anybody in that group been the victim of any kind of crime?

THE JUROR: No.

THE COURT: Has anybody in that group ever been accused of a crime?

THE JUROR: No.

THE COURT: In this case, as in any criminal case, every defendant is presumed to be innocent unless and until the government proves otherwise by the evidence, and the government must prove their guilt beyond a reasonable doubt.

Would you have any difficulty if you were a juror in this case in applying those principles, the presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: From what I said yesterday, I think you'll probably understand what the nature of the case is in general terms, and that is the government accuses the defendants of a conspiracy, or a scheme to defraud, involving real estate transactions and mortgage lending in connection with those kinds of transactions.

Understanding that's the general nature of what the case is going to be about, is there anything in your personal

experiences, in your beliefs or attitudes, potential biases because of the nature of the case that might make it difficult for you to serve as an impartial juror in this case?

THE JUROR: No.

THE COURT: As you heard yesterday, on the schedule that we're going to follow, this is going to take probably several weeks to complete, and that is obviously asking a good bit of jurors, to be here for the several weeks when they have to disrupt their lives and make other arrangements and so on. All jurors share that to some degree.

In your own particular case, over the next several weeks is there anything that would make it especially difficult for you to serve on the jury in this case for that length of time?

THE JUROR: No, I don't think so. My work, they know I'm coming.

THE COURT: I'm sorry?

THE JUROR: My work, they know I'm here.

THE COURT: They know you're here?

THE JUROR: Yes, that I'm here.

THE COURT: All right. Thank you.

(The juror exits the courtroom.)

THE CLERK: Juror No. 99, Darren Josey.

Step up into the box, please. Watch your step.

THE COURT: How are you?

THE JUROR: Good. How are you, sir?

THE COURT: Yesterday we gave the jurors a list of possible witnesses in the case to see if you recognized anyone, and it doesn't look like you recognized anybody?

THE JUROR: No, sir.

THE COURT: Let me ask you about the people who are in your closest circle of family and friends, whatever that is to you. Has anyone in that group, to your knowledge, ever been the victim of a fraud of any kind?

THE JUROR: Other than some online phishing, no. Nothing serious.

THE COURT: Like --

THE JUROR: A credit card.

THE COURT: Hmm?

THE JUROR: A credit card number from, like, a virus.

THE COURT: You or --

THE JUROR: Myself. But it was resolved; it wasn't an issue. And my mother, but...

THE COURT: Same sort of thing?

THE JUROR: Yeah. But no money was taken out. It was just she entered her credit card thinking that it was an anti-virus software, and it wasn't. And my father works in IT, so luckily he got the whole thing resolved very quickly before any money was taken, actually.

THE COURT: All right. Has anybody close to you ever

been the victim of any other kind of crime?

THE JUROR: Yes. My father was hit by an elderly lady running a stop sign while he was riding his bicycle. And he sued her and actually won.

THE COURT: Has anyone within your close circle ever been accused of a crime?

THE JUROR: No.

THE COURT: In a criminal case such as this, a defendant is presumed to be innocent unless and until the government proves otherwise by the evidence, proves guilt beyond a reasonable doubt.

If you were a juror in this case, would you have any difficulty in applying the principles of presumption of innocence and proof beyond a reasonable doubt?

THE JUROR: No.

THE COURT: You've heard what the general subject matter of the case is yesterday, I think. The government charges the defendants with a conspiracy, a scheme to defraud in connection with some real estate transactions and mortgage loans in connection with those transactions.

So understanding that's the general tenor and subject of the case, is there anything in your personal experience or beliefs or attitudes, potential biases about that subject matter that would make it difficult for you to be an impartial juror in this case?

THE JUROR: I don't think so. I've only rented property, so...

THE COURT: As you heard, the case is expected to take several weeks to be presented. That's going to require jurors to be here for a couple of weeks, which is obviously an imposition and disruption for jurors, whoever the jurors are, who are going to have to put up with it.

Apart from the sort of common level of inconvenience that everyone would have being part of such a jury, is there anything in the next several weeks that would make it unusually difficult to serve?

THE JUROR: Yes. Actually, I have a flight for business. I'm one of 18 employees in a very small company in West Concord. We're visiting with our number one client, who actually represents a quarter of our business, in Sumner, Washington. I have a flight on the 26th of April for three days out there.

THE COURT: Is that the beginning of the week? That's a Monday?

THE JUROR: Yes. I've got my itinerary.

THE COURT: I believe you.

(Laughter.)

THE JUROR: I'm only one of a few people in my department. My boss is gone for more than half of this month, so I'm basically running the show, and it will be a little

tough.

THE COURT: Okay. Thank you.

(The juror exits the courtroom.)

THE CLERK: Juror No. 100, John Whittemore.

Step up here, please.

THE JUROR: Sure.

THE CLERK: Thank you. Watch your step.

THE COURT: Mr. Whittemore, how are you?

THE JUROR: Good, thank you. And yourself?

THE COURT: Good.

Yesterday we passed out a list of people who may be witnesses in the case and asked potential jurors to review it and circle anybody they recognized. It doesn't look like you --

THE JUROR: I didn't recognize a soul.

THE COURT: Now, you did answer one question I asked yesterday when I asked whether you, or someone close to you, had an affiliation with banking, real estate or mortgage lending.

THE JUROR: Real estate. I'm a licensed real estate agent.

THE COURT: Practicing?

THE JUROR: Yes.

THE COURT: How long have you done that?

THE JUROR: About five years, part time.

THE COURT: And continuing part time now?
THE JUROR: Continuing part time.
THE COURT: Self-employed, or are you with an agency or --
THE JUROR: I'm with an agency.
THE COURT: Who do you work with?
THE JUROR: Hingham Real Estate Company.
THE COURT: Hingham Real Estate Company?
THE JUROR: Yes.
THE COURT: I gather that's in Hingham?
THE JUROR: Yes, it is.
THE COURT: And before that, what did you do?
THE JUROR: I'd worked for Verizon for a while, and I got downsized from there in 2001. And I've been back and forth to a few different companies. And most recently I was downsized in December of 2008 from Broadridge Financial Solutions. The company itself, the part I was working with was proxy solicitation for mutual funds. We'd call out to individuals to see if they would vote their shares.
So I've been out of work for the last 16 months. I just got a job last week, so...
THE COURT: Doing what?
THE JUROR: Back at Verizon, doing some contract work there, and doing some auditing along the way for different departments, with their technicians within Verizon.

THE COURT: And when did you begin that?
THE JUROR: I started last week. So I was there for my first week of training, and now I'm here for the few days, and hoping to continue, but I don't know.
THE COURT: Hoping to continue here?
THE JUROR: Hoping to continue on the job, but I'm not sure that's going to happen.
(Laughter.)
THE COURT: Okay. Actually, I think in light of your employment, we're going to let you go. You should be back at Verizon, I think.
THE JUROR: That would be great. I appreciate that very much.
THE CLERK: Hold on and I'll give you your card.
THE JUROR: Thank you.
(The juror exits the courtroom.)
THE COURT: Okay. Let's go to --
THE CLERK: Eighty-seven?
THE COURT: Yeah. I think where we left off was 87, Mr. Aiello.
MR. SWOMLEY: I'm happy to let Mr. Borenstein do the bulk of the for-causes; however, with respect to this one, I just want to alert the Court to a lawsuit which I did several years ago which involved the Middlesex County House of Correction, and the extraction team, applying chemicals and not

removing them from the prisoner.

I remember this name. I don't want to say that I know he was definitely involved in that. There were no depositions of the officers at Billerica, so I don't know that he knows me, necessarily, but I did take that case to trial, so...

THE COURT: In?

MR. SWOMLEY: In Lowell Superior.

THE COURT: Lowell?

MR. SWOMLEY: So it's possible that he knows about me, or would know about me. I just don't know. I know I could go back to my office and pull up stuff and figure it out, but I don't know right now.

MR. BORENSTEIN: I was going to ask about Mr. Aiello. He did say -- I think his expression was, "If you played for one team all these years, it's very hard to do something else." He indicated, obviously, after questioning that he would try and believed he could, but he was not 100 percent sure.

And I just am troubled because of his job and the like.

THE COURT: The government?

MR. WILD: We submit it, your Honor.

THE COURT: Yeah, I'll excuse him.

Mr. Bonman? Mr. Bonman had trouble with coming off his night shift and staying alert. I think I'll excuse him.

(Laughter.)

MR. SWOMLEY: Your Honor, I would submit that he works for a hospital and can probably get paid and not have to work the night shift, so --

THE COURT: Say again?

MR. SWOMLEY: He works for a hospital. And I would venture that that employer is not going to refuse him pay even if he is -- if he's doing jury duty. And the fact that his regular shift is in the middle of the night shouldn't prevent him from being relieved of his job while he's doing jury duty.

So I don't think that he should be in a position where he has to do both if he's going to serve.

THE COURT: I'm not sure we know that, though.

Anybody else? No?

I think I'll excuse him.

Mr. Martin, Number 89.

MR. BORENSTEIN: He's the gentleman, your Honor, who said that he is angered that anybody would take advantage of people in mortgage issues.

THE COURT: Yeah. I don't know how much difference that will make here. Is there going to be -- he said elderly people in particular. Will there be --

MR. WILD: There will be some people who might qualify for that. But, your Honor, I particularly noted that he had what seemed to be a hardship matter as well.

THE COURT: He did say that he -- yeah, he thought

that he might -- I don't have the details, actually. But I do remember him saying something about his work. I also had something about April 30th.

MR. SWOMLEY: He has a colonoscopy on April 30th, your Honor.

MR. WILD: He's the one that said he only has ten days of paid leave, and he's already used up two being here, and if he has to take the rest of it, he won't get paid.

THE COURT: I'll excuse him.

Ms. Apollonio had the physical issues with the medication and it seemed to be affecting her. I think I'll excuse her.

MR. SHEKETOFF: You reduced her to tears.

THE COURT: Now, Ms. Gordon. I think that's too much, frankly, for one juror, so I think I'll excuse her.

Mr. Potere? Okay.

Mr. Caffarella?

MR. BORENSTEIN: I think he's the one who came out and said, "If someone's been arrested, they did something wrong."

THE COURT: I'll excuse him.

Miss White?

MR. SWOMLEY: Your Honor, can we go back to Mr. Potere?

THE COURT: Yeah.

MR. SWOMLEY: He said that his father was testifying

in New York recently on something that had a lot of ID theft involved in it and was very -- I mean, I think far more closely involved in ID theft than anybody else thus far. And I have concern that the knowledge that he has about it -- and his father, in fact, lost money in it, and it involved both testimony and conviction -- that there's a spillover effect from all of that.

And I would ask that you excuse him for cause as well.

THE COURT: Anybody else? Mr. Wild?

MR. WILD: Our recollection is he said he didn't lose any money, he was just a witness in the case.

MR. SWOMLEY: 5,000, is what I have.

THE COURT: Yeah.

MR. WILD: Which he got back. He was reimbursed for it.

THE COURT: I'm not sure that was clear. It didn't sound like he did. But I don't think so anyway. Mr. Potere struck me as a relatively sophisticated person, and he didn't personally -- to have any personal animosity about his father's case. He struck me as somebody who could be a fair juror.

MR. SWOMLEY: You don't want to strike him because he's sophisticated?

(Laughter.)

THE COURT: Ms. White. Anybody?

Mr. O'Hara?

Ms. Bancu?

Ms. McLaughlin, I think in light of her teaching schedule, has a direct conflict with the trial schedule.

Ms. Desrosiers?

MR. SWOMLEY: I'm sorry. What did we do with Ms. Bancu? She's on or she's off?

THE COURT: She's not excused. She said she could accommodate her travel.

MR. SWOMLEY: Okay.

THE COURT: So now we're at 99, basically, Mr. Josey, who has travel. I think we have to accommodate his travel schedule.

And Mr. Whittemore.

MR. SWOMLEY: What did we do with Ms. McLaughlin?

THE COURT: We excused Ms. McLaughlin.

MR. LEE: Judge, would you read out the numbers that you have recorded as --

THE COURT: Those who remain, is that what you mean?

MR. LEE: Yes.

THE COURT: Beginning on page 8 --

MR. LEE: No, I don't mean from the beginning, I mean the last go-round.

THE COURT: Beginning on page 8, which is number 92, Mr. Potere; 94, 95, 96, 98. Brings us to what?

VOICES IN UNISON: Forty-six.

THE COURT: Now, we have two jurors that have spoken to Paul that want to bring something back to us. One is Juror No. 23, Susan Turner. She, through the clerk, handed me a note. I'll try my best to read the writing.

She says, "Overnight I remembered another personal, quote, 'brush with fraud,' and in the interest of full disclosure I thought I should relay it to you this morning.

"During a trip to NYC" -- New York City -- "some years back, my credit card number was stolen and used to wire about $500 to eastern Europe by Western Union. I realized the theft only on receiving a Western Union receipt by mail some days later. My credit card company resolved the matter at no cost to me after I made a few phone calls and filled out a few reports.

"I apologize for not remembering this yesterday at my interview."

She's available if anybody wants to re-inquire about that, or not? No? Okay.

The other is Juror No. 10, Liqing Chen. I don't know what her issue is. She spoke to Paul and said she'd like to come back.

THE CLERK: So I'll go get her?

THE COURT: Yes.

Now, while he's doing that, in view of the hour, if we have 45, 46 -- whatever we have, I'm not going to continue on

to peremptories now. Even though I was hoping we'd get that done, we'll finish that in the morning. We'll have those come back, go to the room they've been going to, Courtroom 7. And when we're all organized, we'll bring them into this room and we'll all be here for the peremptory process.

MR. ULLMANN: Your Honor, are you going to seat -- will the first 16 who remain be seated sequentially or are you going to --

THE COURT: I'll entertain whatever you think we would do. My impulse, which was more back then a thought, was to do this as if this had been a simpler case and to treat the first 16 as having been seated and fill in -- in other words, re-create it as if they were physically taking the seats.

MR. ULLMANN: That's what I thought you were going to do, but then it occurred to me that maybe I had a misunderstanding. It doesn't seem to matter which system you use as long as we know which one it is. It will make things a little bit easier.

THE COURT: I hadn't thought it through, as I say. That was my instinct. And if it will work mechanically, we may as well do that. I think it will cause less confusion, frankly, than if we start mixing --

MR. ULLMANN: I think so. So in other words, out of the first 16, Number 2 remains.

THE COURT: Right.

MR. ULLMANN: And then, so, in Seat No. 1 will go Juror No. 18, because she is the first juror after 16.

THE COURT: Correct. That's the way we normally do it in a case. And actually, once we've done that -- it only happens the first seating, because after that it will be all natural, the way it occurs.

Yes. Ms. Chen?

THE CLERK: Step up here, ma'am.

THE COURT: Hi, Ms. Chen.

THE JUROR: Hi.

THE COURT: You had something that you --

THE JUROR: Yes. Last night when I go home and I check the e-mail, I have a starting -- I have already three weeks on-call including this week, so I was scheduling my starting a little bit late. But now the starting, they put it a little bit earlier.

So after two weeks, I have to process some new sample, breast samples. So I'm afraid if over five weeks, I cannot do that. In two weeks, I'm okay.

THE COURT: Okay. Well, as it happens, the third week -- that is, the week beginning April 19th -- we're going to skip. Does this take more than --

THE JUROR: Yeah, more than one week to do it.

THE COURT: It does? It would go into the following weeks?

THE JUROR: Yes.

THE COURT: And is there anyone else in the company that could do that work?

THE JUROR: Because in our project team, another person having the baby, just stay home. So very tight.

THE COURT: The only other person who could do it is --

THE JUROR: I am the project -- only person for the project, yes. So...

THE COURT: Okay. Thanks.

THE JUROR: Thank you.

(The juror exits the courtroom.)

MR. SWOMLEY: I have no idea what she was talking about.

(Laughter.)

THE COURT: She is, apparently, a researcher. And it sounds like in the lab, she's going to begin a new process, in three weeks. That she would be available for two weeks, but beginning the third week and continuing on. And I guess also in light of the absence of another employee, she's the project manager and she has to be there to do it.

MR. SWOMLEY: I have no objection.

MR. WILD: We submit it, your Honor.

THE COURT: All right.

THE CLERK: So she's Number 10, right?

MR. BORENSTEIN: Can I inquire, Judge O'Toole? There might be a couple of other preliminary matters. I don't know if you want to take them up now or in the morning. One of them is the important issue about the BBO, which we had sent you a stipulation and we haven't --

THE COURT: We haven't resolved that.

First of all, I don't want to be at all involved in brokering the language of a stipulation. It does not appear to be a stipulation, which means we'll have to confront the motion on the merits in the absence of a stipulation.

I was suggesting a stipulation maybe in the way of resolving it by agreement. If that's not going to happen, we'll revisit it. I don't want to do that now. We'll do it before openings. So we'll probably do it tomorrow morning.

MR. BORENSTEIN: And I don't know if there are other preliminary issues. Would it make sense to ask the jurors to come back at 9:30 instead to deal with a number or -- I leave it up to the Court. I'm just concerned about them coming at nine and then having to wait while we resolve a number of issues.

THE COURT: No, I would rather get the jury selected. If we have a pause --

MR. BORENSTEIN: And the expectation --

THE COURT: I guess we're now at about 45? Is that where we are at?

MR. SWOMLEY: Yes.

THE COURT: It's pretty thin. I'm wondering if we should call in ten people, or so, to be reserves just in case. I mean, just like this, something occurs overnight. I think we'd better have a little bit of a margin. I don't know. Jim McAlear is in the back. I don't know if it makes a difference between 10 and 19. I don't think realistically we would need 19. Ten?

MR. McALEAR: We called in 19, your Honor, and 16 reported. So we had 16 today that we had kept, and they are on call for tonight to come in tomorrow. I told them to call tonight after six. So, I mean, if you want to bring it down to ten, that's -- I mean, either way.

THE COURT: We'll know early enough. I mean, if everybody shows up and there's no new excuses, then we can let those folks go, but I think we ought to have them here just in case.

MR. McALEAR: Okay.

THE COURT: In case there's any further stick in the process that someone is not available.

MR. McALEAR: Thank you, your Honor.

MR. SWOMLEY: And, your Honor, I know that one of the things that we try to do to make things a little bit easier in terms of the defense understanding of what perempts might be utilized, if I could ask you to go along with Mr. Borenstein's

request to push everything back, we as a group could still come in at nine and probably do some work instead of trying to do it now, which I think is going to be a little difficult. And that way we're a little bit more up to speed ourselves in terms of if you're going to have us exercise perempts. I think there's a value in us having thought, and it's getting late to be doing that now.

I mean, I'm just asking you to maybe -- to push the beginning -- start the time of the day back a little bit to accommodate all of us.

THE COURT: Well, I understand -- maybe you could just come a little earlier than that. The problem is I would like to get -- I think, particularly if we're going to do peremptories, which is going to take some time -- it's not going to take a lot, particularly if we've done some planning -- but I would like to get the openings in tomorrow. And that might even -- maybe we won't. I'm not inclined to build any more time into the schedule.

MR. WILD: May I address what I think will be briefly, your Honor, a couple of issues so they don't have to be taking up time tomorrow morning.

The lead agent in the case, as I said earlier today, is Matt Galas. We would ask that he be present in the courtroom with us as our lead investigator.

I would also ask that postal inspector Joe McGonagle

be present. He is not at all in any way, in fact, expected to testify, but he is trained on Sanction to present the exhibits electronically and all of that, and we do need someone full time available every day. He is an inspector who is committed to this case by his agency; therefore, he will be available every day, and we won't have any glitch in someone being here to run Sanction.

THE COURT: Well, if he's not going to be a witness, I don't see any problem, just like any technical support personnel.

MR. WILD: Well, we're just raising it that way with the Court.

MR. ULLMANN: I assume if Agent Galas is sitting, he's not going to testify either, correct?

MR. WILD: We don't presently anticipate him testifying in the case-in-chief, but it depends on what the defendants may do. And we reserve the right to call him --

THE COURT: The usual rule is that the case agent can be present, even if he's a witness.

MR. WILD: Your Honor, there's one other matter.

MR. ULLMANN: I know that's how it's often done, but I would object to that. I think that it's a -- it becomes a witness who gains credibility from the mere fact he's sitting at counsel table in the bar encloser with the government.

It sounds as if he's not going to testify in this

case, so the Court doesn't have to resolve that, but I would object to it.

THE COURT: Okay. I wouldn't sustain the objection even if he were going to be a witness. That is the usual practice.

MR. WILD: One other matter, your Honor. That is that we've disclosed Tom Zappala of our office as a summary witness at the end of the case. And we would ask that he be present in the courtroom as well, because it may impact -- if there's a change in testimony that he's relying on at this point, it may impact his final summary.

THE COURT: Okay.

MR. WILD: Thank you.

THE COURT: Okay. So we'll re-assemble for peremptories -- now, I want to collect the questionnaires, and I want -- because counsel may want to come in a little bit early, maybe.

THE CLERK: All rise.

(The Court exits the courtroom at 5:13 p.m.)

THE CLERK: Court is now in recess.

(The proceedings adjourned at 5:13 p.m.)

C E R T I F I C A T E

We, Marcia G. Patrisso, RMR, CRR, Debra M. Joyce, RMR, CRR, and Cheryl Dahlstrom, RMR, CRR, Official Reporters of the United States District Court, do hereby certify that the foregoing transcript constitutes, to the best of our skill and ability, a true and accurate transcription of our stenotype notes taken in the matter of Criminal Action No. 08-10121-GAO, United States of America v. Eric L. Levine, et al.

/s/ Marcia G. Patrisso
MARCIA G. PATRISSO, RMR, CRR
Official Court Reporter

/s/ Cheryl Dahlstrom
CHERYL DAHLSTROM, RMR, CRR
Official Court Reporter

/s/ Debra M. Joyce
DEBRA M. JOYCE, RMR, CRR
Official Court Reporter

Date: 4/6/10