UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES | ) | |
| v. | ) | Crim. No. 08-10121-GAO |
| ERNST APPOLON, | ) | |
| Defendant. | ) | |

**DEFENDANT ERNST APPOLON'S SENTENCING MEMORANDUM**

Defendant Ernst Appolon respectfully submits this memorandum in connection with his sentencing, which is currently scheduled for October 22, 2010. Mr. Appolon also submits letters from Mr. Appolon's relatives, Alexis Harding (wife), Aisha Harding (sister-in-law), and Elsie G. Scott (grandfather-in-law) (attached hereto as Exhibits A, B, and C)[1], and letters from friends and acquaintances, from Naheem Garcia (A fellow Freemason), Walter King (former real estate school professor), Kiana Hall (a family firned and mother of Ernst's godson), and Roberta Green (a step-aunt) (attached hereto as Exhibit D, E, F, and G).

Mr. Appolon was convicted of conspiracy to commit wire fraud under 18 U.S.C. § 371 and 34 counts of wire fraud under 18 U.S.C. § 1343. According to the Presentence Report ("PSR") prepared by the Probation Office, the United States Sentencing Guidelines suggest that Mr. Appolon should receive a sentence between 135 and 168 months, or 11.25 to 14 years. The sentence suggested by the Guidelines is driven largely by the loss calculation under USSG § 2B1.1(b)(1), and the application of several enhancements under that section of the sentencing guidelines, as well as an enhancement for Mr. Appolon's alleged role in the offense, pursuant to USSG § 3B1.1. The loss calculation method employed by the prosecution and endorsed by the

[1] Mr. Appolon expects to submit additional letters of support from his immediate family.

Probation Office in preparing Mr. Appolon's PSR, however, has been explicitly criticized as unreasonable and rejected by at least one other Circuit, and the foundations for the sentence enhancements either rest upon assumptions which were not proven at trial or require one to accept unwarranted legal positions.

As described more fully below, although Mr. Appolon was convicted as a member of the conspiracy which resulted in some loss, the term of incarceration recommended for Mr. Appolon is excessive not only because it relies upon an unreasonable means for calculating that loss, but also because the guideline ranges under § 2B1.1 are overly punitive, are at odds with research assessing the specific deterrent effects of sentence duration, and contradict the requirement that that sentences be "sufficient, but not greater than necessary" to achieve the purposes of sentencing in 18 U.S.C. § 3553(a)(2). Given this, many courts have refused to employ the recommended guideline ranges even in instances where proven loss exceeds tens of millions of dollars. Further, the sentencing enhancements applied to Mr. Appolon increase his adjusted offense level by 8 points, effectively doubling the guideline range he would face in their absence. Most, if not all, of these enhancements, however, are a poor fit and inappropriate.

Although Mr. Appolon readily acknowledges the seriousness of the crimes for which he was convicted, it is important to recall that he did not commit a violent crime. The prosecution's assertions that he is directly responsible for millions of dollars in loss to particular lenders, let alone the wholesale decline of several Boston neighborhoods are speculative at best and resemble a crude form of scapegoating. Mr. Appolon's role in the conspiracy was peripheral in many regards, and insofar as the testimony at trial that portrayed him as a more central figure, it is noteworthy that it came primarily from cooperating co-defendants who were far more instrumental in misleading lenders, were eager to unload blame to secure more preferential

sentencing treatment, and who often had extensive records of fraudulent activity, making their testimony inherently suspect. Mr. Appolon is described by his wife as being naïve to a fault, and this characteristic – along with Mr. Appolon's early experiences with poverty – made him an easy mark for more skilled manipulators like Eric Levine and Andre Lamerique. Concededly, Mr. Appolon should have been significantly more concerned about where his money was coming from, but given that he was entirely removed from the mortgage-application aspect of the fraud, and the overwhelming degree of trust he afforded to Mr. Levine, his involvement in the conspiracy was more driven by misplaced ambition and a lack of sophistication than by avarice.

In determining an appropriate sentence for Mr. Appolon, it should also be considered that his conviction will have potentially serious consequences above and beyond his incarceration. Mr. Appolon, who was born in Haiti, is a resident alien and faces the strong likelihood of deportation at the end of his sentence. While incarcerated, his alien status potentially restricts him from certain BOP programs, including early release, reduced credits for participation in a residential substance abuse program, or serving his term in a minimum-security facility. Moreover, Mr. Appolon, before this conspiracy began, had invested significant time and effort into developing a career in real estate. Mr. Appolon had a college degree, graduated from a real estate school, and secured licenses first as an agent and later a broker. He worked for several years at various agencies before starting his own company, a business he continued to develop and invest in well after the conspiracy ended. As a result of his conviction, Mr. Appolon will likely never again be able to work in any capacity in real estate. Any sentencing decision should take into account the additional penalties Mr. Appolon will face as a result of his conviction, as well as the practical impossibility of recidivism.

Accordingly, Mr. Appolon respectfully submits that a 63-month sentence is "sufficient, but not greater than necessary" to achieve the purposes of sentencing in 18 U.S.C. § 3553(a)(2). It is a potent sentence—indeed, a sentenceof more than five years in federal prison is a daunting penalty to an individual who has never been found guilty of any offense or been incarcerated before. It appropriately reflects the seriousness of Mr. Appolon's offense, and is consistent with the sentencing range applied in other cases dealing with this class of crime.

## FACTUAL BACKGROUND

### I. Mr. Appolon's Personal and Family History

Born in Haiti in 1979, during the reign of kleptocrat and dictator Jean-Claude "Baby Doc" Duvalier, Ernst Appolon was left in the care of his grandmother at the age of two, while his parents emigrated to Miami, Florida, in search of stable employment. Presentence Report ("PSR") at ¶87-88. Although his family, hoping to provide a safe and secure environment, secured him a spot in a pre-school attended by children of politicians, Ernst was still affected as a young child by the instability and violence of 1980s Haiti. As a three-year-old, he witnessed –at close quarters– the brutal murder of his pre-school teacher as she taught Ernst's class. *Id*. at ¶ 88. After this traumatic incident, Ernst's parents, Morail and Marie Appolon, arranged to bring Ernst to the United States. *Id*.

Despite being reunited with his parents and family, Ernst's childhood in the United States was plagued by many of the same problems his family had attempted to escape in Haiti; throughout his childhood and early teens, Ernst's family life featured unpredictable swings between security and need, stability and sudden relocation, and safety and violence. Following work and job opportunities, Ernst's parents shuttled the family between the Haitian community in Miami and the community in the Boston area during Ernst's childhood and teenage years. *Id*.

at ¶89. His father, who has suffered from bouts of bipolar disorder, worked numerous jobs during Ernst's youth, including as a nightshift cab-driver. *Id*. at ¶92. Marie Appolon also worked in a number of professions, often holding multiple jobs. *Id*. at ¶93. His parents worked diligently to ensure that their sons did not go without the necessities, stressed the importance of education, and were attentive to the needs of their children. *Id*. at ¶ 90. When the family first arrived in Boston, they lived in rental properties and in-law apartments owned by other Haitians, scrimping to afford a down-payment on their first home. Ernst recalls that when his parents finally purchased their home at 72 Wood Ave. they, in turn, leased their basement apartment at below-market rent to newly-arrived Haitian families.

Although Ernst and his brothers were never neglected, his parents' employment situation meant that one parent was often out of the home (sometimes living in another state), and that the boys were left unsupervised at times, exposing them to dangers and traumas they might have otherwise avoided. At the age of 14, Ernst and a friend discovered the dismembered remains of a close friend, Evan, and Evan's mother and sister, in their home. *Id*. at ¶91. Ernst believes the murders were committed by Evan's father, who was charged and later fled, and who chased and attempted to kidnap Ernst on another occasion. Ernst never told his parents about either the discovery of his friend's body, or the near-kidnapping. *Id*.

Ernst also had to contend with his family's frequent resettlement, which bounced him between schools and uprooted him from friends. *Id*. at ¶ 89. Ernst attended two high schools, Hyde Park High School (from which he graduated in 1998) and North Miami High School. *Id*. at ¶¶89, 120. Although he enjoyed his time at Hyde Park High, where he participated in and excelled at sports, Ernst regarded attending North Miami High as a "very bad experience." *Id*. It was during this itinerant period of his life, when he was moved between schools and forced to

uproot as his family followed job opportunities, that Ernst developed a loathing of poverty and violence. *Id*. at ¶89.

Despite the challenges of his youth, Ernst graduated from high school and attended college at Middle Georgia College in Cochran, Georgia where he received an Associate's degree. *Id*. at ¶120. Although his degree was in pre-law, and he had hoped to attend law school, Ernst became interested in real estate at his mother's encouragement. In 2003, he enrolled in the New England Real Estate Institute, in Quincy, completing the agent's course the same year, and the broker's course in 2005. Id. at ¶121. An avid student, Ernst excelled at the school, performing well on tests and in class, and was remembered fondly by the founder of the school, Walter King. Beyond pursuing his career, King recalled Ernst also helped others become involved in real estate. "Ernst sent me many students . . . Many times he paid their tuition and supervised their attendance. I always believed his actions were uncommonly responsible (and at times – unselfish)." *Exhibit E* (Letter of Walter King, Oct. 14, 2010). Ernst was attending economics courses at UMass-Boston at the time of his arrest in the instant case. Id. at ¶123.

As a father of a young child, and the product of an upbringing which was, at times, buffeted by economic forces, Ernst's aspiration as an adult was to better himself and provide stability for his family. Ernst worked throughout college, and began a career in real estate as soon as he was qualified to work as an agent. *Id*. at ¶¶130-131. After working for several real estate companies, Mr. Appolon formed his own business, Epoch Realty. Id. at ¶¶127-130. Despite the prosecution's characterization of this entity as a shell company for use in the conspiracy, Mr. Appolon invested time and energy into Epoch; he rented office space, had a sign made, and continued the business well into 2008 (two years after the termination of the conspiracy), when he was offered an opportunity to work for Edward Jones. *Id*. at ¶126. During

this time, Mr. Appolon was also becoming involved in his community; most notably, he became involved in Prince Hall Freemasonry, participating in the community service projects in which his lodge was involved. According to Naheem Garcia, a member of Ernst's lodge "[Ernst] was seeking to have a political position to better serve his community, he found love and got married. His religious beliefs were becoming stronger and his sense of self was becoming clearer and was very evident to his peers." *Exhibit D* (Letter of Naheem Garcia, Oct. 11, 2006.)

## II. Mr. Appolon's Offenses in this Case

Between the autumn of 2005 and summer of 2006, Appolon was involved in 17 of the 21 real estate transactions involved in the conspiracy. The degree of Mr. Appolon's involvement varied from property to property, but Mr. Appolon's role remained the same throughout: as a real estate agent or broker. With the exception of the Graham and Robinson transactions, all of the properties involved had already been found without Mr. Appolon's assistance and Mr. Appolon only submitted the offer.

In this role, Mr. Appolon was involved, at most, in identifying and negotiating purchase prices on the properties – the conventional activities of a real estate agent or broker – and received payment from Daniel Lindley or Eric Levine at the closing of the transaction. PSR at ¶¶ 28, 32. As the buyer's broker, Mr. Appolon was not involved in the preparation of the Purchase and Sale agreements.[2] Mr. Appolon was also never involved in the mortgage application process, and – as a corollary – was not involved in the production of the forged or altered documents submitted to the lenders. In so far as Mr. Appolon attracted[3] buyers for these transactions, he acknowledges representing Norma Graham and Peter Robinson (buyers in the 21

[2] As demonstrated at trial, all of the P&S agreements had other names in the authorship line. As the buyer's agent, rather than listing agent, Mr. Appolon would not be involved in preparing the Purchase and Sale agreement. See, e.g., Trial Tr. vol. 25, 107 (May 18, 2010) (testimony of Janet Baxter, confirming that she drafted both P&S documents, not Mr. Appolon).

[3] Mr. Appolon reiterates his objection to the term "recruited" as applied to persons he represented as an agent.

Vera St. and 3231 Washington St. properties, respectively), but disputes their inclusion in the class of "straw buyers," noting that they both intended to, and did occupy their properties.

With respect to several buyers involved in the conspiracy, Mr. Appolon's businesses were sometimes used to provide a veneer of authenticity to their mortgage applications – specifically, by listing the entities as the buyer's employers. *Id*. at ¶31. Mr. Appolon – who was the owner of record of these businesses, and who was attempting to develop them as legitimate enterprises – denies authorizing this, and states that Andre Lamerique began the practice of listing Epoch Realty and Oligarchy Funding, and taking verification of employment phone inquiries from lenders, without Mr. Appolon's knowledge or approval. The bank accounts of Mr. Appolon's enterprises were also used to receive proceeds from the transactions. Id. at ¶32. At least one of these bank accounts, the B.E.S.U. account, was shared with a co-conspirator, Widmer Lamarre.

Mr. Appolon's drive to succeed, to better himself and provide for his family underlies his participation in this conspiracy. Where other co-defendants (notably, the government's star witness, Andre Lamerique) had significant criminal records and an intimate familiarity with various forms of fraud, Mr. Appolon has no convictions and had worked hard to establish himself in his community as a businessman. His sister-in-law, Aisha Harding, who worked for Ernst as a real estate agent recalled that "Ernst did not display anything unethical; rather strived to be a better business person and engaged his team to present and always remain professional." *Exhibit B* (Aisha Harding letter, Oct. 13, 2010).

Mr. Appolon has maintained that his participation in these transactions was premised on assurances from Eric Levine that their activities were within the boundaries of the law. For Mr. Appolon (who was in his mid-20s at the time of the alleged conspiracy), Eric Levine was a

larger-than-life figure – an attorney and a player in the Boston real estate market who had helped turn Robert Odimegwu from a penniless immigrant cab driver into a real estate mogul. Appolon regarded being taken under Levine's wing as a life-changing opportunity. Appolon – who was unaware that Levine had been suspended from the practice of law at the time – regarded Levine's success as a guarantee of the legitimacy of his methods, and it never occurred to him to question his mentor. Levine's ready assurances about the legality of "trapped equity," "construction give-backs," and "seller gifts outside of closing" were sufficient to quell any hesitation felt by an ambitious young man who harbored a deep-seated aversion to poverty, and is described by his wife as "naïve to a fault." *Id*. at ¶106; *Exhibit A* (Alexis Harding letter, Oct. 15, 2010).

**ARGUMENT**

The Presentence Report prepared by the Probation Department places Mr. Appolon at a level 33/I and recommends a sentence of between 135-168 months. Mr. Appolon argues that a sentence in the range of 63 months is more appropriate. As grounds therefore, he first argues that the Probation Department's Offense Level Computation is incorrect in several respects. The method employed in determining the amount of loss has been severely criticized in other courts as unreasonable and producing unreliable results; he contends that the evidence adduced at trial is insufficient to determine the actual loss, and that the appropriate measure should be either the gain, or the intended loss. Moreover, Mr. Appolon argues that a number of specific offense characteristic enhancements and adjustments are inappropriate, or incorrectly figured, and should not be applied. When figuring for these adjustments, this places Mr. Appolon at – at most – level 26; a 63-month sentence is the bottom of the range for a 26/I offender.

Second, Mr. Appolon argues that the advisory guideline range for fraud offenses is flawed, that courts hearing similar cases have repeatedly disregarded it and ordered sentences well below the suggested range, and that it should not be heeded in this case.

Third, Mr. Appolon argues several considerations support downward departure in his case. First, as noted in the commentary to § 2B1.1, a downward departure is warranted where the guideline substantially overstates the seriousness of the offense. Here, the unexpected collapse of the housing market contributed significantly to any "loss" suffered and skewed the guideline level (as calculated by the government) upward so steeply that it distorts Mr. Appolon's true culpability. Mr. Appolon also argues that his solid record of employment should be taken into account (particularly when contrasted against many of the other conspirators), as should the potentially serious additional penalties and disadvantages he faces, both during and after incarceration, as a resident alien.

Finally, Mr. Appolon argues that a sentence of 63 months is "sufficient, but not greater than necessary" to achieve the purposes of sentencing in 18 U.S.C. § 3553(a)(2). Ernst Appolon is a young man with a family (including ailing parents who currently have no children to assist them), who has no prior convictions and faces extremely serious consequences as a result of his conviction. An 63 month term of imprisonment is sufficient to punish Mr. Appolon adequately and to deter Mr. Appolon from future law-breaking, while setting a meaningful example for others who might be tempted to engage in mortgage fraud. A 63 month sentence also avoids sentencing disparity between Mr. Appolon and other defendants with similar records who have been convicted of similar offenses.

## I. The Offense Level Computation for Mr. Appolon is Excessive. Mr. Appolon's Offense Level Should Be No Greater than 26.

As noted above, Mr. Appolon argues that the Probation Department's Offense Level Computation is incorrect in several respects, placing him at an incorrect and much higher offense level. Regarding the first specific offense characteristic, the method employed to determine the amount of loss has been severely criticized in other courts as producing unreasonable results. Mr. Appolon contends that the evidence adduced at trial is insufficient to determine the actual loss, and that the appropriate measure should be either the gain, or the intended loss. Moreover, Mr. Appolon argues that remaining specific offense characteristic enhancements are inappropriate and should not be applied, and argues that the "role in the offense" adjustment overstates his actual role in the conspiracy. Mr. Appolon argues that, at the most favorable finding, his guideline offense level should be no more than 22 (resulting in a sentence of 41 to 51 months) and not greater than 26 (resulting in a sentence of 63 to 78 months.)

### a. The method of calculating loss incorrectly assumes that the original lender held the loan through foreclosure and absorbed the loss, and this method has been criticized as unreasonable by the 10th Circuit in similar factual circumstances.

In figuring the specific offense characteristic pertaining to loss, the Probation department appears to have relied heavily on the prosecution's loss calculation summary, demonstrating the amount borrowed on any given property, the amount recovered (where applicable) in foreclosure, and the difference between these two figures. While this chart is a compelling prop – boiling down complex transactions into a simple arithmetic problem – its simplicity makes it inappropriate at sentencing. The simplicity is the result of omitting any intervening transactions that occurred between the original borrowing and the subsequent foreclosure, a period that frequently took 18 months or more, during which time the mortgages on many properties appear

to have changed hands. It is, in other words, nearly impossible to tell if the original lender actually suffered any loss, how many sets of hands the mortgage passed through, and what costs or profits those subsequent owners of the mortgage may have experienced along the way.

This original-loan-minus-foreclosure-price method of calculating loss employed by the government has been strongly criticized precisely because of the many unknown factors it glosses over. The Tenth Circuit recently reversed in favor of the defendant when a district court employed this method of determining actual loss. *United States v. James*, 592 F.3d 1109 (10th Cir. 2010). In *James*, the district court, calculating the loss from a mortgage fraud scheme by subtracting foreclosure sales prices from the amount of the original loans. The defendant objected to this method, noting that the original lender had frequently sold the loan on to a successor lender, and the equation produced a faulty result.

The Tenth Circuit agreed that the district court's method was not a reasonable means for finding actual loss.[4] Instead, for determining loss to original lenders, the Tenth Circuit observed "that loss is the difference between the outstanding balance on the original loan and what the lender received when it sold the loan." *Id*. at 1115 (internal citations omitted.) The foreclosure sales price, the court warned, "is irrelevant to that computation because the original lender was not the recipient of those proceeds and because there is no evidence suggesting those figures were a reasonable estimate of what the original lenders received when they sold the loans to the successor lenders." *Id*. The Tenth Circuit also cautioned against relying on the foreclosure amount when determining loss, advising:

> "Nor is it reasonable in this case to subtract the foreclosure sales prices of the properties from the amount of the original loans in order to

[4] The Probation Office has suggested that, if the Court relies on *James*, it should find the concurring opinion more persuasive. Specifically, the concurring opinion suggests that the loan-minus-foreclosure equation is reliable for finding the "total loss." It should be noted that the guidelines do not consider "total loss," but look to "actual loss" or "intended loss," as defined in comment 3 of §2B1.1.

> calculate the actual loss sustained by the successor lenders. As noted, actual loss should be measured by the net value of what was taken-in other words, the difference in value between what was given and what was obtained. The successor lenders' actual loss, then, is the difference between what they paid the original lenders for the loans (less principal repayments by borrowers, if any) and what they received for the properties at the foreclosure sales, plus reasonably foreseeable expenses relating to the foreclosure proceedings. Using the amount financed by the original lender as a starting point in this calculation is improper when there is no evidence suggesting that the loans were sold to the successor lenders for sums approximating the original loan amount."

*Id*. (internal citations omitted).

The Government's proposed method for determining loss is unfair because it oversimplifies. A review of the evidence from trial tracking the properties' chains of title shows that the foreclosing party is, in all but a handful of occasions, a different entity than the original lender. [5] Moreover, testimony at trial from a witness familiar with the mortgage industry at the time in question described how loans were pooled and sold on from the original lender to subsequent holders.[6] For the purpose of prosecutorial advocacy, the Loss Calculation Summary provides a convenient broad-strokes précis. But for the purpose of arriving at an accurate estimate of loss and assessing the culpability of a defendant, the equation it employs concentrates entirely on two moments in the life of a loan that existed for more than a year, and leaves out far too much important detail. Put another way, the Loss Calculation Summary gives the first and last pages of a novel, but omits everything that occurred in between.

1. *Rather than relying on a criticized method, the court should look to the gain to the defendant in arriving at an appropriate loss increase.*

---

[5] In its final version of the PSR, the Probation Office notes, in response to an objection on this issue, that "because much of the information pertaining to loss was likely presented at trial, the Probation Office defers to the Court, as it was present to hear the testimony and to assess the evidence . . ." *Final Presentence Report of Ernst Appolon* at pg. 66. In fact, no evidence was presented during trial that took the court through every step of the loss for even one of the 21 transactions.

[6] See Trial Tr. vol. 14, 10-12 (April 29, 2010) (Testimony of Richard Pannone).

Although it might be possible to determine the actual loss, had there been more information available for the various loans, it *is* presently possible to determine the approximate amount earned by a defendant simply by reviewing evidence introduced at trial. Specifically, the government documented the "money trail" from each transaction in the "10"-suffixed exhibits (e.g., Ex. 2010A). Following those exhibits, it is possible to trace how much money flowed from the lender to Daniel Lindley and then on to Mr. Appolon.[7] And, unlike the Government's loss calculation, the gain is scrupulously tracked from the moment it left the lender to the moment it was deposited in Mr. Appolon's accounts; where determining the actual loss involves making a number of significant (and probably incorrect) assumptions, determining gain is a matter of simple bookkeeping.

The sentencing guidelines instruct the court to use "the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." USSG § 2B1.1, cmt. n. 3(B). Substituting gain for loss is, admittedly, not the preferred method as it "ordinarily underestimates the loss." *United States v. Triana*, 468 F.3d 308, 323 (6th Cir. 2006). And sentencing judges are cautioned not to abandon loss calculation in favor of gain "where a reasonable estimate of the victim's loss is feasible." United States v. Munoz, 430 F.3d 1357, 1371 (11th Cir. 2005).

For reasons argued above, determining actual loss is not feasible, at least in a reasonable manner. The gaps in the record make any calculation little better than a back-of-an-envelope guess, and there is also the issue of whether the losses in foreclosure were reasonably foreseeable, or the result of an unpredictably severe real-estate market crash

---

[7] *See* Exhibit 2607A.

(discussed below). For both of these reasons, relying on the loss calculation provided in the PSR renders an unfair result. It *may* be possible to determine the intended loss by looking to the value of the loan and the sale price of the property, as argued below, but the First Circuit cases that endorse this method have significant factual dissimilarities to this case, which might make their application questionable. In any event, of the various methods for determining the increase in levels under § 2B1.1(b)(1), the method advocated by the government relies heavily upon unproven assumptions, rather than on evidence already admitted at trial, and consequently renders a result that potentially overestimates the culpability of the defendants significantly.

Presuming that neither an actual loss nor intended loss figure can be accurately derived from the available evidence, the Government proposed at trial that the total figure earned by Mr. Appolon as a result of the conspiracy was $487,687.19, based upon checks and money orders deposited into his bank account, and the accounts of his business entities.[8] Although this number is a good starting point for determining Appolon's gain, Appolon notes that this figure is somewhat inflated, due to his sharing an account[9] with Widner Lamarre. Mr. Appolon is not certain of the precise figure he gained as a result of the transactions in question, but does recall that at least some of the proceeds deposited into his account were subsequently passed to Mr. Lamarre.

As noted in Mr. Appolon's objections to the PSR, there are several instances of multiple checks, drafted in similar amounts, deposited into one or more of Mr. Appolon's business

---

[8] The guideline notes that the court "shall use the gain that resulted from the offense", but does not elaborate on whether – in a multiple defendant fraud – whether the court should use total gain of all defendants, or gain to the particular defendant. §2B1.1 cmt. 3. In *United States v. Colton*, the 4th Circuit upheld the district court's sentencing decision to rely on the defendant's actual receipts from the fraud ($300,000 that was "kicked out" to the defendant), rather than increasing the level by 4 points for deriving more than $1,000,000 in gross receipts from the offense, where the entire gain was $2,052,000, and where the defendant held a 50 percent ownership interest in the corporation employed in the fraud. United States v. Colton, 231 F.3d 890, 911- 912 (4th Cir. 2000).

[9] The B.E.S.U. account. The government attributes the funds deposited into this account to Mr. Appolon.

accounts within days of a transaction closing. See, e.g., *Exhibit 1210-F* ($20,000 deposited into Oligarchy account, $16,000 deposited into B.E.S.U), *1310-I* ($22,710 deposited into B.E.S.U, followed by $21,096 deposited into B.E.S.U); see also, *1210-K* (two deposits of $43,274, deposited into the Oligarchy Funding and B.E.S.U account, respectively). Although it is difficult to determine how much of the proceeds deposited into these accounts (particularly the B.E.S.U. account) passed to Mr. Lamarre, it is unfair to attribute the full $487,687 to Mr. Appolon. If the "duplicate" deposits are apportioned as if they were payments to two people – as they very likely were – Mr. Appolon's gain should be decreased by between $60,000 and $80,000. It should be recalled that Thomas Zappala, the prosecution's summary witness, acknowledged that he revised the amount attributed to Mr. Appolon for this reason on at least one occasion in preparing exhibits for trial, after a check made out to B.E.S.U. was ultimately show to have been deposited into Mr. Lamarre's account.

In a similar vein, in Exhibit 2607-A (the table describing the distribution of proceeds among the defendants, from which the $487,687 figure is taken), Mr. Appolon is attributed the full $75,645.64 for the 60 Thetford St. transaction. A review of Mr. Appolon's bank records for the Epoch Realty account shows that the same day the $75,645 deposit was made, a $14,000 withdrawal occurred, see*USAO-WD01-00012820*, and a follow-up withdrawal of $22,000 occurred a week later, see *USAO-WD01-00012822*. Although it is impossible to pinpoint the recipient of this combined $36,000, the withdrawals have the characteristics of a distribution to another defendant, and Mr. Appolon's gain should be reduced accordingly.[10]

Reducing the $487,687.19 by the amounts laid out above would result in a gain to Mr. Appolon of between $371,000 and $391,000. At that level of gain, Mr. Appolon would have an

[10] This transaction involved the then-girlfriend of Daniel Appolon, Aneuzira Amado**,** acting as a purchaser**.** Testimony at trial indicated that Daniel Appolon received a large amount of cash in early 2006. *See* PSR ¶ 12.

increase of 12 points, pursuant to §2B1.1(b)(1)(G). Attributing the full $487,687 gain to Mr. Appolon would result in an increase of 14 points, pursuant to §2B1.1(b)(1)(H).

### 2. *As an alternative to relying upon gain, the court could attempt to figure the "intended loss," employing the method used in* United States v. McCoy, *and* United States v. Innarelli.

If the court declines to rely on the gain to Mr. Appolon for sentencing, it may still be possible to approximate intended loss by taking the difference between the loan price and the seller's price on the property. Under this method, the value of the loss on all properties is $1.912 million. The loss on the properties in which Mr. Appolon was directly involved, according to the government, is $1.77 million.[11] In either case, the loss figure would result in a 16 level increase, pursuant to §2B1.1(b)(1)(I).

In determining the amount of loss for sentencing purposes, the relevant commentary to section 2B1.1 instructs that the general rule is ". . . loss is the greater of actual loss or intended loss." U.S.S.G § 2B1.1 cmt. n. 3(A). Actual loss is the "reasonably foreseeable pecuniary harm that resulted from the offense," *id*. at n. 3(A)(i), which is, in turn, defined as "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id*. at 3(A)(iv).

In the First Circuit, a pair of recent cases, which emerged from a property-flipping mortgage fraud scheme in Springfield, Massachusetts, instruct that the intended loss, for sentencing purposes, was the total amount of the loan on a property, minus the amount initially paid for the property in question.

The method was first employed in *United States* v. *McCoy*, involving a land-flipping scheme, in which the defendants purchased properties at auction for a low price, engaged in

[11] Not disputing the jury's verdict, it should be noted that neither Peter Robinson nor Norma Graham were "straw buyer" style fraudulent transactions, and were qualitatively different –in terms of culpability – from other transactions involved in the conspiracy.

fraudulent activity to inflate their value – primarily by using corrupt appraisers – and then sold them on to unsophisticated buyers, who eventually defaulted on the loans. *McCoy*, 508 F.3d 74, 76 (1st Cir. 2007). The mechanics of the scheme differed from that alleged in the instant case, the end result was largely the same as alleged here; the defendants in *McCoy* pocketed the difference between the first and second transactions, and the lenders absorbed the cost when the purchasers defaulted. The defendant pleaded guilty and was sentenced to 46 months, based – in part – on a calculated loss between $400,000 and $1,000,000. The district judge arrived at this figure by taking the full value of the mortgage loan, and subtracting from it the amount "that the conspirators had paid for the properties – treating the latter as a proxy for their value as security." *Id*. at 77.

The defendant, who had suggested the appropriate formula was the difference between the value of the loan and what the banks recovered in foreclosure,[12] appealed. Although the First Circuit remanded for re-sentencing –due to a mathematical error by the sentencing judge – it upheld the loan-minus-price-paid method employed by the sentencing judge as the appropriate means for discerning the intended loss. McCoy, the court noted, was obtaining loans for low-income individuals and those with poor credit, and an objectively reasonable person in his position "could-and-should-have expected that the banks would probably recover only the value of the mortgaged properties. Intended loss was therefore the value of the loans less the expected value of the properties." *Id*. at 79.

The method was challenged again, and once again upheld, a year later in *United States* v. *Innarelli*. The defendant, an attorney who was a member of the same scheme as the defendant in *McCoy*, pleaded guilty and received an 18-point increase for losses between $2.5 and $7 million.

[12] Because the defendants had purchased distressed properties at auction, and because the real estate market had heated up between the defendant's purchase and the seller's eventual default, the lenders, in several instances, recovered more at foreclosure than the defendants had initially paid.

*Innarelli*, 524 F.3d 286, 289 (1st Cir. 2008). Again, the sentencing court employed the loan-minus-price-paid method, and the defendant appealed. *Id*. at 291. The defendant argued that he should not be assessed the full difference between the two values, as he did not intend for purchasers to default (indeed, his professional well-being would have suffered), that not all of the purchasers actually defaulted, and as noted in *McCoy*, that some properties appreciated substantially, allowing the foreclosing lenders to turn a profit. *Id*. The First Circuit reiterated its support for the loan-minus-initial-price, noting that it had recently approved the district judge's method in *McCoy*, and further held that it focused its "loss inquiry . . . on the objectively reasonable expectation of a person in his position at the time he perpetrated the fraud, not on his subjective intentions or hopes." *Id*. at 291.

For the same reason the defendants in *McCoy* and *Innarelli* could not benefit from an unexpected spike in the real-estate market, Mr. Appolon should not be penalized for the losses suffered when the bottom unpredictably dropped out of the market. That Boston's housing market was dangerously overheated may be plainly evident in hindsight, but at the time the transactions occurred, credit was easily available, properties sold quickly and were flipped easily, prices continued to climb, and no one–from the buyers to the defendants to the lenders – anticipated that the hangover was so close or would be so severe.

Mr. Appolon, similar to Mr. McCoy, found real estate for low-income individuals. And, like Mr. McCoy, perhaps he could and should have reasonably expected that some might default, and that the banks would recover only the value of the mortgaged properties. At the time Mr. Appolon should have known this, however, the value of the mortgaged properties was substantially higher; the seller's price, prior to any sort of manipulation or inflation by co-

conspirators or friendly appraisers,[13] represents a reasonable proxy for this value. To determine the loss - as the Probation Office proposes - based on values recovered in the wake of a global recession and near-collapse of the market that blindsided the Untied States Secretary of the Treasury, the Chairman of the Federal Reserve, and CEOs at some of the world's largest financial institutions, would go beyond all bounds of what Mr. Appolon could-or-should-have expected and credit him with something akin to precognition.

**b. The court should not treat the lenders of the original mortgages as victims, and should not find that the offense involved 10 or more victims.**

Mr. Appolon argues that as the transactions to which he was directly connected involved only eight, rather than 10 lenders. On a more fundamental level, Mr. Appolon argues that there was no evidence produced at trial demonstrating that *any* of the original lenders suffered a loss on these transactions, qualifying them as "victims." In the absence of evidence demonstrating loss and proving any lender's "victim" status, this specific offence characteristic should not be applied to Mr. Appolon.

The commentary to § 2B1.1 defines victim, in pertinent part, as "(A) any person who sustained any part of the actual loss determined under subsection (b)(1)". U.S.S.G § 2B1.1 cmt. n. 1. Again, as acknowledged by the Tenth Circuit in *James*, original lenders quickly packaging and reselling loans on to successor lenders was a common practice in the mortgage industry at the time in question. As argued above, the evidence presented at trial focused only on the initial mortgage loans and then the eventual foreclosure. A review of the exhibits shows that the original lender was rarely still the lender at the time of foreclosure, suggesting that the loans

[13] It is noteworthy that many of the properties at issue were subjected to a second round of appraisal by the lenders – who had the most at risk in these transactions - and were still approved at the much-higher inflated price or, where the internal appraisers raised a red-flag, the reductions were still well above the price paid to the seller. See, e.g., USAO-WD01-00028926 – 00028947 (in-house appraisal performed on 602 South St., questioning professional appraisal findings and adjusting price downward 25 percent to $450,000).

changed hands on at least one or more occasions.[14] In many, if not all, of these transactions, the original lender "victims" may have experienced no loss, or even turned a profit. To treat these lenders as victims, absent some evidence to support the claim, accepts an unproven assumption by the government. Although Mr. Appolon does not discount the likelihood that there may have been victims in these transactions, their number and identity is currently unknown and unproven. Absent further information, the court should find that the government has not met its burden to apply this enhancement, with regard to lenders.

Mr. Appolon further argues that the government's assertion that "at least two of the sellers, who did not know about the fraudulent activity" were victims is incorrect, and should not be used in support of this enhancement. It is difficult to fathom how the sellers in these transactions, who were always paid the full amount of their sales price, were *victims* of the alleged fraud. At worst, they accepted a lower price than they might have otherwise received from a different buyer. Any opportunity cost argument, however, is speculative, and the government presented no evidence at trial that a seller turned down a more advantageous offer from a third party. Moreover, as no evidence was produced showing that any seller sustained any part of the actual loss, they should not be treated as victims, as defined by the commentary to § 2B1.1.

A similar argument applies to the government's assertion that the buyers were victims. As many of them, by the government's version of events, were simply credit-score stand-ins who received money for their participation in the fraud, it is difficult to regard them as victims. Again, it should be noted that no evidence or testimony was presented at trial by any of the buyers that they suffered financially for their participation in the transaction.

[14] *See, e.g.*, Ex. 1207A & B (original lender is New Century Mortgage) and 1207C (foreclosing lender is Morgan Stanley) and 1207D (Grantor on Quitclaim Deed is "Consumer Solutions REO, LLC").

**c. The Court should not find that Mr. Appolon or his Co-Defendants employed "Sophisticated Means" in furtherance of the conspiracy.**

Mr. Appolon argues that the "sophisticated means" enhancement is not appropriate in this case. The sentencing guidelines commentary regarding this specific offense characteristic defines sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment on an offense" and gives the use of fictitious entities, corporate shells, or offshore financial accounts as a means to conceal transactions. U.S.S.G. §2B1.1 cmt. 8(B). Instances in which the enhancement has been upheld include instances where defendants have shuffled millions of dollars between multiple accounts, filed fraudulent tax returns and doctored meeting minutes to conceal embezzling and money laundering operations,[15] where defendants engaging in a check fraud scheme suborned bank employees to provide confidential information on checking account activity – allowing the defendants to select accounts where detection would be more difficult – and recruited a substantial group of check cashers;[16] and where defendants engaging in check fraud and the production of false identification moved from state to state, obtaining state identification cards with false information, and used these IDs to establish checking accounts as the assumed identities in a highly complex scheme which had been "extensively planned" and "executed with careful attention to detail."[17]

In the instant case, although the scope of the fraud was considerable, the mechanics were fairly crude in their execution. Mr. Appolon's co-defendants essentially cut-and-pasted signatures to create duplicate documents; certain buyers were re-used in rapid succession, sometimes more than twice, which increased the chance of detection; and, as more than one witness testified, several of Mr. Appolon's co-defendants were seen drinking or smoking

[15] *United States v. Garcia-Pastrana*, 584 F.3d 351 (1st Cir. 2009).
[16] *United States v. Jones*, 530 F.3d 1292 (10th Cir. 2008).
[17] *United States v. Harvey*, 413 F.3d 850, 853 (8th Cir. 2005).

marijuana while conducting their work, suggesting that the scheme did not require a high degree of professionalism, or even sobriety, to carry off successfully. In terms of the complexity of the fraud, it required only a few elements (primarily, a fax machine, a copy of MS-Paint or a similar graphic program, and individuals willing to stand in as straw buyers) and none of these required particular skill or thought. There were no master forgers or computer geniuses at work on these deceptions.

Although the disbursement of the proceeds was somewhat more structured, it is difficult to argue that they accomplished much in terms of concealing the offense, or frustrated attempts to follow the money trail. The payments, despite allegations by the government to the contrary, were not made to “fictitious” entities. Epoch Realty, for example, was Mr. Appolon’s actual real-estate company and continued to exist after the conspiracy ceased. And the bank accounts to which funds were transferred were all domestic, and their records easily produced. This case, quite simply, did not involve illicit funds being routed through a labyrinth of opaque corporate shells and numbered accounts in Zurich. Rather, the disbursements were made to entities whose ownership was a matter of public record,[18] and were deposited into bank accounts which made no attempt to disguise the identity of the signatory. If anything, the volumes of bank records produced by the government during discovery, attest to *lack* of sophistication in whatever attempts may have been made to conceal the money trail.

[18] See Exhibits 2520 (Certified Copy of the Certificate of Organization of Oligarchy Funding, LLC) and 2523 (Certified Copy of the Certificate of Organization of Epoch Realty, LLC).

**d. Mr. Appolon's role in the conspiracy should be treated as a "Manager or Supervisor" Rather Than an "Organizer or Leader," and the adjustment should be reduced accordingly.**

The Probation Office has applied a 4 level increase to Mr. Appolon, asserting that he held an organizer or leadership role in the offense. Mr. Appolon argues that this adjustment is inappropriate at its current level, as it overstates his involvement in the offense.

In support of this adjustment, the Probation Office asserts that Mr. Appolon "recruited straw buyers and co-conspirators," "actively assisted Levine and Lindley in deciding to whom the loan proceeds would be disbursed, "made decisions with respect to which properties to target," and that he maintained shell entities which were used to backstop loan-applicants' employment information, and as a means for distributing proceeds of the transactions.

Mr. Appolon objects to the characterization of Peter Robinson and Norma Graham as straw buyers, and denies involvement in recruiting Andre Lamerique's then-girlfriend to purchase 5 Coleman St. Both Robinson and Graham occupied the properties for a significant period of time after purchasing them (Robinson did renovations on his property, intending to rent one of the units, and Graham was still living in the Vera Street property on the eve of trial). Although the evidence might support a conclusion that Mr. Appolon assisted these individuals in purchasing properties they ultimately could not afford – hardly an uncommon occurrence among those working in real estate in the mid-2000s – it is inaccurate to describe either Robinson or Graham as persons recruited to lend their name and credit rating to a transaction in order to conceal the identity of the true purchaser. Nor did Mr. Appolon solicit Ms. Richardson to purchase 5 Coleman St. Ms. Richardson was the then-girlfriend of Andre Lamerique, who was an associate of Widner Lamarre through a prior check fraud conspiracy. It is through Lamarre and Lamerique, not Appolon, that Ms. Richardson became involved in the 5 Coleman St. transaction. In fact, the most detailed testimony at trial regarding the recruitment of straw buyers

emerged from Elizabeth Son, who detailed the "pitch" she and Andre Lamerique delivered to Reneitia Romaine, the purchaser of one of the 22 Estrella St units.[19]

Mr. Appolon had a role in the conspiracy, but it was not as a leader or organizer, or otherwise-central figure. Unlike attorneys Levine and Lindley, Mr. Appolon was not involved in every property transaction in this conspiracy. Unlike Mr. Levine, Mr. Appolon did not always receive payment for transactions in which he was involved. Mr. Levine also had prior experience organizing real estate enterprises of dubious legality (local media had covered Mr. Levine's questionable real estate practices with partner Robert Odimegwu as early as 2006).[20]

Moreover, after the conspiracy ended, Mr. Appolon went his own way. By contrast, several of the other co-defendants continued their association with Mr. Lamerique –in some cases living with him, or in properties he provided for them – and that this group continued to commit mortgage fraud for another six to eight months before Lamerique's eventual capture.[21] At trial, Jermaine Blake testified that, although the New England Merchants group (the mortgage brokers) operated for a period out of Mr. Appolon's home, Mr. Appolon rarely socialized with them, and was frequently not even in Massachusetts.[22] Blake also testified that Mr. Lamerique had intended to put a contract out on Mr. Appolon's life, and that he had hoped to frame Mr. Appolon.[23] In fact, Mr. Lamerique's contributions to the fraud were far more instrumental than Mr. Appolon's, and Mr. Lamerique continued to hold considerable sway over the conspirators, most of whom worked directly under him.

---

[19] Trial Tr. vol. 12, 58-60 (April 27, 2010).
[20] Kathy Curran, *I-Team Uncovers Lawyer's Questionable Land Deals*, (May 24, 2006), http://wbztv.com/local/I.Team.Eric.2.578953.html
[21] Trial Tr. Vol. 23, 175-179 (May 12, 2010).
[22] *Id*. at 171-173.
[23] Id. at 189-190.

Mr. Levine brought extensive legal and real-estate experience to the table, and Mr. Lamerique his equally extensive experience with fraud; by contrast Mr. Appolon was a relative newcomer to the real estate business –gaining his agent's license in 2003 and his broker's license in 2005 – and his primary contribution to the conspiracy was his ability to serve as a broker in the transactions and the use of his business entities. The jury certainly concluded that Mr. Appolon was a member of the conspiracy, and perhaps that he did exercise some control over it at points, but he was not an organizer or leader as co-defendants Levine and Lamerique were. Based on the evidence produced at trial, the most that can be justified is a 3-point "manager or supervisor" enhancement.

## II. The Advisory Guideline Range Should Not Be Heeded Because It is the Product of a Fraud Guideline Unsupported by Empirical Data.

The advisory guideline range in this case is far greater than necessary to satisfy the goals of sentencing. The harsh sentencing recommendations of § 2B1.1 are not based on past practice or empirical data, and have been increasingly rejected by sentencing courts in high-loss fraud cases. As the sample of cases highlighted below demonstrates, defendants in fraud cases involving less than $100 million in loss typically receive less than 10 years imprisonment, even when the Guidelines recommend a much higher sentence.

Ernst Appolon's advisory guideline range is approximately three times longer than the sentencing range he would have faced under the original guidelines adopted in 1987. Over the past twenty years, the Sentencing Commission has dramatically increased the severity of sentences for fraud offenders by raising the number of points imposed for the amount of loss *and* by approving a five-fold expansion in the number of specific offense characteristics. Because the Commission failed to cite empirical data when making these changes – and thus failed to fulfill

its institutional role – sentencing courts have tremendous discretion to disagree, on policy grounds, with § 2B1.1's sentencing recommendations. *See Spears v. United States*, 129 S. Ct. 840, 843 (2009) (explaining that when the Commission fails to fulfill its institutional role, a district court can vary from the guidelines "based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case").

When the Sentencing Commission adopted the original guidelines in 1987, it sought to ensure that white collar offenders faced "short but definite period[s] of confinement." U.S. Sentencing Commission, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform, at 56 (Nov. 2004) [hereinafter Fifteen-Year Report]. The Commission thus reduced the availability of probation and adopted a fraud guideline that subjected a defendant to no more than 78 months in prison. To justify the increase in the rate of confinement above pre-guidelines practice, the Commission explained that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm." USSG, ch. 1, intro., pt. 4(d) (1987).

But, as noted above, the Commission has abandoned its original goal of ensuring "short but definite" sentences, and has instead steadily increased the prison sentences for fraud. Calculating Ernst Appolon's guideline range under various versions of the Guidelines provides a stark illustration of the dramatic escalation in the punishment for fraud over the past twenty years.

**1987**

| | | |
|---|---|---|
| 2F1.1(a) | base offense level | 6 |
| 2F1.1(b)(1)(L) | amount of loss: over $5,000,000 | 11 |
| 2F1.1(b)(2) | more than minimal planning and/or multiple victims | 2 |
| 3B1.1 | Leadership role | 4 |
| | | 23 |

**TOTAL OFFENSE LEVEL 23**
**GUIDELINE RANGE 46-57 Months**

**1992**

| | | |
|---|---|---|
| 2F1.1(a) | base offense level | 6 |
| 2F1.1(b)(1)(O) | amount of loss: more than $5,000,000 | 14 |
| 2F1.1(b)(2) | more than minimal planning and/or multiple victims | 2 |
| 3B1.1 | Leadership role | 4 |
| | | 26 |

**TOTAL OFFENSE LEVEL 26**
**GUIDELINE RANGE 63-78 Months**

**2001**

| | | |
|---|---|---|
| 2B1.1(a) | base offense level | 6 |
| 2B1.1(b)(1)(J) | amount of loss: more than $2.5 million | 18 |
| 2B1.1(b)(2)(A) | More than 10 victims, less than 50 | 2 |
| 2B1.1(b)(8)(C) | Sophisticated means | 2 |
| 3B1.1 | Leadership role | 4 |
| | | 32 |

**TOTAL OFFENSE LEVEL 32**
**GUIDELINE RANGE 121-151 Months**

**2009**

| | | |
|---|---|---|
| 2B1.1(a)(1) | base offense level | 7 |
| 2B1.1(b)(1)(J) | amount of loss: more than $2.5 million | 18 |
| 2B1.1(b)(2)(A) | 10 or more victims | 2 |
| 2B1.1(b)(9)(C) | offense involved sophisticated means | 2 |
| 3B1.1 | Leadership role | 4 |
| | | 33 |

**TOTAL OFFENSE LEVEL 33**
**GUIDELINE RANGE 135-168 months**

In other words, the Commission has effectively tripled the sentencing range for a defendant guilty of Ernst Appolon's crimes in the twenty years since the Guidelines were first adopted. The Commission has adopted this radical shift in sentencing policy without the support of any empirical data demonstrating the penological value of its substantial increases in sentence severity. *United States v. Aldelson*, 4441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (citing Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)) ("[Be]cause of their arithmetic approach and also in an effort to appear 'objective,' [the Guidelines] tend to place great weight on putatively measurable quantities, such . . . [the] amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors.") Because the Commission failed to cite empirical data – and thus failed to fulfill its institutional role – sentencing courts have tremendous discretion to disagree, on policy grounds, with § 2B1.1's recommendations. *See Spears v. United States*, 129 S. Ct. 840, 843 (2009) (explaining that when the Commission fails to fulfill its institutional role, a district court can vary from the guidelines "based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case"). And indeed, "since *Booker*, virtually

every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines [in corporate fraud cases] and the fundamental requirement of Section 3553(a) that judges imposes sentences 'sufficient, but not greater than necessary' to comply with its objectives." Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 169, 2008 WL 2201039, at *4 (Feb. 2008).

The chart below highlights a number of the fraud cases, including numerous recent mortgage fraud cases, in which district court judges have imposed sentences below the advisory guideline range.

| Case | Conviction | Guideline Amount | Guideline Range | Sentence |
|---|---|---|---|---|
| ***Christian Milton***, AIG, Vice President (D. Conn. 2009) | Convicted at trial of various counts of fraud. | | LIFE imprisonment | 48 months[24] |
| ***Ronald Ferguson***, CEO, General Reinsurance Corp. (D. Conn. 2008) | Convicted at trial of conspiracy, securities fraud, false statements to SEC, and mail fraud. | $544 million | LIFE imprisonment | 24 months[25] |
| ***Hector Orlansky***, President, E.S. Bankest (S.D. Fla. 2007) | Convicted at trial of conspiracy to commit bank fraud and wire fraud, bank fraud, making false statements, wire fraud, conspiracy to commit money laundering and money laundering. | 164.5 Million (ordered in restitution). | 262-327 Months | 240 Months[26] |
| ***Richard Adelson***, CEO & President, Impath (S.D.N.Y. 2006) | Convicted at trial of conspiracy, securities fraud, and filing false reports with the SEC. | $50 - $100 million (ordered in restitution) | Guidelines called for life imprisonment; statutory maximum was 85 years. | 42 Months[27] |
| ***Bernard Ebbers***, CEO, WorldCom (S.D.N.Y. 2005) | Convicted at trial of conspiracy, securities fraud, making false filings with the SEC. | Over $1 billion | 360 months to life | 300 months[28] |
| *Lennox Parris*, | Convicted at trial of | Between $2.5 and | 360 months to LIFE | 60 months[29] |

[24] *United States v. Milton*, Case No. 3:06-cr-00137, Docket Entry 1216 (D. Conn. Jan. 30, 2009) (Judgment); *United States v. Milton*, No. 3:06-cr-00137, Docket Entry 1164 (D. Conn. Oct. 31, 2008) (Ruling on Loss Calculation, Victim Enhancement, and Restitution).

[25] *United States v. Ferguson*, Case No. 3:06-cr-00137, Docket Entry 1199 (D. Conn. Dec. 31, 2008) (Judgment); *United States v. Ferguson*, No. 3:06-cr-00137 , Docket Entry 1164 (D. Conn. Oct. 31, 2008) (Ruling on Loss Calculation, Victim Enhancement, and Restitution).

[26] *United States v. Orlansky*, Case No. 1:03-cr-20951, Docket Entry 1196 (S.D. Fla. Nov. 16, 2007) (Judgment). *See also*, *United States v. Orlansky*, Case no. 1:03-cr-20951, Docket Entry 1054 (S.D. Fla. July 17, 2007) (Defendant's Sentencing Memorandum).

[27] *United States v. Adelson*, 441 F. Supp.2d 506, 514 (S.D.N.Y. 2006), *aff'd* 2008 WL 5155341 (2d Cir. Dec. 9, 2008). *See also United States v. Adelson*, Case No. 1:05-cr-00325, Docket Entry 86 (S.D.N.Y. June 6, 2006) (Judgment).

[28] *See United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006). Ebbers' sentence has been widely viewed as "one of the mostsevere given to a first-time offender for a crime that did not involve violence or trafficking in illegal narcotics." *See* Peter J. Henning, White Collar Crime Sentences After Booker: Was the Sentencing of Bernie Ebbers Too Harsh I, 37 MCGEORGE L. REV. 757 (2006).

| | | | | |
|---|---|---|---|---|
| Director, Queench, Inc. (E.D.N.Y. 2008) | conspiracy to commit securities fraud, securities fraud, conspiracy to commit witness tampering, and witness tampering. | $7 million | | |
| *Lester Parris*, Director, Queench, Inc. (E.D.N.Y. 2008) | Convicted at trial of conspiracy to commit securities fraud, securities fraud, conspiracy to commit witness tampering, and witness tampering. | Between $2.5 and $4.9 million | 360 months to LIFE | 60 months[30] |
| *Leon Truskowski*, Operator of People's Home Mortgage (W.D.Pa 2009) | Pleaded guilty to tax evasion in connection with a wire fraud and money laundering conspiracy that involved submitting fraudulent loan documents to lenders, producing losses to lenders in excess of $1 million | More than $1,000,000 but less than $2.5 million. | 63-78 Months | 46 Months[31] |
| *Harold Stafford*, Owner/Controller Stafford Lease Group, Inc.; Stafford Holding Group, Inc.; Keys to Success, Inc. (M.D. Tenn. 2009) | Convicted at trial of 51 counts of conspiracy, wire fraud, bank fraud, and money laundering in connection with a mortgage fraud scheme involving the purchase of 22 luxury homes by financially unqualified straw buyers. Loan applications overstated borrowers' income, falsely listed homes as primary residences, and failed to disclose multiple home purchases by straw buyers. | Between $2.5 and $4.9 million | At least 135 – 168 months*<br><br>*(based on known loss, and enhancements objected to by defendant) | 96 Months[32] |
| *Larry Nardelli*, Owner of Bay Area Holdings Group; Elba International, LLC. (M.D. Fla. 2009) | Convicted at trial of conspiracy to make false statements to financial institutions in connection with commercial loan applications, making false statements, bank fraud, and money laundering in connection with a land-flipping conspiracy | $5,725,937 | 78 to 97 Months | 48 Months[33] |
| Robert Andrew Penn, | Pleaded guilty in connection | $6,937,843 | At least 87-108* | 84 Months[34] |

[29] *See United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008).
[30] *Id*.
[31] See *United States v. Truskowski*, Case no. 2:09-cr-00029-JFC-1, Docket Entry 11 (W.D. Pa. July 29, 2009) (Judgment); *See also*, *United States v. Truskowski*, Case no. 2:09-cr-00029-JFC-1, Docket Entry 9 (W.D. Pa. July 22, 2009) (Tentative Findings as to Defendant)
[32] *See United States v. Stafford*, Case No. 3:07-cr-00221-1, Docket Entry 189 (M.D. Tenn. June 22, 2009) (Judgment); *See also*, *United States v. Stafford*, Case No. 3:07-cr-00221-1, Docket Entry 165 (M.D. Tenn. June 10, 2009) (Defendant's Objection to Presentencing Report).
[33] *See United States v. Nardelli*, Case No. 8:08-cr-00313-JDW-TBM, Docket Entry 242 (M.D. Fla. Aug. 13, 2009)(Judgment); *See also*, *United States v. Nardelli*, Case No. 8:08-cr-00313-JDW-TBM, Docket Entry 241 (M.D. Fla. Aug. 11, 2009)(Minute entry for sentencing proceedings of Aug. 10,2009).

| | | | | |
|---|---|---|---|---|
| (S.D. Ind. 2010) | with multi-million dollar mortgage fraud scheme in the Indianapolis area involving numerous co-conspirators, and involving as many as 136 fraudulent loans totaling $16.6 million. | | *(based on known loss, and enhancements agreed upon in plea agreement) | |
| *Richard Garries*, Loan Broker/Originator, Security First Funding Corp. (E.D. Va. 2009). | Convicted at trial on 24 charges, including conspiracy, mail fraud, wire fraud, money laundering, structuring and making false statements in a complex property "flipping" scheme which involved misleading both buyers and lenders. At the time of the offenses, Garries was on probation from a previous federal conviction for wire fraud, for which he had received a 25 month sentence. | $967,486.66 | 235-293 months* <br><br> * Garries' PSR placed him at 35/IV, based on offense conduct and his prior conviction. | 240 Months[35] |
| *Stafford Hilaire*, Loan Officer, Vice-President Catalina Century Mortgage. (D. Colo. 2010) | Convicted at trial of conspiracy and conspiracy to commit money laundering in connection with a mortgage fraud scheme which involved falsifying borrowers' information to secure loans which the borrowers were financially unqualified to receive. | $1.2 Million | 87-108 months | 32 Months[36] |

In the above-cited cases, courts have substantially varied from the guideline range based on: (1) policy disagreements with § 2B1.1's sentencing recommendations, (2) concerns about unwarranted disparities *vis-à-vis* the many courts who have declined to impose within-guidelines sentences in fraud cases, and/or (3) mitigating aspects of a particular defendant's history or the nature and circumstances of his/her offense. As discussed at greater length below, these very

[34] *See United States v. Penn et al*, Case no. 1:09-cr-00114-DFH-KPF-1, Docket Entry 58 (S.D. Ind. Jan. 11, 2010) (Judgment); *See also United States v. Penn et al*, Case no. 1:09-cr-00114-DFH-KPF-1, Docket Entry 45 (S.D. Ind. Oct. 6, 2009) (Plea Agreement).

[35] *See United States v. Garries et al*, Case no. 4:08-cr-00050-RGD-JEB-1, Docket Entry 119 (E.D. Va. Oct 19, 2009) (Judgment); *See also United States v. Garries et al*, Case no. 4:08-cr-00050-RGD-JEB-1, Docket Entry 115 (E.D. Va. Oct 6, 2009) (Government Position on Sentencing memo).

[36] *See United States v. Carnegie et al*, Case no. 1:04-cr-00463-MSK-20, Docket Entry 2418 (D. Colo. Apr. 27, 2010); *See also, United States v. Carnegie et al*, Case no. 1:04-cr-00463-MSK-20, Docket Entry 1578 (D. Colo. Jan. 18, 2007) (Government Position on Sentencing memo).

same factors weigh in favor of a statutory sentence below the advisory guideline range in Mr. Appolon's case.

**a. The lengthy sentences, under § 2B1.1, for high-loss fraud defendants do not reflect sound policy.**

When the Sentencing Commission fails to fulfill "its characteristic institutional role" of developing a particular guideline, or its later amendments, based upon empirical data, national experience, or some rational policy basis, the district court has the discretion to conclude that the resulting advisory range "yields a sentence 'greater than necessary' to achieve §3553(a)'s purposes, even in a mine-run case." *United States v. Kimbrough*, 128 S. Ct. 558, 575 (2007). Similarly, when the Commission acknowledges problems with a particular guideline but fails to make appropriate modifications, a sentencing court has greater latitude to sentence outside the advisory range. *Id*. (upholding below-guidelines sentence based on policy disagreement with crack/powder disparity where Commission itself had reported that the disparity produced disproportionately harsh sanctions).

The Sentencing Commission has dramatically increased sentences for fraud over the past 20 years. These steady increases have been adopted without empirical support, without adequate consideration of the cumulative effect of overlapping enhancements, and despite research showing that shorter sentences provide adequate deterrence for white collar fraud offenders. Accordingly, the resulting guideline ranges should be given minimal weight in this Court's § 3553(a) analysis.

1 *The Commission has dramatically increased sentences for fraud despite consensus in the social science community that increases in sentence severity have little, if any, deterrent effect.*

In promulgating the original fraud guideline, the Sentencing Commission aimed to reduce the availability of probation and ensure "short but definite periods of confinement for a larger proportion of [ ] white collar cases." *Fifteen-Year Report* at 56. The Commission's approach was consistent with research, available at the time, showing that the certainty, rather than the length, of a sentence has the greatest deterrent effect. In one widely-regarded study from the pre-guideline era, for example, researchers studied white collar offenders (presumably the most rational potential offender) and found no difference in deterrence even between probation and imprisonment. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995).

In the twenty years since the Guidelines were first adopted, empirical research has continued to show that while certainty of imprisonment has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447,-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."). Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch, et al, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British

Home Office, examined penalties in the United States as well as several European countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id*. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id.* at 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. at 1. Yet another study concluded: "There is generally no significant association between perceptions of punishment levels and actual levels . . . implying that increases in punishment levels do not routinely reduce crime through deterrence mechanisms." *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

In short, the Commission has dramatically increased sentence length for fraud offenders in the face of overwhelming social science research showing that such increases in severity have little, if any, deterrent value. In promulgating the various sentence increases for fraud offenses over the past twenty years, the Commission has offered no empirical data to rebut the virtual consensus in the social science community disputing the deterrent value of such increases. Offenders like Ernst Appolon thus face sentences three times greater than called for by the original guidelines even though they would be equally deterred by much shorter sentences.

*2 The large number of specific offense characteristics under § 2B1.1 are cumulative and fail to accurately reflect the seriousness of the offense.*

When the Guidelines were first adopted in 1987, the fraud guideline, then § 2F1.1,

provided just a small number of enhancements for specific offense characteristics. USSG § 2F1.1 (1987). Besides the amount of loss, the original § 2F1.1 imposed enhancements if the offense involved (1) more than minimal planning, (2) more than one victim, (3) a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious or political organization or government agency, (4) the violation of a judicial or administrative order, or (5) the use of foreign bank accounts/transactions to conceal the nature or extent of the fraudulent conduct. In short, the original fraud guideline provided only six possible enhancements above the base offense level.

Twenty years later, § 2B1.1 – the current fraud guideline – includes nearly thirty different enhancements for specific offense characteristics. USSG § 2B1.1 (2009). And yet, "the [Sentencing] Commission has never explained the rationale underlying *any* of its identified specific offense characteristics, why it has elected to identify certain characteristics and not others, or the weights it has chosen to assign to each identified characteristic." *United States v Adelson*, 441 F. Supp. 2d 506, 510 (S.D.N.Y. 2006) (quoting Kate Stith & José Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)). Furthermore, the Commission has failed to address the problem that many of these factors replicate or overlap with the loss concept, with one another, and with further upward adjustments in Chapter 3. In its *Fifteen-Year Report*, the Commission acknowledged that "as more and more adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness." *Fifteen-Year Report* at 137. But the Commission has done nothing more than identify the risk of what it labeled "factor creep"; it has not taken any action to evaluate which factors might be cumulative and whether its

ever-expanding scheme of sentencing factors under § 2B1.1 produces sentences greater than necessary to achieve the goals identified in 18 U.S.C. § 3553(a).

Though the Commission itself has failed to remedy the problem of "factor creep," an increasing number of courts have declined to sentence within guideline ranges that are the product of overlapping specific offense characteristics. *See, e.g.*, *United States v. Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004) (subsequently vacated in light of *Booker*) (upholding departure to mitigate effect of "substantially overlapping enhancements" at the high end of the fraud sentencing table); *Adelson*, 441 F. Supp. 2d at 506, 510; *United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008) (complaining that guidelines in security fraud prosecutions "are patently absurd on their face" due to the "piling on of points" under § 2B1.1). In *Adelson*, for example, the district court found that the "calculations under the Sentencing Guidelines lead to a result [ *i.e.*, an effective life sentence] so patently unreasonable as to require the Court to place greater emphasis on other sentencing factors to derive a sentence that comports with federal law." 441 F. Supp. 2d at 506. The *Adelson* court criticized the Commission for failing to explain "the rationale underlying *any* of its identified specific offense characteristics" under the fraud guideline and characterized § 2B1.1's overlapping enhancements as an irrational "piling on of points." *Id*. at 510.

Furthermore, a growing chorus of legal scholars have offered their own criticism of the increasingly harsh sentences that result from the large number of specific offense characteristics inevitably present in every high-dollar fraud case. Professor Frank Bowman, for example, explains that "[m]any factors for which loss was already a proxy not only have been given independent weight but also impose disproportionate increases in prison time because they add offense levels on top of those already imposed for loss itself and do so a the top of the sentencing

table where sentencing ranges are wide." Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 170, 2008 WL 2201039, at *7 (Feb. 2008).

*3 Seven of the 18 levels imposed on Ernst Appolon under the current version of the loss table were not based upon any form of empirical evidence or policy basis, and do not further any legitimate purpose of sentencing.*

Under the original Guidelines, adopted in 1987, 11 points would have been added to Ernst Appolon's offense level for the amount of loss caused by his fraudulent acts. USSG § 2F1.1 (1987). Twenty years later, under the 2008 Guidelines, 18 points are being added for the same amount of loss. USSG § 2B1.1 (2008). Though this seven point increase subjects Mr. Appolon to many years of additional imprisonment, the Commission adopted its loss-table amendments without any empirical basis.

Two separate amendments – 154 and 617 – are responsible for the bulk of the increase to the loss table. For an amount of loss between $2.5 and $7 million – as the government alleges in Mr. Appolon's case – Amendment 154 added 3 additional points, while Amendment 617 added 4 points. In support of Amendment 154's increase to the loss table, the Commission stated only that it sought to conform the fraud loss tables to the tax evasion tables and "increase the offense levels for offenses with larger losses to provide additional deterrence and better reflect the seriousness of the conduct." USSG, App. C, Amend. 154 (Nov. 1, 1989). And, in adopting the increases in Amendment 617, the Commission claimed it was responding to "comments received from the Department of Justice, the Criminal Law Committee of the Judicial Conference, and others, that [the fraud guideline] under-punish[es] individuals involved in moderate and high loss amounts, relative to penalty levels for offenses of similar seriousness sentenced under other guidelines." USSG, App. C, Amend. 617 (Nov. 1, 2001).

The explanations offered by the Commission for the two amendments are deficient and faulty. In each instance, the Commission failed to provide any empirical data to support higher sentences for fraud offenders who typically have no criminal history and an exceptionally low recidivism rate. The Commission ignored the overwhelming social science research, discussed at length above, demonstrating that increases in sentence severity, as opposed to certainty, have virtually no deterrent value. Second, in adopting Amendment 154, the Commission sought to conform the fraud loss table with the tax loss table without explaining why the tax loss table should itself be a model. Furthermore, though the Commission cited comments from the Justice Department and the Criminal Law Committee in support the higher sentences adopted through Amendment 617, it ignored clear feedback from the district courts. Though the Guidelines explicitly allow for *upward* departures when the amount of loss does not "fully capture the harmfulness and seriousness of the conduct," *see* USSG § 2F1.1 app. note 11 (2000) *and* USSG § 2B1.1 app. note 14 (2000), the sentencing courts granted upward variances in less than 1 percent of § 2B1.1 cases and only 1.2 percent of cases under § 2F1.1 in the year 2000. *See* U.S. Sentencing Commission, *2000 Sourcebook of Federal Sentencing Statistics,* tbl. 28 (2000). This feedback – from the institutional player best suited to make individualized sentencing determinations – completely contradicted the recommendations of entities like the Justice Department. Finally, in adopting Amendment 617, the Commission relied on the argument that the existing loss table resulted in sentences lower than the penalty levels for offenses of similar seriousness. The Commission failed to point out which offenses it deemed to be of comparable seriousness to high-loss fraud. The end result of its increases under § 2B1.1 have, however, led to the absurd result that first-time, nonviolent fraud offenders like Mr. Appolon are subject to sentences as high as, and sometimes even higher than, those imposed on the most violent

offenders (*e.g.*, sentences for kidnapping, arson, high volume drug trafficking, and voluntary manslaughter). *Compare* USSG § 2B1.1 (2001) (offense level of 26 based only on base offense level and amount of loss over $7 million ) *with* USSG § 2A4.1 (2001) (offense level of 24 for kidnapping), USSG § 2K1.4 (2001) (offense level of 24 for arson creating substantial risk of death or serious bodily injury), USSG § 2D1.1 (2001) (offense level of 24 for trafficking in over 100 kg of marijuana) *and* USSG § 2A1.3 (2001) (offense level of 25 for voluntary manslaughter).

Moreover, though the Commission has made the amount of loss the determinative factor in the offense level calculation for fraud offenders, loss amount is a highly imperfect measure of the seriousness of the offense. *See Adelson*, 441 F. Supp. 2d at 509 (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to [this] factor[ ]"). The specific amount of loss is often "a kind of accident" and thus "a relatively weak indicator of [ ] moral seriousness . . . or the need for deterrence." *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004). Most defendants do not set out to defraud a specific amount of money; rather, the amount of loss is dependent on the security procedures in place and the point in time when the ongoing fraud happens to be detected. *Id.* As the *Emmenegger* court explained: "Had [the defendant] been caught sooner, he would have stolen less money; had he not been caught until later, he would surely have stolen more." *Id.*

In short, the Commission failed to fulfill its institutional role of considering empirical evidence when making the amount of loss central to its fraud guideline and then repeatedly increasing the amount of points imposed for specific loss amounts. The resulting fraud guideline is, therefore, entitled to no deference. This Court should, instead, look to all of the § 3553(a)

factors, and the empirical data not considered by the Commission, in fashioning a sentence "sufficient, but not greater than necessary" to fulfill the various purposes of sentencing.

**III. Downward Departures**

In addition to the issues with his offense level computation, Mr. Appolon argues that his circumstances qualify him for downward departure or a below-Guidelines range sentence. Specifically, he argues that –due to the unforeseeable housing market collapse – the loss calculation overstates the seriousness of his offense, and that Mr. Appolon's solid record of employment and work history should be taken into account. Mr. Appolon also draws the court's attention to the consequences he faces due to his immigrant status to support a below-guidelines range sentence.

**a. The Offense Level Computation substantially overstates the seriousness of Mr. Appolon's offense.**

Mr. Appolon argues that a departure from the sentencing guidelines is warranted under U.S.S.G. § 2B1.1(C), which provides: "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted."

As argued above, the unexpected collapse of the housing market contributed significantly to any "loss" suffered, skewing the guideline level (as calculated by the government) upward so steeply that it distorts Mr. Appolon's true culpability. See *United States* v. *Rostoff*, 53 F.3d 398 (1st Cir. 1995) (affirming district court's consideration of macroeconomic collapse). In *Rostoff*, the Appeals Court upheld a downward departure in a case factually somewhat similar to the instant case. In *Rostoff*, the defendants – condominium developers – "cooked the books" and side-stepped bank regulations to assist potential condominium purchasers secure a first

mortgage.[37] This scheme took place during the inflated housing market of the 1980s, and by the time the defendants were convicted, the bank had entered receivership, one of many casualties of the recession of 1991. *Id*. at 404. The sentencing judge calculated the loss for each defendant, but subsequently downward departed for each, citing as a basis for the departure: 1) the bank's "gadarene rush to participate in the condominium boom despite the obvious risks"; 2) that the buyers were "neither dupes nor victims in the traditional sense. To the contrary, the court thought they had become willing participants in the defendants' scheme"; and 3) the court observed that economic forces not under the control of, or precipitated by, the defendants, especially the sudden, unforeseen collapse of the New England real estate market-a collapse that decimated the demand for residential condominiums-increased the magnitude of the losses. *Id*. at 405.

Although the nature of the conspiracy in *Rostoff* differed somewhat from that of the instant case, the bases for departure in *Rostoff* are all present in this case. While the court limited the opportunity to explore the lending decisions behind the mortgages in this case, testimony from several mortgage company keepers of record confirmed that mortgage applications were not reviewed closely, and it is generally accepted that many sub-prime lenders during the period in question were writing mortgages with an eye toward the secondary market, rather than the risk individual borrowers presented. Similarly, the testimony of Elizabeth Son made clear that buyers in this case were, for the most part, willing participants in the scheme. And finally, as argued

[37] As a brief description of the fraud, the defendants cooked the books, surreptitiously assuring selected buyers that they would not enforce the second mortgages, or that they would not demand interest payments on second mortgages until resale of the condominiums in order to drive up sales. The developers skirted down-payment requirements by creating the impression that the buyers were putting 10 percent down. The developers offered customers a corresponding 10 percent discount from the stated purchase price. The developers then submitted documents to the bank that overstated the actual purchase price by 10 percent, treating the negotiated discount as a down payment. This took on added significance because the bank underwrote the loans on the basis of an 80 percent loan-to-value ratio, using purchase price as a principal measure of value. The inflated purchase price caused the bank to approve higher first mortgages than would have been granted had the true purchase price been known. Thus, many buyers acquired condos without making a down payment or other cash expenditure (except for closing costs). *Rostoff,* 53 F.3d at 403.

above, the depth and suddenness of the recent housing market collapse caught much of the financial world by surprise, so it would be unfair to hold Mr. Appolon to a higher level of awareness of that particular risk. In terms of foreseeable loss, Mr. Appolon and his co-defendants might have been able reasonably to predict losses in line with foreclosure sale prices of the 2005-2006 market, but a loss calculation based on foreclosure sales occurring in 2008 and 2009 produces losses they would not have reasonably foreseen, and overstates their culpability.

**b. Mr. Appolon's steady history of employment and education merits a downward departure.**

Mr. Appolon points to his excellent employment history – he has been consistently employed since entering college – a potential ground for a downward departure pursuant to § 5H1.5. See *United States v. Thompson*, 74 F.Supp.2d 69 (D. Mass. 1999) (departure from 87 to 60 months, where defendant "not only . . . exhibit[ed] a sustained commitment to his family dating back to the instant he became a father, he consistently worked to provide for them."), *reversed* 234 F.3d 74 (1st Cir. 2000) (district court erred in limiting inquiry to cases similar to defendant's criminal conduct); *United States v. Alba*, 933 F.2d 1117 (2d Cir. 1991) (longstanding employment at two jobs); *United States v. Big Crow*, 898 F.2d 1326, 1331-32 (8th Cir. 1990) (excellent employment record). Among Mr. Appolon's Wood Avenue co-defendants, he stands out as one of the few who has held legitimate employment through his adult life. Mr. Appolon received an Associate's degree, attended a real estate institute, and was enrolled in economics classes at the University of Massachusetts at the time of his arrest. He has worked steadily since graduation, and reinvested much of his earnings back into his business, or set them aside to support his child and his family.

It should be considered as well that Mr. Appolon is likely to lose the time, effort and money that he invested in advancing his professional career. As a result of this conviction, it is highly unlikely that Mr. Appolon will ever work in real estate again. Although Mr. Appolon recognizes

that this is a consequence of his actions, he argues that it should be given some weight in determining his sentence.

**c. As a Permanent Resident Alien, Mr. Appolon is puts at a disadvantaged position in prison.**

Finally, Mr. Appolon notes that, as a resident alien likely subject to deportation, he will likely experience more severe restrictions in prison than non-alien inmates, making a shorter term of incarceration appropriate. Unlike inmates who are U.S. citizens, Mr. Appolon will be ineligible for the early-release incentives of certain BOP programs, and will not be able to serve his sentence in a minimum security facility, despite being a non-violent offender with no history of prior convictions. See *United States v. Pacheco-Soto*, 386 F.Supp.2d 1198, 1205 (D.N.M. 2005) (in drug case with a guideline sentence of 74 months, 60-month below-guideline sentence imposed because the defendant was a deportable alien who faced an unwarranted increase in the severity of the sentence, was likely ineligible for early release, would not be able to serve his term in minimum-security, and would not qualify for reduced credits for participation in a residential drug or alcohol abuse program.); *United States v. Bakeas*, 987 F.Supp. 44 (D. Mass. 1997) (departure from 12 months to a probationary sentence and home confinement for legal resident alien convicted of embezzlement because he was ineligible for minimum security confinement); *McClean v. Crabtree*, 173 F.3d 1176 (9th Cir. 1999) (deportable alien ineligible for one-year reduction of sentence available to those who complete the BOP’s 500-hour drug program). In light of these collateral consequences – as well as the threat of deportation looming over Mr. Appolon’s head – a below-guideline range sentence is appropriate.

## IV. A 63-Month Sentence is Sufficient, But Not Greater than Necessary to Achieve the Goals of Sentencing in 18 U.S.C. § 3553(a).

At sentencing, the Court must impose a sentence "sufficient, but not greater than necessary" to accomplish the goals of sentencing, including that the sentence "reflect the seriousness of the offense," "promote respect for the law," "provide just punishment for the offense," "afford adequate deterrence to criminal conduct," and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2). In making this determination, the Court should consider, among other things, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the sentencing range established" by the Guidelines, and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §§ 3553(a)(1), (4), (6). Importantly, by statute, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person . . . which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661 (emphasis added). Thus, the Court is free to consider all relevant factors, including those that were previously discouraged or prohibited by the Guidelines. *See Rita*, 551 U.S. at 364-65 (Stevens, J., concurring) (recognizing that sentencing courts may now properly consider "[m]atters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public service"). Here, taking all these considerations into account, the Court should conclude that a 63-month sentence is "sufficient, but not greater than necessary" to accomplish the goals of sentencing.

### a. A 63-Month Sentence Reflects the Seriousness of Mr. Appolon's Offense, Promotes Respect for the Law, and Provides Just Punishment for His Offense.

Mr. Appolon's crime was a serious one, and he recognizes that fact. At the same time, however, it is important to consider that Mr. Appolon's crime was not violent crime, and Mr. Appolon eventually parted ways with the conspiracy in early June of 2006, prior to its detection (apparently as a result of Ms. Son's interview with Boston police in late November of 2006).[38] Unlike several of his co-defendants, who continued to engage in mortgage fraud until early 2007, Mr. Appolon concentrated on building a legitimate real estate business,. Obviously, this does not excuse Mr. Appolon's conduct, but it does place it in context. As a result of his participation in the conspiracy, Mr. Appolon has been ruined professionally, will be separated from his wife, young children, and ailing parents for a number of years (and possibly permanently, if he is deported), and faces the threat of deportation and liability for restitution. In short, a 63-month sentence reflects the seriousness of Mr. Appolon's offense, promotes respect for the law, and provides just punishment for his offense.

**b. A 63-Month Sentence Affords Adequate Deterrence to Criminal Conduct, and Will Protect the Public From Further Crimes by Mr. Appolon.**

Unlike several of his co-defendants, Mr. Appolon is essentially a first-time offender with no criminal record to speak of, and no prior background in fraud. For an individual who has no substance abuse issues to speak of, who drinks moderately, and had virtually no experience with the penal system prior to his arrest in 2008, a sentence of 63 months affords a more than ample deterrent to future criminal activity, while providing a potent – but not draconian – warning to others who might be tempted to engage in mortgage fraud.

Mr. Appolon, as detailed above, will likely suffer significant consequences outside the loss of his freedom as a result of this conviction. He will likely be barred from his profession and have to start over from square-one. He will lose the standing he was working to build in his

[38] *See* Trial Tr. vol. 12, 158-161 (April 27, 2010)

community at the time of his arrest (e.g., his involvement with the local Prince Hall Freemason lodge, and the community service activities he was involved in through the organization.) Depending on the immigration consequences of his conviction, he may lose the privilege of living in the same country as his parents, his wife, and his children (Mr. Appolon has a son, and also has helped raise his wife's son). Sentencing Mr. Appolon to 10 to 14 years on top of these losses would significantly exceed a term of incarceration "sufficient, but not greater than necessary" to accomplish the goals of sentencing. A sentence of 63 months is all that is required to ensure Mr. Appolon will not break the law in the future.

**c. A 63-Month Sentence Will Avoid Unwarranted Sentence Disparity Among Mr. Appolon and Other Defendants with Similar Records Who Have Committed Similar Offenses.**

Both the Sentencing Commission and the sentencing courts are directed to avoid unwarranted sentencing disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct. *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007) (citing 18 U.S.C. § 3553(a) and 28 U.S.C. § 991(b)). The Commission performs its function "at wholesale," while the district court performs its function "at retail." *Id.* Ideally, the two entities should have a symbiotic relationship, with the sentencing court taking the guidelines into account in its § 3553(a) analysis and the Commission considering feedback from the courts, in the form of departures and variances, when making its regular revisions to the guidelines. *See* 18 U.S.C. § 3553(a)(4) (requiring that sentencing court consider the guidelines' recommendation); *see also Rita*, 127 S. Ct. at 2464 (explaining that "[t]he statutes and the Guidelines themselves foresee continuous evolution helped by the sentencing courts and the courts of appeals" with the courts departing or varying in individual cases and the Commission "collect[ing] and examin[ing] the[se] results").

In making its own effort to avoid unwarranted sentencing disparities – as required by 18 U.S.C. § 3553(a)(6) – the sentencing court is expected to concern itself more with national disparities among similarly situated defendants than with the narrower consideration of equity between defendants charged under the same indictment. *United States v. Simmons*, 501 F.3d 620, 623-24 (6th Cir. 2007). The sizeable chart inserted earlier in this memorandum is, therefore, of particular importance. The chart highlights a large sample of cases from districts across the country where defendants in high-loss fraud cases – including recent mortgage fraud cases – have received sentences substantially below their guideline ranges. As fraud defendants responsible for substantial losses, the defendants are of similar criminal background and have been convicted of similar criminal conduct. The national sentencing trend exemplified by this chart should, therefore, be taken into account by this Court. And, to avoid unwarranted – and unfair – sentencing disparities between Mr. Appolon and the many defendants highlighted in the chart, this Court should grant a variance/departure of similar magnitude in Mr. Appolon's case.

In its recent decision in *United States v. Parris*, the District Court for the Eastern District of New York took a similar collection of cases into account in fashioning an appropriate sentence for two securities fraud offenders. 573 F. Supp. 2d 744 (E.D.N.Y. 2008). At the court's request, each party submitted a sample group of cases to illustrate the sentences imposed in other securities fraud cases. *Id*. at 752. Based on these samples, the court concluded that "[t]hose [defendants] who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); [while] those whose losses were less than $100 million were generally sentenced to single-digit terms." *Id.* at 753. The court took this national pattern into account in arriving at a sentence of just 60 months for the two defendants who each faced an advisory guideline range of 360 months to life. *Id.* at 745. A sentence of XX-months,

although below the guideline range, would be consistent with sentences of similarly situated offenders.

**CONCLUSION**

Despite Ernst Appolon's involvement in a conspiracy of considerable scope, he is not someone from whom the community requires a decade or more of protection. As a newcomer to crime, Mr. Appolon was burned badly by his first foray into fraud, and is unlikely to repeat his crimes. Mr. Appolon has acknowledged that his actions were serious, but the scope of damage caused by them was beyond his – or anyone's – ability to foresee, and should not be interpreted as an accurate gauge of his true culpability in this offense. It should also be recalled that Ernst was a young man when he became involved in the scheme, and that his ambition and naiveté were coaxed and exploited by Eric Levine, whom he regarded as a mentor. Mr. Appolon, unlike several of his co-defendants, worked hard to better himself, develop a career, and provide for his family. His involvement with this conspiracy derailed many of those goals, but the Court should afford Mr. Appolon an opportunity to correct his course and return to his family by giving him a 63-month sentence.

Respectfully submitted,

ERNST APPOLON
By his attorney,

/s/ John G. Swomley
John G. Swomley
BBO # 551450
Swomley & Associates
227 Lewis Wharf
Boston, MA 02110
Tel. 617-227-9443

Dated: October 18, 2010

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), Assistant U.S. Attorney Victor Wild, counsel for the government in this matter. I further certify that a true copy of the above document was served upon Senior U.S. Probation Officer by e-mail on October 18, 2010.

/s/ John G. Swomley
John G. Swomley