UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

No. 1:08-cr-10121-GAO-3

UNITED STATES OF AMERICA

vs.

ERNST APPOLON

*********

For Hearing Before:
Judge George A. O'Toole

Sentencing

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
October 20, 2010

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5200, Boston, MA 02210
bulldog@richromanow.com

A P P E A R A N C E S

VICTOR A. WILD, ESQ.
RYAN M. DiSANTIS, ESQ.
MARY B. MURRANE, ESQ.
United States Attorney's Office
John Joseph Moakley Federal Courthouse
1 Courthouse Way, Suite 9200
Boston, Massachusetts 02210
(617) 748-3145
Email: Victor.wild@usdoj.gov
For the United States

JOHN G. SWOMLEY, ESQ.
Swomley & Associates
227 Lewis Wharf
Boston, Massachusetts 02110-3927
(617) 227-9443
Email: Jswomley@swomleylaw.com
and
JAMES E. HAYNES, ESQ.
10 Essex Avenue
Swampscott, Massachusetts 01907
(617) 240-3396
Email: James.haynes.nusl@gmail.com
For the defendant

P R O C E E D I N G S

(Begins, 2:15 p.m.)

THE CLERK: The United States District Court for the District of Massachusetts. The Court is now in session. Please be seated.

For sentencing in the case of United States of America versus Ernst Appolon, 08-10121. Would counsel identify yourselves for the record.

MR. WILD: Good afternoon, your Honor. Victor A. Wild, Ryan DiSantis, and Mary Murrane for the government.

MR. SWOMLEY: Good afternoon, your Honor. John Swomley for Ernst Appolon and with me is James Haynes.

THE COURT: All right. Mr. Appolon appears this afternoon for imposition of sentence on his conviction on a number of counts -- well, one count of conspiracy and several counts of wire fraud. The convictions coming upon the jury's verdict after trial.

I have a final presentence report from the Probation Office in the customary form. I have extensive sentencing memoranda from both the government and from the defendant.

Under the sentencing statute, 18 U.S. Code, Section 3553(a), there are a number of factors to be

considered in determining an appropriate sentence in a given case. One of them is the recommendation that emerges from the application of the sentencing guidelines to the facts of the case and as is usual the presentence report presents a proposed application of the sentencing guidelines in Mr. Appolon's case.

From my review of the papers, I note that the parties have some disagreements with that, so I think it would be appropriate to go through the various factors or elements of the application of the guidelines and resolve whatever disputes there are before we proceed to consider the more generalized factors in the statute, because it would be important to know what the guideline range is as recommended by the proper application of the guidelines.

So I don't think there's any controversy that the applicable guideline is 2(b)(1.1) or that the current guideline manual is the appropriate manual to apply.

Under 2(b)(1.1)(A)(i), the base offense level is 7, and the next question is what adjustment for the amount of loss should be made under 2(b)(1.1)(B)(i)? And the parties may have different views on that.

MR. SWOMLEY: Your Honor, can I just -- I didn't mean to interrupt you right now, but in terms of the suggestion that there's no dispute that the current

guidelines are the applicable guidelines, I do want to make sure that the Court understands that we did an analysis of what happened from the first guidelines forward with respect to the enhancements and the, um -- the sentencing commission jacking things up without reference to research or anything. So in terms of that, I don't want to suggest by saying, "Yes, this is the current guidelines," that I'm glossing over that and that I'm not rendering my objection.

THE COURT: Fine. That's noted.

Okay. So, now, with respect to the loss amount, the -- I think the government is in agreement with the suggestion in the PSR that there should be an 18-level increase because the range of -- the loss falls within the range of -- (Looks.) of Subsection (b)(1)(J), more than $2,500,000, but not more than $7,000,000.

MR. WILD: Your Honor, I'd be happy to just briefly elaborate the government's position on that to the Court.

THE COURT: I think maybe the way to do it is to hear the objection and to the extent you disagree I'll have you respond to Mr. Swomley's objection.

MR. WILD: Okay.

MR. SWOMLEY: Well, your Honor, I don't know if you want to get into what is the correct method of

calculating loss, but essentially there is dispute about that and the government urges that you adopt the Probation Department's view on that and, um, it is a -- um, a loss calculation, we submit, that is erroneous in two -- potentially two different ways. And we calculate loss both by intended loss and we calculate the, um, harm caused by, um -- instead of calculating the loss, the gain to the defendants. So we urge you to reject the government and the Probation Department's calculation as being erroneously arrived at and one which is not consonant with the law nor the factual circumstances in this particular case.

And if you want the analysis, I mean, we've given it to you in a written form, but essentially it goes along the lines that while it is fair to attribute to a defendant reasonably foreseeable pecuniary harm, it is very unreasonable to suggest that Mr. Appolon, or even any of the defendants in this particular case, could have had the knowledge of the financial markets that would have permitted them to do what the President of the United States could not do, what the U.S. Congress could not do, what the financial advisors of the President of the United States could not do, what Wall Street bankers and the entire banking industry could not do, and that is to prestage that there was a dramatic

collapse on the horizon. And it is that dramatic collapse which I would submit takes this out of any of the simple case law that the government would like you to rely upon which suggests that any half-wit could see that whatever they were doing to the property was going to depress the value of that property and possibly the next door and the door after that.

They cite a case, um, that stands for that proposition, I believe it's -- I'm not sure what it is. (Turns.) ***Parish***, ***U.S. v. Parish***, a Ninth Circuit case, that have a conspiracy that involves essentially rendering 200 homes in the exact same community vacant by foreclosure or the like and as a result of the scheme of the defendants. And they suggest that that is -- they concede that that is grossly more damaging to a community by virtue of the quantity, in the ***Parish*** case, but they'd like you to draw the analogy that's similar to this case insofar as it suggests that a reasonably bad actor engaged in fraud would have foreseen that there would be a decline in the market -- in the immediate market, I guess, is the way they're looking at it in ***Parish.***

But if you follow the logic in their brief, they gloss over this notion that somehow -- in fact, in their memo at Page 12, they say that Ernst Appolon knew or

must have known that, quote, "that property values would dramatically collapse," and that's a quote, and they drop a footnote, Footnote 9 on that page, and in Footnote 9, they say: "The fact is Samuel Jones already testified Ernst Appolon explained the scheme to him in detail near the beginning of the conspiracy."

First of all, Footnote 9 in no way references any part of the transcript, but also in no way supports their position that Ernst Appolon knew that there was going to be essentially a collapse similar to that of the great depression, and the suggestion that he explained what the conspiracy was going to look like to Samuel Jones and he -- well, first of all, you can't go to a transcript and look and see what they meant by it, but they were trying to suggest that that footnote somehow supports the conclusion that Ernst Appolon knew what Mr. Bernacki didn't know or what any of the other President's economic advisors didn't know, and none of that supports that conclusion.

And furthermore, I would suggest, that if you look at the ***James***, um, case, you will conclude that, in fact, that is far more appropriate to an analysis of what happens here and you, I would submit, are within your bounds and, in fact, it would be accurate for you to make a factual finding that there is no evidence that

Mr. Appolon could have foreseen the economic collapse that occurred and that occurred sometime after the first purchasers of the loans that were sold on the secondary market were made.

And so you have a disconnect in their analysis of loss whereby they're suggesting that Ernst Appolon not only should have known that the mortgages would be sold to a secondary market, but that sometime between the secondary market and the tertiary market or between that second buyer of the mortgage and the third buyer, there would be an economic collapse and therefore that he would have the prescience to know that that third buyer was going to lose more money. And I would submit that that is not reasonably foreseeable and the government's version should not be adopted.

And frankly, um, I followed what your Honor decided the day before yesterday in Mr. Appolon's brother's case and the analysis that you engaged in, as I understand it, while different than that advanced by Mr. Ernst Appolon, um, arrives at the same number essentially as your own analysis that you engaged in with Daniel Appolon. And if you intend to engage in the same analysis and that is to apply the same method of loss calculation that you did with Daniel Appolon to the rest of the defendants, I would submit we would not have

any quarrel if you did not accept the method that we used, but went with the method that you used and you would arrive at, as I calculated, the same number, which is a 16-level enhancement as opposed to an 18.

And that -- frankly if that's the analysis that you want to employ, I am -- I'm not --

THE COURT: Well, I'm not sure I follow that. The -- there are, um -- with respect to any given defendant, there are two aspects, there is the formula that's applied and then there is the data that's put into the formula. And as to the last -- as to the latter, the data will vary from defendant to defendant based on the number of transactions that are attributed to that defendant either as convicted conduct or perhaps relevant conduct.

With respect to Daniel, there were relatively fewer number of transactions and with respect to Ernst there are relatively larger. So that even applying the same methodology would likely, and I think in fact, produce a different result for Ernst than for Daniel because the numbers are different.

MR. SWOMLEY: Well, clearly it would produce a larger number of levels of enhancement, but in terms of the methodology you utilized to get to that level of enhancement, I would submit there shouldn't be any

difference. There should be --

THE COURT: Well, I do agree and I think it's likely, if not inevitable, that I will use the same methodology throughout the case.

MR. SWOMLEY: It's certainly not the government's methodology.

THE COURT: But it's close. I don't think it is exactly, but it's close. Here's the way I understand losses to be determined under the guidelines -- under this guideline as it's been interpreted to the extent it has by this circuit.

The Court can look to either the actual loss historically suffered, to the extent it is ascertainable, or -- if that's not possible, and even in the case where it is, I guess, to what's called "intended loss." The circuit has said that we should understand the "intended loss" to mean the "expected loss," that is, the reasonably anticipateable loss, I think.

So in this case, turning to the question of actual loss, I think it is difficult to determine, on the data presented, anyway, a figure of actual loss, historically, and that we are therefore on sounder ground in trying to assess the Court's "intended loss" or, as the circuit put it, "expected loss" at --

In the -- I think it's the ***McCoy*** case, a Springfield situation, the measure that was applied was the loan amount, the fraudulently obtained loan amount, less whatever had been recouped, um, or could be recouped. Well, actually the circumstances are a little different there.

If the said -- less a reliable property value, a continuing property value, um, the sequence of events in ***McCoy*** and in our other cases was reversed from ours in that there was a market purchase before the fraudulent loan and we don't have that here. So the method that has been applied, I think, and approved in this circuit and elsewhere, when we don't have that, is to look at what is recouped on foreclosure or other repayment and that's reflected in -- in -- what is it? Application Note 3(e).

So to put it concretely, in terms of this case, the table that's in the PSR can be followed to the extent those figures are accurate, that is, when it reports the fraudulent loan and the recovery on foreclosure, or, in the absence of that, an estimate of present value on assessments, and that difference then is the loss for any particular transaction, and then accumulated becomes the loss attributable to any defendant. So, in general, I think that, from the

available data, we can follow the table.

Now, what happened with Daniel, the other day, was there was a dispute about whether the data was reliable in a couple of instances and whether the prices noted as recovered on foreclosure were accurate or not. And because of the -- and in part because of the lack of sufficient information from the government to rebut a presentation by the defendant, I concluded that the defendant's figures as to what the disposition had been should be accepted and relied upon. But that's only a dispute about the application of the methodology and not about the methodology.

So in short, for this case, the methodology is a fraudulently-obtained loan less the recovered amount, or the existing property if the case -- if as of now the property has not been disclosed for that foreclosure, what's an estimate -- what an estimate is of its present value.

MR. SWOMLEY: Your Honor, the properties that were -- well, first of all, Ernst Appolon and Daniel Appolon were in the same trial and the government had the same witnesses. And while it is true that Ernst Appolon was found guilty of an involvement in a larger number of properties, or was charged with a larger number of properties, what the -- the quality of the

evidence deduced by the government with respect to loss was the same. It was very poor, um, testimony, in fact, nonexistent in many respects with respect to who lost money, how much money was lost, and, frankly, your Honor, you prevented cross-examination.

THE COURT: Because the loss figure was not important for the substantive offense and that may explain why the evidence wasn't there and, you're right, I excluded a bit of it, I think, because it wasn't germane. It is now germane and the evidence we have is this, as presented, through the Probation report or foreclosure sale proceeds, um, in the absence of anything else showing that that's unreliable, I accept it and I rely on it.

MR. SWOMLEY: So, your Honor, as I understand, you're putting -- you're putting evidence you heard -- you're flipping it on its head, essentially. You're saying that "There was no evidence at the trial. I need to rely on evidence. I'm going to rely on what the Probation Department found in the absence of something to the contrary," which would have been at trial. But it wouldn't have been --

THE COURT: No, it would not have been at trial.

The property losses, as set forth in Paragraph 53

of the PSR, um, rely on information as to what the foreclosure sale price was. All I have is the summary. I presume, and I guess we can hear more about this, if it's necessary, but there was some information on which some evidence, some data from which that figure was taken and then given to the Probation Office. All I have is the conclusion, but I don't have any dispute as to the conclusion. If there were a dispute, then we could have the foreclosure documents and we could see what the price was and so on.

We had a little bit of that with Daniel. Um, but in the absence of a challenge for those numbers, I think, under the usual rules of sentencing, I can rely on the statement of offense conduct as unchallenged to make the conclusion.

MR. SWOMLEY: I have challenged, your Honor, the entirety of the manner in which the information that the Probation Department conveyed to you -- was conveyed to the Probation Department. In fact, I went through in my objections to the PSR precisely the methods that Probation used to present it almost as if it were an objective fact to you, and it is not an objective fact. In fact, what it is, is spoon-fed numbers from the U.S. Attorney's Office. And I have challenged the numbers, I challenged the method that they have conveyed them to

the Probation Department, and I would submit -- I tried during trial to demonstrate that the lenders that the government chose to bring into this court actually didn't suffer any loss whatsoever. And, in fact, I've advanced that theory throughout this trial.

You have ruled that I'm not entitled to tell the jury about that. I'm telling you about that. To say that I have not objected to each and every loss calculation, then I would submit then that I am ineffective. That I should have. But I think I did.

THE COURT: Well, it's apples, oranges and grapefruits, I think.

Let me -- maybe it would be appropriate to hear from the Government as to the source, or the support, if I could put it that way, for the data in the table where it lists the foreclosure sale prices.

MR. WILD: Yes, your Honor.

There are a couple of points that I want to make at the outset. First of all, what's in the presentence report is based on evidence from the trial, particularly it's based on all the mortgages that are in evidence at trial. It's based on all the foreclosure documents that are the -- the "dash 07," if the Court remembers, the organization of property exhibits, um, the foreclosure documents in the trial, and it's based upon a

calculation that the government provided to the presentence -- to the Probation Office in its statement of the -- the government's statement of the offenses with a copy to the defendant that contained those charts.

All that Paragraph 53 is, in the Probation Officer's report, is a conversion to a different format of that same information which was based on evidence at trial and for which the defendant has received copies of the evidence at trial, of the government's statement of the offenses, and now the Paragraph 53 final report by the Probation Officer. That's the first part. It is based on evidence in the case.

Secondly, the defendant acknowledges that he has not made a Daniel Appolon-type of objection here, he's made his own objections on how the guidelines should be calculated and he doesn't assert what Daniel Appolon asserted and that had to do with a particular mortgage and whether a mortgage value on a foreclosure deed means something or doesn't mean something.

In that regard, your Honor, the government was preparing a draft to file with the Court if the issue were raised by future defendants. It hadn't been raised by Daniel Appolon or Latoya Haltiwanger, so we weren't going to submit it in connection with today's

proceedings. But I'm happy to sign a copy of the draft and present it to the Court now.

It is nothing more than what I think is a fairly short, readily comprehensible -- and I don't mean to suggest the Court isn't capable of comprehending anything we would submit, but I think it's a readily understandable explanation of the mortgage process in Massachusetts. We weren't able to present it effectively to the Court two days ago because we hadn't prepared to do that.

We now, in anticipation that maybe some future defendant might raise the same issue, we're prepared to do that, and with documents. And it's a short memorandum, I think it's seven pages, with the attachments, and I'm happy to sign it and --

THE COURT: I don't think it's appropriate at this point to -- it hasn't been part of this proceeding and I don't think it's fair to the defendants to --

MR. SWOMLEY: If there needs to be an evidentiary hearing, your Honor, I would submit then the better course for doing this -- and I do dispute their arrival at the numbers by way of giving them over to Probation and then quoting from Probation. And in terms of how they arrived at them, I would submit that maybe what we need to do is we need to have an economist of

our own here and do an evidentiary hearing with respect to, um, the method of loss calculation and how they can get there from selling the loan to a secondary purchaser. And none of that evidence came into trial and I do dispute it.

If they're suggesting that the secondary purchaser lost money, then they have a duty to prove that, and I have not seen that evidence. I don't submit that I agree that that's what that means, when they put it down, and that frankly with respect to each of these 21 properties, it's my understanding that different things happened, too. And, in fact, I learned in between the time of the end of the trial and today that one of the properties had absolutely no loss and, in fact, it gained initially and only a secondary loss after it was sold again. But what was sold by the, quote, unquote, "conspirators" made money and it wasn't until the bottom dropped out of the market with the secondary purchaser that the property lost money.

Now, it -- I would submit that the question that Daniel Appolon did raise, as I understand it, and I was not there, was that some of these were actually transactions that had a buyer and a seller and it was not simply a paper transaction within the same company. If you have a sale, that's the end of that chain and the

beginning of another one. And all of that has been lost and that they would like to gloss over that for purposes of a sentencing of Ernst Appolon. And I would submit that they can't do that and you should not accept their rather short-circuited arrival at loss by ignoring what happened in the middle.

THE COURT: There's a sentencing process which includes this sharing of drafts, the opportunity to comment, the opportunity to object, um, the data was presented in the table, there was no specific objection to the data, as opposed to the methodology, as opposed to the guideline, and so on, and it simply is, as a matter of procedure, too late in the day to now object that specific numbers in the table, um, are inaccurate.

I'm operating from memory here and my recollection is that Daniel Appolon didn't raise those issues in his objections to the Probation Office, or to the PSR, and that was the proper way to do it and those were preserved.

So in the absence of any timely challenge to the data, I think it is perfectly ordinary and justifiable to rely on that data in assessing the amount of loss, according to the methodology that I've outlined. And that yields a figure which we don't -- and I'm not writing, again, I emphasize, under the "expected loss"

or the "intended loss" rather than an actual accounting, although it might, in some instances, represent an actual accounting, um, to conclude that the Subsection J is the right subsection, and the enhancement, as suggested in the Probation Report of 18 levels, is appropriate.

MR. WILD: Your Honor, may I address the Court's last comments briefly?

THE COURT: Yes.

MR. WILD: The ***McCoy*** case is relied upon by the defense to assert that you should apply the intended loss and I think that is just absolutely incredible for two reasons. In the ***McCoy*** case, the only reason -- the opinion makes it very clear that the only reason they applied an "intended" loss was that actual loss produced an increase in the value of the property. The opinion specifically says: "We would use actual loss but for the fact that intended loss is higher here and the guidelines require us to apply the higher of the two."

Now, had actual loss, in the ***McCoy*** case, been higher than intended loss, the Court made very clear that it would have applied actual loss. That's why ***McCoy*** doesn't apply to this case except for the principle that you have to apply the higher of the two and in this case actual loss is clearly higher than what

counsel has suggested to us and --

THE COURT: No, that's where I disagree. I don't know that actual loss can actually be established. In other words, I think that the table -- I interpret the table, anyway, the data in the table, if not the theory of the table-maker, is that without being able to measure exactly what entity lost what amount of money, um, specifically, historically, a reference to the fraudulent loan amount and the ultimate disposition is a sound estimate of the value of the loss reasonably expected at the time of the fraud. So I think it fits quite well within the intended. And it's not my point that it's higher or lower than actual, but that actual is difficult to ascertain for some of the reasons which I talked about the other day.

MR. WILD: Well, as the Court has noted, your obligation is to make a reasonable assessment and we agree with how the Court's conclusion comes out on that. My father was a judge and said, "When you're ahead on points, don't go too far with that."

THE COURT: Good advice.

MR. WILD: But I do want to make one final point, your Honor, and that is that in the ***James*** case, cited by the defense, the ***James*** case not only said exactly what the Court said, and that is that the

correct calculation is the original mortgage less the net sale at the end of the day. The concurring opinion, which made clear why it was cabined in that particular case to a lesser amount, the concurring opinion makes very clear that you don't do an analysis of the first mortgagor sale to a second lender at a price because when they sell it, if they do, to a successor, you have to add in and subtract out, and it nets, and therefore you don't do interim calculations. The ***James*** case said that. The case they're relying on.

THE COURT: Well, the concurrence said that.

MR. WILD: Right. And that at the end of the day it's the same, you subtract -- as the opinion says, that's exactly the right method that should be used. You subtract the net proceeds from the original mortgage.

And so for all of those reasons we submit that the Court is exactly right that the numbers in Paragraph 53 are the applicable numbers.

THE COURT: Well, all right. It may be that the numbers actually measure actual loss. I don't know. I'm not convinced that they do and therefore I think it's acceptable to address it under the other prong. But perhaps you're right and that if the data were all played out, that you might be able to sustain a

position where it does actually measure the losses. I don't think I have the data to conclude that and I am insecure in concluding that and therefore I'm relying on intended or expected loss.

MR. WILD: And may I make you just a little more secure, your Honor?

In the instance of Daniel Appolon, you were shown a foreclosure deed with the suggestion that it had some value to it that represented the real value of the property. What we've presented to you orally at the time was that that's not the real value at all. That is nothing more than the lender following foreclosure procedure as holder of the mortgage, transferring title after public auction to itself as now titleholder of the property -- not just the mortgage, but transferring title to the property, so that it could then sell the proceeds.

In that formal procedure that is required by law, they put a value -- they make a bid in advance of the public auction. They make a bid that is to protect their mortgage. In other words, if I held a mortgage of $400,000 on a piece of property, I'm going into foreclosure, I will put a bid in in advance that somehow or the other represents at least some amount that I would want, if I could get it, before somebody else

walks in and says, "I'll bid a dollar and I'll buy that property" or "I'll bid 25,000 and I'll buy that property." And so the lender, to protect its own mortgage, will put in a value, but it has nothing to do with an appraised value of other property, the balance on the mortgage, it is simply something to protect itself against somebody walking in as a third party.

THE COURT: I think you're arguing yesterday's case. So --

MR. WILD: Very well.

THE COURT: So let me move down the -- well, let me say one other thing about the -- another point that Mr. Swomley made.

The cases seem to -- they don't address it in great detail, but seem to more or less dismiss any argument that external market forces are to be considered in setting the guideline range. There is a -- ***United States vs. Shattuck***, 961 F. 2nd 1012, in 1992, where the First Circuit said, "It may be an appropriate consideration in a departure analysis, but that it doesn't affect the determination of loss under the guideline." That guidelines was prior to (f)(1.1), but I think the point is the same. And recently the ***McCoy*** court said that the fact that some properties went up in market price had nothing to do with culpability and

suggested that the market be set aside. So I think it can be a consideration, but not in determining the levels under the guideline.

MR. SWOMLEY: Your Honor, can I just take exception to that, your Honor? That when you have something that is not reasonably foreseeable like a great depression or a great recession or something like what happened at the very end of the Bush administration and it continues to plague us today, that is different than market fluctuations, that is different than what happens when a few homes get foreclosed on in a particular neighborhood. We're talking about something of a different order of magnitude, which I would submit, according to the ***James*** court, you can consider and, in fact, you can make specific findings that, um, this was not foreseeable and therefore you shouldn't be holding the loss attributable to my client.

MR. WILD: Your Honor, may I take 30 seconds or less to address foreseeability? Just a bit more.

THE COURT: All right.

MR. WILD: One, is, as we set forth in our memorandum, they foresaw that they were going to be downstream owners of these mortgages. They knew there were going to be successive victims because they're in the industry, he and the others are in the industry,

and, secondly, the documents, as we detailed in our sentencing memorandum.

Secondly, when they put straw borrowers into properties and when they know that there is this pitch that they've given the straw borrowers who are not going to be involved and they know that Ernst Appolon is getting the lion's share of the funds and he's spending it, they are guaranteeing downstream failures of those properties.

THE COURT: Okay. Let's turn to the next suggested adjustment by the Probation Office, which is the adjustment under 2(b)(1.1)(B)(ii)(a), which is an adjustment for more than 10 victims. I don't think we have to pause long on this. The government doesn't recommend it, um, and I'm sure the defense doesn't recommend it, and I do agree with that. So there will be no adjustment on that.

MR. SWOMLEY: Thank you.

THE COURT: The next one is the adjustment under 2(b)(1.1)(B)(ix)(c), which is the use of sophisticated means. Let me hear from the government as to why we should make the adjustment, if we should, and then, as to the defendant, why not.

MR. WILD: Your Honor, in this case there are three people who actually act under the imprimatur of a

licensing, there are two attorneys and then there is this defendant. That's a license issued by mistake through the Board of Realtors, as I understand that's the process. Um, that not only is a piece of paper that gives him some --

THE COURT: Are you sure you're addressing sophisticated means or a position of trust?

MR. WILD: A position of trust, your Honor.

THE COURT: Well, maybe I --

MR. WILD: Well, I wrote down "position of trust" as the point that the Court was addressing.

THE COURT: No, I want the sophisticated means.

MR. WILD: Well, I apologize.

Yes, as to the sophisticated means, your Honor, we address that in our sentencing memorandum at Pages 19 to 20. I think that there's no question that sophisticated means were used here where this defendant is the one who has access to, um, the documents that he can go and change or cause others to go and change. It is not a routine mortgage fraud necessarily that would require one to change the Purchase & Sale agreement, for example. That can be accomplished without doing that. But this was done in this case because he's the one in position to do it.

He inserted, for example, his own girlfriend as a trustee. That's not necessarily typical of a mortgage fraud or a way that most mortgage frauds are being accomplished, but that was done in this case. That's a very sophisticated thing to do. He participated directly in it when he put his girlfriend in as the trustee on one of the properties so that she could act as if she were the buyer, then the immediate seller of the property, and that bumped up the price of the property twice. Not just once, as they usually do on some of the mortgages, but twice, and then that became a device that was being used.

You may recall the testimony of Mr. Lamerique where he said that they weren't happy about this, that they had found this device where they could actually increase, um, the losses to the lenders, is what they were doing, um, and so that's a sophisticated means.

I've laid out a number of the others in my memorandum including the fact that this is the defendant with at least two bank accounts, one was the B.E.S.U., one was the Oligarchy. He argues, "I already had the Oligarchy account." So be it. They created the B.E.S.U. account for the specific purposes of operating this scheme. That's what Lamerique testified to, was that it was created during the scheme for funneling

monies from these mortgage loans.

So now they're using bank accounts that have no relationship to the properties. They're not in the names of the borrowers. It's an account that they can use to funnel the monies through. This fellow is one of the co-signers on it. He's the one that got the lion's share of the money out of that account.

He also is the one who wanted to inflate the multiple-listing values after the fact. That's not a routine matter that is done in mortgage frauds, to my knowledge, and certainly not one that the Court would interpret as a necessarily or ordinarily a part of the mortgage fraud. He was prepared to have, um, sellers agents and sellers increase the multiple listing so that when they want to apply for a mortgage, it looks as if the seller had actually listed it at a higher value. It looks as if, when they go to try to resell these things in a flip, that the previous sale was based on a higher value. You know that from Chowdury's testimony, that's what he asked him to do. You know that from another witness who sold her aunt's house and her company was asked to do it and said, "No, we're not going to do it," and she testified that she dealt with Ernst Appolon on that case. Lamerique testified that the defendant told him he had done this on a number of the properties. So

that's another example of something that is more sophisticated than the usual mortgage fraud, or at least whatever a "usual mortgage fraud" is, that's a sophisticated means employed in this case.

They orchestrated separate closings to make sure that the buyer did not hear what the seller understood the price to be and that the seller did not understand what the buyer thought the price was, and that's significant, your Honor, because you know what happens when Chowdury went to a closing and found out that there was a much-elevated sales price and said, "Wait a minute. I'm not going to do this." Now, he's a selfish individual, he wasn't going to do it because he thought it was going to cost him tax money. So what did they do? Defendant Ernst Appolon steps in, with the two attorneys, and makes sure that it goes through by paying the seller $20,000 to cover his tax loss.

I submit to you that all of those matters and the additional ones, on Pages 19 and 20, amply support the enhancement for sophisticated means in this case and not just generally to the scheme, but in ways that this defendant himself was personally involved in the sophisticated means.

MR. SWOMLEY: Your Honor, the sophisticated means, um, enhancement defines "sophisticated means" to

mean "especially complex" or "especially intricate" offense conduct and you have none of that here. It talks about moving money around in foreign bank accounts. You have none of that here. You have domestic accounts readily obtainable by subpoena. You have, in fact, the government's witness demonstrating how easy it was to follow the money, as it were, and, in fact, that's what they did. And, in fact, that's the evidence against Ernst Appolon. None of the other stuff is the damning evidence against Mr. Appolon. It's the bank records.

And the bank records are very straightforward, they're not under fictitious names and, um, they're identified to particular individuals. You talk about the two bank accounts, yes, Oligarchy already existed, and B.E.S.U., I think, actually was -- it was created so that Widner Lamarre could avoid having to share his money with his baby's mother and their account was in large measure to avoid the disclosures to Widner Lamarre's creditors or relatives.

As far as the inflation of the MLS, I think we developed that largely, your Honor, um, in our opposition memorandum. There was some testimony that Ernst Appolon tried to get one witness to do it one time and that witness did not do it. And other than that,

um, Mr. Wild suggested or tried to argue in, I believe, his brief and I believe we accurately rebutted it with cites to the transcript, that this was attempted to be done with the Jack Conway real estate agent -- and I believe that was Janet Baxter, and, in fact, there were objections to that, it was sustained, and there was no evidence of that. So to suggest that that happened over and over again would be a false impression that Mr. Wild would like you to have but is not justified by the evidence in any respect whatsoever.

Um, the suggestion that having the MLS -- well, strike that. The suggestion that having the computer software to generate a P & S is especially complicated or complex or requires specialized knowledge or requires especially complex or especially intricate activities is just not true. And furthermore, most of the P & Ss, to my knowledge, to my recollection of the trial, were not in any way, shape or form generated by Ernst Appolon.

The listing agent generates the P & S. Mr. Appolon, by most accounts, was the buyer's agent and in that respect he did not prepare the P & S. And, in fact, the evidence showed his fingerprints were not all over the P & Ss, were not on almost any of them, and the bulk of the evidence was that it was Samuel Jean-Louis, it was Mr. Lamerique, and it was a couple of -- a couple

of others that did the cut-and-paste jobs on P & Ss that were generated by the listing agents, the seller agents.

Mr. Appolon was not even involved in that process and that is as complex as it got and it got complicated when you have 72 Wood Avenue and you have a bunch of people getting drunk and smoking pot and clicking and dragging. That's as complex as the fraud part of this transaction got as it related to the mortgage broker end of things. Mr. Appolon was, himself, not a mortgage broker and the government would like to import all of the evidence that was essentially damning on their own witnesses because they put on the mortgage brokers as their witnesses.

The sophisticated part was there with the cooperating witnesses, not Ernst Appolon at all. In fact, there was a fair amount of testimony that Ernst Appolon wasn't involved in a number of the transactions and that his name was put on afterwards or that his company was used to verify information and there was no connection that Mr. Appolon knew they were doing all of that.

So I would suggest that if you really look at what the sophisticated means enhancement addresses, it's especially complicated endeavors and this was, I would submit, a run-of-the-mill mortgage fraud and it was a

run-of-the-mill prosecution of the low-end people in the mortgage fraud as opposed to going with the lawyers, the appraisers, and the bankers, going up to where the real sophistication lies.

THE COURT: Well, in construing this provision, as with any statutory or rule or provision, one of the questions we ask is do we have a situation that's likely that the authors of the rule intended it to apply to?

There isn't a great deal of specific guidance. Even the application note is put in rather general terms. As Mr. Swomley has noted, "especially complex," "especially intricate" are not particularly helpful unless you know compared to what? It's not clear to me whether it's compared to the ordinary mortgage fraud or the run of cases that are ordinarily scored under 2(b)(1.1), which would be a different calculation.

But I do think the last sentence of (b), 8(b) gives us some idea of what the drafters or the sentencing commission had in mind when it said -- when it used the terms "especially complex" and "especially intricate" and it gives some examples: "Hiding assets or transactions through the use of fictitious entities, corporate shells," or "offshore financial accounts" ordinarily indicates sophisticated means. We don't have

any offshore accounts, obviously. But we do have hiding transactions and hiding assets through corporate entities and so on. So I think that, fairly understood, um, that that line was meant for this.

And I suppose the purpose is that the -- the judgment is that sophisticated criminals are more culpable than unsophisticated ones, and with that, as you all well know, policy judgments are made. I think this was meant to apply to the sort of facts that we have here.

MR. SWOMLEY: Could I make one further argument, your Honor, with respect to who is sophisticated? If you're pegging this on, um, the creation of a bank account, first of all, the bank accounts were in real people's names. They're not bank accounts in fake people's names trying to hide assets under some fiction. The reality is that they are real people with real names and real accounts and real Social Security numbers.

And what you have is, um, another facet of this, quote, unquote "conspiracy" is that the sophisticated persons in this conspiracy, I would submit, were Eric Levine and Daniel Lindley, and Eric Levine, by the government's own account, is the person who set up the corporate entities and assisted with, I would submit, is

someone who is, um -- someone with some college education and some real estate degrees and who was essentially in the 20 to 25 year old age range at the time. To suggest that he was the mastermind, he was the sophisticated entity, he was the person that employed these sophisticated means, I would submit would not be -- is not a fair assessment of his role. And I guess we're talking about role, in some respect. But in terms of who you want to say is the sophisticated one, it's not Ernst Appolon.

THE COURT: Okay. I think the adjustment should be made.

So now "role" is the next question and Probation suggested an adjustment under 3(b)(1.1)(a), the four-level adjustment under the leader or organizer and I think the government concurs. I'm sure that the defense does not. But what do you, the government, have to say with respect to that?

MR. WILD: Yes, your Honor. At the outset of our memorandum we set out on about two pages, I think, um, a brief overview of all of the various roles or among the various roles that this particular defendant played in this scheme. He was, first and foremost, a realtor who found the properties. He was, after that, the person who participated in deciding how much value

could be inflated into those properties, because he's the realtor, he would know that kind of thing. He was a recruiter of others in this scheme. And so there were people that acted at his behest, at his request, at his direction. He participated in giving the pitch to people.

The first we know about him is Lamerique and his girlfriend. He's operating his scheme before Lamerique even comes up from Florida, and so therefore he's already an organizer and leader of whatever is taking place, and then he enlarges it by being the person who, with his compatriot, Lamarre, entices with cash, um, other people that become involved, notably Lamerique. But he's engaging Lamerique to join his enterprise. This is not an enterprise Lamerique invented. He is engaging Lamerique and his girlfriend to come in and participate on 5 Coleman at his request and at his personal gain. He's going to pay them $20,000, he ends up stiffing them literally and giving them $10,000 instead.

After that he is the one who literally is in charge of the property at Wood Avenue. He has a realtor office there. But when it comes to the other matters that are taking place there, and by that, of course, we mean the mortgage, you recall the testimony of a witness

at trial in one of the properties who said that when she had something of a dispute about what was going on with the mortgage application, this individual intervened angrily and said, "Look, they work for me. The mortgage company guys, they work for me." And so he is, by his own declaration, an organizer and leader not only of the real estate side of it in finding properties and not only of the recruiting of others to act as sometimes straws, sometimes as trustees, but he's the one who tells the outside world, "I'm running the show here."

I've set out a number of other factors in what he did in the scheme that made him an organizer and leader and part of that included that he and Levine are the ones who are essentially deciding who's going to get what out of all of that $1.9 million of excess funds. Who gets the lion's share of it? Ernst Appolon. $450,000, approximately, out of that approximately $2 million dollars. And all of that represents his leadership role and his organizing of events to make them happen.

So not only is he organizing the scheme to make things happen, but he's a leader when it comes to deciding what's going to happen within the scheme and who's going to be responsible and who works for whom and who's going to get most of the money.

MR. SWOMLEY: I don't know what math Mr. Wild is applying, but $400,000 is not the lion's share of 2 million. 1.6 million is the lion's share of 2 million.

But in terms of what is defining of Mr. Appolon as an organizer or a leader, first of all, I'm going through the numbers that Mr. Wild cited as reasons.

He would find the property. Um, realtors find property. I don't know quite how that makes him a leader of the conspiracy, um, and the suggestion that he then would set the price, I would submit, there's no evidence and there wasn't any evidence that he himself arrived solely at the price, the price was his, that there was -- not even any testimony with respect to how the price was arrived at and much less that Ernst Appolon set it.

Recruiting others and included in the pitch. Um, all of the reasons that Mr. Wild wants to suggest are enhancements under organizer or leader rely entirely upon the government's informant witnesses with the exception, I think, of the one comment he wants to attribute to, I believe it's the, um, Jack Conway realtor, Janet Baxter, and that is the comment that "They work for me." And I'll do this in reverse order starting with the "They work for me."

That evidence was adduced by a witness who never

met Ernst Appolon and could not say that Ernst Appolon was the person over the phone saying those words to her. The person that she had contact with, almost the entire time of that transaction, was Andre Lamerique, and there is no evidence that whoever was on that phone was Ernst Appolon as opposed to Andre Lamerique. There is no evidence that, in fact, any member of the New England Merchants worked for Ernst Appolon. And having someone who says "Someone on the phone said that to me," does not make it so, does not constitute proof beyond a reasonable doubt that, in fact, any member of New England Merchants worked for Ernst Appolon.

And, in fact, I think what the evidence was, was that New England Merchants was a separate entity. It was an office that was separate and apart from Ernst Appolon's real estate business. It was a subsidiary of other New England Merchant offices around Massachusetts and was run by a person who had a license, Widner Lamarre.

Mr. Lamarre was never called as a witness. The government chose not to introduce him or his testimony, and the suggestion, I would submit, is that they would like -- and, in fact, it's pretty clear from the way that they attributed money that went into the B.E.S.U. account is Widner Lamarre essentially is someone we

don't want the Court to focus on, we didn't want the jury to focus on, because that would detract from the view that the government had that they wanted to make Ernst Appolon "the big guy," as it were, in the bottom end of this conspiracy. "The big guy," um, below, um, Eric Levine, or Mr. Lindley.

As opposed to Widner Lamarre, who, I would submit, is the one that ran the New England Merchant's office, was not recruited by Ernst Appolon, and, in fact, Widner Lamarre had a criminal record that predated this case. And, in fact, if you recall, Ernst Appolon did not have such a criminal record. And Widner Lamarre and Andre Lamerique knew each other. To suggest that Ernst recruited them, I would submit, does not flow from the evidence, it is equally plausible that Widner Lamarre and Andre Lamerique were the ones that recruited it and that they were, in fact, more responsible for this conspiracy and they merely used Ernst Appolon's name, his business, and did so without telling him.

And, in fact, if you recall, there was testimony from Samuel Jean-Louis that when all of this hit the fan, they were -- they, the New England Merchants, had a conversation about executing Ernst Appolon and making it seem like he was the big person responsible for all this. You heard testimony about -- from one of the

government's own witnesses.

So to suggest that he was an organizer or a leader, I would submit doesn't flow from the evidence and, um, the straw buyer -- and I don't remember hearing Mr. Wild say this orally, but I know it's in his memo, that Mr. Appolon sought straw buyers.

Um, there really is evidence that he sought Norma Graham and Peter Robinson, who are real living, breathing people who tried to make a go of it. In fact, at the eve of trial, I believe one or both of them still lived in the houses that they bought, one of them invested substantial amounts of money in fixing up the property, and those were the buyers that Ernst Appolon found.

The straw buyers came from Florida and came via Andre Lamerique and there was no evidence that they came to work or to be buyers for Mr. Appolon at all. So I would submit that organizer or leader is not an enhancement that is justified in this case.

THE COURT: All right. Okay. Without rehashing, I think that it is justified. I think the organizing of the properties, as Mr. Wild was pointing out the determination of the economics of the field, and somewhat certainly there's an organizing function, and certainly I think the evidence supports a conclusion

that he was the leader in the sense that the operation on Wood Avenue was under his tutelage and coordination, although people had different roles. So I think that the adjustment is appropriate.

I think that completes the Probation Officer's recommendations. The government had asked for one that the Probation Officer rejected and Mr. Wild started to address that earlier and he may do so now.

MR. WILD: I apologize for preempting my own urging on that, your Honor.

We have been differentiating between defendants -- or among defendants in this case. Probation originally applied the factor, the enhancement for position of trust, and then it reconsidered the matter and when it reconsidered, it essentially said, "We still think it applies. However, because a mortgage lender relying on a Purchase & Sale agreement would rely on a Purchase & Sale agreement from a realtor or a nonrealtor in the same way, then we won't apply it for that reason only in this case."

The government suggests that that's a collateral matter in this case in the sense that there is some case law suggesting that the mortgage company may or may not have a fiduciary relationship directly with the realtor. But we do suggest that, for the reasons in our

memorandum, there is an abuse of a position of trust in this case for very strong other reasons.

First of all, as I started to argue before, this defendant and two others are the only ones in the case that we're arguing abuse of position of trust applies. This defendant operated under two licenses, first as a real estate salesperson and then as a higher-level broker. Those licenses require special training, special certification, special testing, not available to the general public and not taken by the general public and not owned by the general public. But it's not merely just a permit to put in its pocket, it is one that he used that puts him in a position of a fiduciary agency relationship with buyers and sellers.

Whether he wants to claim he was only a buyer's agent or only a seller's agent is not the point because in some of the properties he was, in fact, a seller's agent, and particularly as to one of their relevant conduct bases, he was specifically the seller's agent. But the point is that that's a fiduciary responsibility that he has with those people who are relying on the fact that he's licensed. That's the importance of a license. That's the imprimatur of it -- the fact that they are granted some authority and they have some knowledge that the parties can rely upon.

And so when the buyers or sellers rely upon him as their agent, they rely upon him for the same purpose from opposite ends. The seller relies on him to get the highest price he can for the seller and not to defraud the seller. The buyer relies upon him to get the best low price he can and not to defraud the buyer.

In this case he reversed both those ends. He told the seller, "This property is worth this much, I will buy it for this much, that's the fair market value." He told the mortgage company, he told the buyer, "It's a totally different value." He told the buyers, "This high value is what this property is supposed to cost," because you might come in and pretend to be the buyer on it. All other pitch aside, that's what he told the buyer, not telling them, "I actually bought the property for $150,000 less.

And so he used his position of trust with both of them, whether the buyers were legitimate or not, but particularly to those who were legitimate, as counsel now says there were some, and particularly with those sellers who thought they were selling at the highest price -- and like Chowdury only find out after the fact they weren't, according to the documents that were used by the defendants here. And so that's a position of trust personally to them, but it's also a public

position of trust when it's a license that he operates under that suggests that the State has approved him by his training and his experience to be permitted to act as a realtor and as a broker.

THE COURT: It's not necessary. I don't think the adjustment should be given. The guideline 3(b)(1.3) talks two different things, abuse of position of trust or use of a special skill. The licensing aspect comes in under the definition of what a special skill is and I don't think that's what's relied on here.

And as to the position of trust, I don't think the facts justify concluding that the defendant was in a position of trust with those people who were involved in this transaction. So, anyway, I agree that the adjustment should not be given.

So I think then, to recap, a base offense level of 7, an adjustment for the loss of plus 18, an adjustment of 2 for the sophisticated means, an adjustment of 4 for the role as an organizer or a leader, leads to a total of 31 as an offense level.

Under the -- there's no dispute, I think, that this is criminal history category 1 and therefore the guidelines range for incarceration would be 108 to 135 months.

So now we've determined that. There are other

factors and I'll hear from the parties respectively as to how the other factors ought to be considered and what an appropriate disposition should be.

MR. WILD: Your Honor, we have taken care, in the U.S. Attorney's Office, and spent a considerable amount of time on trying to discern, across the board, sentencing recommendations that were fair and appropriate to individual defendants and ultimately were not at disparity among defendants.

MR. SWOMLEY: Objection. Bolstering.

THE COURT: Go ahead.

MR. WILD: And in doing so, we've considered, first of all, the particular factors of the crime itself. This is an incredibly serious series of events that took place where 20 different properties, used 21 times, in proximity neighborhoods, um, were used by the defendants to garner for themselves $10 million worth of loans out of which $1.9 million of that, and $1.77 million applicable to this defendant on his counts of conviction, was all excess funds. In other words, that's the amount that was bumped up in this case. Not only is the offense serious, but that amount is very serious.

I start from the premise, your Honor, that mortgage fraud, in and of itself, is an extremely

serious offense, as we all know in the communities these days. We read the news. We all hear the reports. I won't belabor that point. But then there's the defendant's own conduct in this event. We've set that out on Pages 4 through 7 of our memorandum.

He acknowledges in his memorandum, at Page 2, that he was a principal player. What he objects to is who said so. He acknowledges that that was the testimony at trial, he just objects to who put that testimony in at trial, calling them co-conspirators and so forth. They were. But as we said in our final argument to the jury, if you want to know what happened inside a conspiracy, ask the fellow co-conspirators, that's how you'll find out. He objects to who said it, but it's nonetheless the testimony that the jury heard in this case that he was, as he acknowledges, a principal player, according to that testimony.

The defendant is simply wrong about his own conduct at Page 7 of his memorandum. He says that, in almost all the cases -- I think he says in all the cases, "The property was already found." That's not so. You may remember the testimony on 5 Coleman. Now that's Property Number 2, that's the one where Lamerique was invited in with his girlfriend from Florida to be the straw borrower. The testimony at trial from a

defense witness, from Mr. Levine, was: "I was going to be the buyer on that property, but the terms were all wrong. I couldn't possibility accept the prices. I couldn't accept the seller's terms at all. Ernst Appolon was my agent when I declined to go through with it because it just couldn't possibility work."

Very soon after that this man, Ernst Appolon, the realtor on that case, the one who found the property, presented that property to Lamerique and his girlfriend to be the straw borrowers and pumped up the price on that. So it's simply not the case, as he puts forth in his memorandum, that the properties were already found.

Nor at Page 8 of his memorandum can the defendant legitimately say: "This is all Mr. Levine's fault. I trusted Mr. Levine to tell me what I was doing was okay and therefore it's not my fault." You don't rely on Mr. Levine to tell you it's okay to lie about a Purchase & Sale agreement. You don't rely on Mr. Levine to say it's okay to set up bogus verifications of employment. You don't rely on a Mr. Levine to say that it's okay for us to set up a scheme to defraud lenders. You don't rely on Mr. Levine to say, "It's okay if I'm the realtor on the property and I lied to the buyers or I lied to the sellers." You don't rely on Mr. Levine to know that it's not okay to take all that excess money and go spend

it on yourself. So he can't blame Mr. Levine. He's responsible for his own conduct.

And so that's what we're considering when we make our recommendation. He's accountable for all of his own multiple roles. First, as the realtor finding the properties, as a recruiter of straws, as a recruiter of his own girlfriend to be a trustee, as the primary controller of what happens at Wood Avenue, as the person who is providing verifications of employment and income through external parties that he has established ties with or maybe actually even paying those people, with Levine in determining the distribution of the money and with himself taking the lion's share, and I don't have to belabor the point on that. 4 1/2 hundred thousand dollars is the biggest share any of the individual defendants pocketed in this case.

Then we consider not only his own conduct, but the losses in this case, your Honor. The losses are $3.9 million under his offenses of conviction. The Probation Department has it at some $6 million dollars, including relevant conduct, by making him accountable for everything that happened in the conspiracy after it began, but the government isn't even asking that high an amount for calculation of loss even though it applies. But clearly $3.9 million of this applies under the

defendant's own counts of conviction.

Then there's the community loss, the harm to the community. What happened at the time, your Honor, with all of these properties was it affected the neighborhoods because the house next door, when someone wants to buy it it is -- this property that is an instant property on one of the counts is used as a con, and somebody says, "That one sold for $500,000, so you have to pay $500,000 here." That inflates the market at the time somebody is buying the property.

And then they set in motion an absolute collapse of the value of that house that was involved in that case, in that particular count. They know that it's going to fail because they've already taken a large sum of money out as their premium, their excess, knowing that that's not the value of the property, and knowing that they're putting someone in there who's not going to take possession of the property, not going to maintain the property, not going to make the mortgage payments on it, it's going to fail, and that house now becomes a comp. when someone goes to refinance or sell their house and now it deflates the value of the house next door and the one down the street. And so they've not only inflated what people paid, unfortunately, they've now destroyed the value that someone needs when they go to

refinance or sell.

And then there are the empty or unkempt properties that resulted from their scheme. We've put in our memorandum 67 Milton Avenue. That's the kind of future crime that was invited by these defendants when they set up their scheme knowing what they were doing with all of these different properties and that's the unfortunate blight and invitation to future crime that took place in this case.

Then there are the 3553 factors. The government submits that there's nothing in the 3553 factors -- and I've addressed the potential deportation issue, but I'll address it further, if the Court wants, but I'm prepared to stand on our brief. Um, there's nothing we submitted in the 3553 factors that suggest that this defendant ought to get some deviation or departure from the applicable guidelines in this case. There's nothing to take what he has in the way of his employment history or wanting to be a family man or any of those kinds of things that is unusual, unique in any way. Those are the ordinary run-of-the-mill things. Just as deportation for someone who may be a resident alien can be a result, indeed a foreseeable result, I submit, of one who intentionally decides to join in on a crime. So I suggest that there's nothing in those factors that

would warrant this court making a deviation or a departure.

So when we consider the nature of the conspiracy, we want to avoid disparity of sentencings. You've already sentenced two individuals, including one who has cooperated and presented evidence in this case, um, a younger brother who is not nearly as involved in this crime, series of crimes, as Ernst Appolon, in his leadership role, as the Court has found, based on the defendant's own egregious conduct in this case, and then considering the other factors, such as the necessity of sending a message that will support respect for the law and abiding by the law and then the deterrent impact. I submit that there is a necessity for personal deterrence here, but there is certainly a greater need for general deterrence.

Those people who are involved in the real estate business and mortgage business, as we know how rife it is with fraud, need to get the message that if they participate in this kind of activity, there's a very, very significant serious consequence, so significant that would induce them not -- them to make the decision not to engage.

For that reason, your Honor, we request that the Court sentence the defendant to 132 months and we're

making that reduction from our original request because of the Court's finding that the position of trust did not apply and therefore it changed the guideline results. We're asking for a sentence of 132 months, 3 years of supervised release, a special assessment of $3500, an order of forfeiture in the amount of $1,912,000, and we have submitted an appropriate order for the Court to consider, and an order for joint and several restitution in the amount of $3,963,100. That's the amount of loss calculated that is applicable to this defendant's counts of conviction. Thank you.

THE COURT: And with respect to restitution?

MR. WILD: That is the amount that we would request.

Oh, your Honor, we do move for 60 days -- no, it's actually 60 by statute. I think the Court previously entered orders of 90, but when I reviewed the statute this morning, I think it's actually 60 days under 3664. And we would ask, if the Court agrees, that it amend its previous orders to 60 days.

(Pause.)

MR. WILD: Not that we wouldn't like the additional 30 days, your Honor.

(Pause.)

THE COURT: Well, as I read it, it says 90.

MR. WILD: I stand corrected, your Honor. I was looking at Section (d)(1) and I did not read it as fully as I should have. That the Court's quite correct, it's 90. Yes, your Honor. And I would request 90 days then to resolve identification of victims and specific restitution.

THE COURT: Okay. Mr. Swomley.

MR. SWOMLEY: (Pause.) Ernst Appolon did not testify and his mother did not testify, although she's here today and may want to address the Court at the appropriate time. I know that Mr. Appolon himself would like to say something.

Your Honor, I think in order to understand what motivated Ernst Appolon and what shaped his life was his early experiences first in Haiti and then in the United States. Um, and I think one can only need look as far as the -- um, the news coverage of the earthquake in Haiti to understand the extreme poverty facing that island nation. And the childhood that Ernst began with and that his parents tried to get him out of was one of extreme poverty.

And if you have had a chance to read the fact portion of our sentencing memorandum, I think it sets up fairly well what life circumstances shaped Mr. Appolon's perspective on how he wanted to live the rest of his

life. And it began with his earliest memories, essentially preschool, when he witnessed his preschool teacher, at the age of 3, being brutally murdered in front of him -- his whole class. She was executed, essentially. And he witnessed that and when that happened, his parents, who had left him with his grandparents to come to the United States to try to earn enough money to give their family a better life, were able to finally bring him over. And he's the oldest of the children. His brother, um -- um, Ralph, was also born in Haiti. His brother Daniel was born here.

Coming here his parents bounced back and forth between Miami, the Haitian community, and the Boston Haitian community, and both of his parents are incredibly hardworking holding multiple jobs to try and provide for their family. They ultimately saved enough to buy 72 Wood Avenue, which figured somewhat prominently in this case. And through the, um, methods of one of the co-conspirators, Andre Lamerique, that house was lost and essentially the -- that much of the hard work of Ernst's parents was wiped out by that loss.

So to suggest that Ernst Appolon was an unqualified beneficiary of this conspiracy is not entirely accurate. But the more important message is that Ernst Appolon grew up in an incredibly impoverished

environment and of the lessons that he learned, maybe not the best of them, was that he himself did not want to be destitute the way he viewed so many of his countrymen in Haiti and indeed a fair amount of the Haitian community here in the United States.

And when his parents were able to buy 72 Wood Avenue, they were able to do so with the assistance of a guy who was holding himself out to be essentially the, um, savior of that community and a number of other immigrant communities and that would be Eric Levine. Eric Levine passed himself off as a friend to the poor and the downtrodden. He passed himself off as someone willing to help immigrant communities when no one else would. And he was viewed and valued by Ernst's parents long before Ernst ever met him. And they valued him, they used him as an attorney, he did refinances for them, he did work in the -- ostensibly with Andre Lamerique converting 72 Wood Avenue to a two-family such that it could be subdivided. Andre Lamerique then guts it and then walks away. And that's when the house is lost in foreclosure.

Ernst Appolon was introduced to Eric Levine and you can find attractive, um, the hyperbole of Mr. Wild when he says that lying is not something that, um, you can blame on Eric Levine. Life is not as simple as

that, nor is it as clear cut as "Oh, that's a lie." If Eric Levine is suggesting -- as an attorney, as a real estate attorney, one that is not known to have been disbarred or suspended by the Appolon family, that there is hidden equity in a property and you have to figure out ways to get it out and there are legal ways to get it out and I'm telling you there are legal ways to get it out, it may not be the sophisticated person, that you concluded a 25-year old Ernst Appolon was, to parse out "Well, actually that may not be legal, that may not be what I should be doing here." Indeed, if an older, wiser, more educated person with a law degree and a law license, in theory, tells you it's legal, as a 25-year old, you kind of sometimes believe it.

Now, Mr. Wild would have you believe that no 25-year old would ever believe any of these things as true and they all must have been evident, self-evident to a 25-year old as lies. I would submit it's not that simple. And maybe there was a moment where Ernst Appolon should have figured it out or knew that the money that he was getting he didn't deserve. But to say that he wasn't told that this is all on the up and up, I think isn't inaccurate. And to say that he wanted to be wealthy and wanted to believe it was okay to do this, on a certain level, I would submit that he did.

Now, whether that's fundamentally reasonable and cognizable under the law as something that you can take credit of? Well, I would suggest you can. You can take it into account. Whether it is a blanket excuse? I would not argue it is. But it's something that you can take into account, in the range of human emotions, in the range of human motivations, is something that a fallible human being would engage in? I think you can, I think you can take that into account, and you can consider that in determining what kind of sentence is appropriate.

He is not -- Ernst Appolon is not someone that came from a well-to-do suburban background, sent to the best of schools, with the best of educations, and given all the finer things in life and then, as a greedy person, went that extra step and took more. That might be Eric Levine. It's not Ernst Appolon. He lived in a different boat, quite different than the two lawyers that they would like you to think are -- stand essentially in the same stead as Ernst Appolon. Ernst Appolon stands in a dramatically different socio-economic group, a dramatically different educational group, a dramatically different motivational group, in terms of what his life circumstances were that caused him to do what he did. And in that respect I think you

can and should take those factors into account. It is not a request that you excuse them.

The harm he caused to his community? I would submit he does apprehend. He does get that he has let both his family down and his Haitian community down. I think at one point in time he thought that he was demonstrating in his community that he was able to succeed. He was hoping that the trappings of wealth would make him better respected in that community and he wanted to be. He joined the Freemason organization and worked in some ways to better that community. Obviously he was not looking at the bigger picture when he did so.

The really bigger picture, though, and this is what actually is kind of offensive about the way that the government wants to go about portraying Ernst Appolon and what the conspiracy did, is this notion that all of this was foreseeable, foreseeable harm, and what happened at 67 Milton Avenue --

I did go to the sentencing of Elizabeth Son. Mr. Wild conveniently ignored all of the harm that Elizabeth Son had to do with that property when it came time to talk about the three days of house parties there that ultimately led to a shooting. They'll talk about it here, but I would bet they won't talk about it when Andre Lamerique is sentenced either. So it's a

convenient -- some people get held responsible for the whole things that happened, based upon their actions, and some people get excused. And Mr. Wild gets to be the determiner of who is held accountable by what he wants to mention.

One other thing that I want to highlight here is the view that Mr. Ernst Appolon might be a bad person for what he did. He clearly did things that were wrong and that does not make him a bad person. But one of the things that I also wanted to make sure of, and I know that you know this, is that I am confrontational, that I took the government to their -- held the government to their burden, as it were, um, and might have even been prickly to this court. That should not be held against my client. And I know that you know that. But I want to say it aloud. That I may be confrontational, but that does not mean my client is, or that you should attribute my style to him.

He, actually, of the Appolon brothers, is the one which his mother would say is the quieter, calmer, more ethereal of the brothers and certainly one that she placed a lot of hope in as one that she could educate, was responsible. He was not a street kid. Daniel was more of that. Um, he's a kid that gets the pleasure-pain principle, that is, he understands and learns from

his mistakes and learns how not to repeat them.

In terms of the deterrent value of punishing him? Well, you can read in our brief that we did some research and put forth the conclusions of that research in our brief suggesting there has been, in terms of the sentencing guidelines, no research to demonstrate that a longer sentence in a fraud context has any greater deterrent value. In fact, to the contrary. Where the sentencing guidelines originally began, with respect to white-collar crimes, is the concept that -- of no more jail time than is necessary to achieve the purposes of the sentencing statute. And, in fact, the research showed that the difference between probation and jail time really do not enhance the deterrent value.

Certainly longer sentences -- well, the Justice Department has clearly urged the sentencing commission to do that, time and again over the years, and has done so without any research to support that more time deters more people or deters the person that you're giving more time to. In fact, there is no evidence to suggest that. So the argument that Mr. Wild would urge you to adopt that justifies more punishment of Ernst Appolon is nowhere supported by scientific evidence. In fact, it's to the contrary.

So in terms of why you would need to give Ernst

Appolon more time? There is no -- there's no deterrent value to it, there's no moral reason for it, and, in fact, it runs counter to what the sentencing commission agreed was their original mandate, which is to find that amount of time that deters and no more.

The amount of time they're asking you to give to Ernst Appolon is more time than some violent criminals get under the guidelines and that, I would submit, is just not an equitable use of the guidelines, is not fair for Mr. Appolon, and should be what you consider grounds for a downward departure.

Insofar as the guidelines themselves, as they apply to the economic crimes that are being sought to be punished in this case, there is no evidence that a longer sentence should be imposed for any reason whatsoever. And I would ask that you not impose, that you do downwardly depart, and that you, um, sentence Ernst Appolon to the sentence that we had recommended, which is 63 months. Thank you.

THE COURT: Okay, Mr. Appolon, you have the opportunity now to say something before I decide on the sentence to impose. You don't have to, but you have the opportunity to do so.

THE DEFENDANT: Would it be okay for my mother to speak first?

MR. SWOMLEY: Can his mother address the Court first?

THE COURT: All right.

MR. WILD: No objection.

MR. SWOMLEY: Do you want her to take the witness stand or just stand there?

THE COURT: Just somewhere near a microphone. Maybe if you would just go to the podium, Ma'am, you can do it that way, so we'll all be able to hear you.

MRS. APPOLON: Judge O'Toole, I'm sorry what happened. Ernst, what happened. Because my son, Ernst Appolon, is my heart, the one I love so much, because he listen to me when I tell him.

He went down to college in Georgia even if it was only -- when he is doing something, he call me, "Mom, I did that. You like it or not?" I say, "You know I'm not going to like it if you do that." "Okay, mom, I'm not going to do it." He's always listen to me.

When he's finished graduate college, he's supposed to go to law school, but my husband get sick, we cannot afford to pay the college. I'm the one who push him to go for two years because he was looking for a job, but he can't find a job, and I say, "Why don't you go two years. You can do part-time job." And he says, "Mom, I don't like school, but because you said so, I'm going to

do it, because I want to listen to you." He do as I say and he started school.

And he always tell me, "Mom, anything that is against the law, I will never do it." He always tell me that. He always said, "Even if I was to buy a house in Florida," the lady he tell me she's doing real estate and she can do the mortgage, when I call up Ernst, Ernst say, "Momma, don't let anybody put you in that situation because it's against the law. We don't do mortgage -- nobody we asked them to do mortgage."

And when Mr. Lamerique call me, ask me to work for him, I went down to Florida because my husband's health. We went down to Florida. And he said, "Ernst doesn't want to deal with him." He tell me that. He says, "Ernst doesn't want to deal with him."

So now I end up in that -- he end up in that situation he was in when he started when he was like 23.

He's my son. He's always there for me and I love him so much. He's the only one who listen to me. I can tell Daniel something, Daniel say, "No." Ernst will never say "No." It's always, "Mom, okay, mom, I will do it if that's what you want me to do." He don't say, you know, "I tried to do it, Mom." It's "Okay, mom, I'm going to do it. I'm going to do it. You don't have to

talk. Let me do it, mom." He's always loved me and I love him so much. He's my first son.

I'm sorry because he doesn't know what's going on, because he was 23, 24, 25. That's the age he was. He was young when the people, 52 years old, 52 years old, had the experience and was using him. I don't know, maybe that's why. But I know Ernst always tell me "Anything is against the law, I will never do it." He rather work in the Bruegger Bagel, the Copley store, when Bruegger Bagel was open, and work for 80 dollars a week there. He always tell me, "Mom, I'm not going to do anything that's against the law." He worked there and when he get his check, $80 check, he bring it to me. He get his $40 check, he bring it to me.

So today is not what I want and I always tell him "When are you going to go back to school? And the time you went back to school is the time you get a job offer." And I love him so much. Thank you. And I hope you'll do something nice for me.

THE COURT: Thank you.

THE DEFENDANT: Your Honor, it's kind of tough. I never envisioned my life to be here in front of the Court. When my mom first brought me from Haiti, I remember she opened the door, and I -- I was, um -- I was very happy and I told my mom -- you know, we used to

live in this apartment building and I told her, "Mom, I promise you, um, you know" -- my mom used to work three jobs. She used to make buttons. And I said, "Mom, I promise you, when I get older, you won't have to work no more and I'll buy you a house and I'll take care of the family."

And, you know -- well, I am not the guy the government or anybody else, Andre Lamerique, um, tried to make me out to be. If you were to even know me for a day, you'd know that this is not my life. This is not -- this is not the things that I do. Like I don't talk too much and I don't associate with bad people. You know, I made a lot of mistakes in life believing in other people.

And my wife always says to me, "You're real naive. You're real naive," like "This person does not have your best interest at hand." I will stop dealing with that person, but to me, because of the way my mother raised me, constantly in church and whatnot, I -- I --

Like I learned in jail, since I've been incarcerated, that people do not have your best interests at heart. And for you to know that is for you to not have their best interests at heart. For you to know that they're going to do something wrong to you is

for you to have that in your heart, also. And I realized that. But before I didn't know that because, you know, it was, you know, I was taught "This is how you do things. Don't try to cut this corner."

You know, all I knew all along was violence, drugs, but my parents weren't like that, my parents were very strong and they worked hard, but the community we lived in always seemed to have that. So I always associated crime with violence and drugs, lying to people and telling them this when it's not, and so I never partook in it.

I never -- my wife always says, "Oh, why you do this first and why do you do it?" I can't -- it's not that I believe them, it's that that's what I've been accustomed to dealing with. You give the person the benefit of the doubt until they prove you wrong.

I apologize to this court. I didn't do any of this to harm anybody. The two buyers that I did help purchase the house, they still live in their house. You know, as a matter of fact, Norma invited me to come here to her house and I declined because at the time in my life, I just had a son. I just had a son and I stopped my education, so I can help raise him. And my dad was sick and I had to balance taking care of him, and my father.

And, you know, he had his bipolar fits sometimes and they asked him -- like right now I know I don't want him to stress because -- (Cries.)

(Pause.)

THE DEFENDANT: Because he's the only father I have and I always try to be there for him. Like whenever he doesn't take his medication, my mother calls me and I have to talk to him.

Sometimes like, um -- you know, Jermaine says, "I was never really at 72 Wood Avenue." I'm not going to sit up here and tell you some story like this, that I was never really there. You know, I sold real estate. I was a real estate agent. I sold it. I put in the offer and after that I let the listing agent who sometimes, on three or four of these properties, was my boss at the time, and then before that, 5 Coleman Street, um, Jack Bessop was my boss at the time, and he's an attorney. You know, I let him deal with Eric Levine. I let everybody deal with Eric directly and the mortgage brokers.

I didn't know this was illegal. I didn't know anything. But I apologize because obviously for the government to spend that much money to prosecute me and hold me behind bars and keep me from my family, obviously this is real serious. And I apologize to the

court. I apologize to the United States government, because they gave me the opportunity to come here. (Cries.) And to try to raise -- just to try to help my family, but obviously this happened. But I didn't do this on purpose. My mother and my wife and my two kids -- (Cries.)

(Drinks water.)

THE DEFENDANT: I didn't do this to harm them. I didn't mean to harm them. I didn't mean to harm people.

During the whole trial the only thing I could hear was when all the people who worked for the bank kept saying, "Yeah, you know, I used to work for this company in Philadelphia, then I worked for this company in Rhode Island, then I worked for this company in Texas," like these families keep relocating and moving, some similar to mine, and I'm thinking like all their children are just relocating from school to school to school and having to deal with the same hardships that I dealt with. And, you know, that doesn't sit well with me. You know, I ask them, "Look at your family and just know that."

I didn't mean to harm anybody. And boy did I learn my lesson on this one. I didn't mean -- you know, I didn't mean at all to harm or scare or defraud or hurt

my family, or be away from my wife. My wife's been getting promotions at work. I'm not there to help her. I'm not there to support her. My son, you know, he's going to miss -- they say things which affects you as a man because, as a man I'm supposed to be there. My father was always there for me. Even though he's sick now, he's still there for me, you know. No matter what, they've been there.

I can't say, you know, a lot of excuses -- I have no excuse. But the fact is I just trusted these certain people and worked with them. But I should have seen it. My wife was always, since she met me, "Baby, you're so naive. Baby, you're so naive." I guess she was right.

You know, I didn't really know Andre Lamerique like that. I didn't -- honestly, I didn't know him. He worked with Widner Lamarre and I knew Widner through his wife and kids. I didn't know Andre. I didn't deal with Andre like that.

My mother -- I remember one time when the plot for them to murder me came up, Andre invited me to a party and I didn't even -- I called and I asked Widner, you know, "He invited me to a party, are you going?" Widner says he doesn't know about the party. And I call my mother and I tell her, "It's weird but he invited me to

a party, but nobody else is going." And my mother said, "Don't go, baby," and I didn't. And now I come to find out they was threatening to kill me. You know, I don't associate with people like that. I have other friends.

And I was the person that helped the family out, that provided for them. Now I've embarrassed -- (cries.) I've embarrassed my family's name and I've embarrassed my wife and her family and now I'm at your mercy. I hope that you will look in my favor. Thank you.

(Pause.)

THE COURT: I think the factors in the statute that are prominent for purposes of this sentencing are fairly obvious. One, of course, is the consideration of the nature and seriousness of the offense, and the offense, of course, as you've heard, was an extended sophisticated scheme to defraud by manipulating the mortgage documents that would obtain loans that were not supported by actual facts. So it was a scheme that required deliberation and persistence both in its preparation and in its execution, and, I guess, to some extent it's considerable. So it's obviously a very serious offense.

The amounts of money are very serious in terms of economic loss both direct and indirect. And as a

serious offense it requires an appropriate level of punishment, which is a factor in the statute. It requires a punishment that will promote respect for the law generally both in those law-abiding citizens who look to the sentence and can consider that it is a just one and be satisfied and to those who might be nonlaw-abiding who might look to the sentence and be dissuaded from following the same course.

So I think deterrence, which is a factor in the statute, is also something that has to be figured in, although consideration of some of these things obviously overlap. The significance of the punishment and the significance of the punishment that has a deterrent value may be overlapping considerations.

Moderately implicated, I think, is the need to protect the public from future crimes of this defendant. I don't think it's as prominent a factor as the others that I've mentioned.

I noted at the outset that a factor is the advice that emerges from the application of the sentencing guidelines by way of a suggested sentencing range. I think in this case particularly the guideline range, properly determined, is highly influential because the application of the guidelines take account of factors which address the various ways in which members of the

conspiracy and the offense participated in it and provide a gauge by which some can be adjudged more morally culpable and others perhaps less so. And the consistent use of those criteria by the application of the guidelines is a way both of appropriately distributing the punishment where it should fall among actors who may be disparately culpable and also avoiding the possibility of disparity that is unwarranted in the sentencing judgments.

So while, of course, the guidelines are not controlling and the Court is free to depart from them, I think, in this case, there is a very strong reason for being consistent with the guideline advice.

The guidelines also serve, to some extent -- or a sentence within the guidelines range serves, to some extent, as a buttress to the deterrent factor because it -- to the extent it can be anticipated that the guidelines are influential, they are a benchmark that can be looked at by potential future offenders to gauge their own risk if they were participating in similar offenses. And as I said the other day that -- and I've said it on many occasions with respect to the drug guidelines, that I think these scalable guidelines are perhaps the guidelines at their strongest in terms of accomplishing those goals.

As to restitution, I will grant the government's request to defer the final decision on restitution for 90 days under the statute. But we'll use the same date, for consistency, for all these cases, even though that will mean it will be less than 90 days for some. I think it's January 9th.

(Interruption by clerk.)

THE COURT: Um, maybe it's the 19th. Well, it will be the same date. I think the Clerk may be right, it may be the 19th. But we'll use the same date for all.

And if by that time -- as I indicated earlier, if by that time the government's unable to have reliable data, I will conclude, under the statute, that it's not possible to make a restitution judgment because of the inadequacy of the data. On the other hand, if the data is available, we'll see what it shows. But restitution, I mention restitution at this point because it is one of the factors in the statute.

So for all those reasons I conclude that a sentence within the range, as I've determined to be in the guidelines, is appropriate. The range is 108 to 135 months and I think a sentence in the middle of that range of 120 months is an appropriate one that is sufficient and not greater than necessary to accomplish

the various aspects of the sentencing statute.

So, Mr. Appolon, if you would stand, please.

(Defendant stands.)

THE COURT: Ernst Appolon, a conviction of these offenses and pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that you be and hereby are committed to the custody of the Bureau of Prisons to be imprisoned for a term of 120 months. This consists of terms of 60 months, on Count 1, and terms of 120 months, on Counts 4 through 15, 18 through 28, and 30 through 40, all to be served concurrently.

Upon your release from imprisonment, you should be placed on supervised release for a term of 3 years on each count, all to be served concurrently. That 72 hours of your release from the custody of the Bureau of Prisons, you shall report in person to the district to which you have been released.

While you're on supervised release, you shall comply with all the standard conditions that pertain to that status and those are set forth in the United States sentencing guidelines at Section 5(d)(1.3)(C). They are incorporated now by reference, but will be set forth at length in the judgment.

In addition to those standard conditions, you shall comply with the following conditions. You shall

not commit any other Federal, state or local crime. You shall not illegally possess any controlled substance. You shall refrain from the unlawful use of any controlled substance and shall submit to a drug test within 15 days of your release from imprisonment and at least two periodic drug tests thereafter, not to exceed a total of 104 tests in any given calendar year. All those may be directed by your probation office. You shall submit to the collection of a DNA sample as directed by the probation office. You're prohibited from possessing a firearm, a destructive device or other dangerous weapon.

I have deferred the consideration of restitution, but if restitution is imposed, it will be a condition of your supervised release that you pay the restitution in accordance with any schedule that has been established for its payment. And during the time when any financial obligation remains outstanding, you are prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office. You are also required to provide to the Probation Office access to any requested financial information, which information may be shared with the Financial Litigation Unit of the United States Attorney's Office.

During your supervised release, you will be

prohibited from engaging in any occupation, business or profession that would require or enable you to participate in the sale or financing of real estate.

And, finally, it is a condition of your supervised release that if you are ordered deported, you are to leave the United States and not return without the prior permission of the Secretary of the Department of Homeland Security.

I will not impose a monetary fine both in light of the circumstances and the possibility of restitution, which would have priority. There is a mandatory assessment in the total of $3500, which is due forthwith.

THE CLERK: Ernst Appolon -- Oh, I'm sorry.

THE COURT: The matter of the forfeiture. The government's motion for forfeiture, previously filed, is remanded.

MR. WILD: Yes, thank you.

THE CLERK: Ernst Appolon, you have the right to file a notice of appeal in this case. If you wish to file an appeal you must file it within 10 days from the day the judgment is entered. And if you cannot afford an attorney to file the appeal on your behalf, you may request the Clerk of the Court to file the appeal for you and I will do so.

Do you understand sir?

THE DEFENDANT: Yes.

THE COURT: All right. The defendant stands committed in the custody of the marshals. We'll be in recess.

(Ends, 4:15 p.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the foregoing record is a true and accurate transcription of my stenographic notes on October 20, 2010, before Chief Judge Mark L. Wolf, to the best of my skill and ability.

/s/ Richard H. Romanow 12-23-10
______________________
RICHARD H. ROMANOW Date